# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

## International Arbitration Tribunal

---

NEPTUNE WELLNESS SOLUTIONS, INC.,  )
                                              )

           Claimant,  )
                                              )     Case No.

             v.  )     01-20-0015-1057
                                              )

PMGSL HOLDINGS, LLC and PETER M. GALLOWAY,  )
                                              )

           Respondents.  )

---

---

PETER M. GALLOWAY and PMGSL HOLDINGS, LLC,  )
                                              )

           Claimants,  )
                                              )     Case No.

              v.  )     01-20-0015-1093
                                              )

NEPTUNE WELLNESS SOLUTIONS, INC.  )
  and SUGARLEAF LABS, INC.,  )
                                              )

           Respondents.  )

---

## <u>FINAL AWARD</u>

     I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the dispute resolution clause in the Asset Purchase Agreement (referred to herein as the "**APA**" or "**Agreement**"), dated May 9, 2019 between the Parties (defined below) or their predecessors and having been duly sworn and having duly heard the proofs and allegations of the Parties, do hereby FIND, HOLD, DECLARE, ORDER, and AWARD as follows.

     The evidentiary hearing ("**Hearing**") was held on April 13, 14, 15, 18, 19, 20, and 21, and August 1, 2, 3, 4, 5, and 29, 2022 on the ZOOM videoconference platform, with TSG Reporting

providing the court reporting services and the ZOOM moderator services. In accordance with Order No. 4 (Order Regarding Procedures For Virtual Hearing, dated February 12, 2021), the Hearing is deemed to have taken place in New York, New York.[1]

As more fully described below, this is a consolidated Arbitration (see caption on page 1, above) and, for ease of reference throughout this matter (and without objection from the participants), one side has been and will continue to be referred as "**the PMGSL side**" (comprising PMGSL Holdings, LLC ("**PMGSL**") and Peter M. Galloway ("**Mr. Galloway**")) and the other side has been and will continue to be referred to as "**the Neptune side**" (comprising Neptune Wellness Solutions, Inc. ("**Neptune**") and Sugarleaf Labs, Inc. (the post-closing "**Sugarleaf**"), which is a wholly owned subsidiary of Neptune). Each of PMGSL, Mr. Galloway, Neptune, and Sugarleaf is a "**Party**" and collectively they are the "**Parties**."[2]

Participating in the Hearing as Counsel for the PMGSL side were Eric H. Cottrell, Esq. and Eric A. Frick, Esq. (both of Parker Poe Adams & Bernstein LLP) and Matthew K. Rogers, Esq. (of The Law Offices of Matthew K. Rogers) on all thirteen Hearing days. Participating in the Hearing as Counsel for the Neptune side were Christopher Waldon, Esq. and John Wirt, Esq. (both of the legal department of Neptune) on all thirteen Hearing days, and one or more of Kelly Evans, Esq., Chad Fears, Esq., and Hayley Miller, Esq. (all of Evans, Fears & Schuttert LLP) during the seven April 2022 (but not the six August 2022) Hearing days.[3]

---

[1] "Place Of Arbitration—The May 17-21 Proceedings (the evidentiary Hearing) will be deemed to have taken place in New York, NY, the arbitration location agreed to by the Parties (see Order No. 1 at pages 4 & 7; see also Order No. 6)." Order No. 4, page 2 (emphasis omitted).

[2] The parties to the APA or their successors are the Parties in this Arbitration. The five parties to the APA were (i) Sugarleaf Labs LLC (the pre-closing "Sugarleaf," a "Seller"), (ii) Forest Remedies LLC ("Forest," a "Seller"), (iii) Neptune Acquisition USA, Inc. (the "Purchaser"), (iv) Neptune Wellness Solutions Inc. ("Parent"), and (v) "the Member that is a party hereto" (Peter M. Galloway, who owned all of Sugarleaf and Forest). After the closing of the transaction contemplated by the APA: (a) the two Sellers (both of whom continued to exist) merged, and the name of resulting entity was changed to "PMGSL Holdings LLC," and (b) the Purchaser (Neptune Acquisition USA, Inc.) changed its own name to "Sugarleaf Labs, Inc." The names of the four Parties in this consolidated Arbitration are the four whose names are underlined in the preceding sentences of this footnote. In this Arbitration: (1) "the Neptune side" is Neptune Wellness Solutions, Inc. (the Parent in the APA), and Sugarleaf Labs, Inc. (the Purchaser in the APA, after the post-closing change of name), and (2) "the PMGSL side" is PMGSL Holdings, LLC (the post-closing name of the entity resulting from the merger of the two Sellers in the APA) and Peter M. Galloway (who owned the two Sellers and was "the Member that is a party hereto" in the APA). See the joint stipulation in the February 6, 2023 Answers/Responses from the two sides to the Panel's questions.

[3] As indicated below, during this Arbitration, each side changed Counsel more than once.

## TABLE OF CONTENTS

The sections/subsections of this Final Award start at the pages indicated below.

|  | **SECTION** | **PAGE** |
|---|---|---|
| **TABLE OF CONTENTS** | | 3 |
| | | |
| **OVERVIEW** | | 8 |
| | The Dispute, Dispute Resolution Clause, Governing Law, And Applicable Rules | 8 |
| | Requested Relief | 9 |
| | By The Neptune Side | 9 |
| | By The PMGSL Side | 12 |
| | Summary Of Final Award | 15 |
| | | |
| **PROCEDURAL HISTORY** | | 17 |
| | The Neptune Side's Demand (October 2, 2020)—ICDR Case No. 01-20-0015-1057 | 17 |
| | PMGSL Side's Demand (October 2, 2020)—ICDR Case No. 01-20-0015-1093 | 17 |
| | Motions To Dismiss, Oppositions, Answers, Etc. | 18 |
| | Appointment Of Panel (October 30, 2020) | 18 |
| | Preliminary Hearing (November 5, 9, and 11, 2020) | 18 |
| | Report Of Preliminary Hearing And Scheduling Order—Order No. 1 (November 14, 2020) | 19 |
| | Stipulation—"So Ordered" November 17, 2020 | 21 |
| | Agreement And Order Regarding Discovery Of ESI—"So Ordered" November 23, 2020 | 22 |
| | Confidentiality Stipulation And Protective Order—"So Ordered" November 24, 2020 | 22 |
| | Order Regarding Addition Of Claims And Document Discovery Disputes—Order No. 2 (December 21, 2020) | 22 |
| | The Neptune Side's Amended Demand (December 23, 2020) | 23 |
| | The PMGSL Side's Amended Demand (December 23, 2020) | 23 |
| | Answers To The Other Side's Amended Demand (December 30, 2020) | 23 |
| | Order Regarding Video Platform Hearing—Order No. 3 (January 7, 2021) | 23 |
| | Proposed Order Regarding Procedures For Virtual Hearing—Proposed Order No. 4 (January 27, 2021) | 24 |
| | Stipulation Regarding Expert Discovery—"So Ordered" February 4, 2021 | 24 |

| | |
|---|---|
| Decisions Regarding Filing Dispositive Motion And Discovery Disputes—Order No. 5 (February 4, 2021) | 24 |
| Stipulated Amended Hearing And Scheduling Order—Order No. 6 (February 9, 2021) | 26 |
| Order Regarding Procedures For Virtual Hearing—Order No. 4 (February 12, 2021) | 26 |
| Procedural Hearing (March 12, 2021) | 26 |
| Procedural Hearing (March 19, 2021) | 26 |
| Decision Re Neptune Side's Request To Add Claims—Order No. 7 (April 17, 2021) | 26 |
| Notification Of Settlement In Principle (April 21, 2021) | 29 |
| Notification That The Matter Did Not Settle (June 18, 2021) | 29 |
| Procedural Hearing (June 28, 2021) | 29 |
| Decision Regarding Discovery Dispute—Order No. 8 (August 21, 2021) | 30 |
| Withdrawal Of Portion Of Order No. 8, Modification Of Confidentiality Stipulation And Protective Order, Etc.—Order No. 9 (August 29, 2021) | 31 |
| Procedural Order—Order No. 10 (September 15, 2021) | 32 |
| Procedural Order Re Modification Of Schedule—Order No. 11 (November 22, 2021) | 33 |
| Procedural Order Re Adjournment—Order No. 12 (January 14, 2022) | 33 |
| Procedural Order Re Revised Schedule—Order No. 13 (January 20, 2022) | 34 |
| Order Re Neptune Motion For Stay—Order No. 14 (March 10, 2022) | 34 |
| Procedural Order—Order No. 15 (March 18, 2022) | 36 |
| The Neptune Side Commences The "Settlement Arbitration" (March 28, 2022) | 37 |
| Order Re Renewed Neptune Motion For Stay And Re Summonses—Order No. 16 (April 1, 2022) | 37 |
| Order Re Hearing Exhibits And Witnesses—Order No. 17 (April 2, 2022) | 40 |
| The Hearing (April 13-15 and 18-21 & August 1-5 and 29, 2022) | 41 |
| Outcome Of The Settlement Arbitration | 41 |
| Hearing Witnesses | 42 |
| Memorialization Of August 8, 2022 Procedural Hearing Regarding Alleged Waiver Of Privilege And Possible Additional Testimony—Order No. 18 (August 8, 2022) | 47 |
| Memorialization Of September 14, 2022 Procedural Hearing Regarding Proposed Additional Exhibits And Close Of Evidentiary Record—Order No. 19 (September 15, 2022) | 48 |
| Filing Of Annotated Chronologies (October 4 & 10, 2022) | 49 |
| Memorialization Of January 9, 2023 Procedural Hearing Regarding Panel Questions/Concerns—Order No. 20 (January 11, 2023) | 49 |

**Answers/Responses To The Panel's Questions/Concerns (February 6, 2023)**    50

**Comments On The Other Side's Answers/Responses To The Panel's Questions/Concerns (February 20, 2023)**    50

**Additional Panel Questions (April 7, 2023)**    50

**Responses To The Panel's Additional Questions (May 1, 2023)**    50

**Comments On The Other Side's May 1, 2023 Responses (May 9, 2023)**    50

**Additional Panel Questions (June 5, 2023)**    50

**Responses To The Panel's Additional Questions (June 9, 2023)**    50

**Comments On The June 9, 2023 Responses (June 16, 2023)**    51

**Attorneys' Fees Requests (June 30, 2023 To July 28, 2023)**    51

**Panel Status Reports**    51

**Close Of Hearing**    51

**SELECTED FACTUAL BACKGROUND AND CHRONOLOGY**    52

**Scientific/Manufacturing/Regulatory Background**    52

**Sugarleaf Labs LLC Establishes Its Conover, NC Location, And Messrs. Galloway And Coles Meet Neptune's Chairman—2016 to November 2018**    55

**Neptune Becomes Interested In Sugarleaf Labs LLC**    56

**Neptune Conducts Due Diligence; Financial Projections By Sugarleaf**    57

**Neptune's Concerns About GMP Certification In January 2019 And The March 11, 2019 cGMP Gap Analysis**    60

**Letter Of Intent & Prepayment Agreement—March 27, 2019**    63

**April & May 2019**    64

**June 2019**    65

**July 2019**    66

**August 2019**    69

**September 2019**    70

**October 2019**    73

**November 2019**    79

**December 2019**    81

**January 2020**    86

**February 2020**    89

**March 2020**    94

**April 2020**    98

**May 2020**    99

**June 2020**    102

**August 2020**    105

September 2020                                                              108

October 2020                                                               109

November 2020                                                              111

2021                                                                       111


**RELEVANT PORTIONS OF THE ASSET PURCHASE AGREEMENT**        112


**RELEVANT PORTIONS OF THE LOCK-UP AGREEMENT**              126


**RELEVANT PORTIONS OF MR. GALLOWAY'S EMPLOYMENT**         127
**AGREEMENT**


**DISCUSSION**                                                             130

   **Global Questions From The Panel During The Hearing**                130

      **Why Wasn't The Acquired Business Successful?**                      130

      **Why Would Neptune Not Make Further Investments If It Stood To Make**   131
      **So Much Money?**

   **Some Preliminary Observations**                                  133

   **"Commercially Reasonable Efforts"**                              138

      **The Test To Be Used To Assess "Commercially Reasonable Efforts"**   138

      **The Neptune Side Does Not Pass The Test**                         143

   **Rule R-47: Scope Of Award**                                     147

   **The Neptune Side's Claims**                                     148

      **Breach Of Contract**                                             148

      **Fraud In The Inducement And Negligent Misrepresentation**         153

      **Summary Of Findings And Holdings On The Neptune Side's Claims**    154

   **The PMGSL Side's Claims**                                       154

      **Count I — Breaches Of APA**                                       154

         **APA § 1.6(a)**                                                155

         **APA § 1.6(b)**                                                158

         **APA Covenants Of Good Faith And Fair Dealing**                159

         **Failure To Provide Sales And Financial Resources Required By The**   162
         **APA**

         **APA § 1.7(a)**                                                162

         **APA § 1.8(a) & (b)**                                          163

         **APA § 1.8(c), item (i)**                                      163

         **APA § 1.8(c), item (ii)**                                     164

APA § 1.8(c), item (iii)     165

APA § 1.8(c), item (iv)     167

APA § 5.13     168

APA § 6.12     168

APA Article 9     169

APA § 11.3     170

Count III — Breach Of Mr. Galloway's Employment Agreement     170

Count VI — Breach Of APA § 5.13     174

The Parties' Arguments     177

Analysis     185

Stock Tranches 1 & 2     189

Stock Tranches 3 & 4     191

Stock Tranches 5 & 6     192

Summary Of Findings And Holdings On The PMGSL Side's Claims     193

Attorneys' Fees, Expenses/Costs, ICDR Fees, And Arbitrator Compensation     194

FINAL AWARD     198

SIGNATURE PAGE     201

## OVERVIEW[4,5,6,7]

- ### The Dispute, Dispute Resolution Clause, Governing Law, And Applicable Rules

Broadly speaking, in the APA, "Sellers" agreed to sell a business in the cannabis field to "Purchaser" via an asset purchase agreement, and part of the purchase price was in cash and part was in restricted shares of Neptune common stock. There was also an opportunity for additional monies to be earned by Sellers if the business exceeded certain financial/production goals after the closing of the transaction (when the business would be owned by the Purchaser). Although not strictly correct, Sellers may be thought of as the PMGSL side and Purchaser may be thought of as the Neptune side (see footnote 2, above).

Again broadly speaking, in this Arbitration, the PMGSL side accuses the Neptune side of, among other things: (i) operating the business after the closing in such a way as to prevent the business from achieving those financial/production goals and thereby prevent earning of those additional monies, (ii) refusing to remove the restriction from the stock and thereby prevent its sale, and (iii) terminating certain employment without cause and refusing to pay money that was owed. For its part, the Neptune side says, among other things, that: (a) it did nothing wrong in operating the business, made a good faith effort to have it succeed, and that factors outside its control, e.g., changes in market conditions, were responsible for the business not meeting those goals; (b) the restriction on the stock was not removed because the papers (e.g., opinion of counsel) required by the APA were not furnished; (c) the subject employment was terminated for cause; and (d) at the time of closing, the business was not in compliance in all materials respects with the law, notwithstanding the representation in the APA that it was.

---

[4] Portions of the APA are set forth below, starting at page 112.

[5] Citation to the Hearing transcript is in the form "Tr. x" or "Tr. x-y" or "Tr. x:a-b" or "Tr. x:a-y:b" where "x" and "y" are page numbers and "a" and "b" are line numbers.

[6] The Hearing exhibits are denominated "Ex. z" where "z" is a number. Not all the exhibits referenced in this Final Award were necessarily cited by the Parties during the Hearing or in the papers (e.g., briefs) they submitted. Order No. 1 provides at page 18 (emphasis in original):

> All exchanged and listed exhibits that are not determined by the Panel to be inadmissible … [during a hearing to resolve unresolved exhibit disputes] shall be (a) admissible at the Hearing for all purposes, and (b) in the record for all purposes (whether or not the subject of Hearing testimony or otherwise discussed or referenced in any way at the Hearing) <u>unless</u> (i) removed from the record by agreement of the Parties and Panel or (ii) removed by order of the Panel.

[7] The procedural history is set forth below, starting at page 17.

APA Section 11.13 (Ex. 9) indicates that the APA "and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal Laws of the State of Delaware …."

The dispute resolution clause (APA Section 11.14) provides for arbitration in accordance with the Commercial Rules of the American Arbitration Association before one arbitrator in New York and requires the award to be rendered within 60 days of the submission of the dispute to arbitration. The clause provides for a 10-day period prior to arbitration for the disputants to attempt to settle. Each side filed an arbitration demand on the same day (October 2, 2020).

The Preliminary Hearing was in three parts (on November 5, 9, and 11, 2020). As memorialized in Order No. 1, dated November 14, 2020:

- "The two arbitration cases are being consolidated for the sake of efficiency. Papers prepared by the Panel will bear a dual caption … and will concern one or both cases, as appropriate. Thus, there will be only one Order No. 1, one award, etc." Id. at page 5.

- The two sides waived the 60-day limit for rendering the award. Id.

- "The Parties agreed that Delaware law applies to and for the Asset Purchase Agreement without regard to Delaware's conflict of laws principles. The Parties also agreed that the Federal Arbitration Act (9 U.S.C. Section 1 et seq.) would apply. Section 11.14(e) of the Asset Purchase Agreement provides that 'the arbitration shall take place in New York, New York.' Accordingly, New York procedural law shall also apply to the arbitration whether the Hearing is held wholly or partially in person or wholly or partially virtually (remotely), regardless of the location(s) of any of the Parties and other participants." Id. at page 7.

- "The AAA's October 1, 2013 Commercial Arbitration Rules (the "Rules"), including the Procedures For Large, Complex Commercial Disputes, govern this proceeding." Id. (footnote omitted).

- **Relief Requested**

  - **By The Neptune Side**

The Neptune side's December 23, 2020 Amended Demand alleged five counts:

- Count I: breach of contract based on Sugarleaf's representations that it was cGMP (current good manufacturing practices) compliant, that "had Neptune known that Sugarleaf Entities [Sugarleaf Labs LLC and Forest Remedies] were not cGMP-compliant, Neptune would not have entered into the APA," and that "Neptune has suffered actual, special, and consequential damages of at least $18 million"; [8],[9]

- Count II: fraud in the inducement ("Neptune suffered damages in justifiable reliance on PMGSL's false statements" concerning cGMP compliance);

- Count III: negligent misrepresentation ("even if PMGSL believed that their representations in the APA were true (i.e., that Sugarleaf Entities operated a cGMP-compliant facility), they had no reasonable grounds for believing so," that Neptune entered into the APA in reliance on those misrepresentations, and that "Neptune suffered damages in justifiable reliance on PMGSL's false statements");

- Count IV: breach of APA confidentiality provision (PMGSL's filing of the complaint in the North Carolina court "made public the Parties' dispute regarding the APA" and that Neptune has as a result "suffered actual, special, and consequential damages of at least $18 million"); and

- Count V: breach of APA Section 1.11 (PMGSL failed to follow the process of Section 1.11 for objecting to Neptune's 12MR [12-month rolling] Adjusted EBITDA [10] Statements and Neptune has as a result "suffered actual, special, and consequential damages of at least $18 million").

---

[8] Mr. James Hamilton, Chief Executive Office and President of Neptune from February 2015 through mid-2019 (Tr. 685-687), testified as follows:

> Good manufacturing processes are a standard with which companies need to abide by in terms of certain quality thresholds and there is [sic] certain levels of GMP for different industry, different industry segments, so natural products, for example, nutritional products may be different to that of pharmaceuticals, but irregardless, they are standards with which people need to produce and comply with. [Tr. 691]

[9] Unless otherwise noted, dollars are U.S. dollars, sometimes indicated as "USD," "US$," etc.

[10] "EBITDA" is understood to mean "earnings before interest, taxes, depreciation, amortization. The purpose is to track the financial health of the entity without costs, such as indebtedness and depreciation of asset values." Tr. 204-205. APA § 1.7 specifies how it is to be calculated (see pages 114-115, below).

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 11 of 201

The relief requested included "equitable restitution, including, without limitation, rescissory damages and restoration of the *status quo ante*," additional damages, pre- and post-judgment interest, and attorneys' fees, expenses, and costs (italics in original).

At pages 4-11 of its February 6, 2023 answer to the Panel's January 9, 2023 questions, including a request by the Panel that each side "itemize (with as much specificity as possible) all of the arbitrations claims of your side," the Neptune side enumerated its claims as follows (boldface removed[11]):

### 1. First Claim for Relief: Breach of Contract

PMGSL Holdings and Mr. Galloway (collectively, "PMGSL") breached the APA by falsely representing at clause 3.9, both on the date the APA was signed (May 9, 2019) and on the date of closing (July 24, 2019) by virtue of clause 6.1 of the APA, that the dietary supplements manufactured by PMGSL complied with all laws, regulations, and codes, including the requirement that all dietary supplements be manufactured in a cGMP-compliant facility. In particular, clause 3.9 represented and warranted as follows: "The Sellers are, and have in respect of the Business been, in compliance in all material respects with all Laws and Orders." …

The representation and warranty at clause 3.9 was brought forward and re-confirmed at closing on July 24, 2019 by virtue of clause 6.1 ….

PMGSL breached the APA because its Conover facility was not cGMP compliant either at the time of signing the APA or at closing on July 24, 2019, which violated its warranties under this agreement, as set out above. …

### 2. Second and Third Claims for Relief: Fraud in the Inducement and Negligent Misrepresentation

PMGSL and Galloway made false statements of material facts, both at the time of signing the APA (May 9, 2019) and prior to closing (July 24, 2019), as to the timing of "foundational cGMP" at the Conover facility and the expected timing of cGMP "sustainment." …[12]

---

[11] Boldface font in original has been removed in most quotations herein.

[12] Foundational GMP is "everything to control manufacturing"—"it's very basic stuff." Tr. 1534-1535. The sustainment phase would be when you "anticipate having your implementation completed and you're following the procedures." Tr. 1530.

Here, as set out above, PMGSL represented in the APA on May 9, 2019 that its Conover operation "complied with all laws," which included using cGMP to produce products marketed as dietary supplements. …

3. Relief Requested

Neptune seeks damages in the amount of:

a. $18,000,000 in purchase consideration plus simple interest at the rate of 9% p.a. from July 24, 2019 based on New York Civil Practice Law and Rules Section 5004,

b. $10,407,417 in capex [capital expenditure] payments plus simple interest at the rate of 9% from May 28, 2020,

c. An award of Neptune's attorneys' fees, expenses, and the costs of this action.

Thus, the Neptune side is no longer asserting two claims of its December 23, 2020 Amended Demand: Count IV (breach of APA confidentiality provision) or Count V (breach of APA Section 1.11 concerning how to object to Neptune's 12MR Adjusted EBITDA Statements).

- **By The PMGSL Side**

The PMGSL side's December 23, 2020 Amended Demand alleged six counts:

- Count I: breach of the APA, including (i) failure to pay everything owed to Sellers, failure to provide Adjusted EBITDA calculations, and interference with the Business (defined in APA Recital A—see page 112, below) so as to negatively affect the ability to achieve the Adjusted EBITDA Threshold (defined in the APA—see page 113, below), (ii) failure to pay the Share Balance and Production Share Balance (id.), (iii) failure to pay the Earn-Out, (iv) failure to act in good faith, (v) failure to provide adequate financing to the Business, and (vi) failure to indemnify for third-party claims;

- Count II: for an accounting, based on an alleged failure by the Neptune side "to provide the required Adjusted EBITDA Statements or any of the [relevant] backup information";

- Count III: breaches of Mr. Galloway's employment agreement, including improper termination for cause, interfering with his ability to perform his responsibilities as President of Sugarleaf, and failing to pay the remainder of his salary;

- Count IV: for a declaration that, among other things, APA Section 11.14 is procedurally unconscionable because of the 60-day limitation for rendering an award;

- Count V: for a declaration that the Neptune side's "'Objection to the 12 MR Adjusted Statement …' and independent auditor provisions relating thereto set forth in Section 1.11 of the APA are stayed until after Final Judgment" in this Arbitration; and

- Count VI: for failure to perform APA Section 5.13 (Assistance With Regulatory Matters), remove restrictions from the restricted stock, and approve transactions relating to all of the restricted stock (see page 126, below, concerning the Lock-Up Agreement).

The requested relief included "damages in excess of $50,000,000," an accounting, declaratory relief, an order requiring removal of the restrictive legend, punitive damages, pre-judgment interest, and attorneys' fees.

At pages 2-23 of its February 6, 2023 answer to the Panel's January 9, 2023 questions, including a request by the Panel that each side "itemize (with as much specificity as possible) all of the arbitrations claims of your side," the PMGSL side enumerated its claims as follows (boldface removed):

- Count I: breach of the APA, including: (i) failure to pay the APA minimum purchase price of $40 million (the PMGSL side says $12 million in cash and $6 million in stock (1,587,301 restricted shares of Neptune stock) were paid/given at closing but that another $8 million in cash[13] and another $14 million in stock[14] were not paid/given) because, were it not for Neptune's improper actions after it took over the business, the

---

[13] Under APA Section 1.6(a) (boldface removed):

> the remaining $8 million (the "Cash Portion Balance") shall be paid following the final determination in accordance with Section 1.7 and Section 1.10 that the cumulative Adjusted EBITDA for any rolling twelve (12) month period after April 1, 2019 exceeds $8 million (the "Adjusted EBITDA Threshold").

[14] Under APA Section 1.6(b) (boldface removed):

> $20 million [is] payable by the delivery to the Sellers of Common Shares at a deemed price of $3.78 per Common Share, of which $6 million shall be paid on the Closing Date by the delivery of 1,587,301 Common Shares and the remaining $14 million shall be paid in two tranches by the delivery of (i) 2,116,402 Common Shares on the date that the Cash Portion Balance is paid (the "Share Balance"), and (ii) 1,587,301 Common Shares on the date that the production facility of the Business achieves from and after April 1, 2019 (i) a total of 120,000 pounds of input material processed, and (ii) sales of such processed material totalling revenues of at least $9 million, in each case to the satisfaction of the Purchaser, acting reasonably (the "Production Share Balance").

thresholds of APA Sections 1.6(a) and 1.6(b) would have been achieved (PMGSL side's February 6, 2023 answer at pages 2-8), for a total of $22 million still owed; (ii) breach of the covenant of good faith and fair dealing by changing the business model upon which the APA was based, thereby preventing reaching the earn-out thresholds, which caused loss of "up to $130 million in earn-out payments" (id. at pages 8-11); (iii) breach of the APA by failing to provide timely sales and financial resources (e.g., capital expenditures related to cGMP needs, including HVAC,[15] equipment for producing THC-free product,[16] and solvent recovery) and by failing to approve the hiring of necessary personnel (e.g., chemists and sales personnel) (id. at pages 11-12); (iv) failing to timely calculate in good faith or provide timely "12MR Adjusted EBITDA Statements" (id. at pages 12-13); (v) failing to attempt to meet in good faith the earn-out thresholds or provide earn-out statements or pay the earn-outs (id. at page 13); (vi) failing to operate the business in good faith, including failing to make commercially reasonable efforts to maintain and increase the level of business and to refrain from actions that would reasonably be expected to materially hurt the business, such actions including diverting resources, changing the management structure, stopping consumer sales without good reason, making commercially unreasonable decisions concerning product labelling, capital expenditures, and pricing, diverting business away from Sugarleaf and to other Neptune businesses, failing to retain the purchased assets during the earn-out period, and failing to maintain an appropriate financial reporting system (id. at pages 13-21); (vii) failing to "offer reasonable administrative or compliance related assistance to … assist with any sale, transfer, or other issues related to" the stock required under APA Section 5.13 (id. at pages 21-22); (viii) failing to continue to employ Sugarleaf key employees, including Mr. Galloway (id. at page 22); (ix) failing to provide reasonable assistance (under APA Article 9 concerning indemnification for third-party claims) for the Fisher-Taylor Arbitration, which is further described at pages 30-31, below (id. at page 22); and

---

[15] Heating, Ventilating, and Air Conditioning. See, e.g., Tr. 653-654.

[16] As to the meaning of "THC," see page 52, below. Reference to "THC-free" material should be understood to mean material in which THC is not detectable. In other words, THC may be present but in a concentration below the threshold of detection. See, e.g., Tr. 226 & 1206.

breach of Section 11.3 (Good Faith) and of the implied covenant of good faith and fair dealing (id. at page 23).

- Count III: breach of Mr. Galloway's employment agreement by improperly terminating his employment before the end of its three-year period (id. at pages 26-27);

- Count VI: breach of APA Section 5.13 (see Count I, item vii (above)), remove restrictions from the 1,587,301 shares of Neptune stock given at closing, and approve transactions relating to them (id. at pages 28-29).

Broadly, for Count I, the requested relief includes the $8 million Cash Portion Balance (id. at page 7), either 3,703,703 shares of Neptune stock or $14 million for the Share Balance and Production Share Balance (id. at page 8), up to $130 million in earn-out payments (id. at page 11), and interest (id. at pages 23-24); for Count III, the requested relief is for lost salary from January 2020 to May 8, 2022 in the amount of $581,250 (based on the assumption that the annual compensation would be $225,000 because the Production Share Balance had been earned and should be paid in accordance with APA Section 1.6(a)—see Section 2.1 of Mr. Galloway's employment agreement (Ex. 9 at page 96)) plus interest (id. at pages 26-27); and for Count VI, the requested relief is $2,317,457 (see Ex. 762) plus interest (id. at pages 28-29).

Thus, the PMGSL side is no longer asserting three claims of its December 23, 2020 Amended Demand: Count II (for an accounting), Count IV (for a declaration that APA Section 11.14 is procedurally unconscionable), and Count V (for a declaration concerning an objection to an EBITDA statement)

- **Summary Of Final Award**

Broadly speaking, for reasons discussed below, the Panel is making a Final Award (see pages 198-200, below) declaring and ordering that:[17]

(a)    All of the Neptune side's claims are denied;

(b)    The PMGSL side's claim for 4 months of severance pay for Mr. Galloway is granted;

---

[17] The section entitled "Final Award," at pages 198-200, below, contains the award. What is set forth in this section entitled "Summary Of Final Award" is a high-level summary; in case of any discrepancy between the two sections, what is in the section entitled "Final Award" controls. Furthermore, what is set forth in those two sections is subject to the discussions, qualifications, etc. set forth in the rest of this document.

Case 1:24-cv-00117-ER     Document 2-5     Filed 01/08/24     Page 16 of 201

(c)    The PMGSL side's claim for damages with respect to tranches 1 to 4 of the Neptune stock that was part of the purchase price is granted.

(d)    All other claims of the PMGSL side are denied.

(e)    Mr. Galloway will surrender the shares of tranches 1 to 4 to Neptune once Neptune has paid the associated damages, pre-award interest, and any post-award interest for late payments.

(f)    The Neptune side shall bear all of its own attorneys' fees and associated expenses, costs, and other disbursements and shall reimburse the PMGSL side for two-thirds of the PMGSL side's attorneys' fees and associated expenses, costs, and other disbursements.

(g)    The Neptune side shall bear two-thirds of the total ICDR fees and arbitrator compensation and shall reimburse the PMGSL side for the excess the PMGSL side has already advanced to the ICDR for those fees and compensation (i.e., the amount in excess of the PMGSL side's one-third obligation).

(h)    Payment by the Neptune side to the PMGSL side for items (b), (c), (f), and (g) will be made by September 29, 2023, and any late payments (payments after that date) will bear post-award interest.

## PROCEDURAL HISTORY[18]

- ### The Neptune Side's Demand (October 2, 2020)—ICDR Case No. 01-20-0015-1057

In the AAA Form Demand for Arbitration filed by Neptune on October 2, 2020 against PMGSL Holdings, LLC and Peter M. Galloway, Neptune stated its causes of action to be breach of contract, fraud in the inducement, and negligent misrepresentation; Neptune requested rescissory damages (the amount of which was stated to be undetermined), attorneys' fees, interest, arbitration costs, and punitive/exemplary damages. The dispute was described as follows:

> In APA § 3.3, Galloway represented that he or his company PMGSL Holdings "are not a party to, bound by, affected by or subject to, any [...] (iii) Laws or Governmental Authorizations, that would be violated. Also, according to APA § 3.9, Galloway and PMGSL Holdings represented that they were—at the time of closing—in compliance in all material respects with all laws and orders. Instead, he and PMGSL Holdings were in violation of at least 21 USC § 331 for "[t]he introduction or delivery for introduction into interstate commerce of any food, [...] that is adulterated or misbranded. It follows that despite his representations in the APA, he and PMGSL Holdings were in violation of at least 21 CFR §§ 111.70(c) and 111.475(b). Galloway and PMGSL Holdings knew or should have known that they were not compliant with current Good Manufacturing Practices for dietary supplements but they represented otherwise. The Respondents also knew that they had product that was likely to be misbranded or adulterated according to 21 U.S.C. § 331. Had such representations not been made, Neptune would not have entered into an agreement with Galloway or PMGSL Holdings.

- ### The PMGSL Side's Demand (October 2, 2020)—ICDR Case No. 01-20-0015-1093

In its form Demand For Arbitration filed on October 2, 2020 by Peter M. Galloway and PMGSL Holdings, LLC against Neptune and Sugarleaf Labs, Inc., Claimants there asked for damages (the amount of which was stated to be undetermined), declaratory judgment, an accounting, attorneys' fees, interest, and arbitration costs. Attached to the form Demand was a

---

[18] This section summarizes the procedural events/documents considered by the Panel to be more relevant to an understanding of what transpired during the Arbitration and is not intended to be exhaustive.

more detailed Statement Of Claim In Support Of Demand For Arbitration.  In it, Claimants there objected to the 60-day period of APA Section 11.14 as "violative of notions of judicial fairness and due process and thus void and unenforceable" (Statement Of Claim, page 2) and said they would soon be filing suit in a North Carolina court "largely mirroring this Statement of Claim, but also asking the Court to invalidate the arbitration provision due to Claimants' due process concerns" (id.).  Claimants there said they were "filing both actions out of an abundance of caution and to preserve all rights."  Id.  The counts were for breaches of the APA, an accounting, breach of Mr. Galloway's employment agreement, a declaration that APA Section 11.14 is "procedurally unconscionable under these circumstances, unenforceable and/or must be amended to correct deficiencies therein," and a declaration that the "independent auditor" provision of the APA (Section 1.11) should be stayed pending final judgment (that provision makes referral to an independent auditor the sole means for reviewing the financial statements used to assess whether the business has met the financial goals for determining earn-outs).

- **Motions To Dismiss, Oppositions, Answers, Etc.**

In each of the two arbitrations, the party/ies in the position of Respondent filed a motion to dismiss; oppositions to the motions, answers to the claims, etc. were also filed.  There is no need to be more specific here because, as discussed below, the two cases were administratively consolidated in this Arbitration, the claims in each case were (or were directly related to) the defenses in the other case, and all claims, counterclaims, and defenses in the two cases were heard together in this consolidated Arbitration and are discussed elsewhere in this Final Award.

- **Appointment Of Panel (October 30, 2020)**

On October 30, 2020, the ICDR notified the two sides in both cases that the undersigned had been appointed as sole Arbitrator in both cases and were given until November 16, 2020 to object to the appointment.

- **Preliminary Hearing (November 5, 9, and 11, 2020)**

The two sides agreed to move forward without objection to the Panel, and what became the first portion of the preliminary hearing was held on November 5, 2020.  The two sides presented their views regarding several issues, including jurisdiction and the 60-day period of APA Section 11.14(d) for rendering the award ("the arbitration award must be rendered by the arbitration tribunal in writing within sixty (60) days of the submission of such Dispute to arbitration").  In response to a question from the Panel, the two sides said they were unaware of

any APA drafting history regarding that APA section, agreed to further check their files concerning that, and agreed to file briefs by Noon Eastern of November 9, 2020 on when the 60-day period commenced. The two sides were asked to promptly consider putting in place a confidentiality agreement.

A second portion of the preliminary hearing was scheduled for 2 PM Eastern of November 9 to further discuss the 60-day period for rendering the award, the possibility of consolidating the two cases, what (if anything) should be done about the pending North Carolina suit instituted by the PMGSL side, etc., and to try to set the rest of the arbitration schedule. During the November 9 portion of the preliminary hearing, the two sides agreed to continue discussing various issues, and a third portion of the hearing was scheduled for November 11.

- **Report Of Preliminary Hearing And Scheduling Order—Order No. 1 (November 14, 2020)**

The third and final portion of the preliminary hearing was held on November 11, 2020. As set forth in Order No. 1 at page 2 (bracketed text in original):

> Prior to the November 5 (first) portion of the Preliminary Hearing, broadly speaking: (a) each side had filed a demand with the AAA (as reflected in the dual caption above), (b) in each of the two arbitration cases, the side in the position of Respondent had filed a motion to dismiss the case, and (c) Galloway and PMGSL had commenced suit on October 5, 2020, against Neptune and Sugarleaf in the General Court of Justice, Superior Court Division, Catawba County, North Carolina (No. 20-CVS-2464), to, among other things, obtain "a determination of whether Section 11.14 [the arbitration agreement, which contains a 60-day time limit for rendering the award (discussed below)] is procedurally unconscionable under these circumstances, unenforceable and/or must be amended to correct deficiencies therein." Complaint And Motion For Preliminary And Permanent Injunctions, para. 119.

With reference to the 60-day limit for rendering the award (APA Section 11.14(d) (set forth at page 122, below)), both sides had initially said the 60-day period of Section 11.14(d) for rendering the award in each of the two cases ran from the filing of the respective demand (i.e., October 2, 2020). In their briefs on the issue (submitted November 9, 2020), the Neptune side adhered to that view but the PMGSL side now said the period would start to run from the evidentiary Hearing. This issue was further discussed on November 9, and everyone agreed the two sides should continue to talk. Resolution of this issue is set forth in Order No. 1 at page 6:

The schedule set forth herein, which has been agreed to by both sides, provides for the award to be rendered months after December 1, 2020 [which was 60 days following October 2, 2020, the date both arbitration demands were filed]. There is no need for the Panel at this time to make any determination as to when the 60-day period of Section 11.14(d) begins or when it ends and the Panel expresses no opinion herein regarding either.

Regarding the motion to dismiss filed by each side in the arbitration commenced by the other side:

The two sides agreed in principle to obviate the two motions and are preparing a stipulation that would formally do so. Once the two sides are satisfied with the stipulation's language, it will be sent to the Panel for review. After the stipulation has been finalized and signed by the two sides, it will be sent to the Panel to be "So Ordered." [Id.]

As to the North Carolina state court suit:

The two sides agreed in principle to obviate the North Carolina suit and are preparing a stipulation that would formally do so. Once the two sides are satisfied with the stipulation's language, it will be sent to the Panel for review. After the stipulation has been finalized and signed by the two sides, it will be sent to the Panel to be "So Ordered" and appropriate action will be taken by the Parties in the North Carolina suit. [Id.]

The two sides also agreed to consolidation, as follows (Order No. 1, pages 5-6):

The two arbitration cases are being consolidated for the sake of efficiency. Papers prepared by the Panel will bear a dual caption (e.g., see page 1, above) and will concern one or both cases, as appropriate. Thus, there will be only one Order No. 1, one award, etc. The Parties are free to continue to file separate papers in each case. All papers filed in either or both cases, and all issues in either or both cases, will be considered by the Panel. In each case, the side that is in the position of Claimant need not (but may if it wishes) file its claims from that case as counterclaims in the other case. The Panel will be keeping track of its time on both cases under the lower (-1057) case number only. The goal is to minimize the burden on the participants while maintaining a clear record. These mechanics/procedures will be revisited as necessary.

Both sides had previously agreed the Panel had the power to consolidate the two cases (id. at page 5, footnote 2).

Order No. 1 also memorialized that:

(a) "[t]here was no challenge to this Panel, and the Parties have accepted the jurisdiction of this Panel over the subject matter of this dispute and over them to decide the matters in dispute" (id. at page 6);

(b) the two sides agreed that Delaware law applied to the APA without regard to Delaware's conflict of law principles, that the Federal Arbitration Act applied, and that "New York procedural law shall also apply to the arbitration whether the Hearing is held wholly or partially in person or wholly or partially virtually (remotely), regardless of the location(s) of any of the Parties and other participants" (id. at page 6-7);

(c) "[t]he AAA's October 1, 2013 Commercial Arbitration Rules (the "Rules"), including the Procedures For Large, Complex Commercial Disputes, govern this proceeding" (id. at page 7); and

(d) two additional claims might be filed: "(i) by the Neptune/Sugarleaf side: a claim for alleged breach of contract (regarding confidentiality) stemming from the Galloway/PMGSL side having filed the North Carolina suit; and (ii) by the Galloway/PMGSL side: a claim concerning an alleged restriction preventing the public trading of securities received by Galloway in connection with the Asset Purchase Agreement." Id. at page 8.

During the Preliminary Hearing, the two sides were asked to submit a proposed confidentiality agreement/stipulation (id. at page 9), and the numerous issues concerning privacy and information security, cybersecurity, motions, exchange of information/discovery, experts, exchange of Hearing exhibits and witness lists, Hearing procedure and schedule, and pre-Hearing briefing were discussed and memorialized (id. at pages 9-25); the Hearing was scheduled for five days: March 8-12, 2021 (id. at page 23).

- **Stipulation—"So Ordered" November 17, 2020**

In a stipulation by the two sides, which was "So Ordered" by the Panel on November 17, 2020, broadly speaking, the Neptune side and the PMGSL side agreed to: (i) procedural consolidation of the 1057 and 1093 arbitrations "without alignment of the Parties" and to "one hearing and one reasoned award," (ii) withdraw the motions to dismiss, (iii) withdraw the suit in the North Carolina court, and (iv) follow the timetable set forth in Order No. 1 for conduct of the consolidated arbitration (and that their disagreement regarding the 60-day time limit for rendering the award was moot). Id. at page 3.

- **<u>Agreement And Order Regarding Discovery Of ESI—"So Ordered" November 23, 2020</u>**

The two sides agreed to a protocol concerning discovery of electronically stored information, which was "so ordered" by the Panel on November 23, 2020.

- **<u>Confidentiality Stipulation And Protective Order—"So Ordered" November 24, 2020</u>**

A confidentiality stipulation/protective order was "so ordered" by the Panel on November 24, 2020. Both sides agreed/stipulated to all terms except that the PMGSL side objected to inclusion of Section 6 (entitled "Attorneys' Eyes Only Material and Outside Counsel Eyes Only Material"), which added a second, more restricted (higher) level of confidentiality.

- **<u>Order Regarding Addition Of Claims And Document Discovery Disputes— Order No. 2 (December 21, 2020)</u>**

In accordance with Order No. 1, document requests were to be served by November 16, 2020, objections were to be served by November 30, the two sides were to attempt to resolve any discovery disputes, and unresolved disputes were to be brought to the Panel's attention by December 7 (which the two sides did). Also in accordance with Order No. 1, requests to file additional claims were to be brought to the Panel's attention by December 11.[19] A two-session hearing to deal with both issues (discovery disputes and additional claims) was held on December 10 and 14, 2020; Order No. 2 (dated December 21, 2020) memorializes the results of that hearing.

As indicated in Order No. 2 (at page 3-4), the Neptune side requested permission to file two new claims: (i) a claim for breach of APA Section 5.6 (the confidentiality provision) stemming from the PMGSL side's filing a complaint against the Neptune side in North Carolina, thereby "making public the Parties' disputes regarding the APA," and (ii) a claim for breach of APA Section 1.11, "which provides a process … which PMGSL was to follow to object to Neptune's 12MR Adjusted EBITDA Statement," which process (according to the Neptune side) was not complied with. The Neptune side requested damages, prejudgment interest, attorneys' fees, and costs for each proposed additional claim.

---

[19] Rule R-6 (Changes of Claim), subpart (b), reads in part as follows: "After the arbitrator is appointed, … no new or different claim may be submitted except with the arbitrator's consent."

In its December 11, 2020 letter, the PMGSL side requested permission to file one new claim: a claim for breach of the Lock-Up Agreement, attached to the APA and dated July 24, 2019.[20]  According to the PMGSL side: (a) under the Lock-Up Agreement, one-sixth of the locked-up (restricted-from-sale) securities transferred as part of the transaction contemplated by the APA were supposed to have their lock-up (restriction) removed every six months following July 24, 2019, (b) two such six-month periods had passed at the time of the December 11, 2020 request, but (c) the restrictions for those two tranches had not been removed despite requests made by the PMGSL side.  The PMGSL side requested damages.  Order No. 2, page 4.

The Panel decided that all three claims could be added to the arbitration: amended demands were to be filed by December 23, 2020, amended answers and any counterclaims were to be filed by December 30, 2020, and any answers to those counterclaims were to be filed by January 8, 2021.  Id.

The Panel also ruled on a number of discovery disputes.  Order No. 2, pages 5-8.

- **The Neptune Side's Amended Demand (December 23, 2020)**

The Neptune Side's Amended Demand is summarized above at pages 9-11.

- **The PMGSL Side's Amended Demand (December 23, 2020)**

The PMGSL Side's Amended Demand is summarized above at pages 12-13.

- **Answers To The Other Side's Amended Demand (December 30, 2020)**

On December 30, 2020, each side filed its answer to the other side's Amended Demand. Broadly, those answers were essentially denials and/or reassertion of what was already pled in the Amended Demands and do not require further description here.

- **Order Regarding Video Platform Hearing—Order No. 3 (January 7, 2021)**

In Order No. 3, the Panel said it continued to believe the Hearing, which at the time was scheduled for early March 2021, would be held on a videoconference platform.  The Panel suggested the two sides review certain AAA online materials and asked them to jointly submit a

---

[20]  APA Section 12.1 (Definitions) defines "Ancillary Documents" to mean "the Bill of Sale, the Assignment Agreement, Non-Competition Agreement, Lock-Up Agreement, all employment contracts entered into pursuant to Section 6.12, and the Employment Agreements."  APA Section 11.1 provides that "[t]his Agreement and the Ancillary Documents set forth the entire agreement of the Parties with respect to the subject matter hereof …." APA Section 11.14 provides that "[a]ll disputes, Claims, controversies, disagreements and Actions relating to this Agreement and any of the Ancillary Documents … shall be fully and finally settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association …."  See pages 121-123, below.

proposed procedural order to govern the videoconference Hearing and ensure its fairness and security.

- **Proposed Order Regarding Procedures For Virtual Hearing—Proposed Order No. 4 (January 27, 2021)**

On January 27, 2021, in accordance with Order No. 3, the two sides submitted proposed Order No. 4 regarding the procedures for conducting the Hearing on a videoconference platform.[21] The Panel suggested a number of changes, and the final version of Order No. 4 issued on February 12, 2021 (see below).

- **Stipulation Regarding Expert Discovery—"So Ordered" February 4, 2021**

The two sides entered into a stipulation "so ordered" by the Panel on February 4, 2022 to govern discovery procedures concerning anyone designated in this Arbitration as an expert (whether a testifying expert or a consulting expert).

- **Decisions Regarding Filing Dispositive Motion And Discovery Disputes—Order No. 5 (February 4, 2021)**

During January 2021: (a) the Neptune side requested permission to file a dispositive motion (broadly, Order No. 1, at page 10, requires anyone seeking to make a dispositive motion to file a short paper requesting permission to make the motion and then to receive permission to make the motion before the motion can be brought) and (b) the two sides filed papers concerning unresolved discovery disputes. Procedural hearings on those issues were held on January 20 and 22, 2021, resulting in Order No. 5.

The dispositive motion the Neptune side sought permission to bring concerned: (i) whether the PMGSL side was entitled to an earnout payment (related to whether Sugarleaf's adjusted EBITDA for the twelve months ending March 31, 2020 exceeded $8 million), (ii) whether there was a breach by the PMGSL side of one or more representations regarding compliance "in all material respects with all Laws and Orders" (related to whether there was compliance on the APA closing date with cGMP), (iii) whether there was a breach by the PMGSL side of the APA's confidentiality provision (related to its filing of the suit in North Carolina courts); and (iv) whether the PMGSL side breached APA Section 1.11 by allegedly

---

[21] Order No. 3 asked the two sides to submit the proposed Order by January 21, 2021, which deadline was extended on that date at the request of the two sides to January 27, 2021.

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 25 of 201

failing to properly object to the EBITDA statement in issue.  As stated in Order No. 5 at page 3-4 (italics in original; boldface font removed):

> Having carefully considered the Parties' submissions and positions, during the January 22 hearing, the Panel denied the Neptune side's request for permission to file the dispositive motion.  There were only six weeks remaining before the start of the evidentiary Hearing; there were significant issues of fact in dispute that had to be resolved (and which appeared to be intertwined with many of the major issues in the case and on which the Panel would like to hear testimony and have the opportunity to ask questions of witnesses); and it was certainly not clear that allowing the motion to be made (even if it were granted in whole or in part) would expedite the *entire* proceeding and make the *entire* proceeding more cost-effective for the Parties.
>
> That denial was without prejudice regarding the substance of the Neptune side's positions and arguments and went only to whether the required permission needed to file a dispositive motion would be granted.

Order No. 5 also dealt with unresolved discovery disputes concerning, among other things: (i) production of chats that might have been recorded; (ii) search of the private email account of Mr. John Moretz (Chairman of Neptune prior to closing) for responsive documents; (iii) search and production of text messages of Mr. John Moretz, Mr. Michael Cammarata (Chairman of Neptune after closing), Dr. Toni Rinow (Neptune's "**CFO**"[22]), and Mr. Lee Moritz (a Sugarleaf executive)[23]; (iv) a computer security incident in the July/August 2020 timeframe that might have required Neptune personnel to use means of communication (e.g., personal email accounts) other than the impaired Neptune email system; (v) privilege issues concerning, e.g., pre-closing legal opinions, alleged over-designation of documents into the more restrictive Attorneys'-Eyes-Only category; (vi) documents withheld on grounds of privilege by Neptune that had been sent or received by Messrs. Galloway, Coles, and Carlsen while they worked for Neptune/Sugarleaf; and (vii) copies of Neptune documents that were on personal devices of Messrs. Galloway, Coles, and Carlsen (laptops, mobile phones, and external hard drives). Regarding the last item, the two sides were asked to try to reach agreement on a third-party

---

[22] Chief Financial Officer.

[23] Because of the similarity of their last names, first names will also be used for Mr. John Moretz and Mr. Lee Moritz.

forensic IT vendor to identify, remove the Neptune documents from those personal devices, and provide the Neptune side with copies of those documents.[24]  Order No. 5, pages 4-14.

- **Stipulated Amended Hearing And Scheduling Order—Order No. 6 (February 9, 2021)**

The two sides jointly asked that the schedule be revised, including moving the Hearing from early March 2021 to June 17-21, 2021, and the Panel "so ordered" Order No. 6 memorializing the new schedule on February 9, 2021.

- **Order Regarding Procedures For Virtual Hearing—Order No. 4 (February 12, 2021)**

The final version of Order No. 4 (incorporating changes suggested by the Panel to the draft jointly submitted by the two sides on January 27, 2021) was "so ordered" on February 12, 2021.

- **Procedural Hearing (March 12, 2021)**

During the procedural hearing, issues concerning the Parties' privilege logs were discussed.  The two sides were asked to promptly complete their review of the other side's privilege log, meet and confer regarding any issues, and then promptly bring any unresolved issues to the Panel's attention.  Also discussed were the issues concerning the Neptune documents residing on the personal devices of Messrs. Galloway, Coles, and Carlsen, which documents Neptune wanted to have and wanted removed from those personal devices.  The two sides were asked to submit letters concerning that and related issues.

- **Procedural Hearing (March 19, 2021)**

During the hearing, various possibilities for providing each side with the documents on the personal devices of Messrs. Galloway, Coles, and Carlsen to which that side was entitled were discussed, and the two sides were again asked to try to promptly reach agreement on a protocol for doing so.

- **Decision Re Neptune Side's Request To Add Claims—Order No. 7 (April 17, 2021)**

In an April 13, 2021 letter from Counsel for the Neptune side to the Panel, the Neptune side requested permission to file additional claims against the PMGSL side for "(1) breach of contract; (2) violations of the Computer Fraud and Abuse Act (18 U.S.C. § 1030); (3) violations of the federal Defend Trade Secrets Act (18 U.S.C. § 1836); and (4) indemnification for a class

---

[24]  Neptune was entitled in the first instance to all of its documents that had been allegedly improperly copied onto those personal devices, and the PMGSL side was entitled in this Arbitration to the subset of those documents (once they were back in Neptune's possession) that were responsive to the PMGSL side's allowable discovery requests.

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 27 of 201

action lawsuit filed against Neptune." More specifically, the first claim was for breach of sections of the APA and its ancillary documents, including Section 5.6 of the APA (concerning confidentiality) and Section 3.2 (concerning confidential information and intellectual property) of Mr. Galloway's employment agreement (one of the Ancillary Documents—see footnote 20, above). The first three claims all stemmed from Mr. Galloway's alleged download and retention of non-public Neptune information (on his personal devices); the fourth claim was for indemnification pursuant to APA Section 9.1(a)(ii) arising from "a putative securities class-action complaint stemming from Neptune's acquisition of Sugarleaf." Id.

In an April 16, 2021 letter to the Panel, the PMGSL side responded to the Neptune side's request to add those four claims.

As set forth in Order No. 7, dated April 17, 2021, after discussing some of the procedural history up to that time and citing Rule R-6 ("Changes Of Claim"), the Panel said (footnotes omitted; emphasis in original):

> Rule R-6(b) is applicable to the Neptune side's request to add the four claims. Because the Panel has already been appointed, those claims cannot be submitted without Panel consent (last sentence of R-6(b)).
>
> The Rules emphasize the need to manage the arbitration process to achieve a "fair, efficient, and economical resolution of the dispute" (Rule R-21(b); see also Rules R-22(a) and R-23, and Preliminary Hearing Procedures P-1(a) and P-2(a)(vi)).
>
> The process has moved forward from the time of filing the Demands by both sides (on October 2, 2020) on the basis that the dispute centered around two key issues: whether the PMGSL side breached its representations concerning the business and whether the Neptune side improperly engaged in certain actions/inactions concerning that business. Discovery proceeded on that basis. The selection of witnesses, preparation of any witness statements, and preparation of expert reports proceeded on that basis. The number of Hearing days was selected on that basis, and the Hearing starts one month from today. Pre-Hearing briefs are due in two weeks and, to the extent they have already been written, they have been written on that basis.
>
> All else being equal, it is often more efficient for two adverse parties to resolve all of their disputes in a single proceeding (even if the proceeding is bifurcated), particularly if those disputes grow out of the same circumstances/nucleus of operative facts. But that is not the situation here.

Case 1:24-cv-00117-ER     Document 2-5     Filed 01/08/24     Page 28 of 201

The first three claims the Neptune side seeks to add all grow out of the Galloway Document Retention, which, again, is defined by the Neptune side as "Peter Galloway's download of non-public, confidential, protected information, data, and communications from Neptune-owned email addresses and servers, and retention of such information in his personal files." That "download" has no relationship to whether the PMGSL side breached its representations concerning the business, whether the Neptune side improperly engaged in certain actions/inactions concerning that business, the alleged breaches of the confidentiality provision, of the provision concerning EBITDA statements, and of the Lock-Up Agreement, or to the underlying circumstances/nucleus of operative facts of those issues.

The fourth claim the Neptune side seeks to add (for indemnification) grows out of "a putative securities class-action complaint stemming from Neptune's acquisition of Sugarleaf." While that acquisition is of the business underlying the original Demands, this claim presumably will turn on issues such as what Neptune did and whether the claimed indemnification is within the scope of the PMGSL's side obligations under the Asset Purchase Agreement and would also seem to have no relationship to whether the PMGSL side breached its representations concerning the business, whether the Neptune side improperly engaged in certain actions/inactions concerning that business, the alleged breaches of the confidentiality provision, of the provision concerning EBITDA statements, and of the Lock-Up Agreement, or to the underlying circumstances/nucleus of operative facts of those issues.

Adding those four claims now would almost certainly result in a significant delay (with both sides likely asking for additional discovery and a postponement of the scheduled Hearing), which presumably would cause prejudice to both sides, since resolution of the claims and issues already in this proceeding would be significantly delayed. On the other hand, not adding the four new claims to the present proceeding would not seem to result in any prejudice to the Parties—there was not even a hint of such prejudice in the April 13 or April 16 letters.

The Neptune side's request to add those four claims is denied without prejudice.

The Panel stated in a footnote that its decision in no way prevented Neptune from then or later asserting those four claims, e.g., by filing a new arbitration demand (if appropriate) and also noted that if both sides agreed to add those claims to the instant Arbitration, they could also

agree, for example, to hold the new claims in abeyance pending the outcome regarding the existing claims.

- **Notification Of Settlement In Principle (April 21, 2021)**

In an April 21, 2021 email from Counsel for the Neptune side to the Panel, with copies to the Counsel for the PMGSL side, the sender wrote "We are pleased to report that the Parties have reached a settlement agreement in principle. We will let you know once it is finalized."

- **Notification That The Matter Did Not Settle (June 18, 2021)**

In a June 18, 2021 email to the Panel from the then-current Counsel for the PMGSL side (of the firm of Fluet Huber & Hoang PLLC), with copies to the Counsel for the Neptune side, the sender wrote:

> I am writing to provide you two important updates in this matter.
>
> The first is that the matter has not settled. The second is that PMGSL is transitioning to new counsel. Copied here are PMGSL's new counsel, Eric Cottrell, Charles Raynal and Eric Frick of Parker Poe, who will be substituting into the case immediately.[25]

A few minutes after that message, attorneys from the Parker Poe firm emailed the Panel, with copies to Counsel for the Neptune side, the email reading in part:

> Because the parties have failed to reach a settlement of this matter, we will proceed to prepare the case for a hearing. To that end, we request that the parties promptly engage in discussions regarding an amended schedule for the hearing and present the revised schedule to the Panel for approval as soon as possible.

- **Procedural Hearing (June 28, 2021)**

A procedural hearing was held to discuss resumption of the Arbitration, including discussion of outstanding discovery issues and rescheduling of the Hearing. Another procedural hearing to deal with the outstanding issues was then scheduled for July 8 so that both sides

---

[25] Until February 2021, the PMGSL side was represented in this Arbitration by Matthew K. Rogers, Esq. (of The Law Offices of Matthew K. Rogers) and attorneys from the firm of Cushing Morris Armbruster & Montgomery LLP. From February 2021 until the time of this email (in June 2021), the PMGSL side was represented by Mr. Rogers and attorneys from the firm of Fluet Huber & Hoang PLLC. And then, from June 2021 through the present (including at the Hearing), the PMGSL side has been represented by Mr. Rogers and attorneys from the firm of Parker Poe Adams & Bernstein LLP. The Neptune side also changed Counsel during this Arbitration (see footnote 26, below).

would have more time to familiarize/refamiliarize themselves with the case (because of the two-month settlement hiatus (from April 21 to June 18) and change of Counsel).

On July 7, the two sides indicated they were making "significant progress" but were still discussing the "document retention issue [concerning the Neptune documents that were on the personal devices] and the privilege issue"; they suggested postponing the July 8 hearing, and it was moved to August 2.

On July 29, the two sides indicated they had made "significant progress" but still had "a few outstanding issues to resolve"; they asked for an extension, and the August 2 date was moved to August 19.

- **Decision Regarding Discovery Dispute—Order No. 8 (August 21, 2021)**

There were two main areas of discussion during the August 19 hearing, the privilege log issue and forensic examination of the personal devices for Neptune documents, and that hearing resulted in Order No. 8.

As to the privilege issue, the PMGSL side challenged the designation of 142 entries of the 1,132 entries on the Neptune side's privilege log on the basis that any claim of privilege had been waived by their contents having been put "at issue" by the Neptune side. Both sides had filed letter briefs about this, and the matter was discussed at length during the August 19 hearing. There is no need to describe this further except to note that the Panel denied without prejudice the PMGSL's challenge and also declined to review those documents in camera. Order No. 8, pages 2-5.

As to the second issue, the PMGSL side in an August 17 letter wrote that the two sides had been working diligently to finalize the protocol to be used to examine the personal devices but that recent developments had made the inspection review protocol infeasible. More specifically, in a separate pending arbitration, *Elizabeth F. Taylor and Fisher Taylor, LLC v. Sugarleaf Labs, Inc. and PMGSL Holdings, LLC* (the "**Fisher-Taylor Arbitration**"), Claimants there filed a motion to compel discovery, and PMGSL responded that it was in possession of some relevant and responsive documents that it could not produce absent an order because Neptune (which was not a party in that other arbitration) contended those documents belonged to it and did not consent to their disclosure. There were additional complicating factors (e.g., the PMGSL side was concerned that if any Neptune documents that Messrs. Galloway et al. allegedly had no right to keep (because they belonged to Neptune) were deleted from the

personal devices (which is what Neptune wanted), that would be regarded as spoliation by the arbitrator in the Fisher-Taylor Arbitration. After further discussion, the Parker Poe attorneys who were present at the August 19 hearing were asked by the Panel to convey to Mr. Rogers (who could not attend the August 19 hearing) certain information/requests by the Panel concerning the other arbitration, and a follow-up hearing was scheduled for August 27.

- **Withdrawal Of Portion Of Order No. 8, Modification Of Confidentiality Stipulation And Protective Order, Etc.—Order No. 9 (August 29, 2021)**

Mr. Rogers submitted an August 25 letter to the Panel regarding the Panel's requests that had been conveyed to him by the Parker Poe attorneys (and which requests were embodied in Order No. 8, which Order was sent by the Panel to Mr. Rogers at the time the Order issued (on August 21, 2021)). The Neptune side responded in an August 26 letter to Mr. Rogers's August 25 letter.

During the August 27 procedural hearing, the two sides were asked if the Sugarleaf Labs, Inc. that is a party in this consolidated Arbitration was the same entity that is a respondent in the Fisher-Taylor Arbitration, and both sides agreed it was. The two sides were also asked if Sugarleaf Labs, Inc. was a wholly owned subsidiary of Neptune. Counsel for the PMGSL side said he would be surprised if it were not; Counsel for the Neptune side said he was not sure, and the Panel asked the Neptune side to promptly investigate and report back. Based on (i) Sugarleaf Labs, Inc. being a party in both this consolidated Arbitration and the Fisher-Taylor Arbitration and (ii) the belief that Sugarleaf was a wholly owned subsidiary of Neptune's, the Panel asked Sugarleaf to send a letter by September 1 to the arbitrator in the other arbitration concerning the documents to which Neptune had asserted ownership that were located on the personal devices of Messrs. Galloway et al., thereby obviating the Panel's requests made of Mr. Rogers in Order No. 8. Accordingly, a portion of Order No. 8 (concerning certain actions the Panel had requested Mr. Rogers to take) was withdrawn. Order No. 9, pages 2-3.

During the August 27 hearing, the two sides agreed the Confidentiality Stipulation And Protective Order, issued November 24, 2020 (see page 22, above), should be modified, and Order No. 9 set forth the modifications (to Sections 4(f), 5(b), and 5(b)i) proposed by the Panel; the two sides were asked to promptly review the suggested modifications. Id. at pages 3-5.

The two sides also stated that the Neptune documents on the personal devices had been identified and that the Neptune side was or would shortly be reviewing those documents and

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 32 of 201

producing those responsive to the PMGSL side's discovery requests.  The two sides said the failure to have the protocol in place (for the third-party IT vendor) regarding the personal devices was not delaying this Arbitration because the two sides had a specific agreement concerning the review and production referenced in the first sentence of this paragraph.  The Panel suggested that the Parties finalize and execute the protocol as soon as possible because its absence was a distraction for both sides.  Id. at pages 5-6.

The Panel also suggested that the two sides confer as soon as possible regarding new dates for the evidentiary Hearing (as well as the rest of the schedule).  A procedural hearing was scheduled for September 10, and a non-exhaustive list of topics to be addressed was then set forth in Order No. 9 at page 6.  The date for the procedural hearing was subsequently moved to September 14.

- **Procedural Order—Order No. 10 (September 15, 2021)**

In a September 1, 2021 email, the Neptune side objected to the modifications to the Confidentiality Stipulation And Protective Order suggested by the Tribunal in Order No. 9.  In a September 3 email, the PMGSL side agreed with the modifications and stated "There is no legitimate reason not to correct what appears to be an oversight in the initial Confidentiality Stipulation and Protective Order."

During the September 14 hearing, several topics (including those listed in Order No. 9) were discussed, including: (i) Counsel for the Neptune side confirmed that Sugarleaf Labs, Inc. was a wholly owned subsidiary of Neptune's; (ii) the proposed modifications to the Confidentiality Stipulation And Protective Order were discussed at length and then adopted by the Panel and made effective as of September 14, 2021; (iii) the Neptune side stated it expected to finish its review of the Neptune documents on the personal devices (for production to the PMGSL side) by the end of September/beginning of October; (iv) the protocol for forensic examination of the personal devices was not yet finalized but both sides reaffirmed that this was not in any way delaying the Arbitration; and (v) possible dates for the Hearing were discussed (the Panel suggested that seven days be allocated for the Hearing, not just five days), e.g., during the first part of February 2022, as well as the need to modify the due dates/deadlines for the action items leading up to the Hearing (e.g., exchange of Hearing exhibits and witness lists).

The two sides subsequently notified the Panel that they had tentatively agreed on the week of January 31 to February 4, 2022 and February 7 and 8, 2022 (October 22, 2021 and November 1, 2021 emails from Counsel).

- **Procedural Order Re Modification Of Schedule—Order No. 11 (November 22, 2021)**

By agreement of the two sides and order of the Panel, a revised schedule (with the Hearing starting January 31) was put in place, including a December 6, 2021 procedural hearing to discuss any unresolved production issues. On December 1, 2021, Counsel emailed the Panel to say that the two sides had resolved the then-remaining discovery disputes, and the December 6 hearing was cancelled.

- **Procedural Order Re Adjournment—Order No. 12 (January 14, 2022)**

In his letter of January 11, 2022, Christopher Waldon, Esq. stated he had just joined Neptune that day as its Deputy General Counsel–Litigation and would be appearing as lead Counsel in the Hearing. He requested a "30- to 45-day continuance of the current hearing date to allow our new team to get up to speed and properly prepare for the hearing." Mr. Waldon also said there were some new discovery/witness issues that he needed time to investigate and consider.[26] In a January 13, 2022 letter, Counsel for the PMGSL side opposed the request, said that, contrary to Mr. Waldon's assertion, the PMGSL side's changes of Counsel had not delayed the Arbitration, and discussed his side's view of the discovery/witness issues referenced in Mr. Waldon's letter.

Order No. 12 memorializes the joint decision made during the January 14, 2022 hearing to postpone the Hearing. The Panel indicated it was available during eighteen specified days in March and April and asked the two sides to confer and jointly select seven of those days for the Hearing. The Panel also asked the two sides to try to resolve the discovery/witness issues discussed in the January 11 and 13 letters and to provide to the Panel a new schedule for the Arbitration. A procedural hearing was scheduled for January 20, 2022.

---

[26] Until about March 2022, the Neptune side had been represented in this Arbitration by attorneys from the firm of Venable LLP (Venable may have formally withdrawn around the end of February 2022). From the time of Mr. Waldon's January 11, 2022 letter through the present (including at the Hearing), the Neptune side has been represented in this Arbitration by Mr. Waldon and John Wirt, Esq. (Neptune's General Counsel). In addition, attorneys from the firm of Evans Fears & Schuttert LLP entered an appearance for the Neptune side on March 30, 2022 and participated in the Hearing during the seven April Hearing days (but not the six August Hearing days). The PMGL side changed Counsel several times (see footnote 25, above).

- **Procedural Order Re Revised Schedule—Order No. 13 (January 20, 2022)**

A procedural hearing was held on January 20 and memorialized in Order No. 13. That Order contained the new schedule, starting with the exchange of Hearing exhibits, exhibit lists, and witness lists on March 24, 2022 and ending with the Hearing being held on April 13, 14, 15, 18, 19, 20, and 21. The two sides were asked to continue their attempt to resolve the issues raised in their January 11 and 13 letters, and a procedural hearing was scheduled for January 31, 2022 to deal with any issues that remained unresolved.

- **Order Re Neptune Motion For Stay—Order No. 14 (March 10, 2022)**

As set forth in Order No. 14:

> On February 28, 2022, Christopher Waldon, Esq. (Deputy General Counsel–Litigation of Neptune Wellness Solutions, Inc.) emailed the Panel as follows:
>
>> [I]t has recently come to our attention that on April 20, 2021, the parties both accepted a mediator's proposal that was unconditional and contained all material terms of settlement. We intend to enforce that settlement, and think that enforcement action should be heard by a different arbitration panel so as not to taint the present panel by disclosing confidential settlement discussions.
>>
>> We request an opportunity to be heard on this. We also request leave to file a motion to stay the present proceeding until Neptune's motion to enforce the settlement is resolved.
>
> A procedural hearing was held on March 10, 2022 … regarding the Neptune[] side['s] request. …
>
> The two sides agreed during the March 10 hearing that on April 21, 2021, Counsel at the time for the Neptune side (Venable LLP) emailed the Panel to say:
>
>> We are pleased to report that the Parties have reached a settlement agreement in principle. We will let you know once it is finalized.
>
> And the two sides also agreed during the March 10 hearing that on June 18, 2021, Counsel at the time for the PMGSL side had emailed the Panel to say:
>
>> I am writing to provide you two important updates in this matter.

The first is that the matter has not settled.  The second is that PMGSL is transitioning to new counsel.  …

Venable LLP had been Counsel for the Neptune side since at least as early as October 2, 2020, when the two demands for arbitration were filed, and through at least as late as February 28, 2022 (see below).

On January 11, 2022, Mr. Waldon wrote to say that he would be appearing as lead Counsel for the Neptune side in the evidentiary Hearing, which, at the time, was scheduled to begin on January 31, 2022.  In his letter, he requested a 30- to 45-day continuance to allow him to familiarize himself with the matter.

A procedural hearing was held on January 14, 2022, and the current schedule was adjourned (Order No. 12, dated January 14, 2022).  The Panel and Parties subsequently agreed to a new schedule in which the evidentiary Hearing is set to commence on April 13, 2022 (Order No. 13, dated January 20, 2022), a continuance of over 70 days from January 31, 2022.

On February 28, 2022, Mr. Waldon wrote to say that "Venable LLP will be withdrawing from the case shortly and will not be counsel for Neptune moving forward."  Thus, Venable was Counsel from at least as early as October 2, 2020 through at least as late as February 28, 2022.

The Parties and Panel agree that this Panel should not decide whether or not there was an enforceable settlement agreement.  During the March 10 hearing, the Panel reaffirmed that it did not want to know who the mediator was, the terms of the alleged settlement, or anything else substantive about the mediation or alleged settlement.

During the March 10 hearing, Mr. Cottrell disagreed with Mr. Waldon that there was an enforceable settlement agreement. Mr. Cottrell pointed to the roughly eight months from June 18, 2021 (the date of the email saying there was no settlement) until January 11, 2022 [sic, February 28, 2022] (the date of Mr. Waldon's email saying there was an enforceable settlement agreement).  Mr. Cottrell noted that the Venable attorneys, who had been copied on the June 18, 2021 email, (a) did not at any time take issue with the assertion in the email that "the matter has not settled" and (b) that the Venable attorneys actively participated in the arbitration after June 18, 2021, including setting a new schedule after the June 18, 2021 email (matters had been put "on hold" by the Panel immediately after it received the April 21 email—see April 21, 2021 emails (i) from the Panel indicating that

it assumed there was to be no further work by the Panel on this matter and (ii) from Venable confirming that assumption).

During the March 10 hearing, the Panel noted the length of pendency of this matter, that the PMGSL side does not agree there is an enforceable settlement agreement and has asserted its own claims in this matter, and that the Panel is not deciding (and will not decide) whether or not there is an enforceable settlement agreement.

The Panel said it believed the next deadline in the case is March 24, 2022 (Hearing exhibits are to be exchanged and exhibit lists and witness lists are to be exchanged and filed). In response to the Panel's question, each side said it was ready to proceed.

The Panel then addressed the substance of the Neptune side's motion for a stay and denied the motion without prejudice. The Panel asked the Parties to keep the Panel informed of any actions they might take regarding the alleged settlement agreement; the Panel indicated it would revisit the issue of a stay, as appropriate.

- **Procedural Order—Order No. 15 (March 18, 2022)**

On March 14, 2022, Counsel for the PMGSL side asked the Panel to issue ten subpoenas in accordance with the relevant portion of Order No. 1 (at page 15).[27]  In an email later that day, the Panel requested certain information, including why the Panel had authority to issue such a summons/subpoena for each identified individual in the jurisdiction where the witness resided or where the summons/subpoena would be executed.  In its email, the Panel noted that some of the individuals in question were indicated in Counsel's email to have Canadian addresses and said that if the request to the Panel was being made under the FAA (Federal Arbitration Act, 9 U.S.C. § 1 et

---

[27]  The relevant section of Order No. 1 is entitled "Summonses/Subpoenas; Third-Party Witnesses" and reads as follows (footnote omitted):

> Any request by a Party to the Panel for a summons/subpoena must be on notice to the other Party, which will then have two (2) business days in which to submit any opposition to the request, and must include a summons/subpoena in the exact form desired by the requesting Party.  Any request for a third-party summons/subpoena must indicate why the Panel has authority to issue such a summons/subpoena in the jurisdiction where the witness resides or where the summons/subpoena will be executed.  The requesting Party is solely responsible for determining whether such a summons/subpoena is enforceable and for any attempt to enforce it (the Panel shall not be involved in any way regarding either).  The Parties are urged to request summonses/subpoenas as soon as possible because of the time that may be required for seeking and obtaining judicial enforcement.

seq.), the Panel was not aware that the FAA had extra-territorial application to Canada. Counsel for the Neptune side noted its objections in a March 16, 2022 email, Counsel for the PMGSL side provided some requested additional information on March 17, and each side cited and provided copies of one or more relevant authorities.

As memorialized in Order No. 15, during a March 18 procedural hearing, each side was asked to obtain certain additional information (e.g., whether any of the individuals would voluntarily testify without a summons), the two sides were asked to meet and confer, and a procedural hearing was scheduled for March 24.

In advance of the March 24, 2022 procedural hearing, the Panel received an email from Counsel for the PMGSL side stating that the two sides had conferred, that some of the ten individuals would testify voluntarily, some would be represented by Neptune's Counsel and would testify, some could not be reached, etc.; both sides suggested that the procedural hearing be cancelled. The Panel canceled the March 24 hearing, asked the two sides to confer regarding several issues, and scheduled a procedural hearing for March 31.

- **The Neptune Side Commences The "Settlement Arbitration" (March 28, 2022)**

By letter dated March 30, 2022, Counsel for the Neptune side notified the Panel that on March 28, 2022, the Neptune side had commenced an arbitration under the AAA's expedited rules "to enforce the binding settlement agreement reached last year …" (the "**Settlement Arbitration**") and requested a stay of this consolidated Arbitration. Counsel for the PMGSL side indicated its opposition in a March 31, 2022 email. Their arguments are set forth immediately below in the discussion concerning Order No. 16.

- **Order Re Renewed Neptune Motion For Stay And Re Summonses—Order No. 16 (April 1, 2022)**

As set forth in Order No. 16 at pages 4-6 (footnotes omitted):

> On March 30, 2022, Kelly A. Evans, Esq., Chad R. Fears, Esq., and Hayley E. Miller, Esq. (all of Evans, Fears & Schuttert LLP) entered an appearance for the Neptune side. Also on that date, Mr. Evans wrote to the Panel, saying (citation omitted):
>
> > In Order No. 14, dated March 10, 2022, the Panel asked the parties to keep it "informed of any actions . . . regarding the alleged settlement agreement" and indicated that the Panel would "revisit the issue of a stay, as appropriate." See Order No. 14 at pg. 3. Accordingly, this correspondence is to inform the Panel that on March

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 38 of 201

28, 2022, Neptune Wellness Solutions, Inc. and Sugarleaf, Inc. (collectively "Neptune") commenced a separate demand for arbitration under AAA's expedited rules to enforce the binding settlement reached last year through the assistance of a JAMS mediator. This new arbitration claim, if successful, fully resolves the issues to be addressed in the current evidentiary hearing set to begin on April 13, 2022. Based on this recent development, Neptune respectfully requests that the April 13 Hearing be stayed pending resolution of the arbitration to enforce settlement.

A stay is warranted under Arbitration Rule and Procedure L-3 (Management of Proceedings), which authorizes the Panel to "take such steps as deemed necessary or desirable ... to achieve a fair, speedy and cost-effective resolution of a Large, Complex Commercial Dispute." Here, the fair, cost-effective, and sensible approach would be to resolve the new and potentially dispositive arbitration to enforce settlement before the parties incur significant legal fees and costs in connection with the April 13 Hearing. Neptune will incur irreparable harm if forced to proceed with the current arbitration. It involves dozens of witnesses and very significant expenses associated with preparing for and conducting a 7-8 day evidentiary hearing. This is equivalent to a party being forced to conduct an evidentiary hearing regarding a dispute before a determination of arbitrability is made. ... The arbitration to enforce the settlement agreement, on the other hand, is much narrower and can be tried much more efficiently. There is no prejudice to either party by staying the current arbitration until the arbitration to enforce settlement is decided.

In his March 31 email in response, Mr. Cottrell for the PMGSL side wrote:

The PMGSL Parties continue to oppose Neptune's request for a stay for the same reasons previously articulated. In addition, the PMGSL Parties point out the following:

1. Although Neptune has made a request for its new arbitral proceeding to proceed under the

AAA expedited procedures, it is far from clear that the expedited procedures will apply. ...

2. The PMGSL Parties have not yet been contacted by AAA regarding their answering statement for the new arbitration.

3. The evidentiary hearing begins 13 days from today.

4. The PMGSL Parties continue to suffer financial harm due to the continued delay, as Neptune's stock was trading at .22 per share as of this morning.

5. Counsel for the parties have been preparing for the upcoming arbitration dates for months, and have made arrangements for the same. Further, there are a total of 26 witnesses between the parties that may testify. Counsel for the PMGSL Parties have already made arrangements with their witnesses to accommodate their schedules.

...

After lengthy discussion, the Panel denied the renewed request without prejudice.

Neptune had asserted in Counsel's March 30 letter that "Neptune will incur irreparable harm if forced to proceed with the current arbitration. It involves dozens of witnesses and very significant expenses ...." During the hearing, the Panel noted that it was empowered by both sides and the governing AAA Rules (R-47) to award attorneys' fees (see Order No. 1, pages 28-29) and that it was also required by the AAA Rules to award AAA fees, expenses, and arbitrator compensation (see R-47(c)). The Panel also noted that the PMGSL side denies there is a settlement agreement, that it has been waiting for some time to present its claims, and that it has alleged several types of prejudice, including a falling stock price of shares it asserts it is entitled to. The Panel also notes that during the March 10 hearing, when asked by the Panel, both sides indicated they were ready to proceed.

The Panel believes that at this point, on the sole issue of the Neptune side's renewed request for a stay, the balance of hardships tips strongly in the PMGSL side's favor.

If a Tribunal of competent jurisdiction ultimately decides the Neptune side is correct about there already being an enforceable settlement agreement (and it is not at all clear how

soon such a decision would be made), if the present arbitration were still ongoing, i.e., a final award here had not been made, the Neptune side would be able to introduce evidence of that other Tribunal's decision and the present Panel would take appropriate action (e.g., terminate the present arbitration and award Neptune attorneys' fees/costs expended in the present arbitration). On the other hand, if the other Tribunal ultimately decided (again, at some as-yet indeterminate time in the future) that the Neptune side is wrong about there already being an enforceable settlement agreement, the present arbitration would have been necessary, Neptune would not have wasted any time or money on its conduct, and whoever was right on the merits would have received a final award to that effect sooner.[28]

Order No. 16 at page 7 also dealt with the question of FAA summonses (footnotes omitted):

After dealing with the renewed request for a stay, the Panel and Parties turned their attention to FAA summonses. The PMGSL side slimmed down its earlier request for 10 summonses to a request for 3 (for Messrs. Hamilton (Darien, CT address), Lijoi (Suffern, NY address), and Moritz, Jr. (Conover, NC address)). The Neptune side continued to object to issuance of FAA summonses violating what it argued was the view of the SDNY. The Panel noted that in view of the tightness of the schedule (the evidentiary Hearing is scheduled to begin on April 13) and the likelihood that Counsel for both sides were busy dealing with many other issues, the Panel did not want to burden them with briefing the enforceability any of those summonses. Accordingly, on April 1, the Panel signed, scanned, and emailed to Counsel PDFs of the three requested summonses.

- **Order Re Hearing Exhibits And Witnesses—Order No. 17 (April 2, 2022)**

On March 31, 2022 each side filed objections to the other side's proposed exhibits and/or witnesses. On April 1, the two sides suggested that the Panel could rule on those objections based on their written submissions and that there was no need for a procedural hearing (which had been scheduled for April 1) to deal with any unresolved objections. The Panel canceled the

---

[28] At the outset of the first day of the Hearing (on April 13, 2022), Counsel for the Neptune side noted its objection "to proceeding with this arbitration, evidentiary hearing. This matter, as we had previously articulated, has been resolved. It was settled as part of a prior settlement agreement. We have sought to stay this arbitration twice … and those requests have been denied." Tr. 7. Despite that objection, this Arbitration proceeded.

scheduled procedural hearing and in Order No. 17 ruled on the objections.  With respect to having Mr. Cammarata testify, Order No. 17 contains the following at page 2 (footnote omitted):

> In its March 31 letter, the Neptune side stated:
>
>> By submitting this letter, Neptune does not waive its objections to summons[es] and subpoenas being issued to any witness not within the geographical limitations of Rule 45 of the Federal Rules of Civil Procedure and calling Mr. Cammarata as a witness under the Apex doctrine.
>
> The Panel notes those continuing objections, which have previously been discussed with Counsel.  Regarding the first, see Order No. 16 (April 1, 2022), page 7, concerning issuance of three FAA summonses.  Regarding the second, Mr. Cammarata is the post-APA closing CEO of Neptune Wellness Solutions, Inc. and at least some of the acts of which the PMGSL side complains occurred post-APA closing.  The Panel indicated to both sides during a previous procedural hearing that a short amount of testimony elicited by one or both sides at the Hearing was likely to quickly reveal whether Mr. Cammarata could offer any testimony that would aid the Panel in deciding the issues in this case—the PMGSL side indicated it believed Mr. Cammarata could provide such testimony.  If he cannot, he will promptly be excused.[29]
>
> In its March 31 letter, the PMGSL side said it had no objections to the witnesses identified on the Neptune side's witness list.

- ### The Hearing (April 13-15 and 18-21 & August 1-5 and 29, 2022)

The Hearing was held over a thirteen-day period on a ZOOM videoconference platform in two tranches, one in April 2022 and one in August 2022.  A total of eighteen witnesses testified (identified below), and there were roughly 800 Hearing exhibits (most of which have more than one page and, in many cases, substantially more than one page).

- ### Outcome Of The Settlement Arbitration

Between the last April 2022 Hearing day and first August 2022 Hearing day in this Arbitration, Counsel for the PMGSL side sent the Panel two emails concerning the Settlement Arbitration.  The body of the first email, dated July 13, 2022, reads as follows:

---

[29] Mr. Cammarata did not testify, and the PMGSL side did not seek an order from the Panel requesting him to do so.  See, e.g., footnotes 93 and 96, below.

The parties completed the separate arbitration related to the Neptune parties' motion to seek enforcement of a settlement agreement on June 15th. The arbitrator informed the parties that an order will be disseminated prior to the evidentiary Hearing on August 1. The arbitrator has previously refused to issue a stay of the primary arbitration. Barring a ruling from the arbitrator which would render the evidentiary Hearing on August 1 moot, it is the PMGSL Parties' expectation that the hearing will proceed on August 1.

The body of the second email, dated July 27, 2022, reads as follows:

We have received the arbitrator's final award in the "Settlement Arbitration." Based on that award, we are now clear to proceed on August 1. Please let us know if you have further questions.

In other words, the outcome of the Settlement Arbitration was that there was no earlier enforceable settlement agreement between the two sides that would bar conduct of this Arbitration and resolution in this Arbitration of all the matters herein in dispute.[30]

- **Hearing Witnesses**

During the Hearing, the following eighteen witnesses testified:

- John Moretz: Joined Neptune Board of Directors in 2014, became Board Chairman in August 2018, and left Neptune in February 2022 (Tr. 14); introduced to Sugarleaf and Mr. Galloway by Mr. Lee Moritz (also a witness—see below), a friend and former employee of Mr. John Moretz's (Tr. 19-21 & 26-30).

- Karina Dmoch: holds a CPA graduate degree; worked in accounting since 2006; joined Neptune in August 2020 as Associate Director Finance of Canada; at the time of her testimony (April 2022), she was scheduled to be promoted to Director of Finance for Neptune (and responsible for Canada and U.S.). Tr. 184-187.

- Mario Paradis: a CPA in Canada; at Neptune from August 2015 to November 2019 as Vice President and Chief Financial Officer; "main guy responsible for acquisition" and "in charge of" the acquisition of Biodroga Nutraceuticals Inc.

---

[30] The Panel made clear on several occasions that it did not want to know anything about the mediation, settlement negotiations, or Settlement Arbitration. The Panel does know all three occurred and does not know the results of any of them other than that the outcome of the Settlement Arbitration did not bar conduct of this Arbitration.

("**Biodroga**")[31] and of Sugarleaf Labs LLC and Forest Remedies.  Tr. 369-372, 535 & 1020.

- Lee Moritz, Jr.: before acquisition of its (and Forest Remedies LLC's) assets by Neptune, worked for Sugarleaf Labs LLC starting in November 2018 as Chief Marketing Officer; after acquisition, in August 2019, worked for Sugarleaf as director of farmer or agricultural relations; in November 2019, became Vice President of business development for tolling; employment at Sugarleaf ended June 6, 2021; had previously worked at another company for 25 years for Mr. John Moretz (also a witness—see above).  Tr. 736, 741-742 & 1049-1050.

- Graham Keith Wood: at time of testimony (April 2022) had done clinical research for about 22 years and had been Chief Science Officer ("**CSO**") and Chief Operating Officer ("**COO**") at two different biotech companies; at Neptune from April 2019 to September 2020 as CSO and responsible for new product development (including "innovative" products like CBD [32]), quality assurance, and regulatory affairs.  Tr. 818-819, 894-895 & 929-930.

- Brett DuBose: since college, most of his employment by the time of his testimony had been in dietary supplement market; was at Sugarleaf for about 4 months (from Fall 2019 to February 2020) as Vice President of Sales and was primarily responsible for sale of bulk oils to U. S. manufacturers and, secondarily, supporting "the finished dose efforts" of Sugarleaf and Biodroga.  Tr. 974-977 & 1002.

- Owen Peterson: with Sugarleaf Labs LLC at its Westbrook, Maine location as production associate until April 2019; took job at Sugarleaf Labs LLC's Conover, North Carolina location in May 2019 working on production and "the quality system" for Mr. Steve Lijoi (also a witness—see below); at time of Mr. Peterson's testimony (April 2022), had been working for Neptune for about a month.  Tr. 560-561, 566-567, 571 & 640-641.

---

[31] Biodroga is located in Laval, Quebec, Canada and does business in Canada and the United States.  Its "business is buying raw material, working with manufacturers, and transforming this raw material into finished good, which takes the form of maybe a soft gel, a capsule, a liquid product in the – mainly in the omega-3 supplement area."  "Biodroga produce[s] white label or turnkey products."  Tr. 1314-1315.

[32] Cannabidiol.  See page 53, below.

- James Hamilton: Chief Executive Office and President of Neptune from February 2015 through mid-2019.  Tr. 685-687.

- Francois-Karl Brouillette: had worked at Biodroga for 11 years at time Neptune acquired it in January 2016 (about 3.5 years before Neptune's acquisition of the Sugarleaf business); started at Biodroga as its Director of Scientific Affairs and, at time of its acquisition by Neptune, was its Vice President of Scientific Affairs; was part-owner of Biodroga and sold his share to Neptune in connection with Biodroga acquisition; at Neptune from time of that acquisition until February 2021, at which point he was Vice President of Science and Innovation; his job was "to basically oversee the scientific department …, which included quality assurance, regulatory affairs, and research and development"; reported to Dr. Graham Wood (also a witness—see above).  Tr. 1152-1156.

- Cedric Billequey: worked in finance and business development for international markets; with Biodroga since November 2020 as its Vice President of Sales and Operations and its General Manger ("**GM**"); responsibilities include overseeing its sales team, overseeing the entire operations chain, supply chain, etc.  Tr. 1312-1314.

- Stephen Lijoi: at several different companies where his work concerned, among other things, in vitro diagnostics, quality control/quality assurance ("**QC/QA**"), radioactive injectables for organ imaging, and vitamins; held several positions, including QC/QA manager, director of QC/QA in analytical services, director of a fermentation plant for production of vitamins, Vice President of North America for the vitamin division of Roche Vitamins, and running a pharmaceutical plant; hired by Mr. James Hamilton (also a witness—see above) to work for Neptune in connection with Neptune's due diligence on its possible acquisition of Sugarleaf; at Neptune's suggestion, was hired by Sugarleaf Labs LLC around April/May 2019 "to start putting together plans and working with that facility to implement cGMPs," which "didn't have any cGMPs at the time"; was Sugarleaf's Vice President Quality and Manufacturing Excellence and then Neptune's Vice President of Operations; left Neptune April 2020.  Tr. 1510-1514 & 1579 and April 18, 2022 Neptune list of individuals.

- Robert B. Burnett: worked as a stockbroker, then in banking, and then as CFO for a defense contractor for almost 15 years; joined Sugarleaf Labs LLC around March/April 2019 and was its Vice President of Finance.  Tr. 1645-1647 and April 18, 2022 PMGSL list of individuals.

- Kimberly A. Stuck: an expert for the PMGSL side in "the field of hemp regulation and hemp and cannabis industry"; worked for Department of Public Health and Environment as a regulator enforcing the food safety regulations in Denver, Colorado; did licensing and inspection at about 2,000 facilities in Denver; currently employed by Allay Consulting, a cannabis compliance consulting firm, which she founded.  Tr. 1758-1763.

- Mark Gallagher: an expert for the PMGSL side "in the quantification of damages and profits [and] in the evaluation of damages and profits calculations and models prepared by others"; an accountant since 1975; a CPA and certified fraud examiner; led Deloitte teams quantifying damages to the Twin Towers, Port Authority of New York, etc.; Managing Director at Standard & Poor's; quantifying damages for litigation for Duff & Phelps for about 15 years and then for Willis Towers Watson since about 2016.  Tr. 1853-1858.

- Peter M. Galloway: a self-described "serial entrepreneur"; in 2014, moved "to state of Maine to get into, or to start various cannabis businesses"; in 2016, started Sugarleaf Labs LLC, which was "exclusively a tolling operation for cannabis" ("take flower in from farmers … and … process the cannabis and return it either as an oil or potentially as a finished good product such as a vape pen or something")[33]; in Fall 2018, he and Mr. Tod Coles (also a witness—see below)

---

[33]  Mr. Galloway testified as follows (Tr. 1885-1886):

> Q.  Could you please … explain to us what tolling is?
> A.  So tolling is an industry term that we use and we refer to as, it's really probably short for toll processing, and what we are doing is we are doing extraction services for another party.  And so this is found in all various forms of cannabis, whether it be marijuana or hemp, we'll see these tolling operations.
> Q.  So in other words, tolling is taking biomass and creating oil out of it, correct?
> A.  Correct.  Creating an extract or even a further product from there for the customer.

decided to move at least of some of Sugarleaf Labs LLC's operations to North Carolina; also started Forest Remedies LLC to market and sell CBD products manufactured by Sugarleaf; at time of Neptune's acquisition, was President and sole owner of Sugarleaf Labs LLC and of Forest Remedies LLC (the two Sellers—see footnote 2, above); left Sugarleaf (the Purchaser, after a name change—see footnote 2, above) in 2020.[34]  Tr. 1884-1890; February 6, 2023 PMGSL Answers To Panel Questions, page 2.

- Tod Coles: moved to North Carolina in the 1990s to enter banking and real estate business; business partner of Mr. Galloway's for roughly last 20 years, including in a Maine cannabis medical marijuana business in 2014 ("Forest Development") and then in Sugarleaf Labs LLC; was bought out by Mr. Galloway in late 2015 and continued to help Mr. Galloway in the business, including as COO of Sugarleaf.  Tr. 2419-2430 & 2691.

- Robert Durkin: an expert for the Neptune side in certain aspects of FDA (Food and Drug Administration) statutory and regulatory law; an attorney whose practice focuses on food and drug law, with a concentration in dietary supplements and food; was with the FDA for about 12 years, starting in the Center for Drug Evaluation and Research, next serving in the FDA Commissioner's Office, then in the Center for Food Safety and Applied Nutrition, then about 5 years as the deputy director of the Office of Dietary Supplements Programs; prior to working at his current law firm, he was a nuclear pharmacist and holds pharmacy and molecular biology degrees.  Tr. 2973-2976.

- John P. Garvey: an expert for the Neptune side in forensic accounting, valuation, and damages; over 40 years' experience in accounting; was an audit partner at Deloitte & Touche; for the last 30 years (at the time of his testimony in August 2022) engaged in litigation consulting concerning accounting, valuation, and damages.  Tr. 3130-3132.

The Panel carefully assessed the credibility and testimony of each witness, taking into account all relevant factors (demeanor; education; training; experience; work history (e.g.,

---

[34] On September 4, 2020, Counsel for the Neptune side sent Mr. Galloway a letter terminating him for cause.  See page 109, below.

current and former employment); personal involvement/familiarity with and understanding of the facts/issues about which he/she offered testimony; etc.).

- **Memorialization Of August 8, 2022 Procedural Hearing Regarding Alleged Waiver Of Privilege And Possible Additional Testimony—Order No. 18 (August 8, 2022)**

Order No. 18 reads in part as follows (footnote 1 in original):

> Days 8 to 12 of the evidentiary Hearing ("Hearing") were August 1 to 5, 2022. During the Hearing, issues arose concerning (i) alleged waiver of attorney-client privilege for certain opinions of counsel resulting from testimony given at the Hearing and (ii) possible additional testimony of Dr. Graham Wood concerning two exhibits (Dr. Wood had already testified earlier in this matter but not about those exhibits). Counsel were asked to confer and try to resolve those issues.

> A procedural hearing was held today (August 8, 2022) … to discuss those issues. …

> During the Hearing, the Neptune side asserted that attorney-client privilege had been waived by the PMGSL side through the testimony of Mr. Tod Coles for one or more opinions of Counsel and asked that those opinions be produced. During today's procedural hearing, Counsel for Neptune withdrew that request based on Counsel's further understanding that those opinions were oral. …

> During the Hearing, testimony by Mr. Coles concerning Ex. 121 (an organizational chart) resulted in a February 14, 2020 email … sent by Dr. Wood concerning Ex. 121 being added to the record as Ex. 768. During the Hearing, the Panel asked whether Dr. Wood would testify regarding those two exhibits.

> During today's procedural hearing, both sides indicated they have sent communications to Dr. Wood about this but have not yet received any reply from him. Counsel will continue to attempt to schedule his testimony concerning those two exhibits ….

> During today's hearing, Counsel for the Neptune side offered to produce three written opinions from Counsel that Neptune had received regarding the "hot oil" issue if the PMGSL side would agree that such production would not constitute a broader waiver of attorney-client privilege.[1] Counsel for the PMGSL side said they wanted some time to consider the offer.

> The PMGSL side had previously requested those opinions, and the Neptune side had refused on grounds of attorney-client

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 48 of 201

privilege.  If the three opinions are produced, they will become Hearing exhibits.

Counsel for the two sides are kindly asked to confer and try to reach resolution on this issue.

_____

[1]  Broadly speaking, the "hot oil" issue concerns the legality vel non of the transfer/shipment of hemp extract containing more than 0.3% THC.

- **Memorialization Of September 14, 2022 Procedural Hearing Regarding Proposed Additional Exhibits And Close Of Evidentiary Record—Order No. 19 (September 15, 2022)**

Order No. 19 reads in part as follows:

At the end of the evidentiary Hearing, the PMGSL side indicated it might want to add a few exhibits to the record, and the Panel indicated both sides could do so ….  At that time, the two sides were asked to try to resolve any disputes concerning proposed additional exhibits by September 9, 2022, and a procedural hearing was scheduled for September 14, 2022 to deal with any remaining disputes.

The PMGSL side proposed adding 19 exhibits to the evidentiary record; the Neptune side proposed adding none.  The Neptune side objected on various grounds to adding most of the 19 items.

A procedural hearing was held yesterday (September 14, 2022) … to discuss the proposed exhibits and objections.  ….

The Panel allowed all of the 19 items to be added, with the understanding that the Neptune side is free to argue that an exhibit should be disregarded or given little or no weight on any appropriate ground (e.g., lack of relevance, ambiguity, hearsay, inconsistency with other evidence).  The Panel assured both sides that if any of the objected-to exhibits was believed by the Panel to be material to its determination of any issue, both sides would be notified and afforded an opportunity to share their views regarding the exhibit(s) in question.

…

With the addition of those 19 exhibits, the Panel hereby declares the evidentiary record closed (but the Hearing itself is not being closed because additional submissions by the Parties are going to be made).

Order No. 19 noted that annotated chronologies from the two sides were to be filed by September 30, 2022 and that a subsequent procedural hearing would be held in late November/early December to discuss how to go forward. The date for that hearing was initially December 2, 2022 and was subsequently moved to January 9, 2023.

- **Filing Of Annotated Chronologies (October 4 & 10, 2022)**

Annotated chronologies were filed by the two sides on October 4, 2022 (the deadline had been moved from September 30), and the PMGSL side filed a corrected annotated chronology on October 10, 2022. See footnote 35, below.

- **Memorialization Of January 9, 2023 Procedural Hearing Regarding Panel Questions/Concerns—Order No. 20 (January 11, 2023)**

Order No. 20 reads in part as follows (emphasis and footnote omitted):

> A procedural hearing was held on January 9, 2023 ….
>
> During the procedural hearing, the Panel indicated that post-Hearing briefs per se were not necessary because each side had already submitted detailed annotated chronologies and that what the Panel needed was, broadly speaking, a detailed listing from each side of its claims, requested relief, and supporting law and evidence, plus certain information concerning parties, one of the witnesses, and one issue of law. The Panel stated it had drafted a paper detailing what it was requesting and discussed its contents; the draft was emailed to Counsel after the hearing.
>
> During the January 9, 2023 hearing, a procedural hearing was tentatively set for January 12, 2 PM Eastern, to discuss any concerns the two sides had regarding the Panel's questions. The Panel said the meeting would be canceled if neither side had any such concerns. On January 11, 2023, the two sides indicated by email that they had conferred and agreed there was no need for the January 12th hearing, which, accordingly, was canceled.
>
> During the January 9, 2023 hearing, the two sides agreed they would file their responses to the Panel's questions on January 23, 2023 and would file their comments on the other side's responses on February 13, 2023.
>
> The Panel's questions/concerns are as follows ….

Broadly, in those questions, the Panel requested: (i) explanation of the relationship of the parties to the APA to the Parties in this Arbitration; (ii) specification by each side of its claims, identification of the other side's alleged wrongs supporting each claim, and discussion of the

specifics supporting each alleged wrong; (iii) specification of the relief requested for each claim and reference to authorities and the record supporting each item of requested relief; (iv) specification of what each side would like the Final Award to say regarding each claim; (v) information concerning Mr. John Ciancanelli and his expert report (prior to the Hearing, he had been identified as an expert witness for the Neptune side and his expert report had been submitted, but he did not testify at the Hearing); and (vi) identification of any doctrine concerning the leeway given to decision-makers in running a business, the elements and scope of that doctrine, how any such protection afforded by that doctrine can be overcome, and how, if at all, good faith, fiduciary duty, and/or any other doctrine concerning any obligations that may be owed to another party figure in.

- **Answers/Responses To The Panel's Questions/Concerns (February 6, 2023)**

The two sides filed their responses on February 6, 2023 (the due date had been moved from January 23).

- **Comments On The Other Side's Answers/Responses To The Panel's Questions/Concerns (February 20, 2023)**

Comments on the other side's answers/responses to the Panels' questions/concerns were filed on March 1, 2023 (the due date had been moved from February 13).

- **Additional Panel Questions (April 7, 2023)**

On April 7, 2023, the Panel asked both sides for certain additional information regarding, e.g., the term "commercially reasonable efforts" and potentially applicable interest rates and for clarifications (concerning, e.g., exhibit numbers).

- **Responses To The Panel's Additional Questions (May 1, 2023)**

The two sides filed their responses on May 1, 2023.

- **Comments On The Other Side's May 1, 2023 Responses (May 9, 2023)**

Comments on the other side's answers/responses to the Panels' questions/concerns were filed on March 9, 2023.

- **Additional Panel Questions (June 5, 2023)**

On June 5, 2023, the Panel asked for some additional information concerning the Fisher-Taylor Arbitration (see page 30-31, above) and the restricted stock (see page 8, above).

- **Responses To The Panel's Additional Questions (June 9, 2023)**

On June 9, 2023, the two sides filed their responses to the Panel's questions.

- **Comments On The June 9, 2023 Responses (June 16, 2023)**

On June 16, 2023, each side provided its comments on the other side's response to one of the June 5, 2023 questions the Panel had posed concerning the restricted stock.

- **Attorneys' Fees Requests (June 30, 2023 To July 28, 2023)**

One June 23, 2023, the Panel asked the two sides to file their requests for attorneys' fees in accordance with what is set forth at page 29 of Order No. 1 in the section entitled "Support For Requests For Attorneys' Fees And Costs." The Parties filed their requests on June 30, 2023, by July 20, 2023 provided some additional information concerning their requests, and were each allowed to comment on the other side's request and file replies to those comments; each side filed its final comments/replies on July 28, 2023).

- **Panel Status Reports**

The Panel sent separate brief status reports to Counsel on June 7, 2022, August 8, 2022, October 4, 2022, November 7, 2022, March 31, 2023, June 16, 2023, June 30, 2023, and July 20, 2023.

- **Close Of Hearing**

The Hearing was first closed on July 21, 2023 and then reopened on July 24, 2023 to allow further submissions regarding the requests for attorneys' fees. The Hearing was again (and finally) closed on July 31, 2023.

## SELECTED FACTUAL BACKGROUND AND CHRONOLOGY[35,36]

- ### Scientific/Manufacturing/Regulatory Background

> Cannabis – …   There are three primary species of cannabis: Cannabis sativa, Cannabis indica, and Cannabis ruderalis. Cannabis plants are known for their psychoactive effects when consumed …. The active ingredient in cannabis that is responsible for its psychoactive effects is THC (tetrahydrocannabinol). Cannabis is also a source of other chemicals called cannabinoids, some of which are believed to have potential health benefits. [PMGSL side's January 5, 2023 glossary, pages 2-3 (boldface removed)]

Hemp and marijuana (also spelled "marihuana") are both members of the botanical species Cannabis sativa.  "Cultivated hemp is often distinguished … by possessing very low levels of the psychoactive substance THC."[37]  PMGSL side's April 18, 2022 glossary, page 4.

> The Agriculture Improvement Act of 2018, Pub L 115-334 (the "2018 Farm Bill") avoided any modifications to the FD&C Act, 21 U.S.C. § 301 et seq, and Section 351 of the Public Health Service Act, 42 U.S.C. § 262.  It explicitly preserved FDA's authority to regulate hemp and hemp-derived products that fall within its jurisdiction. The 2018 Farm Bill created a definition for "hemp" and removed industrial hemp from the Controlled Substances Act, 21 U.S.C. § 801 et seq (the "CSA").  The 2018 Farm Bill defines "hemp" as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a THC concentration of not more than 0.3 percent on a dry weight basis."  The term "hemp production" includes the production of hemp derivatives and extracts.  Similarly, the term marijuana includes "every compound,

---

[35] The Neptune side's October 4, 2022 chronology had over 110 entries spanning a 3.5-year period (last day of 2018 to mid-2022), and the PMGSL side's October 10, 2022 chronology had over 230 entries spanning a 9-year period (mid-2014 to mid-2022)—many of the entries in one side's chronology do not coincide with any entries in the other side's chronology.

[36] This section summarizes representative facts (including events) the Panel considers helpful to an understanding of the Parties' actions and relationship and to the determination of the issues in this Arbitration, which facts are substantially undisputed by the Parties.  Additional facts are referenced in other sections of this Final Award.  To the extent the Parties disagree about a fact that is not identified as being disputed, its recitation in this Final Award constitutes a finding of fact by the Panel.

[37] There is more than one form of THC (tetrahydrocannabinol).  The most potent (most psychoactive) form of THC is delta-9 THC, which is the federally regulated form of THC in the U.S.  See, e.g., Tr. 628-629.  Throughout this proceeding, "THC" per se has been used to refer to the regulated form (delta-9 THC).

manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin." Removing hemp from the CSA has allowed some companies to more freely engage in the growing, manufacture and sale of CBD-related products, as long as the products are derived from hemp and have a THC concentration level that does not exceed 0.3%. [Ex. 214, Mr. Durkin's rebuttal expert report, at pages 4-5 (underlining removed)]

"Marihuana" is considered a schedule 1 controlled substance unless it meets the definition of "hemp" (by falling below the 0.3% delta-9 THC limit on a dry weight basis) or is from exempt parts of the plant such as mature stalks or non-germinating seeds. [Neptune side's April 18, 2022 glossary, page 4 [38]]

Biomass – industrial hemp and hemp plant material …[,] including the stalks, stems, leaves and flowers (sometimes referred to as buds) of the cannabis plant [from which cannabinoids (including CBD) are extracted]. [PMGSL side's January 5, 2023 glossary, page 2 (boldface removed)]

CBD or Cannabidiol – is one of more than one hundred chemical compounds (sometimes referred to as cannabinoids) that are found in the Cannabis sativa plant. It is one of many cannabinoids that are present in the plant, and it is believed to have potential health benefits. CBD is non-psychoactive, which means that it does not produce the psychoactive effects that are associated with the cannabinoid THC (tetrahydrocannabinol). CBD products are made from the CBD-rich parts of the cannabis plant, and they are available in a variety of forms, including oils, tinctures, capsules, edibles, and topicals. [PMGSL side's January 5, 2023 glossary, page 3 (boldface removed)]

Crude Oil – CBD crude oil is a raw, unrefined form of CBD oil that has not been processed, winterized or purified, and may not have been decarboxylized [decarboxylated]. It is typically extracted from the cannabis plant using a method such as ethanol or $CO_2$ [carbon dioxide] extraction, and it contains a mixture of CBD, other cannabinoids, and plant material. CBD crude oil is often used as a starting point for further processing and refining to create other CBD products …. Crude Oil is generally considered to be less pure and less potent than other forms of CBD, and it may contain impurities and contaminants that are removed during the refining process. CBD Crude Oil typically has not been winterized

---

[38] The document on its page 4 bears a date of April 5, 2022 next to Neptune's Counsel's signature but was filed on April 18, 2022.

or gone through decarboxylation process to "activate" CBD. [PMGSL side's January 5, 2023 glossary, page 4 (boldface removed)]

CBD Winterization – a process that is used to purify and refine CBD oil. It involves the use of solvents and low temperatures to remove impurities and plant material from the oil. … Winterization is often used in the production of higher-quality CBD products, as it helps to remove unwanted components such as waxes, chlorophyll, and other contaminants that can affect the taste and purity of the oil. [PMGSL side's January 5, 2023 glossary, page 3 (boldface removed)]

CBD Decarboxylation – … CBD decarboxylation refers to the process of heating CBD-rich plant material in order to activate the CBD and make it more bioavailable. … After decarboxylation, cannabinoids including CBD can be further processed and refined to create various hemp products including CBD products such as oils, tinctures, and edibles. [PMGSL side's January 5, 2023 glossary, page 3 (boldface removed)]

Full Spectrum Extract, or FSE – … In a Full Spectrum Extract, the oil goes through the cannabinoid extraction process and filtration; however, none of the cannabinoids or other compounds are removed. … Full Spectrum Extracts typically have been winterized and the oil decarboxylation process performed. [PMGSL side's January 5, 2023 glossary, pages 5-6 (boldface removed)]

Broad Spectrum Extract, BSE, or Distillate – refers to the result of the next processing step following FSE in processing hemp. As a result of further processing, BSE contains higher CBD and other cannabinoid concentrations. … This more distilled hemp has removed various chemical compounds including most terpenes. The result is a golden oil more concentrated in form with fewer impurities and very little taste or smell. [PMGSL side's January 5, 2023 glossary, page 2 (boldface removed)]

Isolate or CBD Isolate – a pure or almost pure, crystalline powder that contains 99% pure cannabidiol (CBD). It is the most potent form of CBD available, as it contains no other active compounds or cannabinoids. CBD isolate is made by refining BSE to remove all other compounds, including THC, terpenes, and other cannabinoids. It can be used as a raw material for the production of CBD products, such as oils, tinctures, and edibles, or it can be added to other products to increase their CBD content. CBD isolate is also available as a standalone product that can be

consumed orally or used topically. It is non-psychoactive and does not produce any psychoactive effects. [PMGSL side's January 5, 2023 glossary, pages 6-7 (boldface removed)]

THC-Free – hemp or CBD products subject to distillation and/or processing in which Delta-9 THC is removed to such level that no Delta-9 THC is detected in laboratory testing. THC-Free products do not produce any psychoactive effects when consumed. [PMGSL side's January 5, 2023 glossary, page 7 (boldface removed)]

Broadly, and with reference to the foregoing, biomass (plants grown by farmers) is processed to yield crude oil, which is processed to produce Full Spectrum Extract (a liquid), which can be processed to produce Broad Spectrum Extract (a liquid), which can be further processed to produce CBD Isolate. During processing, the liquid can be "winterized" (e.g., to remove substances that can affect taste/purity and to remove waxes, which can solidify when the temperature is too low) and "decarboxylated" to make the CBD (which is non-psychoactive) more bioavailable. Tr. 837-838, 923, 1939-1940.

Again broadly speaking and with reference to the foregoing, a hemp-derived composition containing more than 0.3% THC is a controlled substance under U.S. law. Even if hemp and the crude oil produced from it have a THC concentration of less than 0.3%, as the crude oil is processed to remove various substances other than THC, the THC concentration will increase and can exceed 0.3%. As discussed below, that fact caused significant problems for the Parties.

- **Sugarleaf Labs LLC Establishes Its Conover, NC Location, And Messrs. Galloway And Coles Meet Neptune's Chairman—2016 to November 2018**

In 2016, Peter Galloway started a business in Maine "exclusively [as] a tolling operation for cannabis" ("take flower in from farmers … and … process the cannabis and return it either as an oil or potentially as a finished good product such as a vape pen or something"). In Fall 2018, he and his friend and business partner Tod Coles decided to move some of the business to North Carolina and ultimately chose Conover, NC as a new location for Sugarleaf Labs LLC. Tr. 1885-1888.

In early November 2018, Mr. Lee Moritz, who was Mayor of Conover, met with Mr. Coles at the Sugarleaf Labs LLC Conover facility and then contacted Mr. John Moretz (at the time, Chairman of the Board of Neptune) to ask his thoughts about the Sugarleaf Labs business and its potential. Mr. Lee Moritz had previously worked for 25 years at another

company for Mr. John Moretz, trusted him, and considered him a mentor. After hearing Mr. John Moretz's thoughts, Mr. Lee Moritz met with Messrs. Coles and Galloway and expressed interest in working at Sugarleaf Labs LLC. Tr. 737-739.

In mid-November 2018, at Messrs. Galloway's and Coles's suggestion, Mr. Lee Moritz joined them at the 2018 MJBizCon (an annual conference/trade show for the cannabis and CBD industry) in Las Vegas. Before going there, Mr. Lee Moritz contacted Mr. John Moretz and said that if he (Mr. John Moretz) was going to be in Las Vegas at the time, he (Mr. Lee Moritz) would like to introduce him (Mr. John Moretz) to Messrs. Galloway and Coles to get his (Mr. John Moretz's) opinion of them. Tr. 739-741. Mr. John Moretz met them at that conference/trade show.[39] Tr. 741-742. Mr. Galloway thought his initial meeting with Mr. John Moretz "went very well." Tr. 1899-1900. In late November 2018, Mr. Lee Moritz started working for Sugarleaf Labs LLC as its Chief Marketing Officer. Tr. 742.

- **Neptune Becomes Interested In Sugarleaf Labs LLC**

Neptune had already commenced the process of obtaining a registration for cannabis products in Canada, where such products were "fully federally legal." Tr. 689. And Neptune had "looked at a number of possible investments in the [cannabis] space, in both [the] U.S. and Canada." Id. Mr. Hamilton (CEO and President of Neptune from February 2015 through mid-2019) testified Neptune was aware that in the U.S.

> there was a patchwork of regulations on the state level and federally, it was not legal, and this was one of the … conundrums of the investment thesis, that here [the U.S.] was the largest market in the world with a tremendous amount of potential. Our [Neptune's] view was legislatively, things would develop in a way that was positive for the industry. The unknown was when. [Tr. 690-691]

Mr. Galloway testified that Neptune or Biodroga began looking at Sugarleaf Labs as a potential source of CBD-containing oil and that he knew Neptune was looking for an acquisition. Tr. 1901. Mr. John Moretz (who happened to reside about 20 miles away from the Conover facility), Mr. James Hamilton, and Mr. Mario Paradis (three top executives of Neptune—see

---

[39] Mr. Galloway testified that in 2018 "Neptune Wellness actually held their Board meeting in Las Vegas in part because of that trade show [the 2018 MJBizCon]." Tr. 1899. At the time, Mr. John Moretz was Neptune's Chairman of the Board (see page 42, above).

pages 42-44, above) visited the Conover facility in February 2019. Tr. 378 & 1900-1901. Prior to that visit, Neptune had told Mr. Galloway it was interested in acquiring Sugarleaf Labs. Tr. 1901.

A non-disclosure agreement ("**NDA**") was signed (Tr. 438) and, by March 1, 2019, Neptune had "formally initiated an acquisition project [to acquire the Sugarleaf business] called 'Gold.'" Ex. 300. A letter of intent ("**LOI**") was still being negotiated, and the hope was to complete due diligence by April 30, 2019. Id.

- **Neptune Conducts Due Diligence; Financial Projections By Sugarleaf**

Mr. John Moretz testified as follows (Tr. 133-139):

> Q.   Is it fair to state that Neptune performed extensive due diligence prior to this acquisition?
>
> A.  What I would consider as proper due diligence. I don't know how -- you know. But, yeah, we did extensive or enough due diligence to should have known what we were getting into.
>
> Q.  And there was due diligence prior to the execution of the APA as well as prior to closing; isn't that true?
>
> A.  There was some diligence done, yes.
>
> …
>
> Q.   Do you have any reason to doubt that Sugarleaf was not forthcoming with regard to Neptune's access to data, records, and inspection of their premises?
>
> A.  Not inspection to the premises. Maybe about the difficulty of -- I don't know whether Pete [Galloway] knew or didn't know, and I don't think Lee [Moritz] would have been there long enough to know. But at the time of executing new businesses like this was going to be, and expanding into it, he's the one that came up with the forecast and budgeting and things.
>
> He had been in it for, what, two years, '17 and '18, by what he'd shown. And the timeline of doing that versus the timeline of going from, you know, down in 2018 from 2017 and then '19 was going to be this.
>
> Quite frankly, I think we both were a little naive in accepting the premise that was put together. Hindsight, of course, proves that out. I don't know that's any revelation on my side.
>
> Q.  To clarify, when you say "we," are you referring to Neptune and Sugarleaf?
>
> A.  Yes.

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 58 of 201

Q.  Just referring to the revenue forecast that you just mentioned, I believe your testimony on direct examination was that they were squirr[e]ly.  Do you recall that?

A.  Yeah, I would say it was.  Yeah, we got so many different ones and it was always going down and this and that.  So I would call that squirr[e]ly, yes.  Yeah, I could have used that term.  If you said it's in the record, then I used the term, yes.

Q.  And isn't it true, Mr. Moretz, there were multiple iterations of the revenue projections?

A.  Yes.

Q.  And you personally had input into those revenue projections?

A.  No.

…

Q.  I said you didn't have any discussions with Pete Galloway, Lee Moritz, or Tod Coles?

A.  Oh, I had plenty of discussions with Pete and Lee.  Maybe a few with Tod, but not much.

Q.  During those discussions, did you provide any analysis regarding the revenue projections that Sugarleaf was providing?

A.  My only word of advice is make sure you can deliver on what you're putting down.  Because you've given various numbers, and they continue to decline.  Don't put down anything you're not able to do.

…

Q.  Did Neptune investigate the numbers that Sugarleaf provided?

A.  I'm sure they did to the best of their ability, yeah.

Q.  I believe Mr. Evans showed you on direct examination that Sugarleaf provided profit and loss statements, balance sheets, and other financial documents; isn't that true?

A.  Correct.

Q.  And you agree that Neptune is a sophisticated company?

A.  Sophisticated?  Yes, it's complex and sophisticated in its org structure, yes.

Q.  And Neptune has participated in previous acquisitions?

A.  At this time, one that we had done by that time.

Q.  Neptune didn't just take Sugarleaf's word with respect to the financials that they were provided?

A.  No.  But they would be taking their word based on -- they would have the best knowledge of timing of acquiring new business and uploading new business.  We would be -- Neptune would be taking their word that they're being forthright in the acquisition and onboarding the new business.  I reckon that's the trust factor, which we had no reason not to trust.

You know, but whether it's through expectations were too high or Pete doing something wrong and, you know, saying -- putting down business he knew he would have a challenge to get, that's not for me to say.  But I'm saying, you know, the reality is what it was.

Of course, that's not uncommon in an unforeseen market.  You know, you're making assumptions that you don't have – there's no past history on it for us to really go by.  So Pete had the most experience in it.  So we're putting a lot of faith in that.

Q.  Mr. Moretz, you're not testifying that Mr. Galloway was not forthright in --

A.  No, I'm not saying he wasn't forthright at all.  I was saying we relied a lot on his opinion of what he would be able to accomplish.  And that was, to your point, my counsel, to Lee and Pete to be sure -- they know this business.  We haven't been in this business in the U.S.  We haven't been in the hemp business, per se.

We're in the cannabis business up in Canada, where it's all legal and it's all defined.  We weren't in the U.S.  So we were relying more than normal because it was a new industry, not a mature industry.

So there's all assumptions that Pete would be making, too, that he doesn't really know the outcome of, so.

With respect to financial projections, in February 2019, a slide presentation by Sugarleaf Labs to Neptune personnel (Tr. 380-381) showed Sugarleaf Labs projected the net income of its business would be over $16 million for 2019, over $89 million for 2020, over $192 million for 2021, and over $229 million for 2022.[40]  In 2017, Sugarleaf Labs's actual net income was about $0.47 million, and in 2018, its actual net income was about $0.20 million (Ex. 272 at Bates

---

[40]  These are the figures in Ex. 272 at Bates 96341.  Ex. 235 (a spreadsheet) shows the same figures for 2019, 2020, and 2021 but a higher figure of over $242 million for 2022.  That difference for 2022 (over $229 million v. over $242 million) is immaterial for present purposes.

96338).[41]  In other words, Sugarleaf Labs projected its net income to rise roughly 80-fold from 2018 to 2019 (i.e., from about $0.20 million to about $16 million).

In a spreadsheet transmitted by Mr. Galloway to Mr. John Moretz on March 4, 2019, Sugarleaf Labs reduced its projected net income for 2019 to about $8.7 million (down from over $16 million), for 2020 to about $14.8 million (down from over $89 million), and for 2021 to about $20.8 million (down from over $192 million).  Ex. 283 native.  Mr. Paradis's reaction on March 4, 2019 when he learned from Mr. John Moretz of these lower numbers was "For 2021, the net income (EBITDA) is going from $193M to $20,8M????? [the Canadian style "20,8" is "20.8" in American style; and there are five question marks in the original]" (Ex. 283 at Bates 72084).[42]

- **Neptune's Concerns About GMP Certification In January 2019 And The March 11, 2019 cGMP Gap Analysis**

As early as January 2019, Neptune was interested in whether Sugarleaf Labs had GMP certification (January 28, 2019 email from Mr. Brouillette to Mr. Hamilton, Mr. John Moretz, and others (emphasis added); about two months before the March 27, 2019 LOI):

> Hi Jim,
>
> …
>
> As we are servicing some specific and short term demands from our US clients, below is generally the information we are looking for:
>
> > - would it be possible to purchase full spectrum hemp extract (FSHE) in bulk right away?
> >
> > - can they provide specification sheets for their full spectrum hemp extracts?
> >
> > - do they monitor and report concentrations of non-CBD cannabinoids in their products?
> >
> > - do they have access to organic hemp?
> >
> > - do they have organic certification?

---

[41]  Capital expenditures were estimated to be about $3.2 million for 2019, about $7.8 million for 2020, about $4.4 million for 2021, and about $2.9 million for 2022.  Ex. 272 at Bates 96336 and 96337.

[42]  Prior to execution of the APA, there was additional discussion between the two sides regarding sales projections and the mix of operations that the post-closing Sugarleaf would be conducting, some operations (e.g., tolling) being less profitable than others (e.g., producing branded CBD products).  See, e.g., Exs. 237, 346, 347, 351; Tr. 1914-1916.  Regardless of which side was responsible for the projections upon which the various APA financial thresholds at issue were based, both sides agreed to those thresholds.

> - do they have a GMP certification (NSF, SHS, others)?
>
> - what are their packaging types/sizes for their FSHE raw materials?
>
> - where do they buy their hemp from (local and other state farms)?
>
> - are they working with third party laboratories, Softgel Encapsulators, liquid bottling and packaging/labelling facilities already?
>
> As we are in immediate need of full spectrum hemp extract material, we are ready to start buying, qualifying and validate their products for our US customers.  [Ex. 257]

Thus, even before Neptune personnel visited the Conover facility (in February 2019) and the LOI was signed (March 27, 2019), Neptune wanted to know if Sugarleaf Labs had GMP certification because of the possible importance of such certification for validating products for Neptune's U.S. customers.

On March 11, 2019, at Mr. Brouillette's request, Ms. Arminda Heinbaugh (of Quality Compliant Solutions, LLC) conducted a gap analysis on Sugarleaf Labs against the FDA regulations for dietary supplements.[43]  Ex. 4; Tr. 1390.

On March 22, 2019, Ms. Heinbaugh emailed Mr. Brouillette:

> I know you are anxiously awaiting this gap analysis report.  I promise you that I am working on it every night.  It's 10:25pm and I am going to stop for the night but I am now at a 42 page long gap analysis.  It's inclusive of ALL the CFR elements for supplements. I didn't expect for it to be so large but I don't feel it would be fair to only skim the surface of the regulations and give "brief" information on the gaps identified.  Sadly, as I go through the regulation subpart by subpart it really becomes evident that Sugarleaf is operating completely out of compliance - on just about every level.  I know that isn't a surprise to you. …
>
> They have ZERO procedures and they have almost no knowledge of what the FDA expects-- it's a recipe for disaster for when the CBD oil truly becomes a supplement.  [Ex. 231 at Bates 41714]

As set forth in the report (dated March 23, 2019), which was forwarded by Mr. Brouillette to Messrs. Lee Moritz and Galloway on April 2, 2019:

---

[43]  Mr. Lee Moritz testified that a gap analysis is "basically trying to identify where you are at the current time versus where you need to be."  Tr. 749.

On March 11th, 2019 a gap analysis against the Food and Drug Administration's Code of Federal Regulations (CFR) for Dietary Supplements was performed by Arminda Heinbaugh on behalf of Neptune Wellness Solutions.  Sugarleaf Labs' Hemp Processing facility is located at 408A South Mclin Creek Rd, Conover, NC 28613 USA.

. . .

A comprehensive gap analysis report has been written and includes information collected during the visit in relation to each section of Title 21 CFR Part 111.  Some sections/subsections of part 111 were left out of the report as they did not apply to the type of processing and product being manufactured by Sugarleaf Labs at this time.

Sugarleaf Labs does not have a formal established quality management system and does not comply to [sic] the FDA's regulations that are enforced for supplement manufacturers registered within the USA.  Sugarleaf Labs is not operating with current Good Manufacturing Practices (cGMPs) and as a result they are not adequately prepared to manufacture dietary supplement ingredients at this time.  [Ex. 4 at Bates 40233 (emphasis added)]

The two-page summary in the report identified  twenty significant "non-conformities," including no QA/QC representative; no written manufacturing procedures; insufficient labeling, holding, and storage of  components and product; no validated test methods for total cannabinoid assay; no calibration program for measuring equipment (e.g., thermometers and scales); no preventative maintenance program; no standardized cleaning and sanitation of the facility and equipment; and no packaging and labeling controls (Ex. 4 at Bates 40233-40234).  Those and other problems are detailed in the 43-page report (Ex.. 4 at Bates 40189-40231).[44]  On March 28, 2019, Ms. Harwood wrote to Messrs. Hamilton and Paradis: "There are a lot of non-compliance

---

[44]  In answer to the question "Would it be fair to say that it [the gap analysis] showed that Sugarleaf was not in compliance with cGMP?," Mr. Lee Moritz testified:

We had not really even begun that journey, if you will.  But, yes, I actually accompanied her [Ms. Heinbaugh] through -- through most of her visit, and again, I think she knew early on that we, you know, we had a lot of work in front of us, so, you know, the visit really was very informative to me because she helped me understand, really, what our game plan was going to be moving forward, and of course, me being new to the industry, it was very educational for myself.  [Tr. 750]

observations, mostly related to lack of procedures, record-keeping, and quality control." (Ex. 324 at Bates 118341).[45]

On April 15, 2019, Mr. Paradis emailed Messrs. Coles, Burnett, Hamilton, and others regarding Sugarleaf's projections.  Ex. 351 at Bates 118111-118112.  One of the attachments was a Sugarleaf slide deck, which on slide 9 (Ex. 351 at Bates 118122) indicates that "Major Assumptions" for the projections are "GMP Implementation & Build Sales Team," and on slide 10 (id. at Bates 118123) contains a graph entitled "Revenue by Biomass Weight," which indicates "July 2019 – GMP PROCESSING FULLY IMPLEMENTED."

- **Letter Of Intent & Prepayment Agreement—March 27, 2019**

The first paragraph of the March 27, 2019 LOI reads in part as follows (Ex. 3 (boldface removed)):

> This letter will serve as an expression of the Purchaser's [Neptune's] intent to acquire, directly or through a wholly-owned subsidiary to be created for the purpose of this transaction, all or substantially all of the assets directly or indirectly held by the Company [Sugarleaf Labs LLC and Forest Remedies LLC together] used in the operations of the Company and certain specified liabilities (collectively, the "Purchased Assets") on a basis substantially as outlined below (the "Proposed Transaction").

Also on March 27, 2019, Biodroga (as "Buyer") entered into a Prepayment Agreement with Sugarleaf Labs, LLC (as "Supplier") to "to provide prepayment to Supplier in the amount of $600,000 USD [United States dollars] for the purchase of Products from Supplier (the "Prepayment Amount"), in accordance with the terms and conditions of a Supply Agreement. The Prepayment Amount will serve as an account balance for Buyer and the balance will be reduced each time Buyer places a Purchase Order."  Ex. 316 at Bates 72101.  Mr. Paradis testified about this agreement as follows:

> A.  So the sellers, when we agree to the letter of intent, the seller asked that we help them because it was the season with the farmer and they didn't want to miss the time or the apportion date to buy some raw materials from the farmers.
>
> So they ask us if we can help them to do that.  And we knew that after the transaction or even if we -- the transaction is not

---

[45]  The APA is dated May 9, 2019 (Ex. 9), about 8 weeks after the gap analysis was conducted, and the transaction closed on July 24, 2019 (Tr. 1958-1959 & 1971), about 19 weeks after the gap analysis was conducted.

consumer closed, there will be some business between Biodroga and Sugarleaf.  So that's why we accepted that this loan would be done through Biodroga, our wholly owned subsidiary.

Q.  Did Sugarleaf tell you anything about its current cash position at that time as of March 27, 2019?

A.  I don't know if it was before March 27 or after, but we knew that they were very close to running out of cash.

…

Q.  Do you remember why they were running out of cash; was that discussed with the people at Sugarleaf?

A.  They were running out of cash because they just bought a big equipment, like we discussed earlier.  They have to pay their salary.  And there were no revenues, or practically no revenues.  Most of their money, if you looked at their balance sheet before the acquisition, coming from the owner and friends and family.  [Tr. 417-418]

Mr. Hamilton, in a March 29, 2019 email to Ms. Harwood and Mr. Paradis, said: "On the safety and environemt [sic] front I am working to get an ex[-]DSM/Roche colleague Steve Lijoi in to help.  He was also former NA [North America] head of quality.  Ran various production sites etc."  See page 44, above.

- **<u>April & May 2019</u>**

Mr. Lijoi was hired by Mr. Hamilton in April/May 2019 to help with Neptune's due diligence on Sugarleaf and "to focus primarily on GMPs but also to look at the safety aspects of the operation" (Tr. 1512-1514).

During an April 25, 2019 Neptune internal meeting, the Project Gold Special Transaction Committee reported that the "Foundation for CGMPs exists" (Ex. 5 at Bates 118134), that "Gold [Sugarleaf Labs LLC] understands and supports the need for CGMPs and an overarching Quality System" (id at Bates 118135), and the "Full implementation estimate" was "8 months to a year" at a cost of "$500,000 to $1.0 M" (id.).  Ex. 5 is the PowerPoint slide deck used at the meeting.

When Mr. Lijoi was asked about the time and cost for achieving GMP that were set forth in Ex. 5 (he was not author of that document), he testified:

> I think eight months is aggressive.  And I don't believe I indicated eight months.  I think I indicated more like a year to possibly 18 months.

> Eight months would be aggressive. It probably would be possible. And what we put together a plan -- our initial plan, which we called the Blue Plan, I don't know why anybody chose that, but they called it the Blue Plan, and that was an expedited plan to put something in place that we were calling GMP light. It wouldn't include hitting all the criteria for GMP. [Tr. 1522-1523]

He testified he had reported to Neptune "in the April, May [2019] time frame" that achieving GMP would take "more like a year to possibly 18 months," and that the cost "would have been closer to a million bucks" (id.).

Mr. Galloway's employment agreement was executed on May 8, 2019 (Ex. 8—see pages 127-129, below).

On May 9, 2019, the APA, having unsigned copies of various "Ancillary Documents" attached as exhibits (e.g., Employment and Lock-Up Agreements), was executed by Purchaser Neptune Acquisition USA, Inc. (by Messrs. Hamilton and Paradis), by Parent Neptune Wellness Solutions (by Messrs. Hamilton and Paradis), by Sellers Sugarleaf Labs LLC and Forest Remedies LLC (by Mr. Galloway as Member Manager of each), and personally by Member Peter M. Galloway.[46]

- **June 2019**

Ex. 16 is a June 2019 slide deck, which bears both the Neptune and Sugarleaf names (id. at Bates 118460). Mr. Coles testified that he worked with Neptune to prepare it, that "[i]t was a collaborative thing amongst our executives" (Tr. 2526). Slide 13, entitled "Current Good Manufacturing Practices (cGMP)," shows an assessment phase date starting January 2019, an implementation phase starting July 2019, and a sustainment phase starting September 2019 (Ex. 16 at Bates 118472). The first two bullet items on the slide read "Currently implementing FDA compliance through current Good Manufacturing Practices" and "GMP consultant. Stephen Lijoi, over 28 years of industry experience." Mr. Lijoi said he thought this slide deck looked like "a talking piece for customers to try to show the timeline of how the implementation of GMPs

---

[46] This same day (May 9, 2019), Neptune emailed several customers to say (Exs. 376-382):

> This morning we announced that we signed a definitive agreement to acquire the assets of Sugarleaf Labs LLC of North Carolina. Sugarleaf Labs is a hemp products company providing extraction and turnkey products and formulated products to US-based customers. They have cutting-edge processing facilities and produce great Full, Broad spectrum as well as THC-free hemp extracts.

There is no question that on May 9, 2019, Sugarleaf did not "produce … THC-free hemp extracts."

were [sic] going to go at the site" (Tr. 1529-1530). Mr. Coles said Mr. Lijoi "was responsible for identifying in … slide [no. 13] … implementation phase July 2019" (Tr. 2527).

- **July 2019**

In July 2019, Mr. Lijoi was hired by Sugarleaf at Neptune's request and was to split his time 75% for Sugarleaf and 25% for Neptune (Ex. 425; Tr. 2530-2532), and Mr. Cammarata replaced Mr. Hamilton during the few days of July as the head of Neptune (Tr. 461 & 1971). At Mr. Cammarata's direction, Mr. Galloway reported to Mr. Lijoi even though Mr. Galloway was ostensibly head of the post-closing Sugarleaf, i.e., Sugarleaf Labs, Inc. (Tr. 2532).[47,48]

---

[47] The pre-closing Sugarleaf was Sugarleaf Labs LLC; the post-closing Sugarleaf (Sugarleaf Labs, Inc.) is on the Neptune side of this matter. See footnote 2, above.

[48] Mr. Galloway's employment agreement (Ex. 8—see pages 127-129, below) recited that he was CEO of both Sugarleaf Labs LLC and Forest Remedies LLC (id., Recital A) and that he was being engaged to be "President USA" of Neptune Acquisition USA, Inc., which post-closing changed its name to Sugarleaf Labs, Inc. (see footnote 2, above). Ex. 8, § 1.1. He testified that he thought his duties after the closing would be very similar to his day-to-day duties before the closing as CEO of Sugarleaf Labs LLC and Forest Remedies:

> A. … I thought I would be handling day-to-day operations of the businesses. I believed I would be handling the sales and directing this new -- the new sales force that we would, that we would build under the company, and then reporting up to Jim Hamilton and the Board at Neptune as to the performance of our business unit or, you know, company.
>
> Q. Was it important for you entering into this agreement to have that level of duty and responsibility and authority within Sugarleaf?
>
> A. Very much so. I had just agreed to sell my business for a substantial discount waiting on an earn-out that would have some benefit, some upside. But based upon that and, you know, performance matrixes, you know, set forth in this as to my pounds [of material] I produced and things, it would seem crazy for me to agree to these types of conditions if I wouldn't have any control as to the result.
>
> You know, it would -- it was very much based upon performance, and so for me to have input on to the company's performance would seem appropriate at least, yeah.
>
> Q. Did you have discussions with, say, John Moretz and Jim Hamilton about what your responsibilities were going to be as president USA of Sugarleaf after the Neptune acquisition?
>
> A. I did.
>
> Q. What were those discussions?
>
> A. That I was very much going to be in, in control of this operation. [Tr. 1967-1968]

Mr. Coles also testified to his understanding that during the earnout period, the executive officers would be able to control and would have the authority to operate the business. "That was made very clear from the beginning" by Messrs. Hamilton, John Moretz, and Paradis. Tr. 2489-2490.

*[footnote continued] …*

Mr. Galloway testified that in July 2019 (the closing was July 24, 2019), he was "not very" familiar with cGMP (Tr. 1925), that "beginning around this time, … [Mr.] Lijoi [was] helming up Sugarleaf's attempt to implement cGMP processes" (Tr. 1925-1926), that he (Mr. Galloway) was not "aware of anybody that was CMG [sic, GMP] certified at this point" in the hemp field (Tr. 1930),[49] and that "obtaining cGMP [was] a way for Sugarleaf to differentiate itself from other players in the market" (Tr. 1930-1931).

On July 18, 2019, Mr. Lijoi emailed Mr. Carlsen (Sugarleaf's Director of R&D), saying in part: "The Blue Plan is based on the highest priority CGMP requirements, including having batch records for everything we make, having specifications, CGMP training, and an official release procedure. … We are woefully behind on the Blue Plan which we committed to completing by end of June." Ex. 436 at Bates 7214.

Around this time, a customer (Nature's Sunshine) conducted a gap analysis on Sugarleaf and identified "17 items that need to be addressed, 12 of them prior to execution of the service agreement." Exs. 15 & 17.

In a July 19, 2019 email to Mr. Brouillette, Mr. Lijoi wrote (Ex. 441 at Bates 14649):

> Foundational cgmp system in place end september [2019], basically full system end of ql 2020.[50]
>
> As you know[,] typical estimates for implementing a full system is 12 months to a year [sic]. Don't want to scare anyone away that is why we have been indicating foundational gmp. Thst is [sic, That's?] everything to cotrol [sic, control] manufacturing.

On July 23, 2019, Mr. Belanger emailed Mr. Coles: "Making sure that the [product] labels are compliant is also a top priority for us starting tomorrow am [the closing was scheduled for the next day]. My instructions are very clear, we will not deliver products with non-conforming labels." Mr. Coles replied: "Let us know, and we can easily put a product on hold until we get labels that comply with your direction." Ex. 457 at Bates 128785.

---

*… [footnote continued]*
Consistent with the testimony of Messrs. Galloway and Coles, in a May 4, 2019 email (five days before the APA was signed), Mr. John Moretz (at the time, Chairman of Neptune) wrote "It was always my understanding in our many discussions that it was needed and required that Pete was to be full-time CEO and captained [sic] the ship." Ex. 7 at Bates 134345.

[49]  Mr. Galloway also testified that it was his understanding that, at this time, the FDA had not regulated hemp products (Tr. 1930). Whether or not Mr. Galloway's understanding was correct is a matter of dispute by the Parties.

[50]  Foundational GMP was not in place by the end of September 2019 or at any time thereafter.  Tr. 1196-1197.

The closing occurred on July 24, 2019. That same day, Mr. Galloway executed the Lock-Up Agreement personally and on behalf of Sugarleaf Labs LLC and Forest Remedies LLC as the sole member of each (Ex. 20); he had previously executed his Employment Agreement (Ex. 8) on May 8, 2019, the day before the APA was executed.

On July 26, 2019, a "Sugarleaf Integration Kick-off Meeting" was held. Ex. 22 is a slide deck prepared by Neptune that was used at the meeting (Tr. 1972). On slide 2, an organizational diagram shows Mr. Galloway as President; on slide 3, entitled "Vision, Strategy & Goals," the only goal listed is "Pay the full earnout to the SL team"; on slide 9, entitled "Operations," one of the "Near-term and medium-term goals" is "Achieve cGMP certification … Before calendar year-end," in other words, by the end of 2019; on slide 10, entitled "Sales," the "Long-term plan will be to establish a US based sales team."

There was much back and forth involving Dr. Wood, Ms. Harwood, and Mr. Coles concerning what was posted at the Sugarleaf website. For example, on July 26, 2019, Dr. Wood emailed Messrs. Galloway and Coles (Ex. 23):

> Since the FDA is taking a more active approach in cracking down on CBD products that are ingested I think we need to remove them from the Forest Remedies website right away.
>
> It will really hurt our image if we get an FDA letter about them.
>
> How fast can the change occur?

Mr. Coles promptly replied, saying "Will do immediately" Id.

On July 30, Mr. Coles emailed them (and others), saying "Also, last week Graham [Wood] requested we remove all 'tinctures' from our website as a precaution. As you may be aware, 75-80% of our wholesale and retail orders are for tinctures and soft gels." Ex. 770 at Bates 101365. Dr. Wood replied later that day: "Melody [Harwood] did some great background research, and found that the FDA warning letters go to companies that make big health claims, which we don't do." Ex. 770 at Bates 101364-101365. Mr. Coles replied a few minutes later (Ex. 770 at Bates 101364):

> Thanks Graham. That makes sense to me. I wondered why we jumped so fast to remove these products completely from our line up. We do not make health claims, and the new labels are ready to print …. I understand securing a legal opinion of the labels from [the] Greenberg Traurig [law firm] will be great, however considering the experience that [the] Vicente-Sederberg [law firm]

has in the cannabis industry, I would certainly think we should request their review as well. There is very little, to any "standards" in labelling for this industry and the FDA hasn't even decided if CBD will be considered a food, drug or supplement.

Still later that day (July 30, 2019), Ms. Harwood emailed Mr. Coles, saying that a first review of the product labels was almost finished and that "Unfortunately, my opinion at this point is that they are all going to need a work[-]up." Ex. 774 at Bates 101526.

- **August 2019**

In an August 1, 2019 email from Mr. Martin Landry (Neptune's Chief of Corporate Development & Strategy (Ex. 30 at Bates 130249)) to Messrs. Paradis, Coles, Lijoi, Wood, and others, he said "Steve [Lijoi] estimates that SL could be ready for a visit by officers for GMP certification by early 2020." Id. at Bates 130248.

On August 3, 2019, Mr. Cammarata emailed Mr. Lijoi and Dr. Wood (Ex. 25): "Yes, I had a chat with Pete that his number one focus need[ed] to be on making sure the plant there can pass audits and gets GMP approved."

On August 7, 2019, Ms. Harwood forwarded "detailed comments [from Greenberg Traurig] on each of the product labels" for five product lines (balm sticks, lip balms, massage oils, skin care, and pet soothe) to Mr. Coles. Ex. 774 at Bates 101524. Greenberg Traurig "suggested that the products for oral human consumption indeed be labelled as dietary supplements …, so the softgels and tincture labels will also need to be revised pursuant to the federal regulatory requirements for supplement products." Id.

Ex. 26 is a Neptune slide deck entitled "Sugarleaf Integration Plan" dated August 13, 2019.[51] On slide 2, entitled "Vision, Strategy & Goals," the only goal listed is "Pay the full earnout to the SL team." On slide 5, "Near-Term Objectives," the second boldface item is "GMP Certification ➔ Goal to obtain by April 2020," the first bullet under it indicates that "SOPs [standard operating procedures] are currently being drafted," and the third bullet notes an expectation that the facility will be ready for inspection by January 2020. Also on slide 5, the third boldface item is "Support Sugarleaf with sales resources" (in Ex. 475, "Support Sugarleaf with sales resources" has been moved to slide 6, entitled "Longer-Term Objectives"). In Ex. 26,

---

[51] Ex. 475, a slide deck also entitled Sugarleaf Integration Plan" and also dated August 13, 2019, is a different version of Ex. 26. It is not clear who at Neptune is responsible for the differences between the two versions.

on its slide 6, "Near-Term Objectives," under the third boldface item, the first bullet is "THC[-]free products would be a differentiator, strong demand" (in Ex. 475, slide 6 is entitled "Longer-Term Objectives," and "THC[-]free products would be a differentiator, strong demand" is not present anywhere in that exhibit).

On August 20, 2019, Mr. Lijoi reported to Mr. Lee Moritz and others at Sugarleaf and Neptune that "Foundational CGMP implementation will be comp[l]eted by the end of September instead of July." Ex. 28 at Bates 46344.

On August 27, 2019, Mr. Coles emailed Ms. Harwood and Dr. Wood, saying in part (Ex. 779 at Bates 128628):

> [T]his [Neptune] decision [to remove tinctures and softgels from the Sugarleaf website while the product labels are being revised] has severely impacted our Retail and wholesale sales over the past month. … Our list of customers on hold is mounting and they are going elsewhere on a daily basis. Not to mention bad mouthing us on their way out for not selling them the products they have been buying from us for a year. I'm very concerned about the backlash this is causing and the damage to our reputation.

On August 30, 2019, Mr. John Moretz emailed Mr. Cammarata to say that Sugarleaf "should hire a dedicated sales pro exclusively for SL sales etc." Ex. 30 at Bates 130240. Mr. Cammarata replied later that day, "[T]he purpose of being on the integration team is to decide that." Id.

- **September 2019**

On September 2, 2019, Mr. Paradis (Vice President and Chief Financial Officer of Neptune from August 2015 to November 2019) emailed Mr. John Moretz (on Neptune Board of Directors from 2014 to February 2022) regarding topics for a proposed discussion (Ex. 31):

> • New CFO appointment, timing
>
> • Michael C[ammarata]'s lawyer working on a Transitional Service Agreement[52] between Sugarleaf and Neptune for the calculation of the earnouts. I received a call from Barbara from GT Law [Greenberg Traurig] Friday end of afternoon last week and I WAS NOT AWARE AT ALL about this project.

---

[52] The "Transition Services Agreement," Ex. 55.

• Michael changed the business model to operate Sugarleaf and that would means [sic] that Neptune would have to renegotiate how to calculate the Earnouts with Pete.

• I have no objection to this project but I think we need to agree first about the new way to calculate the earnouts with Pete and afterwards ask the lawyers to finalize an agreement.

• The original thinking was to keep Sugarleaf "as is" as much as possible with only direct expenses as charge-back (example insurance, some legal fees, auditors, Steve Lijoi, etc) would impact the EBITDA.  This concept is actually completely revisited by GT Law.  I think this project is so important that the new CFO should lead this project, not GT law.

• By the way, these discussions will not be easy and I strongly recommend that you are part of them.

• Should this agreement is [sic, be?] more than a way to calculate the earnouts (example: global tax savings), we need to bring tax specialist in "cross border transfer pricing" and accountants to make sure Neptune has no future issues with both US and Canadian tax Authorities in respect of all cross-border transaction.

• Responsibilities as CFO: since I [Mr. Paradis] am not involved in some projects that usually a CFO should be involved, I can not continue from an Officer risk exposure to continue to act as CFO.  Consequently, we need to fix a date [for my departure] and it should be very soon.

On September 3, 2019, Mr. Cammarata emailed Mr. Galloway, saying (Ex. 32 at Bates 130436): "Peter, I want to make sure you hire a dedicated person just to handle sales for sugar leaf and work with other sales teams as well."

On September 4, 2019, after being told that the "Labels are a mess …," Mr. Cammarata said "Track this[;] need to get it done ASAP" (Ex. 33 at Bates 140909).

On September 6, 2019, Mr. Cammarata emailed Mr. Paradis, asking "Do you think we will be profitable in Q2?" (Ex. 34 at Bates 130453); Mr. Paradis replied: "For sure no" (Id.).[53] When asked if "the reason Neptune was not profitable at this point in time had to do with some

---

[53] Neptune's Q2 (second quarter) is July 1 through September 30.  Tr. 516.

problems in their Canadian operations, more specifically their Sherbrooke plant," Mr. Paradis testified "Yes."[54]  He said Sugarleaf was not the "primary driver" of the unprofitability.  Tr. 516.

On September 10, 2019, Dr. Wood emailed Messrs. Galloway, Coles, Paradis, and others, saying with respect to THC-removal:

> I am worried we will fall behind our competitors if we don't push forward with this equipment ASAP.  We really need THC-Free (or BLQ-THC) as right now we can't ship our concentrate to many CMOs.[55]  Also, we can isolate other cannabinoids to make designer products for Forest Remedies.

Dr. Wood testified that at the time, he believed "Sugarleaf's need for THC[-free]" was "important" (Tr. 830).

On September 25, 2019, Mr. Landry emailed Messrs. Paradis, Galloway, Coles, Wood, and others with an agenda for a call the next day (Ex. 41 at Bates 81465).  The first agenda item was "Progress update on THC[-]free equipment."  Id.

On September 30, 2019, Messrs. Cammarata and John Moretz communicated about the Forest Remedies brand, which did not belong to Neptune but which Mr. Cammarata wanted Neptune to own.  At the time, Mr. Galloway had not agreed to any proposed Transition Services Agreement.  Mr. John Moretz suggested to Mr. Cammarata that a planned press release state that Neptune owned the Forest Remedies brand (among others).   "This way in negotiations [regarding the Transition Services Agreement] Pete can understand we can use whatever brand we want to if he doesn't play ball."  Ex. 42.

Also on September 30, 2019, Ms. Camron Rafizadeh (Sugarleaf Marketing Coordinator) emailed Ms. Sabrina Di Blasio (Neptune Director, Marketing) about updated product labels.  Ms. Rafizadeh said Sugarleaf had "looked through the labels and found only a few things" (which

---

[54] Sherbrooke was Neptune's Canadian extraction facility that had produced krill oil and which Neptune had moved into the cannabis space after Neptune sold its krill oil business (Tr. 21-22 & 837).  Ex. 527 is a Neptune slide deck dated October 17, 2019, which notes problems at Sherbrooke.  In the period from August 1, 2019 to October 17, 2019 (which overlaps with Q2), there was "no production" at Sherbrooke because of a "particle issue," "no canopy delivery," and "mill issues" (Ex. 527 at Bates 114191).  Sherbrooke was "pretty new" and initially did not produce cannabis oil of the expected quality.  Tr. 516-517.  Neptune expected to be "EBITDA positive in the third or in the fourth quarter.  …  Excluding the acquisition of Sugarleaf."  Tr. 517.  Mr. Lijoi testified that around December 2019, "we were trying to start up a new extraction line [at Sherbrooke] that was way behind schedule.  It was supposed to be online, I think, in July and there were significant issues with that system"; he "was commuting to Sherbrooke every week."  Tr. 1550.

[55] "CMO" means contract manufacturing organization.  Tr. 1230.

were itemized in the email) and then said, "Excited for these labels, everything else looks great." Ex. 224 at Bates 135253-135254.

- **October 2019**

On October 7, 2019, Mr. Paradis (who had not yet left Neptune) emailed Mr. John Moretz and others (Ex. 45):

> That been [sic, being] said, I continue to reflect on the issue and I would like to raise some element of reflection before meeting Pete.
>
>> • The re-opening of the acquisition contract will certainly not be an easy task[.]
>>
>> • Pete will always try to see and understand why we want to change the rules and it will probably be a high source of de-motivation and a big distraction until we establish new rules to calculate earnouts[.]
>>
>> • If our fears is [sic] to grow the Forest Remedies brand while Pete is not growing the extraction business, I think it is a false debate since even if Forest Remedies brand start to fly very high, we will still need CBD Hemp derived extracts coming from Sugarleaf.
>>
>> • If we grow Forest Remedies so high, Sugarleaf would should [sic] absorb the related expenses to grow that brand[.]
>>
>> • At the end, if we are paying the total earnouts, that would means that extraction business and Forest Remedies brand together are at +$35M EBITDA which would be very good not only for Pete but also for Neptune.
>>
>> • The extraction business is the responsibility of everybody in Neptune not only Pete and it is already started: Michel, Martin and others are bringing business to Sugarleaf for a win-win situation which by the way was always the plan.
>>
>> • If our goals is [sic] still to pay the full earnout amount, we should try avoid change [sic] too much the rules negotiated in good faith in the agreement[.]
>
> Even with all these above points, I still think that scenario #2 is sellable to Pete but you need to approach him very carefully.
>
> As part of the new rules, we should also make clear that bulk business should go directly to Sugarleaf and Turnkey solutions should go through Biodroga. Sales rep should not be attached to legal entities but to Neptune as a whole.

On October 9, 2019, there were communications between Messrs. Paradis and John Moretz concerning, among other things, negotiations with Mr. Galloway (apparently concerning the proposed Transition Services Agreement). Mr. Paradis wrote, "Following the change in leadership at Neptune, we need to adapt the rules to operate Sugarleaf" and listed three items: "All Sales employees will work to bring business to Neptune as a whole"; bulk business will go directly to Sugarleaf; turnkey, white label, and branded business will go to Biodroga and Sugarleaf will be responsible for the extraction. Ex. 47 at Bates 134797. Mr. Paradis indicated that "next week we are to meet w[ith] Pete and say 'we want to take Forest Remedies off their plate so corporately we can develop it to a large consumer brand ...'" Id. at Bates 134798. One of the talking points to be used with Mr. Galloway was that "Unfortunately, Pete didn't bring what was plan [sic] in the business plan they presented to Neptune being tolling customers (mainly farmers) and, as of today, Pete has not bring [sic] any real customer." Id. at Bates 134797.

On October 15, 2019, Mr. Paradis emailed Mr. John Moretz a revised set of talking points for a meeting with Mr. Galloway scheduled for the next day. Those points include: the "'as is' situation is not working and is not viable"; Neptune has already invested its part of the commitment with aggregate loans of $5.7M"; no material agreements have been signed for tolling or other deals; and, therefore, "You are not going to get your earnout amount" and Neptune will also suffer. The conclusion was that "we need to revise or adapt our initial agreement to get a 'win-win' agreement." Ex. 529.

Ex. 52 is an October 18, 2019 email from Mr. Burnett (Sugarleaf's VP Finance—see page 45, above) to Messrs. John Moretz, Paradis, Galloway, and Coles with notes of the October 16, 2019 "Executive Meeting," which notes read:

> We [Messrs. John Moretz, Paradis, Galloway, Coles, Burnett, and Lee Moritz] walked thru a general revised P&L outlook for the next 8 months showing only the revenue from Village Farms and Greg and Greg tolling.
>
> John discussed coming up with a win-win solution for the earn out since the operating structure is changing and different from what the original deal was based on.
>
> The IFF [International Flavors & Fragrances] deal has the potential to be huge.

Michael [Cammarata] really likes the Forest Remedies brand name. … They would like for SL to supply the oil for those FR sales, but everything else would be done by Neptune and they would recognize that revenue instead of the total being applied to the earn out.

Discussed increased efficiencies with SL concentrating on producing oil for toll and for FR. Allows Neptune to concentrate on sales and putting the horsepower behind building the brand.

SL will revise the spreadsheet used to calculate the earnout to see if it makes financial sense.[56]

We owe Mario [Paradis] a spreadsheet on the transfer pricing. Everyone agreed it should be fair and reasonable. Will hold that pricing for 6 months and then readjust every 6 months.

Messrs. Galloway testified about a telephone call he had with Mr. Cammarata (the call was on October 16, 2019 according to the PMGSL side's October 10, 2022 chronology):

I had a rather interesting phone call with Michael Cammarata after those initial discussions where effectively he told me that they weren't going to redo the APA, you know, and that my earn-out was going to be what my earn-out was going to be when he decided what it was going to be. Then proceeded to go into this notion that I was the founder of Forest Remedies, and he could never take that away from me, though.

It was -- I was in shock by the whole phone call. It took me back. Here's a guy I, you know, met once -- or twice at this point. You know, he didn't engage with me in any management meetings. He didn't allow me to participate in them. I certainly -- I think maybe I've had two phone calls with him ever, this being one of them. And I was totally, totally taken [a]back by it.

That basically it was this [sic, his] attitude, we can do whatever we want and I'm going to get -- you know, we'll adjust it

---

[56] Mr. Burnett testified that it did not make sense to prepare a spreadsheet (and he did not do so) because "[i]t was extremely obvious" that what Neptune was proposing did not make sense with regard to the earn-out:

I mean, the deal from the beginning, you know, was to enable us to sell oil through various channels, obviously moving away from tolling and getting into the white label and the selling of our own brand. That's what we wanted -- that's where we knew we could try to get out there and push sales.

But this just cut the legs out from underneath all of it and said you guys concentrate on tolling and it's not going to count when we do the Forest Remedies stuff. Again, you're not -- tolling is, that was one of the things that we identified at the beginning, you've got to get rid of tolling. So the fact they wanted us just to concentrate on it was bizarre. [Tr. 1676-1677]

later on.  You know, and maybe it's right through a complex series of accounting adjustments, could we back out and back in all these transactions from all this business that had been pulled out of the EBITDA calculation, but it certainly didn't seem easy if that was, if that was going to be the case, and I didn't see any efforts being made to attempt such a feat.

So my phone call with Michael to really summarize was concerning to me.  I walked back into my office.  I think I must have made a joke about the only thing I'd have left was the fact I was a founder, and to this day I have a Yeti cup that I drink out of that my employees got me that says, you know, Pete Galloway, the founder, with the Forest Remedies logo on it.

I mean, so it was, it was mind-boggling, you know, to have a CEO of a company call and basically say, you know, this agreement that we had spent all this time negotiating, that it was up to him at the end of the year how we calculate EBITDA.

So when this came about here, I was surprised because I thought they had slammed the door on the subject of modifying the APA based upon what he said was, they're just going to do what they were going to do.  [Tr. 2047-2050]

Mr. Coles also testified about the call:

Mr. Galloway had taken the call on his cell phone.  Mr. Cammarata called him directly on his cell phone, and the call was brief but Pete had told me -- kind of turned around with a dumbfounded look on his face and had told me that that was Michael and he said that we don't have to worry about our earn-out because he hasn't decided what we will get in our earn-out.

And I knew Pete didn't respond much during the phone conversation, and I didn't really understand why until after he told me, you know, the crux of it.  And, you know, how do you respond to something like that?  You know, we've never talked to him. I've talked to him one time, I think, but that was one or two of the times that Pete spoke to him.  And he told him that he's got, he's going to assign a special accountant to determine our earn-out and that they were planning to take the Forest Remedies brand and, you know, the product line and the income.  [Tr. 2613-2614]

The Neptune side consistently objected to Mr. Cammarata's testifying, and he never did testify.[57]

---

[57]  Near the end of the last April 2022 Hearing day (which was April 21) and prior to the first August 2022 Hearing day (which was August 1), after Neptune had again objected to Mr. Cammarata's "being compelled to testify" (Tr. 1846-1848) and before either of Messrs. Galloway or Coles testified in August about the telephone call, the Panel stated (Tr. 1849-1852):

*[footnote continued]* ...

Ex. 527 is a Neptune October 17, 2019 slide deck entitled "Sugarleaf KPIs"[58] (but several of the slides are for Sherbrooke and not Sugarleaf). The second Sugarleaf KPI slide (Bates 114189) is entitled "Cummulative [sic] Sales in USD" and shows for July, August, September, and October 2019 the following:

|        | July    | August  | September  | October   |
|--------|---------|---------|------------|-----------|
| Goal   | 540,000 | 625,000 | 2,000,000  | 2,635,000 |
| Actual | 130,313 | 146149  | 42,096.94  | -         |

On October 18, 2019, Mr. Burnett emailed Mr. Paradis to say "As predicted on the last spreadsheet in late September, we'll run out of cash around October 21. … Can you please send some additional funds as soon as possible?" Ex. 53 at Bates 29227. Mr. Paradis responded later that day: "[I]t does not make sense to continue to purchase all this biomass without a concrete sales plan to sell all this oil." Id. at Bates 29227. Mr. Paradis said Sugarleaf had approximately "$1M of biomass not processed in inventory and 1,000 kg of crude oil to sell." Id.[59]

A few minutes later, Mr. John Moretz emailed the following:

> I agree - without PO's [purchase orders] in house or line of sight for shipment in Oct/Nov[,] can can not [sic] keep buying biomass for the possibility of business on the come. We need to halt this and have a call as to who and when we can sales [sic] what we

---

*... [footnote continued]*

> All of this [the AAA Rules] is understood to mean that the arbitrator has the power to draw adverse inferences. And speaking hypothetically, I know Mr. Galloway is going to be testifying, or at least that's the plan. And in a one-on-one conversation he may have had with Mr. Cammarata, if all I hear is Mr. Galloway's version of the conversation, ask yourself what I'm supposed to do or what weight I'm supposed to give that evidence if there's no documentary evidence or other evidence to contradict what Mr. Galloway says.

Despite this statement by the Panel, and even after Messrs. Galloway and Coles had testified months later in August, the Neptune side still chose not to have Mr. Cammarata testify—and the Panel *had* left the door open for him to testify. Tr. 1852 (Arbitrator on April 21, 2022): "Mr. Waldon, I understand … what you said today [that Mr. Cammarata will not testify] may not be the final word [from you] on whether or not Mr. Cammarata appears."

[58] Key Performance Indicators (Tr. 2161).

[59] The report for Sugarleaf KPIs for the week of January 27, 2020 showed an FSE (full-spectrum extract) inventory of 2,561 kg. Ex. 109 at Bates 91271. The report also shows that 3,000 pounds of biomass were to be delivered that week and that several invoices were being sent, one for conversion of 34 kg of oil to BSE (broad spectrum extract) and one for the processing of 27,000 pounds (presumably of biomass). Ex. 109 at Bates 91269.

already have. If it's shipping in Q3 then that's another matter. [Id. at Bates 29226-29227]

Also on October 18, 2019, Mr. Coles emailed Mr. Paradis:

> Our plan is to process as much hemp for house oil as inventory for contracts in negotiation or forthcoming not limited to bulk sales and Forest Remedies relaunch (back online today), as once our tolling contracts begin, we will have very little time to produce any house oil until we get secondary processing systems fully on line. We need every bit of this inventory or we can't sell it when the orders come in. We will not be able to catch up for any significant orders if we don't get ahead of our tolling commitments. [Ex. 54 at Bates 6937]

In an October 20, 2019 email to Messrs. Paradis, John Moretz, Coles, and others, Mr. Michel Timperio ("president of cannabis in Canada" for Neptune (Tr. 2005)) said: "Frankly, being in a start[-]up mode vs an existing business with order cycle, there may be the needs [sic] to build some inventory and adjust as we have more visibility on our projects and existing discussions with potential customers. It is not exact science in a start[-]up business ...." Ex. 53 at Bates 29225.

On October 21, 2019, Mr. Galloway emailed Messrs. John Moretz, Coles, Paradis, Cammarata, and others:

> Our commitments for purchasing are very low compared to others in the industry and Lee [Moritz] was extremely selective in his choice of farmers to develop relationships with. These farmers are typically organic, experienced farms that we are looking to rely on in future seasons for APCs (Agriculture Purchase Contracts). …
>
> I agree that Year 3 projections would be near impossible to hit by tolling, it is worth noting our projections were very clear that we thought the tolling business was the least profitable and focus was to phase tolling out over next 2 years. Our projections for year 3 had us moved 100% away from tolling and revenues were coming from bulk sales, final forms and BtoC customers. [Ex. 54 at Bates 6936]

On October 22, 2019, Mr. John Moretz emailed Messrs. Galloway, Burnett, John Moretz, and Paradis an "APA Amendment and Transition Services Agreement." Ex. 55 at Bates 3919. Summary bullet items in the cover email indicate the APA will be amended to change the definition of "Business" in its Recital A (see page 112, below) to remove "(iv) branding and

selling hemp products containing hemp-derived extracts and oils" and that a new "Transition Services Agreement or Letter of clarification for operations" will indicate that the turnkey and branded business will no longer be considered in the definition of Business for the earnout calculation, all extract for the turnkey and branded business will be produced by Sugarleaf, "[t]olling extraction and bulk oil [will be allocated] to Sugarleaf," and "turnkey and branded business [will be allocated] to Biodroga or Neptune's affiliate (Neptune Ventures or another entity to be created)." Ex. 55 at Bates 3920.

- **November 2019**

On November 13, 2019, Ms. Khayat (Neptune Vice President of global sales (Tr. 8650)) emailed Mr. Cammarata:

> We don't make any isolates nor the free distillates at SugarLeaf. Increasingly, customers and brands are choosing these 2 forms because they contain no THC and since the FDA has not come out with clear guidelines, this will continue for some time but in the long run, isolates will be a commodity and not the best ingredient to use for full benefits of hemp cbd.  Pete wanted to buy equipment to make TFree [THC-free] in[-]house.  However, we have a small version of the equipment that is sitting in Sherbrooke which we will most likely transfer to Conover so they can use it to make some Tfree in[-]house. [Ex. 66 at Bates 134837]

Also on November 13, 2019, Mr. John Moretz emailed Mr. Cammarata:

> Lay [sic, Last?] night With Pete [Galloway], Graham [Wood], and Steve [Lijoi] will [sic, with?] all the conversation centered around THC[-]free is going to be a requirement by the majority of consumer brands.  That is all they are hearing and being requested by the majority of inquiries.
>
> My comment was let's sell the bulk oil over and above the budget and create financing to buy it.  [Ex. 66 at Bates 134835]

On October 16, 2019, Mr. Timperio indicated that Neptune had lost a customer because

> it really has to do with our [Sherbrooke's (Tr. 956)] delay in our ability to winterized and distillate [sic] in the first place and also our lack of responsiveness from the [Sherbrooke] plant to provide any visibility to deliver in a reasonable time distillates oil.  They [the customer] made the decision to go elsewhere with precise and expectable time line.

We are under the fire as well with Tilray [another Sherbrooke customer (Tr. 957)] now...I have been quiet with them since we have yet to complete winterization of their oil in inventory since early September and was buying time for the plant to go over their challenges of Phase 2...now they want to send 7500kg of Hemp as per the contract schedule...it's frankly disconcerting to say the least...the pressure is unsustainable and the overall Neptune situation starting to be desperate and quite honestly Jackie and I are to say the least, not optimistic and feel that we have worked so hard and in my case for 19 years to see this dysfunctional organization, toxic environment, be on the verge of collapsing. [Ex. 67 at Bates 25780]

Dr. Wood testified he understood Mr. Timperio to be referring to

problems that were happening at the Sherbrooke plant, because they had -- they had a CO2 [carbon dioxide] extractor that got working -- within two weeks of it working, there was [sic] metal particles in the extract, so we had to have months of retooling to fix it.

Then when phase 2 came online, the cooling -- the coolant that was in it started -- which was actually really toxic, started leaking into the actual product.[60]

What he's referring to more here is that they had thought -- the same thought they wouldn't need to winterize so they hadn't really developed the winterization process. So Jackie [Khayat] and Michelle [sic, Michel Timperio], who were responsible for sales, they were going out finding these great clients for us, but then either we'd win the contract and not be able to deliver or just tell them upfront, sorry, we can't give you what you want.

---

[60]  Mr. Galloway testified as follows (Tr. 2374-2376):

When Neptune turned on their Phase 2 extractor [at Sherbrooke], they had the pressure and the coolant higher than the pressure in the oil vessel and leaked Dynalene into Canopy's material. So they had a leak in their equipment. Dynalene is not food grade; should not have been used.

Subsequently, this caused a close-down from when they announced that they commercially ran in October until April, and at this point I made multiple trips up there to assist them on getting back and running. But the end result was a massive collapse in their revenue or income that was not going to provide them with sufficient capital to pay me my earn-out.

And, quite frankly, the capital raised for, the $41 million for the Sugarleaf initiative was now going to life support for the hundred-plus employees in Sherbrooke that were for a period of six months or longer not producing oil out of Phase 2.

So I think that's his frustration as a salesperson us not being able to deliver to his clients. [Tr. 961-963]

Also on November 16, 2019, Dr. Wood emailed Messrs. Cammarata and Lijoi to say:

> The issue within winterization stems from the [Sherbrooke] site assuming that ethanol extraction would not require winterization. Even when we starting [sic] working with Sugarleaf who also use cold ethanol but still winterize[,] the [Sherbrooke] site wouldn't back down on it not being needed. This is part of the culture that needs to be changed as Etienne always thought he knew best even though he has little cannabis extraction experience and Pete [Galloway] has tons. [Ex. 67 at Bates 25778; see also Tr. 837-839]

On November 19, 2019, Mr. Galloway emailed Mr. John Moretz to say that the market for THC material "is very active currently but we have very limited ability to perform THC removal as only have a table[-]top pilot size equipment currently" (Ex. 68 at Bates 134849). Also on that day, Mr. John Moretz emailed Claudie Lauzon (Neptune Corporate Controller and Interim CFO (Ex. 70 at Bates 134855)) and Mr. Cammarata in an email string the subject of which was "Cash flow information" saying, "We must stop them [Sugarleaf] from buying more [biomass]." Id.

On November 21, 2019, Mr. Lee Moritz emailed Mr. John Moritz to say that "Monday [November 18, 2019] we ceased intake of biomass as per the guidance received …." Ex. 73 at Bates 78737.

On November 27, 2019, Mr. Josh Wittensoldner (the Sugarleaf Controller after Mr. Burnett left (Tr. 1738 & 2084)) sent to Ms. Lauzon an email entitled "Use of cash" (Ex. 587), attached to which was a spreadsheet. The spreadsheet shows that Neptune and Biodroga had by that time provided Sugarleaf with over $6.5 million (Tr. 1738-1739). Mr. Burnett testified that, as shown in the spreadsheet, Sugarleaf had used about $1.8 million to purchase hemp and had used about $2.18 million on approved capital expenditures (Tr. 1748). The PMGSL side contends that the total of $6.5 million is too high because it contains items that should not be included (e.g., Mr. Cammarata's salary (Tr. 2266-2267)).

- **December 2019**

Mr. DuBose (Sugarleaf Vice President of Sales from Fall 2019 to February 2020 (see page 43, above)) testified about a telephone call he had with Mr. Cammarata and two or three others at Neptune, including (to the best of Mr. DuBose's recollection) Neptune's head of

finance, concerning extraction services (extraction of oil from biomass) and, more specifically, whether to use Sugarleaf or another company's extraction services for products to be manufactured by other parts of Neptune (e.g., Biodroga). Tr. 986-993. Mr. DuBose said "I was asked to join a phone call with certain leadership and Michael Cammarata interrupted whomever [sic] was speaking at the moment to warn me not to share what I was hearing on the phone call with Pete Galloway." Tr. 986.

Ex. 784 is an email chain started on November 27, 2019 by Mr. Jean-Daniel Belanger's query to an attorney at the law firm of Vicente Sederberg. At the time, Mr. Belanger was Neptune's lead corporate counsel (Tr. 212 & 771), and Vicente Sederberg was a U.S. law firm with expertise in the cannabis area (Tr. 2523). Mr. Belanger asked for guidance on behalf of Neptune concerning shipping hemp extract containing more than 0.3% THC ("hot oil"—see page 47-48, above) within the United States (Ex. 784 at pages 14-17). David Kramer, an attorney at Vicente Sederberg replied on December 16, 2019:

> After talking to Shawn [Shawn Hauser, another attorney at Vicente Sederberg] and our local counsel in North Carolina, we are unable to issue a legal opinion blessing the transport of hot, intermediate extract, even where that extract is intended to be further processed below .3% prior to retail sale. Although there are some clever arguments under both federal and NC law that such activity could be lawful, those arguments are novel and we cannot counsel you to rely on them. Shawn and I did discuss the potentiality of issuing a qualified opinion to the effect of "there are some arguments in support of such transport, but those arguments can be readily countered and have a low likelihood of prevailing if challenged." I doubt that opinion would be of use. We are happy to provide a short memo outlining these arguments if helpful.
>
> I wish I had better news, but we simply do not want to counsel you/the board to undertake activity that could subject the company to criminal and civil penalties. As mentioned earlier, dilution is the solution in these scenarios, though I understand that may not be feasible in your case. [Ex. 784 at pages 3-4][61]

---

[61] Neptune did not contemporaneously share with Sugarleaf any of these communications between Neptune and Vicente Sederberg and first produced them during this arbitration after the PMGSL side agreed it would not assert that such production broadly waived attorney-client privilege. See pages 47-48, above, concerning Order No. 18; Tr. 3183-3186.

On December 3, 2019, Neptune issued a "directive requiring all oils above .3 THC must either be mixed (titrated) below .3 or downstream processed to remove THC to non[-]detectable limits." Ex. 96. Mr. Galloway testified he thought Neptune's directive was "ludicrous" because shipping "hot oil" has "been acceptable in the industry." Tr. 2634. Mr. Galloway asked for the opinion but Neptune refused. Tr. 2634-2635. Mr. Lee Moritz testified about Ex. 96 and the impact of the directive on Sugarleaf:

> Well, it would be -- it would be impossible to sell any full spectrum extract, broad spectrum extract. It would make it next to impossible to do any toll[ing], and that's what you see later on in the paragraph there, is what I was trying to explain to John is, these toll clients, and what a toll client is, is they -- we enter a[n] agreement where they send their biomass, their plant material to us. We extract the oil for a fee or a toll, and they want that oil back.
>
> They have the -- they have the certification to accept that oil, they have the certification to handle that oil and distribute it according to the laws of that state, which we always made sure that they had that.
>
> But this was saying that we could not release a client's toll oil, which technically was theirs because it was in our care to extract, back to them unless it was titrated. And as I was referring to earlier, titrated means mix it with oil, hemp oil, olive oil or MCT, which would be a coconut oil.
>
> Well, a lot of these clients, toll clients, they didn't really have an end client at the time, so you can understand their concerns if we would have said, okay, we're mixing it with olive oil and then we give it back to them and their end client wanted coconut oil or hemp oil. It would make that oil somewhat useless or certainly hurt that transaction. [Tr. 769-770]

On December 16, 2019, Mr. Rod Kight, a North Carolina attorney,[62] answered a question posed to him by Mr. Kramer (of Vicente Sederberg) concerning "hot oil":

> [A] licensed NC processor ("Licensee") receives biomass grown in compliance with the Farm Bill (either '14 or '18); the Licensee does some initial processing at its NC facility, during which time the extract's THC content spikes above .3%; a second processor

---

[62] In a December 2, 2019 email to Mr. Belanger, Mr. Coles characterized Mr. Kight as a "local hemp expert that has been deeply involved in the hemp and cannabis industry since it was reintroduced to market in 2014." Ex. 781 at Bates 122852.

then comes and picks up the extract from the Licensee's NC facility, and that second processor further processes the extract (at a licensed facility) into a final product, whose THC content is less than .3%. (Unfortunately, diluting the hot intermediate extract before the second processor picks it up from Licensee is not an option here.)

The question is would NC law allow this ….

(Of course, even assuming this is permissible (or, not expressly prohibited) under NC law, we then have to grapple with federal law, which in my view would treat the intermediate hot extract as marijuana and thus a schedule 1 substance.) [Ex. 783][63]

Mr. Kight answered:

The scenario you described is common; however, there is nothing in NC law that gives any comfort that this is lawful activity. (There are some clever arguments on both federal and NC law that it is lawful, but I always tell clients that these arguments are novel and not to rely on them in the real world unless they want to be a "test case" with a low chance of prevailing.) I always tell my clients that "dilution is the solution" in these scenarios. [Id.]

On December 18, 2019, Dr. Wood emailed Mr. Galloway to say, among other things, that Mr. Cammarata had decided that Neptune could not take the risk of shipping material with more than 0.3% THC, that, "[t]herefore, we cannot ship extract that is above 0.3% to our tolling customers or any other client," and that "[w]e are also working to expedite the THC removal equipment for Conover as that could allow us to ship extracts with high levels of CBD but without THC above 0.3%." Ex. 80.

On December 19, 2019, Dr. Wood emailed Mr. Cammarata and Ms. Lauzon, saying in part:

In talking to Pete [Galloway] yesterday we have a good solution for the removal of THC that lowers the CAPEX [capital expenditure]. We are just finalizing the details for the cost analysis.

---

[63] This communication and Mr. Kight's response (both in Ex. 783) were not contemporaneously shared by Neptune with Sugarleaf and were first produced during this arbitration after the PMGSL side agreed it would not assert that such production broadly waived attorney-client privilege. See pages 47-48, above, concerning Order No. 18; Tr. 3183-3186.

> However, another urgent item we need to do to prepare is hire 3 chemists to run the equipment and measure the THC levels in-house.
>
> Two of the chemists['] salaries will be around $70k and the lead one around $100k (in USD).  [Ex. 82 at Bates 53386-53387]

Later that same day, Mr. DuBose emailed Mr. John Moretz concerning the required capital investment:

> Attached you will find a powerpoint that includes a summary, as well as the spreadsheet with the details.  In short, we believe that an investment of approx $850,000 would get us in the game to pursue THC-free brand opportunities ….  [Ex. 83 at Bates 82624]

Also on December 19, 2019, in response to a request by Ms. Harwood, Mr. Justin Prochnow (an attorney at Greenberg Traurig) emailed Ms. Harwood, Mr. Belanger, and Dr. Wood about the "hot oil" issue.

> First, as a general statement, I understand the confusion and uncertainty regarding some of these questions.  These issues are complex and the lack of clarity from FDA and DEA [Drug Enforcement Administration] make it more difficult.  Processors of hemp extract and CBD are some of the most exposed right now under the current regulatory climate. …
>
> To be perfectly clear, there is nothing in the 2018 Farm Bill or the definitions of "hemp" and/or "marijuana" which provides for any exemptions for distributing hemp extract with THC in excess of 0.3% THC, be it business-to-business or otherwise.  Cannabis sativa in excess of 0.3% THC is not "hemp" – it is marijuana.  Accordingly, the provisions of the 2018 Farm Bill which allow for the free interstate transport of hemp do not apply.  Distribution of cannabis sativa in excess of 0.3% THC aka marijuana is subject to the possible penalties involved with possessing and distributing a Schedule I controlled substance, whether it is at retail to end use consumers or business-to-business.  Now, exemption or not, there are likely varying levels of risk in transporting a hemp extract over 0.3% THC.  The FDA and the DEA are likely most focused on the substances being provided to end use consumers.  While there is no specific exemption for the provision of substances over 0.3% THC business-to-business, paperwork indicating that the substance is not intended to be distributed in that form and that it will undergo further processing would at least help make the case that it should not be regulated as the transportation and/or possession of a Schedule I Controlled Substance.  However, it doesn't rule out the

possibility that the DEA or an applicable state agency could take action if desired and/or warranted.  [Ex. 785][64]

On December 30, 2019, Mr. John Moretz emailed Ms. Khayat, Mr. Belanger, Ms. Lauzon, and Mr. Christopher Piazza (a Neptune attorney (Tr. 2143)), noting "We know all the tolling is going to be hot until we get the equipment for THC removal or mitigation."  Ex. 90 at Bates 134887.

- **January 2020**

On January 6, 2020, Mr. Belanger emailed Mr. Galloway a "first draft of the letter agreement between Neptune and Sugarleaf in connection with the transfer of the Forest Remedies business to Neptune."  Ex. 89 at Bates 16140.

> The Forest Remedies Business, including the Forest Remedies Assets transferred hereunder, and any and all income or expenses of the Forest Remedies Business, will not be included in the Business of the Purchaser for purposes of the calculation of Adjusted EBITDA for any period following the Closing and the payment of any Earn-Out Payments contemplated by Section 1.8 of the Purchase Agreement.  [Ex. 89 at Bates 16144-16145]

Also on January 6, 2020, Mr. DuBose emailed Mr. Wittensoldner, Mr. Yves Legault (in operations at Biodroga (Tr. 2619)), and Ms. Lauzon concerning a Neptune "process change to allow Sugarleaf to directly manage bulk oil sales to US customers …" (Ex. 94 at Bates 53507). Ms. Lauzon later that day expressed concern internally at Neptune: "My concern here is: SL [Sugarleaf] has an advantage to get more revenues because of the earnout, and we don't want Biodroga to get in the situation where their revenues are falling down because this would maybe trigger an impairment right-off of the goodwill value."  Ex. 94 at Bates 53506.

On January 7, 2020, Mr. Galloway emailed Messrs. John Moretz, Belanger, and Cammarata regarding the proposed revision to the APA:

> After discussing your draft modification back in October and further conversations with Michel Cammarata lead me to believe that rather than modifying our APA we could handle this another way.  This proposal takes what began as an achievable earn-out

---

[64]  These communications were not contemporaneously shared by Neptune with Sugarleaf and were first produced during this arbitration after the PMGSL side agreed it would not assert that such production broadly waived attorney-client privilege.  See pages 47-48, above, concerning Order No. 18; Tr. 3183-3186.

> and substitutes complex changes to Sugarleaf business which would negate the earn-out potential for me.
>
> If you can suggest a less cumbersome way for Neptune to restructure the business and still preserve the upside benefits for seller envisioned in the APA, I would be open to exploring it. [Ex. 97 at Bates 136141]

On January 9, 2020, after communicating with Dr. Wood about the need for chemists, Mr. Lijoi stated he was "ok going with chemists." Ex. 100 at Bates 157268.

On January 10, 2020, Dr. Wood emailed Mr. Lijoi, and Ms. Casey Harbinson (Sugarleaf HR manager (Tr. 2110)) to say that Mr. Cammarata had to approve hiring the chemists. Ex. 102 at Bates 80653.

On January 13, 2020, Dr. Wood wrote to Mr. Coles about the hiring of a Quality Manager, saying "With the current revenue projections, it might make sense to delay in hiring this role." Mr. Coles replied:

> To not have an experienced manager leading this team internally on a daily basis with the goal of having GMP implemented in the next 30-60 days, will not [sic] longer be realistic. Not to mention carrying this forward and getting further certifications. … I think this would be a huge mistake to not continue the search for this person. [Ex. 624 at Bates 53629]

On January 21, 2020, Mr. Jeffrey Joyner (an attorney at Greenberg Traurig) sent Mr. Galloway a "Notice of Direct Claim for Indemnification" made under Section 9.1(a) of the APA. Broadly, Neptune said it was requesting indemnification for "Losses" stemming from the alleged misrepresentations that on the closing date, Sugarleaf was materially in compliance with all "Laws" and "Orders." "Purchaser has been made aware that, among other things, the Business, as it relates to hot oil production, as it was operated through the Closing Date was not in material compliance with all Laws …" and that this constitutes a breach of APA Section 3.9. Neptune said it had "invested significant resources" in the Business and that these investments were made in reliance on Sellers' representations. Ex. 103.

On January 22, 2020, Ms. Khayat emailed Messrs. Galloway, Wittensoldner, DuBose, Lee Moritz, Coles, Belanger, Timperio, and Cammarata Neptune's January 21, 2020 "U.S. Sales & Pricing policy issued in order to provide clarity to all and establish clear guidelines as to how we should proceed as of today." Ex. 106. Under that policy (Ex. 230):

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 88 of 201

> All sales, purchase orders and agreements for finished form products and bulk extracts will be executed through Biodroga. [Policy, Section 3.2]
>
> All white label and turnkey solutions opportunities will be executed through Biodroga. Biodroga will determine the appropriate contract manufacturing organization ("CMO") for such products, it being understood that Sugarleaf will be considered by Biodroga as a CMO for products where appropriate and feasible.[65] [Policy, Section 3.3]
>
> Sales of toll processing hemp-solutions in the United States will be executed directly through Sugarleaf. [Policy, Section 3.4]

Mr. Brouillette, who testified about the policy and a meeting of Neptune "[m]ostly top executives" concerning it held a few days before its announcement, did not remember if anyone from Sugarleaf had been present at that meeting. Tr. 1238 & 1446. An email chain concerning that meeting and an agenda for it do not show anyone from Sugarleaf being involved. Ex. 752.

On January 22, 2020, Mr. Lee Moritz emailed Mr. John Moritz (Ex. 104) about the U.S. Sales & Pricing Policy," which Mr. Lee Moritz had received a few minutes earlier: "Just received .... interesting ... all revenue being diverted ... minus market oil prices ...."  When asked what he meant, Mr. Lee Moritz testified as follows:

> I was trying to make him understand that the new pricing policy, in particular, what they were going to purchase, when I say "they," Biodroga was going to purchase the product from Sugarleaf that not only do we not have a profit margin in there, but some of it wouldn't even cover -- cover overhead.  [Tr. 781]

When asked what the impact of the U.S. Sales & Pricing Policy was on Sugarleaf's business, Mr. Galloway answered, "Essentially we were closed."  Tr. 2065.  He added that he wasn't sure if tolling was permitted (because of the "hot oil" issue) and that "the prices that Neptune was paying us for our oil were below cost, so we were losing money at every sale to Biodroga."  Id.

---

[65]  In a January 22, 2020 Neptune internal email, Ms. Khayat said "SL is a CMO but that we own...."  Ex. 106 at Bates 120302.

Ex. 636 is a January 27, 2020 proposed agreement pursuant to which the Forest Remedies Business would be transferred to an entity to be formed by Neptune or to Neptune's designee. There is no express mention in Ex. 636 of EBITDA, earn-outs, or its or their calculation.[66]

Ex. 109 comprises a January 30, 2020 transmittal email from Mr. Coles and a slide deck showing, among other things, Sugarleaf KPIs (Ex. 109 at Bates 91266). The bar graph at the left side of that slide is entitled "12 Month Extraction Goal (Kgs)" and for each month starting in June 2019 and ending in May 2020, it shows the monthly actual extraction in kilograms. The table below shows the numbers from that exhibit for the eight months for which actuals were reported and the cumulative numbers calculated by the Panel.

| Month & Year | Monthly Actual Extraction (kgs) | Cumulative Extraction (kgs) |
|---|---|---|
| June 2019 | 4,262 | 4,262 |
| July 2019 | 7,521 | 11,783 |
| August 2019 | 6,271 | 18,054 |
| September 2019 | 7,981 | 26,035 |
| October 2019 | 20,712 | 46,747 |
| November 2019 | 3,210 | 49,957 |
| December 2019 | 11,457 | 61,414 |
| January 2020 | 19,993 | 81,407 |
| TOTAL | 81,407 | -- |

APA § 1.6(b) specifies a threshold of "120,000 pounds of input material processed" "from and after April 1, 2019" before certain consideration might be paid (see page 113, below); 120,000 pounds is equal to 54,431 kilograms. With reference to the last column of the table above, the running total exceeded that number of kilograms by the end of December 2019.[67]

---

[66] Compare the Ex. 636 proposed agreement with the Ex. 89 proposed agreement (see page 86, above). The first two sentences of the January 27, 2020 email from Mr. Christopher Piazza (Neptune Senior Legal Counsel and Assistant Corporate Secretary (Tr. 2143; Ex. 226 at page 4 of 7)) to Mr. Galloway and others transmitting the January 27, 2020 Ex. 636 proposed agreement read: "We are attaching hereto a greatly simplified copy of the letter agreement which relates simply to the assignment of the FR [Forest Remedies] assets. We understand that this had been discussed between Pete and Michael and should be as agreed." Ex. 634 at Bates 128459.

[67] Ex. 118, comprising emails and a slide deck entitled "Sugarleaf KPI week 2/10/2020," at Bates 25580 has a bar graph containing numbers for several of the monthly actual extractions that are different from those shown in the
*[footnote continued] ...*

- **February 2020**

On February 7, 2020, Mr. Wittensoldner emailed Ms. Lauzon and Messrs. Lijoi and Galloway, saying:

> From August 2019 till a couple weeks ago, SLL [Sugarleaf Labs] was working under the directive from Mario [Mario Paradis] that Neptune CAPEX forms only needed to be completed for projects greater than $50k USD.  We now understand that a Neptune CAPEX form must be completed for any and all capital projects.  [Ex. 113 at Bates 5182]

Ms. Lauzon replied almost immediately, confirming that now: (i) all capital expenditures, regardless of amount (not just those over U.S. $50,000), had to be approved and (ii) approvals from her and Messrs. Lijoi, Wood, and Cammarata were required.  Id.

On February 12, 2020, Ms. Khayat emailed Messrs. Cammarata and John Moretz about Mr. DuBose's resignation from Sugarleaf as Vice President of Sales (see page 43, above).  She stated:

> Brett [Brett DuBose] started interviewing with us prior to your arrival and prior to having clarity as to how we will work with SL and reporting lines.
>
> Things changed along the way and it did impact his every day job and relationship with SL.  We need to realize that top management at SL is not happy, so the conversation is not always positive and it affects staff top down[.]  [Ex. 115 at Bates 25889-25890]

Later that day, Mr. Cammarata responded, saying "Let's make sure not to base the sales people in NC….  they should be better on[-]boarded with HR and HQ management before being exposed to factory level if even needed to be[.]"  Id. at Bates 25889.

In a February 13, 2020 press release, Neptune announced the "official launch" of the Forest Remedies brand and stated that consumers would be able to purchase Forest Remedies products directly from a new website (www.forestremedies.com).  Ex. 120.

On February 14, 2020, Dr. Wood sent Messrs. Cammarata and John Moretz and others within Neptune a revised organizational chart.  Dr. Wood's cover email reads in part:

---

*… [footnote continued]*
analogous bar graph of Ex. 109 but, even so, the bar graph of Ex. 118 still shows the 54,431 kg threshold being reached by the end of December 2019.  Mr. Galloway testified that "[B]y January we … had exceeded the 120,000-pound mark" (Tr. 2196).

> Attached is the revised org structure that Jackie [Jackie Khayat], Paola [Paola Patti, Neptune director of HR (Tr. 2135)] and I worked on over the last few days. This is Part 1 of the plan. Part 2 will be the savings from production floor staff (due Monday). Part 3 will be the savings from cutting back in contractors in Sherbrooke (due Monday or Tuesday).
>
> In Part 1 we are trying to accomplish two things. First, to right size the management team to achieve some cost savings. The second, is to remove employees who are not performing and/or who are contributing to the bad culture (i.e. working against the cultural changes we are trying to make).
>
> …
>
> The total savings from Part 1 is $$1.02 M, which represents a reduction of approximately 7% of our total payroll …. [Ex. 768]

Ex. 121 is the revised Neptune organizational chart. The names of nine individuals/positions, including Messrs. Galloway and Coles, are shown in or surrounded by red. Dr. Wood testified about his email and chart as follows:

> [A]t that point in time [early 2020] the, I mean, finances of Neptune weren't that great because our revenue was below expectations both at Sherbrooke, the cannabis extraction, as well as in Sugarleaf as well. They were both behind, behind where they were expected to be. If I remember right, I think Biodrogra [sic] was down a little bit, but not significantly.
>
> So Michael, Michael [Michael Cammarata] with Claudie [Claudie Lauzon], who was the acting CFO at the time, asked us to look at, basically, how could we find some cost savings in the business so that we could cut, cut our losses from not having enough revenue.
>
> …
>
> Red indicated -- I mean, from my memory, these were the positions that would be eliminated to get the cost savings. Looking at what's red there, I mean, it does follow with what I remember in terms of how we picked. And you can see there's individuals across kind of, I guess, each different, each different business line who were picked. [Tr. 3158-3161]

When asked how it was determined who would go, Dr. Wood testified:

> [I]t had to do with, I guess, a number of factors. I mean, obviously how -- their cost. Because we were trying to achieve -- I can't remember what the savings was, like X number of dollars in savings we were trying to achieve. So definitely the cost savings.

And then as well could we, can we survive without that position?  Do we have other people within the business who can, who can take over as well?

So, I mean, I know -- I mean, for Pete [Peter Galloway] I think it was in the email, but I know it's been a discussion, he would be retained -- we discussed retaining him as a consultant because we still -- he had some great ties within the hemp industry, obviously really understood the business really well.

…

[E]ach line of business needed to keep going, but we needed to achieve a certain savings from across all those lines of business.

There was no, no directive where certain people have to go. I don't remember any directive, Well, you better cut more from one versus the other.  It was really focused on how can we achieve these savings and still have these businesses be able to function without these roles.  [Tr. 3162-3164]

Finally, Dr. Wood testified that no one told him that Messrs. Galloway and Coles had to go (Tr. 3164) and that he did not remember any discussion "aimed at depriving Mr. Coles and Mr. Galloway of their earnouts" (Tr. 3172).[68]

On February 17, 2020, Mr. Galloway emailed Ms. Khayat to say that the price Sugarleaf was receiving from Biodroga was too low: "[W]e need to work on transfer pricing as we are consistently receiving POs [Purchase Orders] that are less than costs …."  Ex. 122 at Bates 147415.  Ms. Khayat responded later that day, saying "We will need to review our prices monthly to ensure we are competitive and relevant to the market reality.  So we need to make sure that we can meet these from an ops standpoint otherwise we will have no choice but to source material outside of SL which is obviously not what we want to do."  Id. at Bates 147414.

Mr. Coles testified that Neptune "started to just arbitrarily change our set intercompany pricing or the fixed pricing that was agreed for Biodroga business.   When I say 'change it,' I mean dramatically reduce it based solely on their opinions, not discussing with us, not taking into consideration our cost and we needed to be a profit center, and quite frankly not adjusting their cost to the customer."  Tr. 2653-2654.

Also on February 17, 2020, in an email chain the subject of which was "Projects to put on hold to reduce cash outflow," Ms. Khayat wrote to Dr. Wood, Messrs. Cammarata and John

---

[68] Mr. Coles's entitlement to any earn-out is not at issue in this Arbitration.

Moretz, and Ms. Lauzon that "[W]hat we manufacture at SL … should be focused on types of extracts that we can make a profit on such as thc[-]free …." Ex. 127 at Bates 25892.

On February 18, 2020, Dr. Wood approved the capital expenditure for "all costs for labor, materials, ductwork, electric and roofing to be done in order to get the HVAC fully installed and operating." Ex. 129. HVAC was needed, among other reasons, to maintain appropriate temperature and humidity for storing materials, to keep workers from sweating (which might result in product contamination), because ethanol (a solvent) was used in processing, and for being cGMP compliant (Tr. 653-655, 1559-1560, 1568 & 1987-1989).

Also on February 18, 2020, Mr. Belanger emailed Messrs. Lee Moritz, Coles, Galloway, and Cammarata:

> After long deliberation, the Board has decided not to resume or pursue tolling activities for third parties that would involve hot products, despite all the proposed mitigation measures that we had developed over the last few weeks. This means that the only tolling activities that should be pursue[d] should be with material that is not "hot". Obviously, the same instruction applies to our own bulk extracts. Bull [sic, bulk] extracts developed by SL from purchased hemp biomass below 0.3% THC should not result in bulk extract containing hot product. [Ex. 130]

As noted above, Mr. Galloway said Sugarleaf "[e]ssentially … [had been] closed" by Neptune's U.S. Sales & Pricing Policy (see pages 87-88, above) but that tolling was still "theoretically allowed." Tr. 2068. He then testified that "[t]he process of extraction is going to produce oil that's got elevated levels of THC in its process" (Tr. 2069)[69] and that the effect of the Board's later, February 2020 directive was that "Sugarleaf could no longer perform tolling activities." Tr. 2069-2070.

On February 24, 2020, Ms. Jenna Agin (a Sugarleaf R&D Process Engineer) emailed Ms. Lauzon, which email reads in part:

> I wanted to check on the HVAC CapEx I recently sent, we have already made two payments towards this and purchased the HVAC units. This new CapEx is to finalize their implementation by cutting the holes in the roof for them to be installed. Once this project is completed we will no longer be paying for our rental AC

---

[69] Mr. Lee Moritz testified that it was not "possible to do tolling work and not end up with oil that was over .3[%] THC … unless you had hemp that was not worth processing." Tr. 772.

> units. Without these HVAC units implemented we cannot finish setting up the new THC free equipment due to the methanol [sic, ethanol?] solvent we will be using for the equipment. [Ex. 143 at Bates 5340-5341]

Later that day, Mr. Galloway forwarded Ms. Agin's email to Mr. Lijoi and noted that "[t]he HVAC units are actually already bought and paid for and we need installed for both GMP reasons (rooms) and THC remediation as that requires those rooms to be operational with proper ventilation." Ex. 143 at Bates 5340.

On February 26, 2020, Ms. Lauzon emailed Mr. Lijoi and Dr. Wood about the HVAC Capex request: "Did you have any question from Michael [Cammarata] or did you have any conversation with him regarding this capex? He is not answering to me at all to provide his approval." Ex. 148 at Bates 54700. Mr. Lijoi replied, "Haven't heard anything either." Id.

- **March 2020**

On March 1, 2020, Mr. Kight again wrote to Mr. Kramer at Vicente Sederberg to address

> the legal status of the transportation of work in progress hemp extract (WIPHE) that contains delta-9 tetrahydrocannabinol (THC) concentrations in excess of three tenths of one percent (0.3%) under federal and North Carolina (NC) law. For purposes of this letter WIPHE means extract of hemp that is in a partially processed state.
>
> As you know, this is a mostly unresolved issue that arose with enactment of the Agricultural Improvement Act of 2018 (Farm Bill). Despite there being a strong argument that interstate transport of WIPHE extract between processing facilities is lawful under the Farm Bill, intrastate transportation of WIPHE appears to be unlawful under NC law. Possession of it under either circumstance poses considerable risk for both the processor(s) and the transporter. [Ex. 787, page 1][70]

On March 6, 2020, the Vicente Sederberg firm provided Neptune with a memorandum entitled "Talking Points Regarding Intermediary Hemp Extract." Ex. 786.[71]

---

[70] This communication was not contemporaneously shared by Neptune with Sugarleaf and was first produced during this arbitration after the PMGSL side agreed it would not assert that such production broadly waived attorney-client privilege. See pages 47-48, above, concerning Order No. 18; Tr. 3183-3186.

[71] This communication was not contemporaneously shared by Neptune with Sugarleaf and was first produced during this arbitration after the PMGSL side agreed it would not assert that such production broadly waived attorney-client privilege. See pages 47-48, above, concerning Order No. 18; Tr. 3183-3186.

Both the [2018] Farm Bill and the CSA [Controlled Substances Act of 1970] use THC content (0.3% THC on a dry weight basis) to distinguish legal hemp from illegal marijuana, but it remains ambiguous as to whether and how this 0.3% THC standard should be applied to lawfully sourced, hemp-derived material that is subject to further processing and is neither intended nor marketed for sale to the end-consumer. In other words, although both the FDCA [Federal Food, Drug, and Cosmetic Act] and the CSA are applicable to the processing and handling of certain hemp-derived material, the application of these laws to in-process hemp-derived material with uncertain end uses is ambiguous and the subject of differing legal interpretations. As such, the applicability of the CSA to intermediary hemp-derived material is unsettled, and there are not any explicit federal protections applicable to processing, possessing and/or distributing intermediary hemp-derived material whose THC content may temporarily exceed .3% prior to further processing. It is anticipated that federal law will be adopted in the future to more specifically address hemp processing and the spike in THC content that is inherent to the initial extraction of raw hemp biomass. [Ex. 786, pages 1-2]

The final paragraph of the memorandum reads in part as follows:

In summary, the degree to which existing federal laws, including the FDCA and CSA, apply to lawfully sourced, intermediary hemp-derived material is unsettled and subject to debate. The same is true at the state level where intermediary hemp-derived material with a THC content exceeding 0.3% appears to be illegal marijuana under North Carolina law, but such position has not yet been enforced and upheld in a court of law. As a result of this ambiguity, the manufacture and distribution of intermediary hemp-derived materials with a THC content exceeding 0.3% is not explicitly protected at either the federal or state level. It is unclear whether the DEA or other federal, state, or local law enforcement agencies would classify such intermediary hemp-derived material as illegal marijuana if the source material is lawfully sourced hemp. As a practical matter, however, (i) we are unaware of any federal enforcement of such activities to date, but note that the DEA or other authorities could adopt and enforce an interpretation of the federal definition of hemp contrary to the "Source Rule"; (ii) we are unaware of any enforcement of such activities to date by North Carolina law enforcement, but note that authorities in North Carolina could adopt and enforce an interpretation of "marijuana" that encompasses intermediary hemp extract with a THC content exceeding 0.3%; and (iii) we are hopeful that federal and state laws and regulations will in time explicitly permit such activity, though we obviously cannot say if or when such change in law will

> actually happen. In addition, some industry stakeholders have advanced and operated pursuant to the Source Rule Argument—arguing that so long as the underlying hemp biomass is lawfully cultivated, then all derivatives and extracts derived therefrom which ultimately fall below the .3% THC threshold are also lawful. [Ex. 786, page 6]

Ex. 167 is a March 11, 2020 "Exit Questionnaire" completed by Ms. Casey Habinson, who was leaving her position as Sugarleaf's Human Resources Manager. In response to the question "Why are you leaving Neptune Wellness," she answered: "I have chosen to resign due to the lack of trust in Neptune Management and the way employees have been put in the middle of the constant disagreement between Neptune and SLL." Ex. 167 at Bates 55548. She rated "Direction received from your direct Supervisor/Head" as "poor," saying:

> My biggest issue with the direction I received was that it caused me to be constantly pulled between SLL and Neptune. I was personally hired by SLL prior to the acquisition. Once the acquisition took place, I saw a large amount of HR change, which is not always a bad thing. Unfortunately it was unnecessary changes, such as constantly being reminded that I was not allowed to share information with the SLL Executive Team (ie. Tod [Coles] & Pete [Galloway]). The information that I would be informed to not disclose was not confidential information such as salaries, compensation packages, etc., it would be as little as a sales employee for Neptune being added to SLL headcount and I could not disclose this information to Josh [Wittensoldner] (my controller) or Tod and Pete (President & COO of Neptune). It seemed that everything had to be hidden from SLL even though we were supposed to be "one" company, it has been a constant divide. [Ex. 167 at Bates 55549]

On March 20, 2020, Ms. Khayat emailed Mr. David Mayers (Neptune's COO at the time):

> We really need to discuss Sugarleaf and what next.
>
> It shocked me to find out that all of the tolling work we have recently done, we have not been paid for and it is not clear if we will.
>
> We have already too much inventory and don't need additional quantities for the time being.
>
> I don't have big faith in farmers being able to pay, the entire supply chain in the USA is struggling. [Ex. 153 at Bates 135226-135227]

Mr. Mayers replied a few minutes later, "I had a discussion last night with Stephen [Lijoi] about essentially shutting the plant down except for critical activities," to which Ms. Khayat promptly replied, "Ok good, we are on the same page. This tolling business is obviously bad business and Conover [Sugarleaf] is draining us." Id. at Bates 135226.

On March 24, 2020, Mr. Coles emailed Mr. Mayers (Neptune's COO) about the HVAC capital expenditure requested by Sugarleaf:

> The HVAC was in our original budget for $400k, we have 282k remaining in the budget for installing and ductwork, we feel we will be within budget. The HVAC units were ordered and deposits paid several months ago and have been sitting outside awaiting installation. As a reminder, none of our enclosed lab spaces currently have central air or HEPA filtration. Currently we are running 3 temporary rental units. Our Quality dept. office, shop office, and several other work areas have nothing. With the warmer weather rapidly approaching in NC (mid 80's the rest of the week), we will not be able to keep the temperatures low enough inside the plant to run ethanol extraction. Also keep in mind, we spend $7000 per month on renting our current portable AC units which we will no longer require once this is complete.

> This is a matter of proper filtration and air flow for quality and GMP. Last, but not least, for safety. We must have the proper air circulation for the C1 Dl and C1 D2 explosion[-]proof rooms to be working in those enclosed areas. For those reasons, this is a critical and necessary installation. [Ex. 156 at Bates 74848-74849]

Also on March 24, 2020, Mr. Mayers asked Dr. Wood and Mr. Lijoi what the impact would be of delaying HVAC Capex approval, saying, "I am trying to slow cash burn where I can but without more context this may be a critical spend." Ex. 154 at Bates 13001. Mr. Lijoi replied later that day: "We are currently leasing some portable air handling but it really isn't adequate. Finishing this job really is needed for maintaining operations from both a building and CGMP basis." Id.

Mr. Coles testified he was terminated "about that time [March 24, 2020]. It might have been a week later." Tr. 2672-2674.[72]

---

[72] His last day with Sugarleaf was on or about May 22, 2020. Ex. 174 at Bates 138152-138153.

- **April 2020**

In an April 6, 2020 email to Ms. Khayat and others, Mr. Lee Moritz wrote: "[T]oday we received legal notification that we are cleared to market bulk oil again above .3 THC. Legal has a doc that the customer must sign ... and we must make sure they can purchase and accept." Ex. 161 at Bates 160160. In the same email chain (entitled "Cleared to see oil above .3 THC"), on April 7, 2020, Mr. Lee Moritz wrote to Ms. Khayat: "We are looking at ways to reduce our bulk oil inventories this quarter. You can see from the email trail below that FSE market pricing is well below our FSE book value or $1,100 USD per kg." Id. at Bates 160158.

On April 28, 2020, Ms. Khayat wrote to Mr. Mayers that prior to his joining Neptune, "we had decided based on some conversations with Michael [Cammarata] that all POs of bulk extracts and turnkey solutions would go through Biodroga so that they can manage all customer orders. Our previous CFO did not think this was a good idea ...." Ex. 166 at Bates 13270.

On April 30, 2020, Ms. Khayat circulated to Messrs. Lee Moritz, Wood, Galloway, Coles, Lijoi, Mayers, Cammarata, Ms. Lauzon, Ms. Rinow, and others the HEMP BENCHMARKS report for April 2020.[73] In her transmittal email, Mr. Khayat noted the following from the report:

> After last month saw some stabilization in certain product categories - namely CBD Flower, THC Free CBD Distillate, and various types of seeds and clones - significant price declines were observed across the board in April.
>
> …
>
> Significant inventories of extracted CBD remain unsold, even as some processors shifted their production lines this month to making hand sanitizer in response to the COVID-19 pandemic.
>
> COVID-related concerns have thrown up additional hurdles to businesses competing in an already tough market ….

---

[73] HEMP BENCHMARKS is a monthly report for the U.S. hemp industry containing news (e.g., production, weather, labor, federal and state regulatory, and licensing news as well as commentary and forecasts) and financial information (e.g., prices and price trends for biomass and various products). See the April 2020 report (25 pages long) in Ex. 667 at Bates 140386-140410. Mr. Brouillette testified: "My understanding was that it [the report] was the benchmark of pricing -- or hemp -- pricing for hemp materials that was set by a certain firm looking at market pricing." Tr. 1220. Mr. Lee Moritz said Sugarleaf did not have a subscription to the report but that he believed Neptune did and would normally send the reports to Sugarleaf every month. Tr. 1122.

[I]n the hemp-derived cannabinoid extraction sector, numerous prominent product manufacturers had already declared bankruptcy in the months prior to the pandemic gripping the U.S. …

Since then, several large extractors have followed GenCanna into Chapter 11 …. There are rumblings in the field that a number of other well-known, large-scale extraction companies are facing critical capital constraints, which may require that they curtail operations, sell or liquidate assets, or file Chapter 11 to allow them to reorganize. …

Finally, the pandemic and the coincident downturn in the stock market and capital markets has forced investors and lenders to reassess investment opportunities. Capital is being re-allocated to lower-risk assets and companies that may generate higher risk-adjusted returns ….

In the near-term, the distress in the extraction sector will continue to put pressure on the price of crude CBD oil, distillates, and isolates as processors look to move large backlogs of inventory to generate cash. Longer term, the consolidation and rationalization of the processing sector will help right-size extraction capacity and product manufacturing, which should help stabilize prices across the industry closer to the marginal cost of production.

Later that same day, and with reference to Mr. Khayat's email, Mr. Lee Moritz emailed Mr. Galloway: "So glad we took the deal when we did.....has done nothing but go south since." Ex. 667 at Bates 140384.

- **May 2020**

On May 13, 2020, Ms. Michelle Sept ("Account Manager / Business Development" at Neptune) emailed Mr. Coles to check on the status of "the cGMP process." Ex. 170 at Bates 90861-90862. Mr. Coles replied a few minutes later, saying "We took it as far as we could get with the resources they made available. We got to 90% and would pass phase 1 and likely phase 2, but Bartleson does not want to schedule at this point." Id. at Bates 90861.[74]

In a May 20, 2020 email from Ms. Rinow (CFO of Neptune after Mr. Paradis left) to Mr. Michael Baratta at the accounting firm KPMG, in answer to his question about the expected rate of growth for Sugarleaf for FY2022[75] and 2023, she wrote: "[W]e are planning internally for

---

[74] Michael Bartleson, head of Quality Assurance for Neptune. Tr. 600, 878, 1574 & 2103.

[75] Neptune's fiscal year runs from April 1 of one calendar year through March 31 of the following calendar year. Tr. 279-280. For example, "Fiscal2022," "Fiscal Year 2022," "FY2022," and "FYE2022" all refer to the Fiscal
*[footnote continued]* …

doubling revenus [sic] every year, when would we have bought a plant of that size. Look at Sherbrooke, a fraction of the size and projecting 30M$ revenues which is 3 times Surgaleaf [sic], so 45% is rather conservative." Ex. 172 at Bates 137744-137745.

On May 22, 2020, Mr. Bartleson emailed Messrs. Lijoi, Galloway, and Lee Moritz and Ms. Khayat to suggest that "[t]he entire audit [Standard Operating Procedure (SOP) (Tr. 3062) review, and of documents and records] may be done in one step" and that such a combined audit of Sugarleaf should be scheduled for September or October. Ex. 173 at Bates 5963.

In a May 24, 2020 email, Ms. Rinow wrote to Messrs. Mayers and Cammarata and Ms. Khayat:

> We have to show close to 12.5 M USD in projected revenue for Sugarleaf for FY 2021 to the auditors.
>
> Every 1 M$ less … in projected revenue is an equivalent in 5M$ in impairment which we want to avoid so that we can use this asset for asset[-]based lending.
>
> We can use the sales sheet as a basis. Which contracts are signed and for how much. Jackie: could you update and indicate which ones are the guaranteed sales ?
>
> Will we use Sugarleaf for our own inhouse production? If yes, which products? And for how much? Handsanitizer, Forest Remedies. others?
>
> Can we show with documentation how we will get there? The auditors need this info by Tuesday. [Ex. 175 at Bates 25435-25436]

A few minutes later that same day (May 24, 2020), Mr. Cammarata apparently forwarded Ms. Rinow's email to Mr. John Moretz (id. at Bates 25435). Mr. John Moretz replied, writing only to Mr. Cammarata: "how do we do this and not increase the Earn Out as the ebitda will go up with these added sales? Hand Sanitizers would normally go thru Neptune USA[.] can't we show SL as a sub to Neptune USA??" Id.

On May 27, 2020, Ms. Rinow asked Ms. Shannon Minogue (Neptune Senior Financial Analyst (Ex. 159 at Bates 58185)): "How much cash did we send to Sugarleaf since the beginning of the year?" Ex. 685 at Bates 26464. A few minutes later, Ms. Minogue answered

---

*… [footnote continued]*
Year ending March 31, 2022, which would start on April 1 of the preceding calendar year, namely, April 1, 2021. Tr. 285-287.

that the total in Canadian dollars was $14,362,238, net of the salaries chargeback.[76] Ms. Rinow then asked "Ok, are we saying that in 5 months we send 14.3 M $ net of Neptune needs[,] which is a burn rate of 3 M$ a month at Sugarleaf?" Id. Ms. Minogue answered: "This is the accumulated sum sent since July 24, 2019[,] so a monthly burn rate of $1.4-$1.5M." Id. at Bates 26463.

On May 28, 2020, after more back-and-forth, Ms. Minogue forwarded a spreadsheet to Ms. Rinow, which shows the figures behind the $14,362,238 total. See Ex. 685. In her email transmitting the spreadsheet, Ms. Minogue said "Take note that they [Sugarleaf] have no cash as of May 28, 2020 and were only able to pay their operating and other expenses thanks to the transfer we made." Id.

On May 29, 2020, Ms. Rinow answered questions from Mr. Baratta of KPMG in connection with its work for Neptune, saying in part:

> The Sugarleaf facility will focus on three areas of growth and activity in fiscal 2021, Tolling (distillate and THC free), Contract Manufacturing (Hand sanitizers, custom formulas) and Isolates (CBD market, pharmaceutical and internal vertical integration). …
>
> A thorough review has been undertaken to look at all operating business units to address revenue and costs in order to drive improved EBITDA throughout the organization. The Sugarleaf facility has been operating on a model centred on areas that have seen significant price constraint although the fundamentals of the business remain sound and the opportunity significant. To facilitate the change in the market towards THC[-]free distillate and high[-]quality Isolate material we will further focus our efforts in utilizing our existing infrastructure and capital investment to create a centre of excellence in these areas. As we grow our Brand business such as Forest Remedies we will use this facility to

---

[76] Using an exchange rate of 1.38 Canadian dollars to 1.00 U.S. dollar (as shown in the Ex. 685 spreadsheet), Canadian $14,362,238 equals U.S. $10,407,418.80. Tr. 2272-2274. Sugarleaf's total sales for the period September 2019 to June 2020 were U.S. $3,157,902.62 (Ex. 210 (and see Tr. 2189 & 2892)). The two time periods are not identical but they overlap to a large extent (July 24, 2019 to May 27, 2020 for "cash" sent to Sugarleaf; and September 2019 to June 2020 for Sugarleaf sales). When asked if those numbers indicated "that even by summer 2020, Neptune ha[d] put in a multiple more in cash than revenue ha[d] been generated by Sugarleaf," Mr. Galloway said it was "not a fair assessment of … the situation." Tr. 2272-2276. Mr. Galloway indicated that, for example, the Canadian $14.3M included salaries of a number of Neptune individuals, including Mr. Cammarata. Tr. 2270 & 2276. The "Salaries and expenses" on the Ex. 685 spreadsheet are about Canadian $3.1M, which, if subtracted from Canadian $14.3M, leaves about Canadian $11.2M, which is about U.S. $8.1M, still more than Sugarleaf's total sales for the period September 2019 to June 2020 of about U.S. $3.2M. Tr. 2276-2277.

formulate and further develop Hemp based products in the OTC and consumer brands space.  [Ex. 181 at Bates 136338]

- **June 2020**

Earlier in the year, on February 17, 2020, Dr. Wood had given Messrs. Cammarata and John Moretz his thoughts concerning Capex expenditures, including some for Sugarleaf: (i) "Ventilation [HVAC] required to get us to GMP ($400k USD)"—Dr. Wood commented: "Proceed as GMP is required for Conover" and (ii) "T-free analytical equipment - $250,000"—Dr. Wood commented "Proceed as will help us capture revenue.  But will come with extra salary in Conover (approx. $100k)."  Ex. 182 at Bates 26483-26484.

The next day (February 18, 2020), Ms. Lauzon told Mr. Cammarata that his approval was required for the THC-free project, that "the equipment has been already transferred from Sherbrooke, but it needs analytical equipment in addition," that "it is needed because it will help to get revenues," and that Dr. Wood and Mr. Lijoi had already approved.  Id. at Bates 26482.

On June 2, 2020, Ms. Rinow wrote to Ms. Lauzon and Ms. Shannon Minogue:[77] "Please put a hold on the capex expense."  Id. at Bates 26481.  A few minutes later, Ms. Minogue confirmed that she had "advised Josh [Wittensoldner] that no further payment will be made for this project until further notice."  Id.  This was four days after Ms. Rinow told Mr. Baratta of KPMG "The Sugarleaf facility will focus on three areas of growth and activity in fiscal 2021, Tolling (distillate and THC free), …" (see above May 2020 subsection of this Final Award).

In an email chain the subject of which is "Sugarleaf HR structure," on June 2, 2020, Mr. Cammarata wrote to Mr. Lee Moritz, saying: "Lee, adjustments have been made to move you to President and GM [General Manager] of sugarleaf plant."  Ex. 183 at Bates 88267-88268.

The next day (June 3, 2020), Mr. Lee Moritz replied to Mr. Cammarata:

> Boss ... I do appreciate the vote of confidence ..... as you could probably tell, this came as news to me.
>
> Please allow me [to] share my thoughts since last night.  I am not opposed to considering this position however do believe Sugarleaf must be organized in such a way where I have an opportunity to lead and be successful.
>
> …

---

[77]  Senior Financial Analyst of Neptune.  Ex. 159 at Bates 58185.

> I would request Pete [Galloway] have a role where he can make the biggest battle for who gets credit for what revenues. This
>
> Michael, our other challenge we all need to get behind us is this earnout. Its [sic] been a hurdle and a point of frustration since the acquisition. I have watched this cause numerous operational and morale issues for both Sugarleaf and Neptune employees. There is a constant battle for who gets credit for what revenues. This earnout has contributed to unequal Sugarleaf compensation and benefit packages not being offered to Sugarleaf employees that are standard for the Neptune counterparts. There is a reasonable reduced earnout number (from the 6m) that could be resolved through fair negotiations. We need to be ..... One Team, One Fight. I am happy to have this conversation with you and/or John. [Ex. 183 at Bates 88267]

Mr. Lee Moritz testified that he never discussed with Mr. Cammarata this elevation to President either before or after June 2, 2020 and that he never assumed the title of President of Sugarleaf because he wanted to make sure he understood his goals, duties, and responsibilities but he did not receive any guidance on those issues from Neptune (other than in some conversations with Mr. John Moretz about wanting to keep the facility open and make it profitable). Tr. 788-792.

On June 4, 2020, an email the subject of which is "Officers at Sugarleaf" lists Mr. Lee Moritz as President & General Manager, Ms. Rinow as Treasure and CFO, Mr. Belanger as Secretary, and Mr. Mayers as COO; Mr. Galloway is not listed. Ex. 185 at Bates 138783.

Also on June 4, 2020, Mr. Adam Stockman (Sugarleaf's plant manager (Tr. 605 & 1101), who worked with Messrs. Coles and Galloway in Maine (Tr. 2432)) emailed Mr. Galloway and others: "HR received a complaint from QA today about how hot it is in the offices. … Today we have reached 85 deg, I had to stop production on biomass just to be safe." Ex. 186 at Bates 6049-6050. Later that day, Mr. Galloway contacted Mr. Mayers: "This HVAC capex hold is something we can't continue to ignore. It is effectively impacting all aspects of business and we need to address." Id. at Bates 6049.

On June 5, 2020, Mr. Galloway wrote to Messrs. Lee Moritz, David Mayers, and Lijoi:

> If we could install the large unit for Warehouse and extraction area without ducting we can at least stand a chance at bringing building down to workable temp. The temporary units we operated with last year didn't keep up on hotter days and will not keep up with all the added equipment adding BTUs. Additionally the temp room ac

Case 1:24-cv-00117-ER   Document 2-5   Filed 01/08/24   Page 104 of 201

units blow heat into warehouse creating a large amount of heat for those rooms when in operation.  [Id. at Bates 6048]

In a June 10, 2020 press release, Neptune reported a net loss of over $39 million Canadian dollars for the quarter ending March 31, 2020 (as compared to a net loss of over $12 million Canadian dollars for the quarter ending March 31, 2019).  The net loss included an impairment of goodwill of over $41 million Canadian dollars, "which was partially offset by a gain of $36,782 [thousands of Canadian dollars] related to a reduction in the fair value of the contingent consideration  in connection to the acquisition of SugarLeaf Labs."  Ex. 190 at page 1 of 11.

On June 16, 2020, Counsel for Mr. Galloway and PMGSL Holdings, LLC wrote to Mr. Belanger, concerning, among other things, the replacement of Mr. Galloway as President by Mr. Lee Moritz and breaches of the APA by Neptune.  Ex. 198 at Bates 130138-130146.  By means of an email to Mr. Mayers that same day, Mr. Galloway transmitted a copy of the letter being sent to Mr. Belanger.  In his transmittal email, Mr. Galloway said:

> After our video call on Monday, I have had a chance to further reflect on your suggestion that I step down as President of Sugarleaf and consider a consulting role for the Company.  While I feel my contributions can continue to benefit the operation and your vision, unfortunately I can only view this as perhaps the final step in Neptune's efforts over the last year to marginalize me and to deprive me of the benefits I bargained for when selling my interests in Sugarleaf and Forest Remedies to Neptune just over a year ago.  [Id. at Bates 130136-130137]

Later that day, Mr. Mayers forwarded Mr. Galloway's email to Messrs. Cammarata and John Moritz.  Mr. Mayers wrote in part: "The fact remains the business did not provide the revenue/EBITDA/milestones it projected.  When we turn this around it is because of new focus and strategy and the fact previous management did not is not a result of impairment or obstruction by Neptune."  Id. at Bates 130136.

A June 19, 2020 Neptune Weekly Update for its employee reported that Neptune "is now all about [six] business units" (e.g., Consumer Brands, Cannabis & Hemp).  The leadership team for Cannabis & Hemp was listed as Messrs. Mayers, Timperio, and Lee Moritz and Ms. Khayat.  Ex. 199 at Bates 75050.  Mr. Galloway emailed Messrs. Mayers and Lee Moritz and Ms. Khayat about the Weekly Update later that day, saying "This is disappointing that we would send this

out without restructuring sugarleaf. This is causing confusion and continues to impact my ability to manage staff." Id. at Bates 75049.

- **August 2020**

On August 18, 2020, Mr. Galloway completed and executed a request "to remove the restrictive legends and stop transfer instructions" from the certificate for all of the 1,587,301 shares of Neptune stock that were was part of the purchase price paid on the Closing Date (APA § 1.6(b): "$6 million shall be paid on the Closing Date by the delivery of 1,587,301 Common Shares" (see page 113, below)). Ex. 226 at pages 5-7 of 7. The paper made its way to Mr. Mark King at UBS, whom Mr. Galloway had hired to help with the sale of the shares. Tr. 2142. The paper was eventually received by Neptune's agent (see below).[78]

On August 26, 2020, Mr. Paul Mea (an associate director of finance USA at Neptune (Tr. 297)) emailed Ms. Rinow, Ms. Patti, and others: "I was told that most of the office staff (not sure about production) at Sugarleaf will likely be sent home over due to Covid concerns." Ex. 232 at page 4 of 4. Later that day, Ms. Patti replied, saying that Mr. Lee Moritz's mother had tested positive for Covid and that he had been exposed. Id. at page 3. That same day, Ms. Rinow forwarded those emails to Messrs. Cammarata and John Moretz. Id. Mr. Cammarata re-sent the email, adding Mr. Christopher Piazza (Neptune Senior Legal Counsel and Assistant Corporate Secretary (Tr. 2143; Ex. 226 at page 4 of 7)) to the distribution list. Id. at pages 2-3. Still on August 26, 2020, Ms. Rinow asked Messrs. Cammarata, John Moretz, and others: "[C]an we just lay off all, except Jenna Agin, engineering and accountant for a couple of months?" Id.

---

[78] The Lock-Up Agreement was dated July 24, 2019 and provided for release of one-sixth of the 1,587,301 shares every successive six-month period (page 126, below). Thus, the first tranche was released starting January 24, 2020, the second tranche July 24, 2020, the third tranche January 24, 2021, the fourth tranche July 24, 2021, the fifth tranche January 24, 2022, and the sixth tranche July 24, 2022. At the time Mr. Galloway prepared the request (August 18, 2020), only the first two tranches had been released. Mr. Galloway agreed. Tr. 2361-2362:

> Q. Okay. But Neptune wasn't able to release all the shares because the contract didn't require the release of all the shares, true?
>
> A. That's true. And it was made very clear by Chris Piazza on a telephone call to the UBS team. They realized the mistake that had been, had been made and were awaiting that opinion from, from Chris. But it was -- that was something that was discussed.
>
> Q. Okay. But once Chris told them while this request that's been signed by Mr. Galloway was faulty, it can't apply to all the shares, they never sent the revised request, did they?
>
> A. They sent requests. They certainly were looking for updates. I don't believe that we submitted a new form. We were getting ignored by this point.

at page 2.  Mr. Cammarata replied, "Yes let's forlow [sic] them."  Id.  Ms. Rinow then directed Ms. Patti (Neptune director of HR) to "furlough all employees at Sugarleaf except accounting (2) and Jenna Agin, engineering."  Id. at page 1.  Finally, on August 26, 2020, Ms. Patti (Neptune director of HR) instructed Ms. Sarah Canahai (Neptune's HR Coordinator for Conover (Ex. 202 at Bates 133280)): "[J]ust to be clear: please keep this to yourself."  Id.

Separate and apart from that August 26, 2020 email chain, on the same day, Ms. Canahai emailed Mr. Lee Moritz:

> Jenna [Agin] let me know that Pete [Galloway] came into the office this morning yelling at her (in front of our finance team) about his title and signature being removed off from CapX Forms and PO's.  Jenna had tears in her eyes asking me not to do anything.  As HR, I must take corrective action.

> I can see Pete's frustration as to no one in this company knows what is going on with title changes and so forth.  We really need to get a hold of this.  Pete just wants a resolution to this; until than [sic] he says he is liable for the company and will be taking charge unless stated otherwise from corporate.

> I have reached out to Paola [Patti] so we can get this resolved. [Ex. 202 at Bates 133280]

On August 27, 2020, Mr. Joyner (at Greenberg Traurig), on behalf of the Neptune side sent a letter to Mr. Galloway and PMGSL Holdings, LLC, c/o their Counsel, responding to the June 16, 2020 letter that had been sent to Mr. Belanger (Ex. 198 (see above June 2020 subsection of this Final Award)).  Broadly, Mr. Joyner's letter: (i) rejected the accusations that Neptune had breached the APA, (ii) said the allegation that Neptune had frustrated Mr. Galloway's ability to receive the earn-out amounts was "absurd because … blocking Sugarleaf's ability to increase its revenue would also disadvantage Neptune"; (iii) stated "[C]ontrary to Mr. Galloway's assertion in your Letter regarding his employment status at Sugarleaf, Mr. Galloway is and has always been Sugarleaf's President"; (iv) alleged failures of Mr. Galloway as President; (v) alleged that "Mr. Galloway had made false representations in connection with the APA that Sugarleaf was in compliance in all material respects with all Laws and Orders," including cGMP; (vi) said "Neptune regretfully wishes to negotiate Mr. Galloway's departure from Sugarleaf under mutually beneficial circumstances" and (vii) offered "severance in the amount of  $48,000," which was equal to four months of his salary ($144,000 per annum).  Neptune closed by saying it

was making this offer "despite having ample justification to terminate Mr. Galloway for Cause" (emphasis in original) and that the offer remained effective until September 1, 2020.  Ex. 203.

On August 31, 2020, Mr. Peterson emailed Mr. Tim Knisely (a finance person at Sugarleaf, who, among other things, coordinated month-end reporting to Neptune (Tr. 325-326)) regarding a purchase order for $7,000 for a cGMP certification audit.  Ex. 204 at Bates 128223. Mr. Lee Moritz, who had been copied on Mr. Peterson's email, wrote back to explain:

> cGMP Audit-- The last 14 months the team has been preparing to win and received [sic] our cGMP certification.
>
> Just 3 weeks ago we received our final pre-audit check and did very well.  I believe we are ready.  Our certification audit has been scheduled for 17 Sep and what Owen [Peterson] sent you is the cost for the inspector to travel here and perform this 2[-]day certification audit.  [Id.]

Also on August 31, 2020, Ms. Canahai emailed over two dozen people, including Ms. Rinow, Dr. Wood, and Messrs. Mayers and Lee Moritz, announcing that ten individuals no longer worked at Sugarleaf, including two QA Coordinators, one Executive Coordinator, and seven people in production (e.g., lab technicians, warehouse associate).  Ex. 205 at Bates 126872-126873.  Less than two hours later, Dr. Wood emailed Messrs. Lee Moritz and Mayers and Ms. Rinow:

> Considering the site[']s cGMP audit is coming up, the timing of letting go the QA department isn't not [sic] great.  A decent auditor would make having one person in QA a critical finding.  [Id. at Bates 126871-126872]

Still later that day, Dr. Wood wrote to the same three recipients of his prior email:

> I just had a good discussion with Lee and Owen.  He informed me that the change was a fourlough [sic] and not permanent layoffs.  That will help with the explanation but I still think only one person in QA is not enough for the audit.
>
> I would highly recommend … one person in QA be brought back until at least a week after the audit (the audit is Sept 17th).  Having them come back right away is ideal but September 8th can work as well.  [Ex. 205 at Bates 126871]

In the final email in this exhibit, Dr. Wood explained to Ms. Rinow why the audit was needed:

> Supplement GMP, which is what the site is going for now, is needed as the minimum requirement to work with most reputable companies that want to use CBD. Since, the US still hasn't decided how to treat CBD, GMP is not required by the FDA. However, the second the FDA decides what to do about CBD, GMP will be required and it might even be food GMP and not supplement GMP (food is harder to get).

> We do have current customers who we told we are getting our GMP certificate for. They wanted it a while back but cut is [sic, us] some slack. If we put off this audit I don't see us losing short term business but it will eventually come back to bite us and we will lose business. When the FDA acts, we would have to stop all activity until we have the certiticate [sic]. [Id. at Bates 126870]

- **September 2020**

On September 1, 2020, Mr. Piazza (Neptune Senior Legal Counsel and Assistant Corporate Secretary (Tr. 2143; Ex. 226 at page 4 of 7)) emailed Mr. Mario Suric, "a UBS team member of Mark King's" (Tr. 2143), with a copy to Ms. Rinow and Ms. Sofia Parvin, a Neptune paralegal (Ex. 121). Mr. Piazza wrote:

> We received a note from our investor relations firm that you reached out to inquire about removing a restriction on shares of Neptune held by one of your clients. Please share with us details of the shares and the investor and we can advise on next steps. [Ex. 226 at page 4; Tr. 2142-2148]

A few minutes later that same day, Mr. Suric (at UBS Restricted Sales) replied:

> Our client is PMGSL Holdings LLC[.] They acquired restricted shares of Neptune Wellness in the merger with Sugar Leaf Labs LLC. The shares are restricted under the U.S. Securities Act of 1933, they would like to have the restriction lifted under rule 144 (b)(1). They have made representation that they have held the shares for over one year and that they are not control person's [sic] or affiliates of NEPT. I have attached a copy of the rep letter as well as a copy of the stock certificate. Can you issue the legal opinion to the transfer agent to remove the restriction? Also can you please let me know if NEPT is a former shell company? Thank you very much for your help with this request. [Id. at pages 3-4; Tr. 2142-2148.]

On September 2, 2020, Mr. Stockman wrote to Ms. Canahai. He noted he was "being let go" on September 11 as Sugarleaf's Director of Manufacturing and was concerned about several items that would require attention after his departure, e.g., securing inventory in proper locations and shutting down and cleaning the equipment. Ex. 206 at Bates 133938. A few minutes later, Ms. Canahai forwarded that email to Ms. Patti (Neptune director of HR). Id. at Bates 133938. Ms. Patti forwarded the email to Mr. Lee Moritz, saying: "I understood that the 15-30 days we planned to keep the production team was to avoid the below concerns. Can you clarify what are the true risks?" Id. at Bates 133937. Mr. Lee Moritz replied later that day, indicating that he had requested the itemized list Mr. Stockman had prepared and included in his email. Mr. Moritz noted that Mr. Stockman had been leading all the capital expenditure improvements. Id. at Bates 133936-133937. Still later that day, Ms. Rinow emailed Mr. Lee Moritz, Ms. Patti, and others, directing that the plant should be kept idle after September 31. Id. at Bates 133936.

In emails of September 3, 2020, Messrs. Lee Moritz and John Moritz discussed mothballing the Conover plant. Ex. 206 at Bates 133935-133936.

On September 3, 2020, Mr. Suric emailed Mr. Piazza regarding the Neptune shares: "Can you please respond to my previous email when you have a moment?" Ex. 226 at page 3; Tr. 2142-2148. Mr. Suric's previous (original) email to Mr. Piazza was on September 1, 2020 (see above).

On September 4, 2020, Mr. Joyner, on behalf of the Neptune side noted they had not received any response to the offer made to Mr. Galloway in their August 27, 2020 letter and that the offer was good only through September 1, 2020. "As such, Mr. Galloway's employment is terminated for Cause (pursuant to the Employment Agreement), effective today, September 4, 2020." Ex. 207.

Also on September 4, 2020, Mr. Lee Moritz emailed Ms. Rinow, saying: "I hope we have not decided to abandon cGMP." Ex. 208 at Bates 126852. Later that day, Mr. Rinow emailed Dr. Wood, Mr. Lee Moritz, and others: "We will continue with the cGMP facility audit." Id. at Bates 126851. However, a September 8, 2020 email from Mr. Lee Moritz to Ms. Rinow, Dr. Wood, and others indicates that, after further discussion, it was decided not to proceed with the audit (scheduled for September 17, 2020). Id. at Bates 126847-126848; Tr. 2136-2137.

On September 14, 2020, Mr. Suric again emailed Mr. Piazza regarding the Neptune shares: "Can you please respond to my previous email when you have a moment?" Ex. 226 at

page 3. Mr. Suric's original email to Mr. Piazza was on September 1, 2020 and a follow-up had been on September 3, 2020 (see above). Tr. 2142-2148.

On September 30, 2020, Mr. Suric emailed Mr. Piazza: "We spoke last week regarding the shares of Neptune Wellness, can you please let me know when we can expect a response regarding the legend removal?" Id. at pages 2-3. A few minutes later, Mr. Piazza replied: "I will try to get the opinion done by end of day tomorrow. Apologize for the delay." Id. at page 2. Mr. Suric replied almost immediately, writing: "Thank you, I appreciate that, can you please email a copy to me when issued?" Id. Mr. Piazza replied shortly thereafter, saying: "Will do." Id. at pages 1-2. See Tr. 2142-2148.

- **October 2020**

On October 2, 2020, the Neptune side and the PMGSL side each filed an arbitration demand (see pages 17-18, above).

On October 21, 2020, Mr. Suric emailed Mr. Piazza regarding the Neptune shares (see subsections of this Final Award concerning August and September 2020): "Can you please let me know when I can expect the opinion letter for PMGSL Holdings?" Ex. 226 at page 1; Tr. 2142-2148.

On October 28, 2020, Mr. Suric again emailed Mr. Piazza: "Can you please let me know when I can expect the legal opinion for PMGSL Holdings LLC and their shares of Neptune Wellness?" Id.

Also on October 28, 2020, Counsel for the PMGSL side wrote to the Neptune side c/o Mr. Joyner to object to the Adjusted EBITDA Statement for the twelve-month period ending March 31, 2020, which period was also Fiscal Year 2020 (see footnote 75, above). The letter indicated it was being delivered "under protest and with full reservation of rights about the enforceability and applicability of [APA] Section 1.11." That section is entitled "Objection to 12MR Adjusted EBITDA Statement,[79] Earn-Out Statement or Closing Statement" and, broadly speaking, provides a mechanism for objecting to 12MR Adjusted EBITDA Statements, Earn-Out Statements, and Closing Statement (see pages 116-117, below).

---

[79] The adjusted EBITDA statement for a twelve-month rolling period. APA § 1.7 (see pages 114-115, below).

- **<u>November 2020</u>**

On November 20, 2020, Mr. Suric emailed Mr. Piazza regarding the Neptune shares (see immediately preceding sections concerning August, September, and October 2020): "Can you please review the attachment and issue the legal opinion to remove the restriction from the shares of Neptune Wellness for PMGSL Holdings?"  Ex. 226 at page 1; Tr. 2142-2148.

- **<u>2021</u>**

On August 6, 2021, Mr. Cottrell (Counsel for the PMGSL side) wrote to Mr. Joyner concerning several issues,

> including the status of Sugarleaf Labs LLC's and Forest Remedies, LLC's assets and operations.  It has recently come to our attention that Neptune publicly announced that it is no longer in the hemp extraction business in North America.  As you are no doubt aware, Section 1.8(c) of the Asset Purchase Agreement requires - among other things - that during the three-year Earn-Out Period Neptune "shall retain the Purchased Assets and the operation of the Business, and not transfer them to a different entity."
>
> . . .
>
> Finally, the July 24, 2019 Lock-Up Agreement requires that one-sixth of Sellers' Locked-Up shares be released from the applicable restrictions every six months following the July 24, 2019 execution date.  Another six[-]month anniversary has now passed.  Please advise whether Neptune consents to release the restrictions on this tranche of stock as well as the prior tranches. [Ex. 217]

On August 2, 2021, Mr. Galloway testified that Neptune was no longer in the hemp or CBD business, had sold much of the Sugarleaf equipment, and that Neptune had closed operations at Sherbrooke.  Tr. 2410-2414.  He said he believed Neptune had made "a strategic decision to shift into the CPG markets"  Tr. 2413-2414.  Mr. Paradis had previously testified that "CPG" meant consumer packaged goods and that Mr. Cammarata came "from the CPG industry."  Tr. 511 & 541.

## RELEVANT PORTIONS OF THE ASSET PURCHASE AGREEMENT

Relevant portions of the Agreement (Ex. 9) are set forth below (emphasis omitted).[80],[81]

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is entered into as of May 9, 2019, by and among Sugarleaf Labs, LLC, a Maine limited liability company ("Sugarleaf"), Forest Remedies LLC, a North Carolina limited liability company ("Forest", and together with Sugarleaf, the "Sellers"), Neptune Acquisition USA, Inc., a Delaware corporation (the "Purchaser"), Neptune Wellness Solutions Inc., a Quebec corporation (the "Parent"), and the Member that is party hereto[82] pursuant to the terms and conditions set forth in this Agreement. Unless otherwise defined herein, capitalized terms shall have the meaning set forth in Section 12.1 for all purposes of this Agreement.

RECITALS:

A.  The Sellers are in the business of (i) extracting, refining and producing hemp-derived extracts and oils in the U.S., (ii) sourcing natural resources for the purposes of producing hemp-derived extracts and oils, (iii) developing advanced extraction equipment, high capacity filtering and purifying techniques and responsible growing practices, including organic and regenerative farming techniques, and (iv) branding and selling hemp products containing hemp-derived extracts and oils (the "Business").

B.  The Sellers wish to sell, and the Purchaser wishes to purchase, all of the assets of the Sellers as more fully set out and defined in this Agreement.

C.  The Parent and the Member agree to be bound by certain rights and obligations set forth in this Agreement.

### ARTICLE 1

### PURCHASE; PURCHASE PRICE

1.1  Purchased Assets

Subject to the terms and conditions of this Agreement, on the Closing Date, the Sellers hereby agree to sell, transfer, convey, assign and deliver to the Purchaser, and the Purchaser hereby

---

[80]  Ex. 9, comprising the APA and all of its exhibits and schedules, is 217 pages long.  For obvious reasons, only the portions that are more relevant to this Arbitration are reproduced in whole or in part in this Section of the Final Award.

[81]  As previously indicated, boldface font in original has been removed in most quotations herein.

[82]  Mr. Galloway is "the Member that is party hereto" (APA, Section 12.1 (Definitions)).

agrees to purchase, acquire and accept from the Sellers, the Purchased Assets and all of the Sellers' legal and beneficial title and interest therein …. For the purposes of this Agreement, "Purchased Assets" means any and all of the Sellers' right, title and interest in, to and under any and all of the assets of the Sellers as of immediately prior to the Closing … including, but not limited to …: [e.g., contracts, agreements, revenues, tangible assets, technology, books and records, receivables, and intangibles ("including all goodwill and the going concern value of the Business")].

### 1.6 Purchase Price

In consideration for the Sellers' sale, transfer and conveyance of the Purchased Assets to the Purchaser and of the Sellers' and the Member's covenants, representations and warranties set forth in this Agreement, and at all times subject to any set-off provided for in this Agreement, the Purchaser agrees to assume from the Sellers the Assumed Liabilities at the Closing and to pay to the Sellers, subject to applicable adjustments under Sections 1.10, a purchase price for the Purchased Assets of $40 million (the assumption of the Assumed Liabilities and such amounts required to be paid pursuant to this Section 1.6 collectively referred to herein as the "Purchase Price"), which shall be satisfied as follows:

(a) $20 million payable in cash (the "Cash Portion"), of which $12 million shall be paid on the Closing Date (the "Initial Cash Portion") and the remaining $8 million (the "Cash Portion Balance") shall be paid following the final determination in accordance with Section 1.7 and Section 1.10 that the cumulative Adjusted EBITDA for any rolling twelve (12) month period after April 1, 2019 exceeds $8 million (the "Adjusted EBITDA Threshold");

(b) $20 million payable by the delivery to the Sellers of Common Shares at a deemed price of $3.78 per Common Share, of which $6 million shall be paid on the Closing Date by the delivery of 1,587,301 Common Shares and the remaining $14 million shall be paid in two tranches by the delivery of (i) 2,116,402 Common Shares on the date that the Cash Portion Balance is paid (the "Share Balance"), and (ii) 1,587,301 Common Shares on the date that the production facility of the Business achieves from and after April 1, 2019 (i) a total of 120,000 pounds of input material processed, and (ii) sales of such processed material totaling revenues of at least $9 million, in each case to the satisfaction of the Purchaser, acting reasonably (the "Production Share Balance"). The Cash Portion Balance, the Share Balance and the Production Share Balance shall be forfeited and shall no

longer be payable if not paid under the terms of this Agreement, at the latest, by such time that the 12MR Adjusted EBITDA Statement as of the end of the end of the Third Earnout Period has been finally determined in accordance with Section 1.10.

1.7 Calculation of 12MR Adjusted EBITDA

(a) Until the last of the payments of the Cash Portion Balance, the Share Balance and the Production Share Balance, as soon as reasonably practical and in any event not later than fifty-five (55) days after each completed financial quarter of the Parent, or no later than one hundred (100) days after the applicable financial quarter of the Parent if the end of such quarter also corresponds to the end of a financial year of the Parent (the financial year of the Parent currently ends on March 31 of each year), the Purchaser shall deliver to the Sellers its good faith calculation of the cumulative Adjusted EBITDA for the rolling twelve (12) month period ending at the end of the applicable financial quarter (each a "12MR Adjusted EBITDA Statement"), together with all reasonably relevant supporting documentation.    The final determination of the 12MR Adjusted EBITDA Statement shall be determined in a manner determined by the Parties acting reasonably.

(b)  Any payment to be made pursuant to Section 1.6 of (i) the Cash Portion Balance or the Share Balance shall be made within ten (10) calendar days after the applicable 12MR Adjusted EBITDA Statement has been finally determined pursuant to Section 1.10, and (ii) the Production Share Balance shall be made within ten (10) calendar days after the applicable threshold being met pursuant to Section 1.6, and no interest shall accrue on the amount of any such payment, unless such payment has not been made within the ten (10) day period, in which case it shall bear interest following the expiration of the ten (10) day period at a rate per annum equal to the then prevailing Bank Rate (in which case all accrued interest will be payable in cash).  The Purchaser may, at its discretion, pay (i) the Share Balance portion of the Purchase Price in cash by paying to the Sellers the higher of (A) $8 million and (B) an amount corresponding to the value of the Common Shares, calculated as of the actual payment date, that would otherwise have been issued to satisfy the Share Balance, as if such Common Shares had been issued on the execution date of this Agreement (taking into account any increase in value of such Common Shares between the execution date and the actual payment date), and (ii) the Production Share Balance of the Purchase Price in cash by

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 115 of 201

paying to the Sellers the higher of (A) $6 million, and (B) an amount corresponding to the value of the Common Shares, calculated as of the actual payment date, that would otherwise have been issued to satisfy the Production Share Balance, as if such Common Shares had been issued on the execution date of this Agreement (taking into account any increase in value of such Common Shares between the execution date and the actual payment date).

1.8 Earn-Out Payments

(a) The Sellers shall be entitled to the following additional payments as additional consideration for the Purchased Assets, subject to achieving the earn-out performance conditions set forth below:

(i) First Earn-Out: the Sellers shall be entitled to receive a payment equal to five times (5x) the aggregate Adjusted EBITDA in excess of $8 million for the twelve (12) month period ending March 31, 2020 (the "First Earn-Out Payment", and such twelve (12) month period, the "First Earn-Out Period");

(ii) Second Earn-Out: the Sellers shall be entitled to receive a payment equal to five times (5x) the aggregate Adjusted EBITDA during the twelve (12) month period ending March 31, 2021 (the "Second Earn-Out Period") in excess of the greater of (i) $9.6 million, and (ii) 120% of the aggregate Adjusted EBITDA for the First Earn-Out Period (the "Second Earn-Out Payment"); and

(iii) Third Earn-Out: the Sellers shall be entitled to receive a payment equal to five times (5x) the aggregate Adjusted EBITDA during the twelve (12) month period ending March 31, 2022 (the "Third Earn-Out Period", and each with the First Earn-Out Period and the Second Earn-Out Period, an "Earn-Out Period" and collectively the "Earn-Out Periods") in excess of the greater of (i) $11.52 million, and (ii) 120% of the aggregate Adjusted EBITDA for the Second Earn-Out Period (the "Third Earn-Out Payment", and together with the First Earn-Out Payment and the Second Earn-Out Payment, the "Earn-Out Payments").

(b) Schedule 1.8(a) provides examples of the calculation for the Earn-Out Payments. …

(c) Notwithstanding anything to the contrary in this Agreement, the maximum amount payable by the Purchaser to the Sellers hereunder, including the Purchase Price and the Earn-Out

Payments (in each case, whether paid in cash or in Common Shares), is capped and limited to $150 million (the "Purchaser Cap"). Notwithstanding the foregoing, the Sellers' members and other employees shall still be eligible (but are not guaranteed) for future rewards, bonuses and other incentive programs that may be applicable as employees of Purchaser. Funds conveyed to or paid by Purchaser to the Sellers in the form of loans, investments, purchase orders, reimbursement or other similar transactions, expenses or purchase order related payments or fees will be excluded in calculating the aggregate Purchaser Cap. Subsequent to the Closing, the Purchaser shall have sole discretion with regard to all matters relating to the operation of the Business, provided that during the Earn-Out Period, the Purchaser (i) shall act in good faith with respect to the operation of the Business, including, but not limited to, using commercially reasonable efforts to maintain and increase existing levels of business, and to refrain from taking any actions that would reasonably be expected to be materially adverse to the operation of the Business, (ii) shall retain the Purchased Assets and the operation of the Business, and not transfer them to a different entity; (iii) shall maintain a financial reporting system that enables the Purchaser to separately account for the items of revenue and expense of the Purchaser relating to the Business necessary to make the calculations required by this Agreement with respect to the Business, and (iv) provide adequate financing to the Business, in amounts established in consultation with the executive officers of the Business and within the parameters of the Parent's and the Purchaser's annual budget. Subject to the above covenant, the Sellers acknowledge and agree that (i) neither Parent nor the Purchaser shall be under any obligation to carry on the Business in order to achieve the earnings required to result in any payment to the Sellers under this Agreement, and (ii) that subject to the above covenants there is no restriction on the ability of the Parent to carry out activities that are similar to, or competing with, the Business.

1.11 Objection to 12MR Adjusted EBITDA Statement, Earn-Out Statement or Closing Statement

(a) The Sellers may object to the 12MR Adjusted EBITDA Statement, Earn-Out Statement or Closing Statement by written notice to the Purchaser within thirty (30) days following receipt thereof, which notice shall specify in reasonable detail those items or amounts as to which the Sellers object (the "Objection Notice") and the Parties shall be deemed to have agreed with all other items and amounts (the

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 117 of 201

"Undisputed Amounts") contained in such 12MR Adjusted EBITDA Statement,….

(b)  If an Objection Notice is delivered in the manner and within the thirty (30) day period specified in the preceding paragraph, the Purchaser shall promptly pay the Undisputed Amounts to the Sellers, … and the Parties shall in good faith attempt to resolve any matters in dispute with respect to the 12MR Adjusted EBITDA Statement, Earn-Out Statement or Closing Statement, as applicable, as promptly as practicable. … If the Sellers and the Purchaser are unable to resolve all such items in dispute within thirty (30) days after the receipt of the Objection Notice giving rise to such dispute, shall be referred to the Independent Auditor.  The Independent Auditor shall act as an expert and not as an arbitrator and shall be required to determine the items in dispute …

(c)  … [concerning fees and expenses]

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each of the Sellers hereby represents and warrants to the Purchaser and Parent that the statements contained in this Article 3 are true, correct and complete and acknowledge that the Purchaser and Parent are relying on said representations and warranties for the purpose of entering into the Transactions:

### 3.9  Compliance with Law

The Sellers are, and have in respect of the Business been, in compliance in all material respects with all Laws and Orders.  The Sellers have all Governmental Authorizations that are necessary to conduct the Business as presently conducted, all of which are listed in Schedule 3.8.  There is no pending or, to the Knowledge of the Sellers, threatened, applications or pleadings with any Governmental Entity that challenges or questions the validity of any material rights under any Governmental Authorization held by the Sellers.

### 3.16  Employees

(a)  Schedule 3.16 contains a list of all Employees and Consultants of the Sellers ….  All employees of the Sellers are employed on an at-will basis.

### 3.25  Common Shares

Each of the Sellers:

(a)  acknowledge that the Common Shares issuable hereunder are being issued on a prospectus exempt basis under the securities laws of the Province of Québec as consideration for the assets of the Seller, which have a fair value of not less than CAD$150,000;

(b)  acknowledges that the certificates or statements evidencing the Common Shares will contain the following legend or a similar legend (together with any other legend required by applicable Law):

> "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"). THE HOLDER HEREOF, BY PURCHASING SUCH SECURITIES, AGREES FOR THE BENEFIT OF NEPTUNE WELLNESS SOLUTIONS INC. (THE "CORPORATION") THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, DIRECTLY OR INDIRECTLY, ONLY (A) TO THE CORPORATION, (B) IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND WITH APPLICABLE LOCAL LAWS AND REGULATIONS, (C) IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE U.S. SECURITIES ACT PURSUANT TO RULE 144 UNDER THE U.S. SECURITIES ACT, IF AVAILABLE, OR (D) IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT OR ANY APPLICABLE UNITED STATES STATE SECURITIES LAWS, AND IN THE CASE OF (C) AND (D) ABOVE THE SELLER FURNISHES TO THE CORPORATION AND THE CORPORATION'S TRANSFER AGENT AN OPINION OF COUNSEL OF RECOGNIZED STANDING IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE CORPORATION TO SUCH EFFECT. UNLESS PERMITTED UNDER SECURITIES LEGISLATION OF CANADA, THE HOLDER OF THE SECURITIES REPRESENTED HEREBY MUST NOT TRADE SUCH SECURITIES BEFORE [DATE THAT IS 4 MONTHS AND A DAY AFTER CLOSING]. DELIVERY OF THIS CERTIFICATE MAY NOT CONSTITUTE "GOOD DELIVERY" IN SETTLEMENT

OF TRANSACTIONS ON STOCK EXCHANGES IN CANADA

After a period of four (4) months and one (1) day following Closing, the penultimate sentence of the preceding legend may be removed upon written request for trading on the TSX, provided that the Common Shares must be admitted to trading on the TSX prior to any legend removal pursuant to a request for trading on the TSX.

(f) acknowledges that the Common Shares will be "restricted securities" within the meaning of Rule 144(a)(3) under the Act, and it agrees that if it decides to offer, sell or otherwise transfer any of the Common Shares, it will only offer, sell, pledge or otherwise transfer such securities, directly or indirectly (i) to the Purchaser, (ii) in compliance with Rule 904 of Regulation S under the U.S. Securities Act ("Regulation S") and in compliance with applicable local laws and regulations, (iii) in a transaction exempt from registration under the Act pursuant to Rule 144 under the Act, if available, or (iv) in a transaction that does not require registration under the Act, and in the case of (iii) and (iv) above, it has furnished to the Purchaser and the Purchaser's transfer agent, an opinion of counsel of recognized standing in form and substance reasonably satisfactory to the Purchaser to that effect;

(k) agrees that the certificates of statements evidencing the Common Shares may bear legends evidencing the lock-up restrictions imposed under the Lock-Up Agreement.

## ARTICLE 5

## OTHER COVENANTS OF THE PARTIES

### 5.8  Further Assistance and Efforts

Each Party will use its commercially reasonable efforts to execute and deliver such further certificates, agreements and other documents and take such other actions as the other Party may reasonably request as may be necessary or appropriate to consummate or implement the transactions contemplated hereby or to evidence such events or matters.

### 5.13  Assistance with Regulatory Matters

The Purchaser and the Parent will offer reasonable administrative or compliance related assistance to assist Sellers and its Member with any sale, transfer, or other issues related to the Common Shares issuable under this Agreement, provided that the Sellers or the Member, as applicable, shall be responsible for any out-of-

pocket expenses of the Purchaser or Parent in connection therewith.

## ARTICLE 7

### SELLERS' CONDITIONS PRECEDENT

The obligations of the Sellers to complete the sale of the Purchased Assets under this Agreement shall be subject to the satisfaction of or compliance with, at or before the Closing Time, each of the following conditions precedent (each of which is acknowledged to be inserted for the exclusive benefit of the Sellers and may be waived by them in whole or in part):

### 7.1  Truth and Accuracy of Representations of the Purchaser at Closing Time

All of the representations and warranties of the Purchaser made in or pursuant to this Agreement shall be true and correct in all material respects at the Closing Time and with the same effect as if made at and as of the Closing Time and the Sellers shall have received a certificate from a senior officer of the Purchaser confirming the truth and correctness of such representations and warranties.

## ARTICLE 10

### PARENT GURANTEE

(a)  The Parent hereby absolutely, unconditionally and irrevocably guarantees, as primary obligor, to the Sellers the obligations of the Purchaser under the terms of this Agreement.

(b)  The liability of the Parent under the guarantee contemplated by this Article 10 (the "Guarantee") is absolute and unconditional and the Guarantee shall be binding upon the Parent and its successors and assigns ….

## ARTICLE 11

### MISCELLANEOUS

### 11.1  Entire Agreement; Rights Cumulative

This Agreement and the Ancillary Documents set forth the entire agreement of the Parties with respect to the subject matter hereof and supersede all prior agreements, arrangements, communications, representations and warranties, either oral or written, by the Parties or any representative of the Parties with respect to the subject matter hereof or thereof, including the letter

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 121 of 201

of intent entered into by the Sellers and Neptune Wellness Solutions Inc., dated March 27, 2019, as amended, and the non-disclosure agreement entered into by the Sellers and Neptune Wellness Solutions Inc., each of which are hereby terminated. The rights and remedies under this Agreement are cumulative and none is exclusive of any other, or of any rights or remedies that any Party may otherwise have at law or in equity.

## 11.3  Good Faith

The Parties shall govern themselves and exercise their rights and discharge their obligations under this Agreement in good faith.

## 11.4  Severability

If any provision, including any word, phrase, sentence, clause, section or subsection, of this Agreement is deemed invalid, inoperative or unenforceable under applicable Law for any reason, such provision shall be deemed and treated by the Parties to be in effect to the fullest extent permitted by applicable Law, and such circumstances shall not have the effect of rendering such provision in question invalid, inoperative or unenforceable in any other case or circumstance, or of rendering any other provision herein contained invalid, inoperative, or unenforceable to any extent whatsoever.

## 11.8  Waiver

No delay or omission on the part of either of the Parties in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion, or any other right hereunder.

## 11.13  Governing Law

This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal Laws of the State of Delaware, without regard to the Laws of any other jurisdiction that might be applied because of the conflicts of Laws principles of the State of Delaware. The Parties agree to administer this Agreement in English.

## 11.14  Arbitration

All disputes, Claims, controversies, disagreements and Actions relating to this Agreement and any of the Ancillary Documents (each, a "Dispute") shall be fully and finally settled by arbitration in accordance with the Commercial Arbitration Rules of the

American Arbitration Association (the "AAA") (as such rules are amended from time to time), except to the extent that such rules are inconsistent with this Section 11.14. For the avoidance of doubt, any Dispute that arises under Section 1.10 shall be governed by the terms of Section 1.10. The arbitration procedure shall be as follows:

(a) for a period of ten (10) days from the date a notice setting out a Dispute (a "Arbitration Notice") is delivered by any one Party to any other Party or Parties, the Parties shall in good faith attempt to resolve such Dispute, and if the Parties are unable to reach agreement on such Dispute within such ten (10) day period, the Dispute shall be resolved by binding arbitration upon the written submission of such Dispute by any such Party to the AAA (the "AAA Notice") within seven (7) days following such ten (10) day period;

(b) the arbitration tribunal shall consist of one AAA arbitrator who is qualified by education and training to pass upon the particular matter(s) to be decided. Such arbitrator shall be appointed by mutual agreement of the Parties within ten (10) Business Days of the submission of the AAA Notice or, in the event of the failure to agree within such delay, any Party may request that the arbitrator be chosen by and in accordance with the Commercial Arbitration Rules of the AAA;

(c) the arbitrator shall resolve the Dispute contained in the Arbitration Notice pursuant to the Commercial Arbitration Rules of the AAA, except to the extent such rules are inconsistent with this Section 11.14;

(d) the arbitration tribunal shall be instructed that time is of the essence in proceeding with his determination of the matter to be decided and, in any event, the arbitration award must be rendered by the arbitration tribunal in writing within sixty (60) days of the submission of such Dispute to arbitration;

(e) the arbitration shall take place in New York, New York;

(f) the language to be used in the arbitral proceedings shall be English;

(g) the hearing and any other proceedings of the arbitration shall be held in private and, except with the consent of the parties, and subject to the discretion of the arbitration tribunal to exclude witnesses, no persons shall attend or be present at any arbitration hearing or other proceeding who are not representatives of the parties, their legal counsel or witnesses, including expert witnesses;

(h)  the arbitration award shall be given in writing and shall be final and binding upon the Parties, not subject to any appeal, and shall deal with the question of costs of arbitration, including the determination of which party shall bear them or in what proportion they should be borne by them, and all matters related thereto; and

(i)  judgment upon the award rendered may be entered in any court having jurisdiction, or, application may be made to such court for a judicial recognition of the award or an order of enforcement thereof, as the case may be.

## ARTICLE 12

## DEFINITIONS AND INTERPRETATION

### 12.1 Definitions

Whenever used in this Agreement the following words and terms have the meanings set out below:

"Adjusted EBITDA" means, for any measurement period, the sum of the following determined on a consolidated basis, without duplication, for the Business of the Purchaser:

(a)  net income determined in accordance with IFRS for such period; plus

(b)  the sum of the following to the extent deducted in determining net income for such measurement period:

> (i)  income tax expense,
>
> (ii)  interest expense,
>
> (iii) depreciation expense,
>
> (iv)  amortization expense; and
>
> (v)  the amount of all non-recurring expenses, claims or expenses not related to the Business, fees, costs and charges incurred in connection with the Agreement to the extent not capitalized.

Adjusted EBITDA shall be calculated for the Business as carried out by the Purchaser, it being understood that such Business may evolve or grow beyond its current definition, and that the Adjusted EBITDA shall be calculated on such Business carried out by the Purchaser as it may evolve or grow over time during the Earnout Period.

"Ancillary Documents" means the Bill of Sale, the Assignment Agreement, Non-Competition Agreement, Lock-Up Agreement, all

employment contracts entered into pursuant to Section 6.12, and the Employment Agreements.

"Governmental Entity" means any government or any agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, provincial, state or local, domestic or foreign.

"Laws" means all laws (including common law and civil law), statutes, by-laws, rules, regulations, Orders, ordinances, protocols, codes, guidelines, treaties, policies, notices, directions, decrees, judgements, awards or requirements, in each case of any Governmental Entity or supranational entity, body, organ, authority or court;

"Orders" means orders, injunctions, judgments, administrative complaints, decrees, rulings, awards, assessments, directions, instructions, penalties or sanctions issued, filed or imposed by any Governmental Entity or arbitrator.

12.2  Certain Rules of Interpretation

In this Agreement:

(b)  Including – Where the word "including" or "includes" is used in this Agreement, it means "including (or includes) without limitation".

(c)  No Strict Construction – The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

The Exhibits to the Agreement are:

| | |
|---|---|
| Exhibit A | Bill Of Sale |
| Exhibit B | Assignment And Assumption Agreement |
| Exhibit C | Lock-Up Agreement |
| Exhibit D | Non-Competition/Non-Solicitation Agreement |
| Exhibit E | Employment Agreements (between Neptune Acquisition USA, Inc. and each of Messrs. Peter Galloway, Tod Coles, Adam Stockman, Lee Moritz, and Mike Carlsen) |

There are also a number of Disclosure Schedules containing information scheduled in accordance with various sections of the APA, e.g., Schedules 1.1(b), 1.1(c), 1.1(d), 1.1(e), and 1.1(f) list the Purchased Assets; Schedule 1.8(a) provides examples of the calculation for the Earn-Out Payments (see APA Section 1.8(b)); Schedule 3.8 lists "All Governmental Authorizations that are necessary to conduct the Business as presently conducted" (see APA Section 3.9); and Schedule 3.16 contains a list of all Sugarleaf and Forest employees and indicates their names, titles, compensation, etc.

Relevant portions of the Lock-Up Agreement and Mr. Galloway's employment agreement are set forth in the next two sections of this Final Award.

## RELEVANT PORTIONS OF THE LOCK-UP AGREEMENT

Exhibit C of the APA contains the unsigned Lock-Up Agreement. Relevant portions of the Lock-Up Agreement that was executed on July 24, 2019 by Mr. Galloway personally and on behalf of Sugarleaf Labs LLC and Forest Remedies LLC as the sole member of each (Ex. 20) are set forth below (boldface removed).

> For the sum of $1 now paid by the Company to each of the undersigned and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of the undersigned hereby agrees as follows:
>
> 1. Each of the undersigned hereby agrees that during the period commencing on the date hereof and ending on July 23, 2022 (the "Lock-up Period"), it will not, without the prior written consent of the Company [Neptune] given after approval of same by the board of directors of the Company (the "Board") (a "Company Consent"), such consent not to be unreasonably withheld, directly or indirectly … [broadly, engage in transactions concerning] any common shares or securities convertible into, exchangeable for, or otherwise exercisable to acquire common shares or other equity securities of the Company held from time to time by each of the undersigned during the Lock-up Period (collectively, the "Locked-up Securities") ….
>
> 2. Notwithstanding Section 1, one-sixths (16.667%) of the Locked-up Securities held by each of the undersigned shall be released from the restrictions set forth in Section 1 above every six months following the date hereof.
>
> 7. This lock-up agreement and all disputes or controversies arising out of or relating to this lock-up agreement shall be governed by, and construed, performed and enforced in accordance with the laws of the State of Delaware, without giving effect to its principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of the laws of another jurisdiction.[83]

---

[83] The Lock-Up Agreement itself does not contain a dispute resolution clause, but it is an Ancillary Document. APA § 11.14 provides in part: "All disputes, Claims, controversies, disagreements and Actions relating to this Agreement and any of the Ancillary Documents (each, a "Dispute") shall be fully and finally settled by arbitration …." See pages 121-122, above.

## RELEVANT PORTIONS OF MR. GALLOWAY'S EMPLOYMENT AGREEMENT

Exhibit E of the APA contains the unsigned employment agreements between each of Messrs. Peter Galloway, Tod Coles, Adam Stockman, Lee Moritz, and Mike Carlsen, on the one hand, and Neptune Acquisition USA, Inc. (which became Sugarleaf Labs, Inc.—see footnote 2, above), on the other.  Relevant portions of Mr. Galloway's executed employment agreement (Ex. 8) are set forth below (italics in original; boldface removed).

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made as of the signature date set out below (the "Effective Date") between Neptune Acquisition USA, Inc., a Delaware corporation (the "Company") and Peter M. Galloway (the "Employee") (collectively referred to as the "Parties").

RECITALS:

A.  WHEREAS the Employee currently occupies the function of Chief Executive Officer of both Sugarleaf Labs LLC and Forest Remedies LLC (together, the "Old Company");

B.  WHEREAS concurrently with the execution of this Agreement, the Old Company is entering into an Asset Purchase Agreement with the Company (the "APA"), pursuant to which the Company will, directly or indirectly, acquire the assets of the Old Company (the "Transaction");

C.  WHEREAS it is a condition of closing of the Transaction that the Employee enter into this Agreement;

D.  WHEREAS, the Employee will become an employee of the Company concurrently with the closing of the Transaction;

E.  WHEREAS, the Employee will be entitled to certain severance payments as set forth herein in the event his employment is terminated other than for Cause (as defined herein) or he resigns for Good Reason (as defined herein); and

F.  WHEREAS the Company and the Employee have agreed to enter into an employment agreement on the terms set out in this Agreement.

THEREFORE, for good and valuable consideration, the Parties agree as follows:

### 1.  DUTIES AND RESPONSIBILITIES

1.1.  Employment

The Company hereby engages the Employee as the President USA of the Company.  The Employee will carry out those duties,

responsibilities and reporting requirements which are ordinarily expected of a President, and such other reasonable duties as may from time to time be assigned by the Company.

The term of this Agreement commences on the Effective Date and continues until the third anniversary of the Effective Date (such three[-]year period referred to as the "Term"), unless earlier terminated by the Employee or the Company upon written notice to the other at any time for any reason. The Employee acknowledges and agrees that his employment with the Company is at-will.

## 2. COMPENSATION & BENEFITS

### 2.1. Base Salary

The Employee will be paid an annual salary in the amount of $144,000 USD (the "Base Salary") from the Effective Date and payable in accordance with the Company's payroll practices. Any future increases in Base Salary (if any) will be at the sole discretion of the Company'[s] board of directors and reviewed on an annual basis in accordance with the Company's practice for similarly situated individuals. Notwithstanding the foregoing, the Employee's Base Salary will increase to $225,000 USD effective as of the date the Production Share Balance (as such term is defined under the APA) is paid (if at all) in accordance with Section 1.6(b) of the APA.

### 2.2. Severance

In the event the Company or its applicable affiliate terminates the Employee's employment other than for Cause, or the Employee resigns for Good Reason, the Employee shall be entitled to severance pay equal to 4 months of his Base Salary in effect on the date of such termination or resignation.

"Cause" means any of the following: (a) fraud, embezzlement, material dishonesty, breach of fiduciary duty against the Company or any of its affiliates; (b) conviction or pleading of *nolo contendere* to a felony or a crime involving moral turpitude; (c) a material breach of, a material failure to perform, or material negligence or willful misconduct in the performance of the duties of employment or other engagement by the Company or any of its affiliates that, if susceptible of cure, remains uncured or continues 10 days after the Employee receives written notice thereof from the Company or its affiliate or recurs more than twice in any 12[-]month period; or (d) drug use or intoxication which negatively impacts job performance.

"Good Reason" means that any one or more of the following has occurred as a result of an action by the Company or its applicable

affiliate and is not rectified within 30 days of written notice of such occurrence provided by the Employee to Neptune Wellness Solutions Inc.: (a) a material reduction in Employee's aggregate annual base salary as in effect from time to time other than as part of an across-the-board reduction applicable to similarly situated employees that results in a proportional reduction to such Employee's equal to that of other such employees; (b) a material diminution of position or duties; provided, however, that a diminution of position or duties as a result of a sale of part of the business, the acquisition of another business by the Company or its affiliates, organic growth of the business of the Company or its affiliates, or internal restructuring in the management or reporting structure of the Company or its affiliates shall not constitute "Good Reason"; or (c) relocation of such Employee's principal place of business more than 90 miles from the Old Company's head offices in Conover, North Carolina.

## 4. GENERAL

### 4.5. Governing Law

This Agreement is a contract made under and shall be governed by and construed in accordance with, the laws of the State of Delaware, without regard to conflict of law principles, and the federal laws of the United States applicable in the State of Delaware.[84]

---

[84] The employment agreement itself does not contain a dispute resolution clause, but it is an Ancillary Document. APA § 11.14 provides in part: "All disputes, Claims, controversies, disagreements and Actions relating to this Agreement and any of the Ancillary Documents (each, a "Dispute") shall be fully and finally settled by arbitration …." See pages 121-122, above.

## DISCUSSION

- ### Global Questions From The Panel During The Hearing

During the Hearing, the Panel asked several "global" questions and elicited the testimony noted below.

- ### Why Wasn't The Acquired Business Successful?

Mr. John Moretz (Neptune's Chairman at the relevant time) testified as follows (Tr. 75-78):

> Q. Now, we looked at the hemp oil prices earlier. Is that – I'm using the word "crash," but we'll have other witnesses talk about this. Is that crash in the price of CBD oil, is that why this business was not successful?
>
> A. One of the reasons, yes. The primary reason I would state, but not the only one.
>
> Q. And --
>
> ARBITRATOR: Excuse me. What are the other reasons?
>
> THE WITNESS: Well, the projections, in my opinion, were too -- hindsight is 20/20 – weren't practical. The onsetting of getting new customers particularly to sell that amount of oil that was shown, you've got to get – that's not -- whether you call that white label or selling the oil, those customers required GMP, and that was known by Jim Hamilton and expressed.
>
> And the reason, the whole premise of getting Steve Lijoi in and then hiring him to give an assessment and then to hire him to help implement GMP, we could never begin to get 80 percent of that market, or half of that market, without being GMP. So that was critical from the begin point.
>
> So it's not just the crash. The crash was, I would say, still the biggest component of making money. But even the sale of the product and get it adapted was really -- turned out real quickly to understand the 6- to 12-, 18-month process. It could have never have happened that quickly, in my business assessment. And then in reality of the marketplace, it was never going to happen that quickly.
>
> ARBITRATOR: So we have crash of the oil price and then failure to get GMP certification; is that right?
>
> THE WITNESS: Yes. But even with the certifications, then they've got to come in and examine the -- examine your facility. And still it can be three, six months before you actually get written orders from people.

We totally missed, even Neptune in our assessment, and certainly particularly in their assessment -- the time element for getting adoption by GMP-requiring customers was never really going to be six months to where it could really have happened in 2019 at all, basically.

That was a huge miss on all of us.

ARBITRATOR: Anything else? I think you've identified three things now.

THE WITNESS: Cultures didn't mesh very well. You know, I've been in businesses where cultures don't mesh. And that alone can cause a demise in the business. And certainly there were plenty of culture differences here, unfortunately.[85]

- ### Why Would Neptune Not Make Further Investments If It Stood To Make So Much Money?

The Panel noted its puzzlement and asked Mr. Galloway why, if Neptune stood to make money from Sugarleaf as a captive producer of high-end THC-free material for Biodroga and Neptune products (cf. the proposed changed business model for Sugarleaf (see pages 70-71 & 78-79, above)), Neptune didn't install the HVAC, provide the requested chemists, install all the other equipment needed to increase capacity, and make that facility GMP-compliant? Tr. 2371-2374. Mr. Galloway answered as follows (Tr. 2374-2376):

> So I had the support of Neptune senior management when it was to Graham [Wood], when it was to, to Steve Lijoi, even Jackie Khayat chiming in saying these are must-haves. Seemingly I had support from everyone at Neptune on these initiatives or projects because they did make sense, but Michael Cammarata would just simply ignore them.
>
> He would not discuss them with us. We would not get a response on a CapEx request. And we would just be ghosted. So it became a pretty concise single person that was standing in the way of what I would say progress on the facility and these projects.

---

[85] Mr. DuBose testified as follows (Tr. 1003-1004): "[T]here was nobody that took ownership of running and aligning the business, and it floundered, and you could feel it throughout the entire organization, and that was really the rub of it, in my opinion. … [Y]ou had silos, you had the Neptune silo in Quebec, you had the Sugarleaf silo in North Carolina, you had the Biodroga silo in Quebec and nobody was in charge of the whole thing. … And that created a lot of … cultural challenges …." Mr. Coles agreed there were cultural differences (Tr. 2910): "Q. … So you have a large public company integrating with a startup hemp extraction company in North Carolina and there were cultural differences, correct? A. Okay. Q. Do you agree with that? A. There were cultural differences? Yes. I guess so, yes."

And my second part of this answer, which may need some, some additional, is Neptune at the time of closing had represented they had two to three years of their capacity in Canada sold out -- sold -- pre-sold.

When Neptune turned on their Phase 2 extractor [at Sherbrooke], they had the pressure and the coolant higher than the pressure in the oil vessel and leaked Dynalene into Canopy's material. So they had a leak in their equipment. Dynalene is not food grade; should not have been used.

Subsequently, this caused a close-down from when they announced that they commercially ran in October until April, and at this point I made multiple trips up there to assist them on getting back and running. But the end result was a massive collapse in their revenue or income that was not going to provide them with sufficient capital to pay me my earn-out.

And, quite frankly, the capital raised for, the $41 million for the Sugarleaf initiative was now going to life support for the hundred-plus employees in Sherbrooke that were for a period of six months or longer not producing oil out of Phase 2.

And so there's, you know, motivation that there was a pretty big financial reason, too.

After Mr. Galloway answered, the Arbitrator said (Tr. 2377):

[I]t's been a puzzlement to me as to why -- well, Mr. Waldon, you shook your head yes. If that's the reason, if that's the reason that the funds couldn't be provided to Sugarleaf, if that's going to be a defense that the economics of the corporation were in grave danger of taking it down, this is the first I've heard about this massive problem.

Counsel for the Neptune side then said (Tr. 2378-2379):

[W]hat I don't want to be is misinterpreted. So just for the record, I am nodding because I share the same puzzlement. Why would Neptune intentionally destroy a corporate, you know -- an operation that it paid $12 million for, plus 6 million in shares? It was a money pit. They lost well over $10 million on this and that's why.

My puzzlement is, why would they shoot themselves in the foot intentionally by constricting capital if it was actually producing revenue? It was not.

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 133 of 201

I honestly -- this is the first I've heard from anyone that there was this leak in Sherbrooke. I have no idea. I don't have any intention of putting that forward as a defense.

I do know that cash is precious, especially during the pandemic. It was a very big issue for a lot of companies, including Neptune. And it got tighter and tighter as the pandemic unfolded in 2020.

So, yes, if you have a business unit that is producing almost no revenue, it becomes a serious issue continuing to put CapEx and other operational support into that entity. And I think that's perfectly reasonably commercially -- [.]

- **<u>Some Preliminary Observations</u>**

After considering the evidence (the documents of record and testimony) and arguments made by Counsel, the Panel is persuaded, and finds and holds, that:

- Sugarleaf Labs LLC was almost completely (if not completely) ignorant about cGMP before the March 11, 2019 gap analysis. For example, as reported by Ms. Heinbaugh: "They [Sugarleaf Labs LLC] have ZERO procedures and they have almost no knowledge of what the FDA expects-- it's a recipe for disaster for when the CBD oil truly becomes a supplement." See page 61, above.

- Neptune knew from a time *before* execution of the APA (which was on May 9, 2019) through a time *after* the closing (which was on July 24, 2019) that Sugarleaf was not cGMP-compliant. See for example:

  - Ms. Heinbaugh's email to Mr. Brouillette of March 22, 2019 (48 days before execution of the APA): "Sugarleaf is operating completely out of compliance - on just about every level. I know that isn't a surprise to you." See page 61, above.

  - Ms. Heinbaugh's March 23, 2019 gap analysis report (47 days before execution of the APA): "Sugarleaf Labs is not operating with current Good Manufacturing Practices (cGMPs) and as a result they are not adequately prepared to manufacture dietary supplement ingredients at this time." See page 62, above.

  - Neptune's Project Gold Special Transaction Committee report that was prepared for an internal Neptune meeting on April 25, 2019 (14 days before execution of the APA): full implementation of

GMP was said to require 8 months to a year. See page 64, above. An 8-month period starting on April 25, 2019 would end months after the closing date of July 24, 2019.

- Mr. Lijoi's testimony: he thought the Committee's estimate of 8 months (for full implementation of GMP) was "aggressive"; he told Neptune in a report he made "in the April, May [2019] time frame" that achieving GMP would take "more like a year to possibly 18 months." See pages 64-65, above. A year from April 2019 would put achieving GMP well after the closing date of July 24, 2019.

- A June 2019 slide deck bearing both the Neptune and Sugarleaf names: its slide 13, entitled "Current Good Manufacturing Practices (cGMP)," shows a cGMP assessment phase date starting January 2019, a cGMP implementation phase starting July 2019, and a cGMP sustainment phase starting September 2019. See page 65, above. This also puts achieving GMP after the closing date of July 24, 2019.

- Mr. Lijoi's July 19, 2019 email to Mr. Brouillette 5 days before the closing: Mr. Lijoi wrote that the foundational (not full) cGMP would be in place by the end of September (i.e., over 2 months after the closing) and that typical estimates for implementing full cGMP were at least a year. See page 67, above.

- A slide deck prepared by Neptune for the "Sugarleaf Integration Kick-off Meeting" on July 26, 2019 (just 2 days after the closing): it states that one of the near- and medium-terms goals was to achieve cGMP certification by the end of 2019. See page 68, above.

- An email from Neptune's Chief of Corporate Development & Strategy August 1, 2019 (8 after the closing): it states that Mr. Lijoi "estimates that SL could be ready for a visit by officers for GMP certification by early 2020." See page 69, above.

- ▪ Mr. Cammarata's August 3, 2019 email (10 days after the closing) to Mr. Lijoi and Dr. Wood: Mr. Cammarata states he had spoken with Mr. Galloway and told Mr. Galloway that his (Mr. Galloway's) "number one focus" needed to be on making sure the plant passed the audits and became GMP approved.  See page 69, above.

- • Mr. Galloway had good reason to believe his duties after the closing would be very similar to his duties prior to the closing.

  - ▪ He was engaged to be President USA of Neptune Acquisition USA, Inc. (which post-closing changed its name to Sugarleaf Labs, Inc.).  Mr. Galloway's Employment Agreement with the post-closing Sugarleaf specifies in Section 1.1 (emphasis added): "The Employee will carry out those duties, responsibilities and reporting requirements <u>which are ordinarily expected of a President</u>, and such other reasonable duties as may from time to time be assigned by the Company."  See pages 127-128, above.

  - ▪ From conversations with Messrs. John Moretz and Jim Hamilton (pre-closing, they were Neptune's Chairman and President), Mr. Galloway understood he would post-closing be in control of the operation.  See footnote 48, above.

  - ▪ Mr. John Moretz had the same understanding (email sent by Mr. Moretz on May 4, 2019, 5 days before the APA was executed (see footnote 48, above)): "It was always my understanding in our many discussions that it was needed and required that Pete was to be full-time CEO and captained [sic] the ship.").

  - ▪ Mr. Coles's understanding, based on communications with Messrs. John Moretz, Hamilton, and Paradis, was consistent with Mr. Galloway's and Mr. John Moretz's, namely, that after the closing, the Sugarleaf officers would be able to control, and would have authority to operate, the business.  See footnote 48, above.

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 136 of 201

- During the first 20 days after the closing (July 24, 2019), Neptune said it wanted to pay the earn-outs, which meant Neptune was implicitly saying it wanted Sugarleaf to meet the targets.  See, e.g.:

  - A slide deck prepared by Neptune for a "Sugarleaf Integration Kick-off Meeting" on July 26, 2019 (2 days after the closing) indicates on slide 3, entitled "Vision, Strategy & Goals," the only goal listed is "Pay the full earnout to the SL team."  See page 68, above.

  - In a Neptune slide deck entitled "Sugarleaf Integration Plan" and dated August 13, 2019 (20 days after the closing), on slide 2 (entitled "Vision, Strategy & Goals"), the only goal listed is "Pay the full earnout to the SL team."  See page 69, above.

- No later than 37 days after the closing, Mr. Cammarata (who replaced Mr. Hamilton as President of Neptune about 8 weeks after the APA had been executed and about 3 weeks before the closing) "changed the business model to operate Sugarleaf," a change Mr. Paradis (Neptune's Vice President and Chief Financial Officer and the "main guy responsible for acquisition") believed would require renegotiation of "how to calculate the Earnouts with Pete [Galloway]."  See Mr. Paradis's September 2, 2019 email to Mr. John Moretz (Neptune's Chairman), in which Mr. Paradis reported that "Michael C's lawyer[s]" (at Greenberg Traurig) were working on a new agreement "between Sugarleaf and Neptune for the calculation of the earnouts" and that he (Mr. Paradis) had received a call from one of the Greenberg Traurig attorneys the previous Friday "about this project."  Mr. Paradis stated he "WAS NOT AWARE AT ALL about this project."  See pages 70-71, above.  The "previous Friday" was August 30, 2019, 37 days after the closing (on July 24, 2019).

- Neptune had good reason to believe that possession and transport of "hot oil" was highly problematic.  See, e.g.:

  - Vicente Sederberg December 16, 2019 opinion (page 82, above): "[W]e are unable to issue a legal opinion blessing the transport of hot, intermediate extract, even where that extract is intended to be

further processed below .3% prior to retail sale. … I wish I had better news, but we simply do not want to counsel you/the board to undertake activity that could subject the company to criminal and civil penalties."

- Greenberg Traurig December 19, 2019 opinion (pages 85-86, above): "[E]xemption or not, there are likely varying levels of risk in transporting a hemp extract over 0.3% THC. … [I]t doesn't rule out the possibility that the DEA or an applicable state agency could take action if desired and/or warranted."

- Mr. Kight's March 1, 2020 opinion (page 94, above): "Despite there being a strong argument that interstate transport of WIPHE extract [work in progress hemp extract] between processing facilities is lawful under the [US] Farm Bill, intrastate transportation of WIPHE appears to be unlawful under NC law. Possession of it under either circumstance poses considerable risk for both the processor(s) and the transporter."

- Vicente Sederberg March 6, 2020 opinion (pages 94-96, above): "[I]t remains ambiguous as to whether and how this 0.3% THC standard should be applied to lawfully sourced, hemp-derived material that is subject to further processing and is neither intended nor marketed for sale to the end-consumer. … [T]he DEA or other authorities could adopt and enforce an interpretation of the federal definition of hemp contrary to the 'Source Rule'; … authorities in North Carolina could adopt and enforce an interpretation of "marijuana" that encompasses intermediary hemp extract with a THC content exceeding 0.3%[.]" Each interpretation would be problematic for conduct of the Sugarleaf business.

- **"Commercially Reasonable Efforts"**

A key issue is whether after the closing, the Neptune side "act[ed] in good faith with respect to the operation of the Business,[86] including, but not limited to, using commercially reasonable efforts to maintain and increase existing levels of business" as required by APA § 1.8(c), which reads in part (emphasis added):

> Subsequent to the Closing, the Purchaser[87] shall have sole discretion with regard to all matters relating to the operation of the Business, provided that during the Earn-Out Period, the Purchaser (i) shall act in good faith with respect to the operation of the Business, including, but not limited to, using <u>commercially reasonable efforts to maintain and increase existing levels of business</u>, and to refrain from taking any actions that would reasonably be expected to be materially adverse to the operation of the Business ....

Thus, broadly speaking, after the closing, although the Neptune side could run the acquired business as it saw fit, it still had to act in good faith during the Earn-Out Period in running that business. Under APA § 1.8(c), acting in good faith with respect to running the business included but was not limited to "using commercially reasonable efforts to maintain and increase existing levels of business."

- **The Test To Be Used To Assess "Commercially Reasonable Efforts"**

At the Panel's request of April 7, 2023, in their May 1, 2023 submissions, both sides discussed *Menn v. ConMed Corp.*, 2022 WL 2387802 (Del. Ch. June 30, 2022), and cases cited in *Menn*.

In its May 1, 2023 submission, the Neptune side said this about *Menn* (id. at page 3):

> Defendant [ConMed] was required to use "commercially best efforts ... to maximize payouts for the benefit of the Shareholder Parties pursuant to Section 4.02 and Section 4.03

---

[86] "Business" is defined in Recital A of the APA (Ex. 9) and, broadly speaking, includes producing and selling hemp-derived extracts and oils, sourcing relevant natural resources, and developing equipment and processes (see page 112, above).

[87] The Purchaser in the APA was Neptune Acquisition USA, Inc., which post-closing changed its name to Sugarleaf Labs, Inc. (see footnote 2, above). Under APA Section 10(a), Neptune Wellness Solutions, Inc. ("Parent") "hereby absolutely, unconditionally and irrevocably guarantees, as primary obligor, to the Sellers the obligations of the Purchaser under the terms of this Agreement" (see page 120, above). Thus, all of Purchaser's obligations are also Neptune's, and no Party in this matter has argued to the contrary. Again, the two Parties on the Neptune side are Sugarleaf Labs, Inc. and Neptune (Neptune Wellness Solutions, Inc.). See footnote 2, above.

hereto, including the maximization of net sales of Products." (*Menn* at *33). The contract did not define "commercially best efforts," which the court equated to "commercially reasonable efforts." The "efforts" clause is distinguishable from APA clause 1.8(c), as it required defendant to use best efforts to maximize sales and post-closing earnouts, while APA 1.8(c) does not require efforts to maximize earnouts or sales. The Court concluded that defendant, whose efforts were comparable to Neptune's efforts, complied with and did not breach the "efforts" clause.

In its April 7, 2023 questions/requests, the Panel also invited both sides to provide "additional Delaware (state and Federal) cases precisely on the meaning of the term 'commercially reasonable efforts' with your comments on each case." In response to that invitation, at page 5 of the Neptune side's May 1, 2023 submission, it said:

> Neptune thanks the Panel for providing the opportunity to provide additional citations regarding the courts' interpretation of "commercially reasonable efforts" clauses in Delaware. However, having shepardized the *Conmed* [*Menn v. ConMed Corp.*] opinion, which was decided in June 2022 and provides a helpful contemporary survey of Delaware law on this point, Neptune does not feel the need to present further authority for the Panel's consideration.

*Menn* concerned acquisition by ConMed (via stock purchase) of EndoDynamix, Inc., a start-up that was developing a surgical device. Plaintiff Menn is the representative of the former shareholders of EndoDynamix. In the stock purchase agreement, broadly, ConMed agreed to pay money upfront to the EndoDynamix shareholders, to make additional payments as milestones were achieved, and to make earn-out payments for the first sale and certain subsequent sales. ConMed agreed to use commercially best efforts to maximize milestone and earn-out payments.

As recognized by the Neptune side in its May 1, 2023 response, in the present matter, there is no promise by the Neptune side to maximize any such payments to the PMGSL side. But that distinction over *Menn*—the only distinction the Neptune side asserted in its May 1, 2023 submission—is irrelevant in view of the clear, broad teachings of *Menn*.[88] As the Neptune side stated, *Menn* "provides a helpful contemporary survey of Delaware law on this point," i.e., the

---

[88] The Neptune side subsequently argued a second distinction over *Menn* (see below).

"interpretation of 'commercially reasonable efforts' clauses in Delaware."  See, e.g., *Menn's* discussion at *33-35 (italics in original; boldface removed; footnotes omitted; underlining added):

> ### B.  The Obligation To Use Commercially Best Efforts
>
> Section 4.03(g) of the [EndoDynamix] Agreement provides:
>
>> Buyer and the Company shall work in good faith and use commercially best efforts to maximize payouts for the benefit of the Shareholder Parties pursuant to Section 4.02 and Section 4.03 hereto, including the maximization of net sales of Products.
>
> The "commercially best efforts" provision is what is known as an "efforts" clause.  Efforts clauses generally replace "the rule of strict liability for contractual non-performance that otherwise governs" with "obligations to take all reasonable steps to solve problems and consummate the" contractual promise.  Efforts clauses "define the level of effort that the party must deploy to attempt to achieve the outcome."
>
> Often, transactional designers will define benchmarks for the "commercially reasonable" standard relevant to the efforts clause within the governing agreement.  For example, in two recent decisions, this court interpreted provisions requiring a buyer to use "commercially reasonable efforts" to maximize milestone and earn-out payments post-closing—*Himawan v. Cephalon, Inc.* [2018 WL 6822708 (Del. Ch. Dec. 28, 2018)] and *Neurvana Medical, LLC v. Balt USA, LLC* [2020 WL 949917 (Del. Ch. Feb. 27, 2020)].  In each case, unlike here, the agreement contained a contractual definition—a "yardstick"—by which the court was to measure "commercially reasonable" efforts.  In each case, the court's decision centered on the adequacy of the plaintiff's allegations relative to the specific contractual yardstick.  While the efforts provision and context of *Himawan* and *Neurvana* are similar to that at issue here, the Agreement lacks any express contractual standard by which to gauge ConMed efforts.  These cases are thus of little help.  The court thus turns to other inputs in search of guidance on the meaning of "commercially best efforts."
>
> Deal practitioners who draft efforts clauses "have a general sense of [the] hierarchy" of such clauses [*Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *86 *(Del. Ch. Oct. 1, 2018)*].  One commonly cited version of this hierarchy places "best efforts" as the highest standard with "reasonable best efforts," "reasonable efforts," "commercially reasonable efforts," and "good faith efforts" following in descending order.  "Commercially best

efforts" provisions are not found on the standard hierarchy. Logically, such provisions would fall between "best efforts" and "commercially reasonable efforts."

Although deal practitioners have some sense of the hierarchy among efforts clauses, courts applying the standards have struggled to discern daylight between them.  <u>This court, for example, has interpreted "best efforts" obligations as on par with "commercially reasonable efforts."</u>

<u>Because this court has consistently interpreted "best efforts" obligations as on par with "commercially reasonable efforts,"</u> it follows that there is even less daylight between "best efforts" and "commercially best efforts" provisions.  Indeed, the parties make no distinction in briefing.  This decision, therefore, interprets "commercially best efforts" as imparting the same meaning as "best efforts."

<u>"When assessing whether a party has breached an efforts clause in a transaction agreement, 'this court has looked to whether the party subject to the clause (i) had reasonable grounds to take the action it did and (ii) sought to address problems with its counterparty.'"</u> [*Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *41 (Del. Ch. Apr. 30, 2021) (quoting *Akorn*, 2018 WL 4719347)]  <u>"This standard applies with equal force to 'reasonable best efforts' and 'commercially reasonable efforts' language."</u>  [Id. (citing *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, 2020 WL 7024929 (Del. Ch. Nov. 30, 2020) and *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715 (Del. Ch. 2008))]  In that context, this court has interpreted "best efforts" to require "a party to do essentially everything in its power to fulfill its obligation (for example, by expending significant amounts or management time to obtain consents)."[89]

In its May 1, 2023 answers to the Panel's questions, the PMGSL side said this about *Menn* (id. at pages 2-3; italics in original):

*Menn* establishes that Delaware courts treat "commercially reasonable" and "best efforts" clauses as essentially the same and evaluate a party's conduct under both using the following test: whether a party a) had reasonable grounds to take the action it did, and b) sought to address problems with its counterparty.  "In that context, this court has interpreted "best efforts" to require "a party to do essentially everything in its power to fulfill its obligation (for

---

[89]  See also cases cited in *Menn* to the same effect, e.g., *Akorn*; *Hexion*; *Snow Phipps;* and *Channel Medsystem, Inc. v. Boston Scientific Corp.*, 2019 WL 6896462, at *37-38 (Del Ch. Dec. 18, 2019).

example, by expending significant amounts or management time to obtain consents)." *Id.* at *35. Neptune fails both prongs of this test. The record contains numerous examples where it lacked a valid business reason for its actions and did not seek to address the issue with Sugarleaf. For example, Neptune's failure to hire chemists, install HVAC, issue the January 2020 Sales Policy, and shut down the facility all fail this simple test.

In response, in its May 9, 2023 comments on the PMGSL side's May 1 discussion of *Menn*, the Neptune side said (id. at pages 2-4; footnote omitted):

> In its May 1, 2023 submissions, PMGSL urged this panel to apply a two pronged-test to evaluate whether Neptune complied with the "commercially reasonable efforts" clause at APA 1.8(c) – namely, "whether the party (a) had reasonable grounds to take the action it did, and (b) sought to address problems with its counterparty." However, this two-pronged test has only been applied by Delaware courts in the merger context, and is not on point here.

But, in its clear and broad pronouncements in *Menn*, the Delaware Court made no distinction in between merger and non-merger transactions: "When assessing whether a party has breached an efforts clause in a transaction agreement, 'this court has looked to whether the party subject to the clause (i) had reasonable grounds to take the action it did and (ii) sought to address problems with its counterparty.'" and "This standard applies with equal force to 'reasonable best efforts' and 'commercially reasonable efforts' language." The Court did not limit its pronouncements to any particular type of transaction, merger or otherwise. For example, the Court did not say: "When assessing whether a party has breached an efforts clause in a <u>merger</u> transaction agreement, 'this court has looked to …'"; it would have been easy enough for the Court to so limit its pronouncements had it wished to do so. Moreover, acquisition of a business is a result of a merger agreement as well as a result of a *non*-merger agreement to purchase all assets, and earn-outs to be paid to the seller based on the performance of the acquired business are conceptually identical in the two situations. The *Menn* Court provided no reason to distinguish between them when determining whether efforts were "commercially reasonable efforts."

Separate and apart from that, the Neptune side in its May 1, 2023 submission clearly and broadly observed that *Menn* "provides a helpful contemporary survey of Delaware law on <u>this point</u>" (emphasis added), namely, the "interpretation of 'commercially reasonable efforts'

clauses in Delaware"—the Neptune side in its submission did not say that "this point" was the "interpretation of 'commercially reasonable efforts' clauses in merger transactions in Delaware."

Furthermore, as stated by the Neptune side: (a) under the efforts clause in *Menn,* "Defendant [ConMed] was required to use 'commercially best efforts … to maximize payouts for the benefit of the Shareholder Parties'" pursuant to their agreement (page 3 of the Neptune side's May 1, 2023 submission); and (b) "The most closely analogous Delaware cases to the instant matter are the post-closing earnout disputes in *Menn* and *Neurvana*" (page 4 of the Neptune side's May 9, 2023 comments on the PMGSL side's May 1, 2023 responses).[90]

Finally, the Neptune side has not explained why the Court's pronouncements in *Menn* are not instructive here for understanding the meaning of "commercially reasonable efforts" in APA § 1.8(c), pursuant to which the Neptune side was obligated to "act in good faith with respect to the operation of the Business, including, but not limited to, using commercially reasonable efforts to maintain and increase existing levels of business … [emphasis added]." Those pronouncements by the Delaware Court *are* on point and *are* helpful.

- **The Neptune Side Does Not Pass The Test**

Again, the question is whether the Neptune side used "commercially reasonable efforts to maintain and increase existing levels of business." Whether we use a one-prong test (Did Neptune have reasonable grounds to take the actions it did to try to maintain and increase existing levels of business?) or a two-prong test (Did Neptune have reasonable grounds to take the actions it did to try to maintain and increase existing levels of business? *and* Did Neptune

---

[90] *Neurvana Medical, LLC v. Balt USA, LLC,* 2020 WL 949917 (Del. Ch. Feb. 27, 2020), was discussed by the Neptune side at pages 17-18 of its February 6, 2023 answers to Panel questions:

> [*Neurvana*] involved a post-closing earn-out dispute based on a "commercially reasonable efforts clause," just like the instant case. In *Neurvana*, plaintiff Neurvana sold a medical device to defendant Balt, setting post-closing earnout "milestones," including regulatory approval of the medical device. The contract required Balt to use "commercially reasonable efforts" to achieve those milestones …. Ultimately, Balt failed to achieve regulatory approval of the device, leading Balt to sue for breach of the commercially reasonable efforts clause, among other claims.
>
> . . .
>
> In essence, the plaintiff in *Neurvana*, just like the plaintiffs in *InspiRx* and *Sekisui* [two New York cases]—and similarly to the instant matter— presented the court with a laundry list of complaints about defendant's conduct, but failed to identify any bad faith action or failure to use "commercially reasonable efforts." Again, it is not enough for a party simply to disagree with the other party's business decisions or strategy.

seek to address problems with its counterparty?), Neptune fails.[91,92]  The record is replete with evidence of Neptune's failure to make the required efforts, including the following.

Not later than August 30, 2019, which was only 37 days after the July 24, 2019 closing, Mr. Cammarata, who had replaced Mr. Hamilton as President of Neptune about 8 weeks after execution of the APA and about 3 weeks before the closing, had already "changed the business model to operate Sugarleaf" and asked for Greenberg Traurig's help to implement that.[93] Mr. Paradis (Neptune's Vice President and Chief Financial Officer, the "main guy responsible for acquisition," and "in charge of" the acquisition of Sugarleaf) stated in his September 2, 2019 email that "[t]he original thinking was to keep Sugarleaf 'as is' as much as possible" but that "[t]his concept is actually completely revisited by GT Law."  Id.  Mr. Paradis wrote he was "NOT AWARE AT ALL about this project" (capitalization in original).

Mr. Cammarata's change in the Sugarleaf business model led to Neptune proposing a new contractual arrangement (Transition Services Agreement) for Sugarleaf pursuant to which, broadly speaking, the more profitable work (e.g., turnkey and branded business) would be transferred away from Sugarleaf to Biodroga (or to another Neptune company), and Sugarleaf would be made a captive producer for the more profitable products Biodroga (or other Neptune company) would produce (furthermore, in practice, the transfer price Biodroga was willing to pay Sugarleaf was sometimes even below Sugarleaf's cost).

Mr. Galloway refused Neptune's proposal, and Neptune then imposed its new "U.S. Sales & Pricing Policy," which, broadly speaking, had the effect of doing much of what Neptune's proposed contractual arrangement would have done had it been agreed to by Mr. Galloway.  That new Policy was adopted apparently without any input from Sugarleaf.  Mr. Galloway testified that, as a result of the Policy, "Essentially we [Sugarleaf] were closed."

The Neptune side refused to have Mr. Cammarata testify, and neither side has called to the Panel's attention any evidence of record that explains why Mr. Cammarata had "changed the

---

[91]  If it fails that one-prong test, it would necessarily fail that two-prong test.

[92]  "Action" includes inaction.  For example, failing to make a recommended capital expenditure is the act of doing nothing and has consequences (e.g., a needed piece of equipment is not purchased/installed, which thereby prevents/hampers product manufacture).

[93]  The Neptune side refused to have Mr. Cammarata testify, and neither side has called to the Panel's attention any evidence of record at odds with Mr. Paradis's statement in his September 2, 2019 email (Ex. 31 (see pages 70-71, above)) that Mr. Cammarata had "changed the business model to operate Sugarleaf."

business model to operate Sugarleaf" almost contemporaneously with the acquisition of the Sugarleaf business. Sugarleaf presumably had not yet had a significant enough impact on Neptune's finances (not more than 37 days after the closing) for Neptune to complain that Sugarleaf was a "money pit." See pages 132-133, above.

Neptune did not make the investment required for producing THC-free material (e.g., for purchasing the necessary equipment), for installing HVAC, etc., even though those expenditures were strongly recommended by Mr. Lijoi, Dr. Wood, Ms. Khayat, etc. because that would allow Sugarleaf to operate in hot weather, make higher value products, become GMP-certified, etc. Mr. Cammarata failed to approve those expenditures or provide any reason why ("He [Mr. Cammarata] would not discuss them with us. We would not get a response on a CapEx request. And we would just be ghosted."). Again, Neptune refused to have Mr. Cammarata testify in this Arbitration, and why he refused to approve those strongly recommended expenditures (some of which were relatively small) has not been satisfactorily explained by the Neptune side, particularly if the goal was to maintain and increase the existing levels of Sugarleaf business.

Neptune marginalized Mr. Galloway, who had significant U.S. cannabis experience and was supposed to be running the post-closing Sugarleaf.[94] Although Mr. Galloway was hired to be President of the post-closing Sugarleaf and was assured before the closing that he would be in control of the operation (see footnote 48, above), he was not allowed by Neptune to "carry out those duties, responsibilities and reporting requirements which are ordinarily expected of a President" (Galloway Employment Agreement (see pages 127-128, above)). Mr. Cammarata had Mr. Galloway report to Mr. Lijoi (not to him, Mr. Cammarata) and, on more than one occasion, Mr. Cammarata or others at Neptune instructed Sugarleaf employees not to disclose information concerning Sugarleaf to Mr. Galloway that he, as Sugarleaf's President, should have been privy to. On June 2, 2020, Mr. Cammarata wrote to Mr. Lee Moritz, saying that "adjustments" had been made to move him (Mr. Lee Moritz) to the positions of President and General Manager. Mr. Lee Moritz said he never assumed the title of President.

About three months later, the Neptune side fired Mr. Galloway for cause (Greenberg Traurig September 4, 2020 letter (Ex. 207)), apparently based on the reasons set forth in

---

[94] Neptune thought enough of Mr. Galloway to send him to Sherbrooke to help it recover from its shutdown resulting from the Dynalene leak (see page 132, above). And in Dr. Wood's November 16, 2019 email to Messrs. Cammarata and Lijoi, he noted that Mr. Galloway had "tons" of cannabis extraction experience (see page 81, above).

Greenberg Traurig's August 27, 2020 letter (Ex. 203), which were thin at best (see pages 170-172, below).  In that August 27, 2020 letter, Neptune said "Mr. Galloway is and has always been Sugarleaf's President," notwithstanding the "adjustments" referenced in Mr. Cammarata's June 2, 2020 communication to Mr. Lee Moritz, which included Neptune making Mr. Lee Moritz Sugarleaf's President.

Neptune did not have reasonable grounds to engage in the above-described behavior if it was trying to maintain and increase the existing levels of Sugarleaf business.  The Panel finds and holds, therefore, that Neptune did not make commercially reasonable efforts to maintain and increase existing levels of business as required by APA § 1.8(c) and, therefore, did not act in good faith with respect to the operation of the Business as required by APA § 1.8(c).[95]

For the sake of completeness, the Panel notes that if the two-prong test is used, Neptune fails that too.  Its first prong is identical to the one-prong test (which the Panel has already held Neptune fails) and, with respect to the second prong (Did Neptune seek to address problems with its counterparty?), although some of Neptune's employees did communicate with Sugarleaf about some problems, it was Mr. Cammarata who made the final key decisions and he rarely communicated with Messrs. Galloway or Coles about anything, much less about the serious problems.[96,97]

---

[95]  There are still other Neptune actions at odds with Neptune's obligation to maintain and increase existing levels of Sugarleaf business, but the above-described actions are more than sufficient to support the Panel's determination on that issue.  However, the Panel believes that Neptune had reasonable grounds for some of its actions concerning the "hot oil" issue, the interruption of website operation/sales for some products, and the change/delay in approving/implementing revised product labels for some products.

[96]  When testifying about the telephone conversation Mr. Galloway had with Mr. Cammarata in mid-October 2019 (about 3.5 months after Mr. Cammarata became President of Neptune), Mr. Galloway said that up to that point, he had met Mr. Cammarata only twice and had had only two phone calls with him (see pages 75-76, above).  Mr. Coles testified he had spoken with Mr. Cammarata only once (see page 76, above).  Mr. Galloway also testified with respect to capital expenditure requests (see page 131, above):

> So I had the support of Neptune senior management when it was to Graham [Wood], when it was to, to Steve Lijoi, even Jackie Khayat chiming in saying these are must-haves.  Seemingly I had support from everyone at Neptune on these initiatives or projects because they did make sense, but Michael Cammarata would just simply ignore them.

> He would not discuss them with us.  We would not get a response on a CapEx request.  And we would just be ghosted.  So it became a pretty concise single person that was standing in the way of what I would say progress on the facility and these projects.

Being ghosted by Neptune's President about something as important as highly recommended capital expenditures is hardly "seeking to address problems."  This testimony of Messrs. Galloway and Coles stands unchallenged.  Again,

*[footnote continued] ...*

- **<u>Rule R-47: Scope Of Award</u>**

Before turning to the claims, the Panel sets forth Rule R-47 (Scope Of Award), which reads as follows (emphasis added):

> R-47.  Scope of Award
>
> (a)     The arbitrator <u>may</u> grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.
>
> (b)     In addition to a final award, the arbitrator <u>may</u> make other decisions, including interim, interlocutory, or partial rulings, orders, and awards.  In any interim, interlocutory, or partial award, the arbitrator <u>may</u> assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.
>
> (c)     In the final award, the arbitrator <u>shall</u> assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55.  The arbitrator <u>may</u> apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.[98]
>
> (d)     The award of the arbitrator(s) <u>may</u> include:
>
>> i.  interest at such rate and from such date as the arbitrator(s) may deem appropriate; and
>>
>> ii.  an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement.

---

*… [footnote continued]*

Neptune refused to have Mr. Cammarata testify, and no evidence of record has been called to the Panel's attention to contradict their testimony.  The Panel does not agree with Neptune that it "had reasonable grounds to take all the actions it did, and always sought to address problems collaboratively with Sugarleaf throughout the relevant period in this case…."  Neptune side's May 9, 2023 submission, page 4.

[97]   The portion of APA § 1.8(c) that gives Neptune "sole discretion with regard to all matters relating to operation of the Business" after the closing does not save Neptune because its "sole discretion" is subject to, among other things, the requirement that, during the Earn-Out Period (the 36-month period ending March 31, 2022), it act in good faith with respect to the operation of the Business, including using commercially reasonable efforts to maintain and increase existing levels of business.  APA §§ 1.8(a)(iii) & (c).  See pages 115-116, above.

[98]   The three rules cited in R-47(c) are Rule R-53 (Administrative Fees), which concerns the AAA's administrative fees, Rule R-54 (Expenses), which concerns expenses of the arbitrators etc., and Rule R-55 (Neutral Arbitrator's Compensation), which concerns arbitrator compensation.

- **The Neptune Side's Claims**

The Neptune side asserts three claims (see pages 9-12, above) and must prove its claims by a preponderance of the evidence (Neptune side's Pre-Hearing Brief, page 13; *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005)).   Broadly speaking, Neptune's claims are all based on the alleged misrepresentation Sellers made at one or more of the following times: before the APA was executed on May 9, 2019, when the APA was executed, and during the closing on July 24, 2019. Still broadly speaking, the alleged misrepresentation is that Sellers were in compliance with all laws, regulations, and codes, namely, being cGMP-compliant, when in fact they were not.  The claims are for breach of contract, fraud in the inducement, and negligent misrepresentation.

- **Breach Of Contract**

The Neptune side says (February 6, 2023 answers to Panel questions, page 5 (citations omitted)):

> PMGSL breached the APA because its Conover facility was not cGMP compliant either at the time of signing the APA or at closing on July 24, 2019, which violated its warranties under this agreement, as set out above.  A breach of representations and warranties is treated as a claim for breach of contract in Delaware. …   However, Delaware law is settled that "reliance is not an element of a claim for breach of any of the representations or warranties" in a contract.

Neptune goes on to argue, among other things, that: (i) some of the products being produced by the Conover facility were "dietary supplements" and that such products must be cGMP-compliant (id. at page 6); (ii) while negotiating the APA, Sellers had asked to "severely dilute[]" Section 3.9 but ultimately agreed to the wording in the final version of the APA "in order to receive the $18 million initial purchase consideration" (id. at pages 6-7); (iii) there is no dispute that on May 9, 2019 (execution date of the APA) and July 24, 2019 (closing date), the Conover plant was not cGMP-compliant and, therefore, PMGSL was immediately in breach on the day it executed the APA (id. at page 7); (iv) two presentation slide decks, dated June 2019 and July 2019, contain an admission that the Conover plant needed to comply with FDA regulations and representations that the facility would be or was compliant "by following 'foundational cGMP' prior to closing," that "cGMP 'sustainment' would be achieved by September 2019," and that it was '[c]urrently implementing FDA compliance through Good

Manufacturing Practices" (id. at pages 7-8 (bracketed text in original)); (v) any argument by Sugarleaf that it told Neptune that Sugarleaf was not going to be cGMP-compliant by May 9, 2019 "runs afoul of the integration clause of Section 11.1 …" (id. at page 8); and (vi):

> [A]lthough Neptune was aware that PMGSL had not achieved cGMP as of the signing of the APA on May 9, 2019, PMGSL affirmatively represented to Neptune management in July 2019—the same month as closing—that it had reached "foundational cGMP" and was only two months away from "sustainment." Put simply, PMGSL chose to make those representations in order to receive the $18 million in purchase consideration, was responsible for complying with its own repeated representations, and assumed the risk of damage to Neptune caused by Sugarleaf's operations not being compliant with FDA requirements, including cGMP. [Id.]

The PMGSL side asserts several defenses in response (see, e.g., its March 1, 2023 submission at pages 4-11), including, broadly, that: (i) APA § 3.9 does not require cGMP-compliance; (ii) the representation/warranty of that section cannot cover such compliance because both sides were well aware at the time of executing the APA that there was no such compliance and that there would still be no compliance by the time of the closing; (iii) Neptune has not proved it suffered any damages as a result of the alleged breach; and (iv) Neptune waived the breach and/or failed to mitigate damages.

As noted by Neptune at page 11 of its Pre-Hearing Brief (underlining added):

> To prevail on a breach of contract claim, a party must prove the existence of a contractual obligation, the breach of that obligation, and <u>resulting damages</u>. *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005).

First, with reference to defenses (i) and (ii) above on this page, it is not clear that the Sugarleaf products in question are in fact "dietary supplements," or that the manufacturing facility and process for making them must be cGMP-compliant, or that APA §3.9 includes cGMP compliance, but because other defenses of the PMGSL side are sound (see below), there is no need to further discuss (and the Panel makes no finding or holding concerning) defenses (i) and (ii).

Neptune knew at all relevant times (before the May 9, 2019 execution of the APA, between the execution and the July 24, 2019 closing, and after the closing) that Sugarleaf was

not cGMP-compliant and that any such compliance would not be until well after the closing (see pages 133-135, above). The Panel does not understand how Neptune can have been damaged in the breach of contract sense by Sugarleaf's shortcoming (of not being cGMP-compliant) when Neptune knew at all relevant times of that shortcoming and was, in fact, throughout that period a participant in taking steps to try to obviate it.

That Neptune might have realized less profit than it otherwise would have if Sugarleaf had been cGMP-compliant (resulting from Neptune's increased expenditures and possibly decreased revenue) is not damage here in the breach of contract sense, as asserted by Neptune. Neptune chose to acquire the Sugarleaf business knowing that Sugarleaf was not cGMP-compliant, that it would take time and Neptune's money to achieve any such compliance, and that revenue and profit might be lower until after it was achieved. Neptune cannot knowingly and willingly assume that burden and risk and then later claim that any resulting decreased profit or the investment it knowingly chose to make should be awarded to it as breach of contract damages. In other words, there were no "resulting damages" from the alleged breach and, thus, under Neptune's own cited authority (*Interim Healthcare* (see preceding page)), there was no breach, and the Panel so finds and holds.

Even if there had been the breach that Neptune asserts, by Neptune's own lights, its right to complain first accrued on May 9, 2019, when the APA (containing Section 3.9) was executed, at which time it already knew that Sugarleaf was not cGMP-compliant (and, therefore, was, according to Neptune, immediately in breach of Section 3.9 (see page 148, above)). At that moment, broadly speaking, Neptune had invested no money in furthering Sugarleaf's goal of becoming cGMP-compliant, it had not otherwise invested any significant sum in Sugarleaf, and Neptune's expenditures concerning Sugarleaf were for conducting Neptune's own due diligence, negotiating the APA, preparing for and conducting the closing, etc.

As soon as the APA was executed on May 9, 2019, Neptune could have said "Gotcha" to Sugarleaf and taken action, but it did not. Instead, after the closing, the evidence shows Neptune was focused on Sugarleaf's becoming cGMP-compliant. For example, on July 26, 2019 (two days after the closing), at the "Sugarleaf Integration Kick-off Meeting," slide 9 of the presentation slide deck prepared by Neptune identified a goal of achieving cGMP certification by the end of 2019 (see page 68, above). On August 3, 2019, Mr. Cammarata in an email said he had told Mr. Galloway that Mr. Galloway's "number one focus" needed to be on getting cGMP

approval (see page 69, above). And in a Neptune August 13, 2019 presentation slide deck, slide 5 indicated a "Near-Term Objective[]" of obtaining GMP certification by April 2020, about 9 months after the closing (see page 69, above).

According to a January 21, 2020 letter from Mr. Joyner to Mr. Galloway, by January 21, 2020 (about 6 months after the closing), Neptune had "invested significant resources" in the Business (see page 87, above). As far as the Panel can determine, January 21, 2020 is the earliest date on which Neptune notified Sugarleaf of any alleged breach of APA § 3.9 (id.), but it was not the breach now being pointed to by Neptune. Rather, in Mr. Joyner's letter, the alleged breach of that section of the APA stemmed from Sugarleaf's "hot oil" production—GMP is not even mentioned in the letter.

Even after the need for and problems with producing THC-free product came to the fore and problems with the Sugarleaf product labels and website, production and transport of "hot oil," Mr. Cammarata's change of the Sugarleaf business model, and the proposed Transition Services Agreement, among other things, were causing friction between Neptune and Sugarleaf, Neptune apparently did not notify Sugarleaf of any breach of Section 3.9 concerning cGMP until Mr. Joyner's August 27, 2020 letter, over 15 months after execution of the APA and about 13 months after the closing (see pages 106-107, above).

> [T]hree elements must be demonstrated to invoke the waiver doctrine: (1) that there is a requirement or condition capable of being waived, (2) that the waiving party knows of that requirement or condition, and (3) that the waiving party intends to waive that requirement or condition. [*Amirsaleh v. Bd. Of Trade of N.Y.*, 27 A.3d 522, 529-530 (Del. 2010)]

> A waiving party typically is prohibited from retracting its waiver if the non-waiving party has suffered prejudice or has relied to his detriment on the waiver. [*Amirsaleh v. Bd. Of Trade of N.Y.*, 27 A.3d 522, 530 (Del. 2010)]

With reference to the first quoted paragraph, the three elements for waiver by Neptune are met here. First, APA § 3.9 clearly contain contractual requirements capable of being waived (the one at issue is in § 3.9's first sentence). Second, Neptune clearly knew of that requirement. See, e.g., the Neptune side's Pre-Hearing Brief, page 5 (emphasis added; footnotes omitted):

> Before closing the deal, Sugarleaf sought to exempt its failure to be GMP compliant, specifically proposing a schedule to Section 3.9

which stated that Sugarleaf "was striving to meet the FDA's Good Manufacturing Practices regulations and guidelines." … <u>Neptune rejected the request</u>, requiring a "clean rep" if they were to go forward with the deal. <u>Sugarleaf acquiesced and executed the APA [that] contained the "clean rep" representation in Section 3.9.</u>

Third, Neptune's actions demonstrate its intent to waive during the period from execution of the APA (May 9, 2019), through closing (July 24, 2019), until Mr. Joyner's August 27, 2020 letter, over 15 months after execution of the APA.[99] Neptune was aware at all relevant times that the requirement had not been met (see pages 133-135, above). During that period, Neptune recognized the importance of Sugarleaf's being cGMP-compliant, actively encouraged Sugarleaf to become cGMP-compliant, and spent money to help Sugarleaf become cGMP-compliant, including having Mr. Lijoi hired "to start putting together plans and working with that facility to implement cGMPs," which "didn't have any cGMPs at the time" (see page 44, above), having gap analyses performed, etc. No reasonable observer could believe that Neptune, by its conduct, had not waived any breach of contract claim it might have had based on APA § 3.9 (according to Neptune) covering cGMP-compliance.

It was not until Mr. Joyner's August 27, 2020 letter (over 15 months after execution of the APA) that Neptune said or did anything in any way inconsistent with that waiver. But that letter and Neptune's subsequent actions (e.g., filing the arbitration demand) cannot retract the waiver. With reference to the second quoted paragraph from *Amirsaleh* on the preceding page, the non-waiving party (the PMGSL side) "has suffered prejudice or has relied to … [its] detriment on the waiver."

Here, in reliance on Neptune's failure to complain during those 15-plus months about any alleged breach resulting from Sugarleaf's not being cGMP-compliant and on Neptune's actions in furtherance of Sugarleaf's becoming cGMP-compliant, the PMGSL side invested its own resources (time, energy, etc.) and was prevented from promptly and, presumably, substantially less expensively, dealing with a problem (the alleged breach) that had never previously been brought to its attention (for example, if the breach had been asserted by Neptune immediately after execution of the APA (which Neptune says it could have asserted), any damages claimed by Neptune would presumably be far less than the millions of dollars it now seeks).

---

[99] It is not necessary for any of the parties to have explicitly used the word "waiver" during the 15-month period for Neptune's conduct to have given rise to a waiver.

The Panel finds and holds that if there was a breach of APA § 3.9 based on Sugarleaf's not being cGMP-compliant, Neptune waived its right to complain about that breach and, therefore, recover any damages for it.[100]

Thus, the Panel finds and holds that, for two separate and independent reasons, the PMGSL side is not liable for breach of contract as asserted by the Neptune side, namely, there was no breach and, if there was a breach, any ability or right to hold the PMGSL side liable for the breach was waived.

- **Fraud In The Inducement And Negligent Misrepresentation**

From pages 9-10 of the Neptune side's February 6, 2023 submission (emphasis added; citations omitted):

> PMGSL and Galloway made false statements of material facts, both at the time of signing the APA (May 9, 2019) and prior to closing (July 24, 2019), as to the timing of "foundational cGMP" at the Conover facility and the expected timing of cGMP "sustainment." As the same facts in this case underly both claims, they are both set out here in the same section.

> To succeed on its fraud in the inducement claim, Neptune must prove, by a preponderance of the evidence, that PMGSL (1) made a false representation of fact; (2) had knowledge that the representation was false or was recklessly indifferent to the truth of the representation; and (3) intended to induce Neptune to act; that Neptune (4) took action in justifiable reliance on the representation; and (5) suffered damages as a result of that reliance. …

> To succeed on its claim for negligent misrepresentation, Neptune must prove that (1) PMGSL had a pecuniary duty to provide accurate information, (2) PMGSL supplied false information, (3) PMGSL failed to exercise reasonable care in obtaining or communicating the information, and (4) PMGSL [sic, Neptune] suffered a pecuniary loss caused by justifiable reliance upon the false information." …

Broadly, both claims require Neptune to have suffered a loss as a result of Neptune's justifiable reliance on PMGSL's falsity. Again, Neptune knew at all relevant times that Sugarleaf was not cGMP-compliant (see pages 133-135, above). And, as discussed above in

---

[100]  There is no need to discuss PMGSL's failure-to-mitigate defense, and the Panel makes no finding or holding regarding it.

connection with Neptune's breach of contract claim, Neptune chose to acquire the Sugarleaf business knowing that Sugarleaf was not cGMP-compliant, that it would take time and Neptune's money to achieve any such compliance, and that revenue and profit might be lower until after it was achieved. Accordingly, there can be no justifiable reliance by the Neptune side on what the PMGSL side told the Neptune side about its cGMP status or its becoming cGMP-compliant. Therefore, the PMGSL side cannot be liable for fraud in the inducement or negligent misrepresentation, and the Panel so finds and holds.

- **Summary Of Findings And Holdings On The Neptune Side's Claims**

The Panel finds and holds that the Neptune side has not proved that the PMGSL side committed or is liable for the alleged breach of APA § 3.9, the alleged fraud in the inducement, or the alleged negligent misrepresentation. All of the Neptune side's claims are denied.

- **The PMGSL Side's Claims**

The PMGSL side asserts three Counts (sets of claims; see pages 14-15, above) of the six Counts originally asserted (see pages 12-13, above) and must prove its claims by a preponderance of the evidence. Broadly, the claims are (i) for numerous alleged breaches of the APA (PMGSL side's February 6, 2023 submission, Count I, pages 2-26), (ii) for alleged breach of Mr. Galloway's employment agreement by improperly terminating his employment (id., Count III, at pages 26-27), and (iii) for alleged breach of APA § 5.13 concerning the restricted stock (id., Count VI, at page 28-29). The claims are discussed below.

- **Count I — Breaches Of APA**

The first group of alleged breaches consists of breaches of APA § 1.6 by failure to pay the entirety of the $40 million purchase price.

Of that entire amount, $20 million was to be paid in cash. Of that $20 million in cash, $12 million was paid upon closing. Broadly, the remaining $8 million (Cash Portion Balance) was to be paid if the EBITDA for any 12-month rolling period after April 1, 2019 exceeded the threshold amount of $8 million. APA § 1.6(a) (page 113, above).

The other $20 million of the purchase price was to be paid in Neptune common stock. Of that $20 million in stock, $6 million was paid upon closing (1,587,301 shares at the deemed price of $3.78 per share). Broadly, the remaining $14 million (equivalent to 3,703,703 shares at $3.78 per share) was to be paid in two portions: (i) 2,116,402 shares (Share Balance) to be paid when the remaining $8,000,000 in cash (the Cash Portion Balance (see preceding paragraph)) was

paid; and (ii) the other 1,587,301 shares (Production Share Balance) to be paid if, starting April 1, 2019, the business processed 120,000 pounds of input material and sales resulting from the processed material totaled at least $9 million.  APA § 1.6(b) (pages 113-114, above).

The cash and stock that were not paid at the closing (the $8 million in cash and the $14 million in stock) were forfeited and no longer payable "if not paid by under the terms of this Agreement, at the latest, by such time that the 12MR Adjusted EBITDA Statement as of the end … of the Third Earnout Period (March 31, 2022) has been finally determined in accordance with Section 1.10."  APA §§ 1.6(b) & 1.8(a)(iii).  See pages 113-114 & 115.

- **APA § 1.6(a)**

With respect to the Cash Portion Balance, the PMGSL side says (PMGSL side's February 6, 2023 submission, page 2 (emphasis added)):

> Neptune breached APA §1.6(a) by failing to pay the $8 million Cash Portion Balance while obscuring and failing to provide information necessary to calculate the cumulative Adjusted EBITDA, and materially impairing Sugarleaf's ability to exceed the $8 million target for cumulative EBITDA during any rolling twelve-month period after April 1, 2019.  But for Neptune's actions, Sugarleaf should have hit the target for the Cash Portion Balance ($8 million in cumulative EBITDA during any rolling twelve-month period after April 1, 2019).

In support, the PMGSL side cites testimony and a number of exhibits and points to, among other things, a 2-year extraction agreement, Neptune's internal sales projections, a Neptune press release, Neptune's diverting sales to Biodroga, communications between Neptune and its auditors, Neptune's "fail[ure] to make necessary expenditures" (e.g., for HVAC and equipment to make THC-free product), Neptune's stopping sales of product, Neptune's halting Sugarleaf's operations involving "hot oil," Neptune's not providing Sugarleaf with the appropriate sales force, Neptune's furloughing the majority of the Sugarleaf employees (because of COVID), and Neptune's not giving Mr. Galloway and other Sugarleaf executives the authority to effectively run Sugarleaf.  PMGSL side's February 6, 2023 submission, pages 2-7.

There is no question that Neptune could have done more to try to "maintain and increase existing levels of business," as required by APA § 1.8(c), and the Panel has already found and held that Neptune did not make commercially reasonable efforts to maintain and increase existing levels of business as required by APA § 1.8(c) (and, therefore, did not act in good faith

with respect to the operation of the Business as required by APA § 1.8(c)).  See pages 143-146, above.

However, for this claim, the burden is on the PMGSL side to prove by a preponderance of the evidence that, but for Neptune's actions (including its inactions), a 12-month rolling Adjusted EBITDA after April 1, 2019 (and before the cut-off) would have exceeded the $8 million threshold, as required by APA § 1.6(a)—this the PMGSL side did not prove.  It is true it can rightly point to actions by Neptune that made hitting the target more difficult, but it has not shown that, had Neptune not engaged in those actions, it is more likely than not that the threshold would have been reached.  There are simply too many unknowns.

How much capital, over what period, and in what was Neptune supposed to invest (installing the HVAC and buying and installing the equipment to allow production of THC-free material are easy to single out, but Neptune clearly did invest substantial sums in Sugarleaf, even if perhaps not as much as it claims.  How soon could the equipment have been installed, would it have functioned as desired, would it have been operated properly, could the requisite number of skilled chemists have been hired, would they have done a good job, etc.?  How many good salespeople could have been hired and when?  How effective/successful would they have been?  Could Sugarleaf have become cGMP-compliant and cGMP-certified and, if so, when?  What effect would that have had on revenues and when?  If Mr. Galloway had been allowed to buy as much biomass as he wished, would the bottom line have been helped or hurt?  There are still more unknowns tied to Neptune's actions.

Making assessment of the issue even more problematic are other significant challenges over which Neptune had little or no control but which made meeting the threshold of APA § 1.6(a) more difficult.  If the relevant U.S. federal and state laws (and their application) concerning "hot oil," product labeling, etc. had been clearer and not unfavorable to the nascent industry, the Sugarleaf website and Sugarleaf's toll and other processing (and presumably its sales and revenue) would not have been as adversely affected.  If the cultures of the two organizations had been more compatible, that might have helped the bottom line (e.g., by eliminating internecine friction[101]).  What would the competition, Sugarleaf's existing and

---

[101]  A March 24, 2020 email from Mr. Coles to Mr. Mayers urging approval of a capital expenditure to install the already-purchased HVAC equipment then prompted Mr. Mayers to email Mr. John Moretz; Mr. Mayers wrote in part: "I believe we do need a pound of flesh."  Ex. 155 at Bates 13865.  That seems at odds with collegiality.

potential customers, and its suppliers (farmers) have done if Sugarleaf had not had the problems it did, if the regulatory landscape had been more favorable, or if Sugarleaf's cGMP-compliance had existed from the outset—or promptly been achieved—and certified?  What effect would the actions of those third parties have had on Sugarleaf's revenues?  If oil prices had not dropped so precipitously, what would that have done to Sugarleaf's (and Neptune's) bottom line? [102],[103]

Predicting with any useful degree of confidence how a start-up in any field will perform is usually difficult, at best.  Predicting how Sugarleaf would have performed but for Neptune's actions is made all the more difficult by Sugarleaf's being in a fledgling industry with a challenging and uncertain regulatory landscape.[104]

The PMGSL side's papers implicitly acknowledge the uncertainty, saying, e.g., "materially impairing [not "destroying"] Sugarleaf's ability to exceed the $8 million target" (February 6, 2023 submission, page 2); "Sugarleaf should have [not "would have"] hit the target" (id.); "could have [not "would have"] hit the target" (id.); "could have potentially [not "would have"] hit" (id. at page 4).

The evidence is insufficient to prove that it is more likely than not that the required threshold of APA § 1.6(a) would have been achieved but for the Neptune side's actions and, therefore, the evidence is insufficient to prove that the Neptune side owes the Cash Portion Balance to the PMGSL side; and the Panel so finds and holds.[105]

---

[102]  As shown by the various Hemp Benchmark Reports of record from April 2019 (Ex. 739) through July 2020 (Ex. 698), and, as summarized in Ex. 741, the price of Crude Oil (see page 98, above) fell 95% during that 15-month period, from $4,661/kg to $245/kg.  The prices of more refined products (e.g., Full Spectrum Distillate, Broad Spectrum Distillate, and THC-Free Distillate) from October 2019 to July 2020 also fell, but only by 65% - 37%.

[103]  If Sherbrooke had not had the problem it had (see pages 80-81 & 132, above), Neptune could have and presumably would have devoted more resources (financial etc.) to Sugarleaf.  As between the two sides here, Neptune is still ultimately responsible for the effect on Sugarleaf of the Sherbrooke mishap.

[104]  See Mr. John Moretz's testimony, set forth in more detail above at pages 58-59, during which he noted in connection with Neptune's pre-APA due diligence and the pre-APA sales projections from Sugarleaf: "[T]here's no past history on it for us to really go by" and "[I]t was a new industry, not a mature industry."  The Neptune side in its May 1, 2023 submission at page 10 characterized PMGSL as a "business with virtually no trading history."

[105]  See Ms. Dmoch's testimony (Tr. 261-269 & 339-340) and her underlying notes (Ex. 731).  At the time she testified, she was scheduled to be promoted to Director of Finance for Neptune and responsible for Canada and the U.S. (see page 42, above).  Ms. Dmoch testified there was no 12-month period (from August 1, 2019 through March 31, 2022) in which the EBITDA was not negative, sometimes by more than $4 million.  The numbers were not shown by the PMGSL side to be materially incorrect.  Of course, the PMGSL side could argue that those numbers do not reflect what would have happened but for Neptune's actions.  Nevertheless, Ms. Dmoch's testimony and the EBITDA numbers of Ex. 731 do suggest the difficulty of hitting the $8 million target.

- **APA § 1.6(b)**

As to the two tranches of $14 million worth of stock that were part of the purchase price but not paid at closing (see page 113, above), the first portion of 2,116,402 shares (Share Balance) was to be paid when the remaining $8,000,000 in cash (Cash Portion Balance) was paid. APA § 1.6(b), item (i). Because the Panel has found and held that the Neptune side does not owe the Cash Portion Balance to the PMGSL side, the Panel also now finds and holds that the Neptune side does not owe the Share Balance to the PMGSL side.

The second tranche of stock (1,587,301 shares (Production Share Balance)) would become payable "on the date that the production facility of the Business achieves from and after April 1, 2019 (i) a total of 120,000 pounds of input material processed, and (ii) sales of such processed material totaling revenues of at least $9 million ...." APA § 1.6(b), item (ii).

Ex. 109, which is discussed above (see page 89), shows that by January 2020, the 120,000-pound processing threshold had been met; Mr. Galloway testified similarly (Tr. 2196). The Neptune side did not successfully challenge this. Consequently, the claim turns on whether the Business achieved revenues of at least $9 million from the sales of such processed material. This the PMGSL side did not prove.

The PMGSL side did not clearly tie any proffered sales revenue to sales of "such processed material." But, even assuming the actual revenue of the Business all stemmed from processing of "such processed material," the revenue for the three fiscal years during which the Business operated (from the closing on July 24, 2019 through some time around mid-2021, when Neptune publicly announced it was no longer in the hemp extraction business in North America), which would be the fiscal years ending March 31 of 2020, 2021, and 2022, actual sales for the Business were about $2.7 million (for FY2020), $1.4 million (for FY2021), and $0.5 million (for FY2022), for a total of $4.6 million, only about half of the required $9 million. Ex. 730.

Mr. Galloway testified that the 120,000 pounds of "input material processed" would yield 2,727 kg of THC-free material, which, if sold at $3,600/kg, would generate a total revenue of $9.8 million, above the $9 million threshold (Tr. 2196-2198). Thus, the PMGSL side is in essence arguing that, had Neptune provided much/all of what had been requested (capital investment; hiring of chemists and sales personnel; etc.), the 120,000 pounds would all have been converted to THC-free product and sold at $3,600/kg to provide a total of $9.8 million.

However, it is not clear that the 120,000 pounds of input material would all have been converted to THC-free material or, even if they had been, would have yielded that much THC-free material (2,727 kg). And even if they had, there is no way of knowing that the product would all have been sold or, that even if it were, it would have been sold at a price of $3600/kg.[106] There are simply too many insufficiently proved assumptions being made by the PMGSL side underlying its $9.8 million figure, particularly given all the other significant uncertainties (see pages 156-157, above).

There is no question the $9 million threshold of APA § 1.6(b) was not actually achieved by the Business (see above). The evidence is insufficient to prove it is more likely than not that the $9 million threshold of APA § 1.6(b) would have been achieved but for the Neptune side's actions and, therefore, the evidence is insufficient to prove that the Neptune side owes the Production Share Balance to the PMGSL side; and the Panel so finds and holds.

- **APA Covenants Of Good Faith And Fair Dealing**

The description of the next alleged breach reads in part as follows (PMGSL side's February 6, 2023 submission, pages 8-11 (underlining added; boldface removed and footnotes omitted)):

> 3. Neptune Breached the APA's Covenants of Good Faith and Fair Dealing By Changing the Business Model The APA Was Based Upon.
>
> Neptune breached the APA by changing the business model that the APA was based upon and which was fundamental to the deal struck between the contracting parties. … All discussions and projections assumed that Galloway would manage the Business for three (3) years to execute the Business Model. Neptune's own Special Transactions Committee presentation confirms that Business Model. …
>
> The APA contemplates good faith attempts to execute that Business Model for three (3) years. The acquisition and APA assumed that Galloway would control all of the U.S. Hemp

---

[106] Ex. 741 shows the price per kilogram of THC-free material falling from $4,485 in October 2019 to $3,962 in November 2019 to $3,677 in December 2019 to $3,120 in January 2020 (by which time the 120,000 pounds had been processed) to $3,069 in February 2020 to $2,997 in March 2020 to $2,497 in April 2020 to $2,400 in June 2020 (there is no May 2020 THC-free price). The price was falling during the time Sugarleaf would have been trying to sell the THC-free material (although by July 2020, the price had recovered to $2,838, but still well below $3,600/kg). Once the average price of the alleged 2,727 kg of THC-free material fell below about $3,300, the total revenue would have been under the $9 million threshold.

Business, Neptune would provide timely and adequate financing, including without limitation: ….

There is no dispute that by September 2, 2019, Neptune's management (now led by a new CEO) did not intend to perform the Business Model, and was planning to breach the APA. … Neptune failed to provide Galloway and his management team the authority and visibility into business operations to effectively operate the Business. … In late October 2019, Neptune began to change the deal set forth in the APA, including removing the "branding and selling of hemp products containing hemp derived extracts from the definition of business." … It was apparent to Sugarleaf's management team that these changes breached the APA and were motivated by a desire to reduce the Earn-Out. …

After Galloway refused to accept Neptune's proposal, Neptune failed to perform and breached the APA in a bad faith effort to punish Galloway for refusing to go along with its plans. Simply put, Neptune implemented its plan to change the APA's terms without agreement to amend the agreement. Cammarata caused Neptune on January 21, 2020 to formally implement a "Sales and Pricing Policy" contrary to the APA. …

The damages proximately caused by Neptune's broad-based breach of the APA are hard to quantify with mathematical certainty; however Paradis's testimony supports that the earn-out could put "potential $130 million in Pete's pocket." Tr. 513:5-12 (Paradis). It is reasonable to conclude that Galloway has been damaged by reduction in the reasonably expected value of the Earn Out and the value of a Business which E&Y and TD Bank valued at more than $150,000,000.00. Whether motivated by bad faith or not, Neptune's breach prevented Galloway from achieving the Production [Share] Balance and Earn-outs, and Neptune's stock suffered due to lack of revenues and failures to complete the plan. This "Business Model Breach" of the APA caused and magnified the other breaches herein identified below.

Galloway is entitled to damages of the $22 Million identified in Sections 1 and 2 [the alleged breaches of APA §§ 1.6(a) & (b) discussed above], as well as up to $130 million in earn-out payments, plus prejudgment interest measured from the date of first breach.

APA § 1.8 is entitled "Earn-Out Payments." See pages 115-116, above. Broadly, APA § 1.8(a) provided for a payment to Sellers for each one of the three 12-month periods ending March 31 of 2020, 2021, and 2022 if the aggregate Adjusted EBITDA for the period in question exceeded a given amount. More specifically, the payment for each period was 5 times the

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 161 of 201

amount by which the Adjusted EBITDA for that period exceeded the threshold value for that period. For example, the earn-out for the First Earn-Out Period (the 12 months ending March 31, 2020) was 5 times the amount by which the aggregate Adjusted EBITDA for that period exceeded $8 million. APA § 1.8(a)(i). The threshold for paying an earn-out for the Second Earn-Out Period (the 12 months ending March 31, 2021) was greater than the $8 million for the First Earn-Out Period, and the threshold for the Third Earn-Out Period (the 12 months ending March 31, 2022) was greater than that for the Second Earn-Out Period. APA § 1.8(a)(ii) and (iii). According to the PMGSL side, the total earn-out for the three periods "could put 'potential $130 million in Pete's pocket.'"[107]

The PMGSL side has failed to prove that it is entitled to any earn-out payments, and the Panel so finds and holds. There is no sufficient showing that but for Neptune's actions, the aggregate Adjusted EBITDA for any of the earn-out periods would have exceeded the respective threshold. See pages 155-157, above. Mr. Gallaher's report does not prove such entitlement; Mr. Gallagher calculated potential earn-outs "assuming PMGSL would have hit the targeted sales and corresponding EBITDA figures described in the APA." Ex. 211, paragraph 12. And the fact that E&Y and TD Bank may have valued a business at "more than $150,000,000.00," which is pointed to by the PMGSL side, does not prove that the threshold for Neptune's owing an earn-out for any of the three periods would have been reached (much less exceeded) but for Neptune's actions.

Finally, there is either liability for paying an earn-out or there is not. The fact that, as an example, there might have been a 15% chance of the aggregate Adjusted EBITDA for the First Earn-Out Period exceeding the $8 million threshold by $1 million if Neptune had done everything the PMGSL side thinks should have been done does not mean that the Neptune side owes for that period an amount equal to 5 multiplied by $1 million (the earn-out calculated in accordance with APA § 1.8(a)(i)) multiplied by the 15% probability. There is no basis for making such a calculation. To suggest otherwise is to confound the determination of liability

---

[107]  Mr. Gallagher (the PMGSL side's damages expert) said the total earn-out was in the range of $103.9 million to $118.4 million. Ex. 211, paragraph 12(c) ("assuming PMGSL would have hit the targeted revenue figures and resulting EBITDA amounts …").

with the quantification of damages after liability has been proved by a preponderance of the evidence.[108]

- ### **Failure To Provide Sales And Financial Resources Required By The APA**

The PMGSL side alleges Neptune failed to provide sales and financial resources required by the APA, such as capital expenditures (related to becoming cGMP-compliant, for installation of HVAC, for THC-free equipment, etc.), failed to approve necessary personnel (e.g., chemists), did not timely provide sufficient THC-remediation equipment or resources to produce THC-free products, and delayed hiring of and refused to fund a dedicated sales force for Sugarleaf necessary to achieve the earn-outs (PMGSL side's February 6, 2023 submission, pages 11-12).[109] The PMGSL side concludes by saying (id. at page 12 (emphasis added)):

> Neptune's failure to timely provide adequate financial and other resources to critical projects underlying the valuations prepared by E&Y and TD Bank support awarding Galloway the full amount of Earn-Out he likely would have been entitled to had those resources been provided. Although there is no evidence suggesting that had foregoing resources been provided that the full Earn-Out would not have been achieved, the Panel has authority to award a percentage of the Earnouts.

As discussed above (see pages 155-157), there are simply too many unknowns for the Panel to conclude that it is more likely than not that if Neptune had provided all of the requested resources, any earn-out, much less the requested "full amount," would have been earned. Furthermore, as also discussed above (see pages 161-162), there is no basis for the Panel "to award a percentage of the Earnouts," as asserted by the PMGSL side. The PMGSL side has failed to prove it is entitled to any earn-out payments, and the Panel so finds and holds.

- ### **APA § 1.7(a)**

The PMGSL side alleges Neptune breached APA § 1.7(a) by failing to timely calculate in good faith or provide either quarterly or year-end "12MR Adjusted EBITDA Statement[s]" despite notice and repeated demands. The PMGSL side notes that this "makes it difficult to

---

[108] See, e.g., Mr. Gallaher's damages report, Ex. 211, Schedule 1 ("Yearly Calculation Of Damages Based Upon TD EBITDA Projections"), Note E: "If the arbitrator decides to award damages based on a success factor, he can multiply the Total Payout on either Row 17 or Row 24, Columns J through L by the success factor." And see the subsection immediately below.

[109] Nothing in the APA commits the Neptune side to any specific line of credit or amount of working capital and, as to alleged pre-APA discussions, the APA contains a merger and integration clause (APA § 11.1).

determine damages owing to Galloway with mathematical certainty," suggests that "Neptune withheld this information from Galloway to prevent Galloway from sooner challenging (what Galloway asserts) is Neptune's accounting manipulation 'writing off' earnouts," says Mr. Galloway requested the EBITDA statements several times but never received the requested information, and that this is "additional evidence of Neptune's bad faith." Id. at pages 12-13.

There are no damages specifically requested/quantified for this alleged breach in this portion of the PMGSL side's February 6, 2023 submission.[110]  The Panel has already held that Neptune did not act in good faith with respect to the operation of the Business during the earn-out period as required by APA § 1.8(c) (see pages 143-146, above).

- **APA § 1.8(a) & (b)**

The PMGSL side alleged Neptune breached APA § 1.8(a) and (b) by failing to attempt to meet in good faith the earn-out thresholds, calculate or provide the earn-out statement or pay any earn-out payment.  PMGSL side's February 6, 2023 submission, page 13.

There are no damages specifically requested/quantified for this alleged breach in this portion of the PMGSL side's February 6, 2023 submission.  The Panel has already held that the PMGSL side has failed to prove that it is entitled to any earn-out payments (see pages 159-162, above).

- **APA § 1.8(c), item (i)**

As to APA § 1.8, item (i) ("Purchaser shall act in good faith with respect to the operation of the Business …'), the PMGSL side alleges "Neptune breached APA §1.8(c)(i) by failing to act in good faith with respect to the operation of the Business …" and points to Neptune's diversion of resources, improper allocation of costs, a change in management structure, decisions to stop consumer sales, failure to support Sugarleaf sales, labeling delays and costs (including concerning dietary supplements), the withholding of information from Mr. Galloway and others, capital expenditure decisions, diversion of business away from Sugarleaf, etc.  Id. at pages 13-19.

---

[110]  The February 6, 2023 submissions from the two sides were in response to questions posed by the Panel in Order No. 20.  That Order at page 3 asked the two sides to "[i]temize (with as much specificity as possible) all of the arbitration claims of your side" and also asked (emphasis in original):

> 5.  What is the <u>specific requested relief</u> for each claim, including, for each <u>monetary</u> claim, the amount. …

The Panel understands that some of the breaches alleged by the PMGSL side do not have any damages amounts ascribed specifically and uniquely to them and are in support of other alleged breaches for which specific damages are claimed.

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 164 of 201

There are no damages specifically requested/quantified for this alleged breach in this portion of the PMGSL side's February 6, 2023 submission, and the Panel has already held that Neptune did not act in good faith with respect to the operation of the Business during the earn-out period as required by APA § 1.8(c) (see pages 143-146, above).

- **APA § 1.8(c), item (ii)**

As to APA § 1.8(c), item (ii) (Purchaser "shall retain the Purchased Assets …"), the PMGSL side alleges "Neptune breached APA §1.8(c)(ii) by failing to 'retain the Purchased Assets and the operation of the Business, and not transfer them to a different entity' during the Earn Out period." PMGSL side's February 6, 2023 submission, page 20. The PMGSL side says (id. (emphasis added)):

> "Transferring Sugarleaf Assets to Neptune" – From the Summer through November 2021 Neptune transferred important and valuable equipment that Neptune wanted from Conover to Canada. ... Eventually, Neptune sold all of those assets in October and November 2022. …
>
> "Selling Sugarleaf's Assets to Third Parties". Evidence establishes that without notifying Galloway, Neptune either transferred or sold all of the assets and equipment used in the business to third parties in 2021, and closed the Conover location. … Neptune's conduct occurred after terminating Galloway. Despite requesting information regarding Neptune's conduct, Neptune did not provide PMGSL parties with any information regarding Neptune's conduct. ...
>
> Evidence also supports that Neptune transferred the Forest Remedies Brand, including new products (see Neptune and Forest Remedies current website) using the Forest Remedies brand to other Neptune entities, including Neptune Forest. …
>
> Neptune did not provide any information regarding sales of all Forest Remedies products, or sales relating to hand sanitizers manufactured to meet high COVID19 demand. Lack of such information should be considered adversely against Neptune when determining damages.
>
> These breaches of contract are particularly egregious because it deprived Galloway of specific performance as a remedy. Had Neptune not breached the contract by transferring and selling the assets, Galloway could have received a cGMP[-]ready facility and had all of the equipment and operating procedures to be a leader in the Hemp extraction business. At that time, one of the remedies potentially available to Galloway was to receive the

> value of such a facility and Business that E&Y and TD Bank
> valued in excess of $130 million ... and in a market that grew
> faster than expected. ... Neptune took the money from selling that
> equipment and used it for its own, undisclosed purposes. Damages
> awarded to Galloway should recognize the value of the lost
> opportunity to operate the Sugarleaf Labs facility after September
> 2020 as a hemp-cannabis extraction and processing facility valued
> at more than $130 million.

The assertion that "Had Neptune not breached the contract by transferring and selling the assets, Galloway could have received a cGMP[-]ready facility and had all of the equipment and operating procedures to be a leader in the Hemp extraction business" (emphasis added) is speculative. "Could have" is not "would have." And assuming "cGMP[-]ready facility" means a facility that was cGMP-compliant (or was close to being so) and was not yet certified but would pass a compliance audit (with no more than a little tweaking), there is insufficient evidence to prove that, at the time the Conover equipment was transferred (or at any earlier time), Conover was such a facility. There is also insufficient evidence to prove that, even if it was such a facility and passed a compliance audit to become certified, it would have been "a leader in the Hemp extraction business." The Panel does not understand the PMGSL side to be ascribing any quantified damages specifically to this alleged breach by Neptune. To the extent there are any such damages being ascribed specifically to this alleged breach and claimed by the PMGSL side, that claim is denied.

- **APA § 1.8(c), item (iii)**

As to APA § 1.8(c), item (iii) (Purchaser "shall maintain a financial reporting system ..."), the PMGSL side alleges "Neptune breached APA §1.8(c)[(iii)] by failing to maintain a financial reporting system that enables the Purchaser to separately account for the items of revenue and expense of the Purchaser relating to the Business necessary to make the calculations required by this Agreement with respect to the Business." PMGSL side's February 6, 2023 submission, pages 20-21. The PMGSL side says (id. at page 21):

> Although Neptune likely had sufficient financial reporting systems,
> this provision incorporates a good faith obligation to make sure
> that all of the revenue streams set forth in the Business are
> provided to PMGSL. Neptune did not keep required information.
> Tr. 337:9-340:12 (Dmoch). The evidence supports that Neptune
> attributed those revenues to various different entities, but did not
> provide sufficient financial information to PMGSL to determine all

of those revenues. This is notable in light of the definition of "Adjusted EBITDA" recognizing that that business will evolve. Neptune provided no financial information relating to sales of non-hemp derived Forest Remedies products, hand sanitizers or other products. See Exhibit 130, see also definition: "Adjusted EBITDA shall be calculated for the Business as carried out by the Purchaser, it being understood that such Business may evolve or grow beyond its current definition, and that the Adjusted shall be calculated on such Business carried out by the Purchaser as it may evolve or grow over time during the Earnout Period.["]

Neptune's failure to provide a complete financial picture, or present witnesses with knowledge of Neptune's entire financial reporting system, or even the formulas, costs and sales information used to determine the Adjusted EBITDA should be considered adversely by the Panel, and the Panel should conclude that such failure was intended to obscure the true revenues attributable to the Business.

In Ms. Dmoch's cited testimony (Tr. 337:9-340:12), she said she had not read the APA and, thus, did not know how EBITDA for Sugarleaf was to be calculated under that agreement, did not do "anything to determine if the EBITDA calculation with regard to Sugarleaf was different than an ordinary EBITDA calculation that you might run," etc.

But, the PMGSL side did not prove that the EBITDA calculations made by Ms. Dmoch and about which she testified (see Ex. 731 for her definition of EBITDA) were so different from the APA calculation of Adjusted EBITDA under APA Article 12 (Ex. 9, pages 56-57) and/or sufficiently flawed (because of failure to account for revenue, deduction of amounts that should not have been deducted, making calculational errors, etc.) as to make a difference in whether any damages are owing by the Neptune side (e.g., under APA § 1.6 and § 1.8(a)).

The PMGSL side's damages expert, Mr. Gallagher, in making his damages calculations was asked to assume "that the targeted sales and EBITDA figures discussed and described in the Asset Purchase Agreement" would have been reached (Ex. 211, paragraphs 10 & 12(c)), and he based his calculations on third-party projections (Ex. 211, Schedule 1 ("Yearly Calculation Of Damages Based Upon TD [Bank] EBITDA Projections")). He also stated he understood (from the PMGSL side) that Forest Remedies sales were included on Biodroga's books and not credited to Sugarleaf (Ex. 211, paragraph 57). However, as indicated below, even if those sales had been credited to Sugarleaf, it would not have raised Sugarleaf's Adjusted EBITDA over the various thresholds for determining whether damages are owed by Neptune.

Ex. 748 shows Biodroga's Hemp/CBD sales for FY2020 were about $1.2 million, for FY2021 were about $1.4 million, and for FY2022 were about $0.9 million (Ex. 748). Even if those sales were added to the revenues for Sugarleaf for those three fiscal years (Ex. 730), the total combined revenue for all three years would be only slightly over $8 million. And Ms. Dmoch testified she had never seen "$8 million of gross sales equate to an $8 million EBITDA." Tr. 279-288.

Finally, the PMGSL side had ample opportunity to request discovery regarding financial matters, including about Neptune's financial reporting system and records, and to promptly move to compel if it believed that was necessary.

The burden was on the PMGSL side to prove that Neptune breached APA § 1.8(c), item (iii) (Purchaser "shall maintain a financial reporting system …"), and that the PMGSL side did not do. The Panel also notes that there are no damages specifically requested/quantified for this alleged breach, only a request that the alleged breach be "considered adversely by the Panel, and the Panel should conclude that such failure was intended to obscure the true revenues attributable to the Business." The Panel declines to do either.

- **APA § 1.8(c), item (iv)**

As to APA § 1.8(c), item (iv) (Purchaser "provide adequate financing to the Business …"), the PMGSL side alleges "Neptune breached APA §1.8(c)(iv) by failing to provide adequate financing to the Business, in amounts established in consultation with the executive officers of the Business and within the parameters of the Parent's and the Purchaser's annual budget." PMGSL side's February 6, 2023 submission, page 21. The PMGSL side says (id.):

> As already described above, Neptune failed to fund sufficient Hemp …. Further, despite the fact that Neptune's senior management agreed that various capital expenditures were necessary for Sugarleaf …[,] Cammarata inexplicably never approved necessary CAPEX expenses. Cammarata's refusal to respond and failing to approve reflects that Neptune did not attempt to consult in good faith with Sugarleaf about yearly budgets. … Rather than perform the APA, Neptune wrote-down the Earn-Outs to manipulate Neptune's financial and balance sheet in violation of the APA.

There are no damages specifically requested/quantified for this alleged breach in this portion of the PMGSL side's February 6, 2023 submission. The Panel has already held that Neptune did not act in good faith with respect to the operation of the Business during the

earn-out period as required by APA § 1.8(c) (see pages 143-146, above). The Panel also specifically notes that the PMGSL side did not prove that "Neptune wrote-down the Earn-Outs to manipulate Neptune's financial and balance sheet in violation of the APA."

- **APA § 5.13**

As to APA § 5.13 (Assistance with Regulatory Affairs), the PMGSL side alleges "Neptune breached APA §5.13 by failing to offer reasonable administrative or compliance related assistance to assist the Seller and its Member with any sale, transfer, or other issues related to the Common Shares issuable under the APA. Exhibit 226; Tr. 2142:22-2148:11." PMGSL side's February 6, 2023 submission, pages 21-22. This alleged breach is discussed below at pages 174-189.

- **APA § 6.12**

As to APA § 6.12 (Key Employees), the PMGSL side alleges "Neptune breached APA §6.12 by failing to continue to employ Sugarleaf's key employees, including without limitation Pete Galloway, Tod Coles, Brad Burnett, Mike Carlsen and Adam Stockman." PMGSL side's February 6, 2023 submission, page 22. The PMGSL side says (id. (emphasis added)):

> For more than four years preceding acquisition Close, Galloway worked with Coles, Carlsen and Stockman developing unique knowledge and experience in the newly emerging, cannabis and hemp markets. … Following Close, Neptune immediately took control of all decisions relating to Sugarleaf and Forest Remedies, excluding Galloway (and Coles) from key management information and communications, stripping Galloway of his authority and control over the Business, and dictating commercially unreasonable policies and practices which ensured the failure of the Business …. Then, Neptune terminated Coles in May 2020, Galloway in June through September 2020, and terminated Stockman and Carlsen via furlough in the Fall of 2020.
>
> … The Panel should consider that <u>had the Business been operated by Key Employees with an incentive to meet or exceed APA thresholds (Adjusted EBITDA and Earn Out), then the Business had a significant likelihood of meeting the thresholds.</u>

There are no damages specifically requested/quantified for this alleged breach in this portion of the PMGSL side's February 6, 2023 submission. The Panel has already held that Neptune did not act in good faith with respect to the operation of the Business during the earn-out period as required by APA § 1.8(c) (see pages 143-146, above). The Panel also notes

there are too many unknowns for it to conclude that "had the Business been operated by Key Employees with an incentive to meet or exceed APA thresholds …, then the Business had a significant likelihood of meeting the thresholds," as asserted by the PMGSL side, and that saying something "ha[s] a significant likelihood" of occurring is not the same as proving by a preponderance of the evidence that it is likely to occur.

- **APA Article 9**

The PMGSL side alleges:

> Neptune Breached APA Article 9 Indemnification including specifically Sections 9.3(e) by failing to cooperate or provide necessary defense in the Fisher-Taylor arbitration. PMGSL's Amended Statement of Claim, as corroborated by Exhibit 248, reflect these claims. All but one claim asserted by Fisher-Taylor were dismissed. The only remaining claim arises from Neptune's failure to produce records kept by Sugarleaf to Claimant. These claims are still being considered in arbitration. At a minimum, this action should be considered as Neptune harming the value of farmer relations in relation Damages incurred to the Business. [PMGSL side's February 6, 2023 submission, page 22 (underlining added; boldface removed)]

The Fisher-Taylor arbitration is described above at pages 30-31.

In response to the Panel's June 5, 2023 question ("Has anything happened in the Fisher-Taylor arbitration that bears on liability or damages (or otherwise) in this arbitration? If so, what?"), on June 9, 2023, the PMGSL side responded as follows (emphasis added):

> All claims by Claimants Elizabeth F. Taylor and Fisher-Taylor, LLC against Sugarleaf Labs, Inc. and PMGSL Holdings, LLC ("PMGSL") were denied. PMGSL asserted crossclaims against Sugarleaf Labs, Inc. in the Fisher-Taylor arbitration for breaches of Sections 5.6 , 9.2, 9.3(e) and 9.3(f) of the APA**,** seeking recovery of PMGSL's costs and attorney fees relating to the Fisher-Taylor arbitration. Those crossclaims were bifurcated, and briefing relating to PMGSL's crossclaims is due on June 23, 2023. Although Neptune and Sugarleaf Lab, Inc.'s misconduct relating to the Fisher-Taylor arbitration are breaches of the APA, those breaches are properly being considered in the Fisher-Taylor arbitration. Under these circumstances, there is no need for the Panel to address issues being resolved in the Fisher-Taylor arbitration.

Accordingly, there is no need to further discuss in this Arbitration (or in this Final Award) the alleged breach of Article 9, and the Panel makes no finding or holding regarding that alleged breach or the Fisher-Taylor arbitration.

- **APA § 11.3**

The PMGSL side alleges:

> Neptune Breached APA §11.3 along with implied covenants of Good Faith and Fair Dealing in the APA. APA sections 1.8(c) and 11.3 set forth express obligations for Neptune to act in good faith. All of the above breaches set forth violations of Neptune's duty of good faith.. [PMGSL side's February 6, 2023 submission, page 23 (boldface removed)]

APA § 11.3 (Good Faith) reads as follows: "The Parties shall govern themselves and exercise their rights and discharge their obligations under this Agreement in good faith." APA § 1.8(c), item (i), is discussed above and requires the Purchaser during the earn-out periods to "act in good faith with respect to operation of the business …" (see pages 163-164, above).

There are no damages specifically requested/quantified for this alleged breach in this portion of the PMGSL side's February 6, 2023 submission. The Panel has already held that Neptune did not act in good faith with respect to the operation of the Business during the earn-out period as required by APA § 1.8(c) (see pages 143-146, above).

- **Count III — Breach Of Mr. Galloway's Employment Agreement**

Mr. Galloway's Employment Agreement is Ex. 8 and is set forth in part at pages 127-129, above. Under Section 2.1, he was to be paid a base annual salary of $144,000 starting on the agreement's Effective Date (May 8, 2019) for a three-year term. His annual salary was to be "increased to $225,000 if Sugarleaf satisfied the Production Share Balance, as defined by the APA." Sugarleaf did not "satisf[y] the Production Share Balance" of APA § 1.6(b). See pages 158-159, above.

Mr. Galloway was an "at will" employee. Ex. 8, Section 1.1, second paragraph, last sentence: "The Employee acknowledges and agrees that his employment with the Company is at-will."

Section 2.2 of the Employment Agreement reads as follows:

2.2. Severance

In the event the Company or its applicable affiliate terminates the Employee's employment other than for Cause, or the Employee

resigns for Good Reason, the Employee shall be entitled to severance pay equal to 4 months of his Base Salary in effect on the date of such termination or resignation.

The definitions of "Cause" and "Good Reason" are set forth above at pages 128-129. Mr. Galloway did not "resign[] for Good Reason."

Mr. Joyner's September 4, 2020 letter (Ex. 207) notified Mr. Galloway's Counsel that Mr. Galloway's employment had been terminated for Cause on that date (September 4, 2020) but did not set forth any substantive reason. The September 4 letter referenced Mr. Joyner's August 27, 2020 letter (Ex. 203), which at pages 1-3, in a section entitled "Neptune Was Forced To Take Action To Address Mr. Galloway's Failures," sets forth what Neptune regarded as problems (broadly, (i) Mr. Galloway's allegedly excessive purchase of biomass, (ii) his allowing products to be sold that possibly contained more than 0.3% of THC (but Neptune admitted at the end of the relevant paragraph that they didn't: "The levels were high but still below 0.3% THC"), (iii) his allegedly allowing products to be sold that were misbranded/mislabeled, and (iv) his allegedly making misrepresentations concerning being in compliance with applicable laws).

The August 27 letter stated that Mr. Galloway was an at-will employee, that if he were terminated for Cause, he would receive no severance, and that if he were terminated without Cause, he would be entitled to 4 months' severance (id. at page 3). The letter then noted that Neptune had "ample justification" to terminate his employment for Cause, but did not intend to do that, and that Neptune wanted to negotiate a severance package with him. The letter concluded (at page 4) with an offer ("[T]his is Neptune's offer despite have ample justification to terminate" for Cause).

In its Pre-Hearing Brief, the Neptune side at page 11 in a section entitled "Galloway Was Terminated for Cause," asserts (bracketed text added for ease of reference):

> Galloway was terminated for cause in September 2020. Galloway's termination was so justified because: [v] he failed to get Sugarleaf GMP compliant and organic certified by late 2020 resulting in lost customers and opportunities; [vi] he failed to achieve commercial production of THC-free product (for which he knew there was a "high market demand"), and [vii] he purchased commercially unreasonable amounts of biomass without an ability to sale it hoping to reach payout goals to the detriment of Neptune.

Broadly, "Cause" means (a) fraud, embezzlement, material dishonesty, breach of fiduciary duty against the Company or any of its affiliates, (b) conviction or pleading *nolo contendere* to a felony or crime of moral turpitude, "(c) material breach of, a material failure to perform, or material negligence or willful misconduct in the performance of the duties of employment …," or (d) drug use or intoxication that negatively affects job performance.  See page 128, above.  There is no assertion by Neptune that any of categories (a), (b), and (d) is relevant.  Therefore, the only possibly applicable category is (c).

The Panel finds and holds that none of the grounds alleged by the Neptune side for termination for Cause of Mr. Galloway's employment rises to the level of anything within the Employment Agreement's definition of "Cause" (i.e., the alleged grounds do not constitute Cause) and, therefore, that termination of his employment for Cause was unjustified and wrongful.[111]  His employment could be terminated by the Neptune side at any time for any reason or for no reason (he was an at-will employee), but there were no grounds to terminate "for Cause."

Accordingly, under § 2.2 of the Employment Agreement, he is entitled to 4 months' severance, which is equal to 4 divided by 12 multiplied by $144,000, or $48,000.[112]  That sum

---

[111] As to buying too much hemp (items i and vii in the August 27 letter and the Pre-Hearing Brief), Neptune's own Mr. Timperio ("president of cannabis in Canada" for Neptune (Tr. 2005)) said in an October 20, 2019 email: "Frankly, being in a start[-]up mode vs an existing business with order cycle, there may be the needs [sic] to build some inventory and adjust as we have more visibility on our projects and existing discussions with potential customers.  It is not exact science in a start[-]up business ...."  Ex. 53 at Bates 29225.  As to products possibly containing more than 0.3% THC (item ii), they didn't—Mr. Joyner wrote: "The levels were high but still below 0.3% THC."  As to misbranding/mislabeling (item iii), the regulatory landscape was unclear, there was a difference of opinion by the regulatory experts (e.g., as to whether certain products were dietary supplements), and Neptune itself reversed position on how to deal with the "hot oil" issue.  As to the alleged misrepresentations by Mr. Galloway concerning compliance (item iv), there is no way Neptune could reasonably rely on any of them, having conducted its own due diligence (including a cGMP audit)—it full well knew the situation.  As to "fail[ure] to get Sugarleaf GMP compliant and organic certified by late 2020 resulting in lost customers and opportunities" (item v) and "fail[ure] to achieve commercial production of THC-free product" (item vi), those failures cannot fairly be laid at Mr. Galloway's feet—the Neptune side bears most responsibility for them, if blame must be assigned.

[112] Mr. Galloway's term of employment under the Employment Agreement was to run for 36 months from May 8, 2019 through May 7, 2022, and the termination was on September 4, 2020 (about 16 months after May 8, 2019), leaving about 20 months between termination and the end of the three-year period.  Mr. Galloway was paid through September 5, 2020 (PMGSL side's May 1, 2023 submission, page 5, footnote 2).  The Panel does not understand the basis for the PMGSL side's request for Mr. Galloway's salary for the balance of the three-year term of employment following termination (PMGSL side's February 6, 2023 submission, pages 26-27) *plus* 4 months' severance (PMGSL side's May 1, 2023 submission, pages 5-6).  The fact that the Panel has found and held that there were no grounds to terminate his employment "for Cause" does not impair the right to terminate Mr. Galloway's employment at any time during the contemplated three-year period for any reason, or for no reason at all, without owing any salary for any portion of the three-year period remaining after termination.  The only issue is whether Mr. Galloway is entitled to the 4 months' severance because of the termination, and the Panel has found and held he is.

should have been paid to him at the time of the termination of his employment, which was on September 4, 2020.

Under Rule 47(d)(i), the Final Award "may include: (i) interest at such rate and from such date as the arbitrator(s) may deem appropriate." Delaware law governs the Employment Agreement and the APA (see pages 121 & 129, above).

> "In Delaware, prejudgment interest is awarded as a matter of right." Pre-judgment interest is awarded to "compensate plaintiffs for losses suffered from the inability to use the money awarded during the time it was not available." Generally, pre-judgment interest "accumulates from the date payment was due." …
>
> The Court of Chancery generally looks to the legal rate of interest, as set forth in 6 Del. C. § 2301, as the "benchmark" for the appropriate rate of pre- and post-judgment interest. That legal rate of interest—5% over the Federal Discount Rate—"is a mere guide, not an inflexible rule." [*Murphy Marine Services of Delaware, Inc. v. GT USA Wilmington, LLC*, 2022 WL 4296495, at *24 (Del. Ch. Sept. 19, 2022) (footnotes omitted)]

Because severance should have been paid at the time of termination, interest will run starting from September 4, 2020.

For the period September 4, 2020 to February 2022, the Federal Discount Rate was about 0.25%; for the following five months (to July 2022), it averaged about 1%; July to September 2022, about 2.5%; September to November 2022, about 3.25%; November to December 2022, about 4%; December 2022 to February 2023, about 4.5%; February to March 2023, about 4.75%; March 2023 to July 2023, about 5%; July 2023, about 5.25% and then 5.50%. See Federal Discount Rates found using the link provided by the PMGSL side in its May 1, 2023 submission at page 5 and the table provided by the Neptune side in its May 1, 2023 submission at page 6.

To try to avoid calculational difficulties and disagreements between the two sides (and resulting delay) that might well ensue if a series of increasing interest rates were used over the period in question and the interest were compound (as used in *Murphy Marine*), the Panel is picking a single interest rate for the period and using simple, not compound, interest.

Assuming the $48,000 is fully paid on September 29, 2023 (which is what the Panel will order) and that the Federal Discount Rate is not significantly increased thereafter from the current level of 5.50%, the Panel holds that the applicable interest rate for the period

September 4, 2020 through September 29, 2023 is 6.25%.[113] Using an annual 6.25% rate, simple interest, and a 365-day calendar year leads to the following calculation of pre-award interest owed to September 29, 2023 (September 4, 2020 to September 29, 2023 is 1,120 days):

$$1{,}120 \,/\, 365 \;\times\; 0.0625 \;\times\; \$48{,}000 \;=\; \$9{,}205.48$$

That is a total of $57,205.48 due on September 29, 2023 for breach of the Employment Agreement ($48,000 plus interest of $9,205.48). If payment is made after September 29, 2023, interest on any portion of the $57,205.48 remaining unpaid after September 29, 2023 shall be owing and payable and determined using a rate of 10.50% per annum (the current Federal Discount Rate of 5.50% plus the 5% of 6 Del. C. § 2301), simple interest, based on a 365-day calendar year, until paid in full. For the avoidance of doubt: there will be no decrease in the $57,205.48 owed if the Neptune side pays any or all of it before September 29, 2023.[114]

- **Count VI — Breach Of APA § 5.13**

Part of the purchase price Mr. Galloway received was in restricted stock. More specifically, 1,587,301 shares of Neptune common stock were paid to Mr. Galloway in connection with the closing at a deemed price of $3.78/share, or approximately $6 million worth of stock. See pages 113-114, above.

Under the Lock-Up Agreement (page 126, above), Mr. Galloway could not sell any of those shares until certain restrictions were removed. That agreement was executed on the day of closing (July 24, 2019), and the three-year lock-up period ended on July 23, 2022. Under § 2 of that agreement, one-sixth of the shares were automatically released from the restrictions every six months after July 24, 2019. Thus, each of the six tranches of stock was first eligible to have its restrictive legends removed on (i) January 24, 2020, (ii) July 24, 2020, (iii) January 24, 2021, (iv) July 24, 2021, (v) January 24, 2022, and (vi) July 24, 2022.

---

[113] That is consistent with the following. Roughly half of the entire period (from September 2020 through September 2023) has a Federal Discount Rate of about 0.25%, and roughly half of the period has an average Federal Discount Rate of about 2%. The average Federal Discount Rate for the period is about 1.25%. Adding the 5% of 6 Del. C. § 2301 makes the applicable rate 6.25%. The Panel notes that the PMGSL side in its May 1, 2023 submission at page 6 said: "For periods during which the Federal Discount Rate changed, the PMGSL Parties suggest that the Panel use an average of the applicable rate."

[114] This determination by the Panel (of no decrease in $57,205.48 being owed if any of it is paid before September 29, 2023) obviates another area of possible dispute and works little or no hardship on the Neptune side (Neptune is a large corporation and presumably would not be able to pay much sooner than September 29, 2023, and the interest for the period from the date of this Final Award to September 29, 2023 is small).

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 175 of 201

APA § 3.25 required the Sellers to furnish to Purchaser and its transfer agent a satisfactory opinion of counsel before the shares that were no longer locked-up (because of the passage of time) could have their restrictive legends removed so that they could be sold. Under APA § 5.13, the Neptune side was to offer "reasonable administrative or compliance related assistance" to Mr. Galloway "with any sale, transfer, or other issues related to the Common Shares issuable under this Agreement." See pages 118-120, above.

On August 18, 2020, Mr. Galloway executed a request "to remove the restrictive legends and stop transfer instructions" from the certificate for all 1,587,301 shares (i.e., all six tranches). Ex. 226 at pages 5-7. See page 105, above. But, as Mr. Galloway acknowledged at the Hearing, it was a mistake to request removal of the legends for all of the shares; on August 18, 2020, only the first two tranches were eligible: the first tranche, whose lock-up period had expired on January 23, 2020, and the second tranche, whose lock-up period had expired on July 23, 2020.

On September 1, 2020, Mr. Piazza (at the time, Senior Legal Counsel and Assistant Corporate Secretary of Neptune) sent an email to Mr. Suric of UBS Restricted Sales indicating receipt of the request (Mr. Galloway had asked UBS for its assistance with selling the shares (see pages 105 & 108, above)). Ex. 226 at page 4. There is no compelling evidence showing that the Neptune side received the request any earlier than September 1, 2020. In his September 1 email, Mr. Piazza said "Please share with us details of the shares and the investor and we can advise on next steps." Id. Mr. Suric responded just a few minutes later with information and a request: "Can you issue the legal opinion to the transfer agent to remove the restriction?" Ex. 226 at pages 3-4.

On September 3, 2020, Mr. Suric sent a first reminder and then a second reminder on September 14, 2020. Id. at page 3. A further September 30, 2020 reminder email to Mr. Piazza says: "We spoke last week regarding the shares of Neptune Wellness, can you please let me know when we can expect a response regarding the legend removal?" Id. at pages 2-3. Mr. Piazza responded less than an hour later, saying "I will try to get the opinion done by end of day tomorrow. Apologize for the delay." Id. at page 2. Mr. Suric emailed about ten minutes later, saying "Thank you, I appreciate that, can you please email a copy to me when issued?," to which Mr. Piazza responded half an hour later: "Will do." Id. at pages 1-2.

On October 21, 2020, Mr. Suric sent a reminder ("Can you please let me know when I can expect the opinion letter for PMGSL Holdings?") and another on October 28, 2020 ("Can

you please let me know when I can expect the legal opinion for PMGSL Holdings LLC and their shares of Neptune Wellness?"). Id. at page 1.

On November 20, 2020, Mr. Suric sent another reminder ("Can you please review the attachment and issue the legal opinion to remove the restriction from the shares of Neptune Wellness for PMGSL Holdings?"). Id.

Mr. Galloway testified that at some point, UBS spoke with Mr. Piazza and realized a mistake "had been made and were awaiting that opinion from, from Chris [Piazza]" but the date of that conversation is not in evidence. Mr. Galloway further testified:

> Q. Okay. But once Chris told them while this request that's been signed by Mr. Galloway was faulty, it can't apply to all the shares, they never sent the revised request, did they?
>
> A. They sent requests. They certainly were looking for updates. I don't believe that we submitted a new form. We were getting ignored by this point. [See footnote 78, above]

On December 23, 2020, the PMGSL side amended its arbitration demand to include a prayer for "an order requiring Neptune to immediately cause the removal of the restrictive legend and restrictions on Claimants' Shares to be removed, and for all of the 1,587,301 Common Shares to be free from the Lock-Up Agreement." Amended Statement of Claim, ¶ 140.

On August 6, 2021, Counsel for the PMGSL side (Mr. Cottrell) wrote to Counsel for the Neptune side (Mr. Joyner), saying "Another six[-]month anniversary has now passed. Please advise whether Neptune consents to release the restrictions on this tranche of stock as well as the prior tranches." Ex. 217. By August 6, 2021, the first four of the six tranches were eligible.

In response to requests for the required information made to the Neptune side starting August 30, 2022 by Counsel for the PMGSL side (by this time, the three-year lock-up period had expired and all six tranches were eligible to have their restrictive legends removed), the Neptune side promptly provided the information. In January 2023, the PMGSL side finished supplying the required documentation and taking the required actions for the removal of the legends, and the legends were removed on January 9, 2023. Neptune side's March 1, 2023 submission,

Exhibit A.  In answer to a Panel question, the PMGSL side said Mr. Galloway has been unable to sell any of his Neptune shares.[115]  PMGSL side's June 9, 2023 submission, page 1.

- **The Parties' Arguments**

The PMGSL side at page 28-29 of its February 6, 2023 submission says (italics and boldface removed):

> I.  Pursuant to Section 1.6(b) of the APA, the PMGSL Parties received 1,587,301 Common Shares on the closing date.  Pursuant to Section 3.25 of the APA, the Common Shares have a restrictive legend.  On July 24, 2019, Galloway executed a Lock-Up Agreement which set forth that one-sixth (16.667%) of the Locked-up Securities shall be released from restrictions every six months.  Neptune has never released the PMGSL Parties' Common Shares as required by the Lock-up Agreement.
>
> II.  On August 18, 2020, Galloway submitted a request to remove the restrictive legends on the 1,587,301 shares.  (Exhibit 226).  Neptune's in-house counsel ignored this request despite numerous requests from UBS Restricted Sales, on behalf of Galloway, to issue the legal opinion to remove the restriction.  (Exhibit 226).
>
> III.  Counsel for the PMGSL Parties also made a similar request to Joyner on August 6, 2021 (Exhibit 217), which was ignored.
>
> IV.  Galloway prepared a spreadsheet which identifies the dates at which each tranche of one-sixth of the Common Shares should have been released, and the corresponding Neptune stock price available on those respective dates (Exhibit 762; see also Tr. 2150-2156:16).
>
> V.  RELIEF REQUESTED:  Accordingly, the PMGSL Parties are entitled to damages in the amount of the value of their restricted stock on the date that it was eligible to be released, totaling $2,317,457 (see Exhibit 762), with pre-judgment interest accruing as of January 24, 2020 at 9.5% (4.5% Federal Discount Rate + 5%) and post-judgment interest accruing as of the date of the judgment at 9.5% (4.5% Federal Discount Rate + 5%).
>
> VI.  REQUESTED AWARD LANGUAGE:  For the foregoing reasons, the Panel finds that Neptune breached Section 5.13 of the APA by failing to timely remove restrictions to the PMGSL Parties' common shares of Neptune stock.  Neptune is ordered to pay the PMGSL Parties $2,317,457, with pre-judgment interest accruing as of January 24, 2020 at 9.5% (4.5% Federal Discount

---

[115]  This assertion is noted by the Panel but is not in evidence (e.g., it has not been tested by cross-examination) and is not relied on in this Final Award.

Rate + 5%) and post-judgment interest accruing as of the date of the judgment at 9.5% (4.5% Federal Discount Rate + 5%).

In response, the Neptune side said at pages 43-47 of its March 1, 2023 submission (emphasis in original):

> Here again, PMGSL is attempting to add provisions to the APA that simply are not there. The Lock-Up Agreement does not provide that Neptune must remove the restrictive legends on PMGSL's common shares every six months, though that is what Mr. Galloway apparently *thought* it meant. (TT 2141:16-18). As a matter of law, Neptune would not have been able to do that, as documentation from PMGSL was required to remove the legends—documentation that was clearly described in APA 3.25 and in the restrictive legend printed on PMGSL's share certificate. (See Exhibit 9 (APA), clause 3.25, page 32) (requiring that PMGSL, as the seller of the securities, "FURNISHES TO THE CORPORATION AND THE CORPORATION'S TRANSFER AGENT AN OPINION OF COUNSEL OF RECOGNIZED STANDING IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE CORPORATION TO SUCH EFFECT"). Mr. Galloway eventually agreed at trial that Neptune could not remove legends PMGSL unless and until has shown that the removal would be in compliance with securities laws. (TT 2359:18-21).

> Rather, the Lock-up Agreement provides that one[-]sixth of the shares shall be released from the "restrictions set forth in section 1 [of the Lock-up Agreement]" every six months, meaning that one[-]sixth of the shares became *eligible* for removal of the restrictive legends every six months post-closing. Section 1 of the Lock-up Agreement makes no mention of the actual *removal* of restrictive legends, nor does it make Neptune responsible for removing the restrictive legends unilaterally. The word "legend" does not appear in the Lock-up Agreement at all. It was therefore not a breach of clause 5.13 or the Lock-up Agreement for Neptune not to unilaterally remove the restrictive legends on PMGSL's common shares, which it could not have done anyway.

> PMGSL further alleges that Neptune failed to "offer reasonable administrative or compliance related assistance" relating to removing the legends when, in the fall of 2020, PMGSL's investment agent submitted a faulty request to remove the legends on *all* 1,587,301 common shares, even though, at that time, only one third of those shares was eligible to have the legends released. (Ex. 226, p. 5). PMGSL argues that Neptune "ignored this request." (PMGSL Answering Statement, p. 28,

Section (II)).  That is untrue.  In fact, Neptune *did* offer reasonable administrative and compliance [assistance] related to PMGSL's shares at that time, informing PMGSL's agent that the request was defective, and that PMGSL could only request the removal of legends on one[-]third (529,100.3) of the common shares.  Mr. Galloway himself testified:

> Q:  Okay.  But for some reason UBS requested the release of all the shares; do you recall that?
>
> A:  I do.
>
> Q:  Okay.  But Neptune wasn't able to release all the shares because the contract didn't require the release of all the shares, true?
>
> A:  That's true.  And it was made very clear by Chris Piazza on a telephone call to the UBS team.  They realized the mistake that had been, had been made and were awaiting that opinion from, from Chris.  But it was -- that was something that was discussed.
>
> Q:  Okay.  But once Chris told them while this request that's been signed by Mr. Galloway was faulty, it can't apply to all the shares, they never sent the revised request, did they?
>
> A:  They sent requests.  They certainly were looking for updates.  I don't believe that we submitted a new form.  We were getting ignored by this point.  (TT 2361:25-2362:20 (Galloway)).

Rather than submitting a revised request for removal of the legends on the 1/3 of the eligible shares, on December 23, 2020, PMGSL amended its existing lawsuit [sic, arbitration demand] against Neptune and Sugarleaf to include a prayer for "an order requiring Neptune to immediately cause the removal of the restrictive legend and restrictions on Claimants' Shares to be removed, and *for all of the 1,587,301 Common Shares* to be free from the Lock-Up Agreement."  (See Amended Statement of Claim, ¶ 140) (emphasis added)).  Rather than submitting a corrected request for removal of only 1/3 of the legends, therefore, PMGSL chose to double down on its demand that 100% of the legends be removed in December 2020, despite not being entitled to that relief as of filing on December 23, 2020.

PMGSL now seems to argue that Neptune was required to provide a legal opinion that would support releasing the restrictive legends back in fall 2020, and that it was Neptune's failure to

provide that opinion that prevented PMGSL from removing the legends on 1/3 of its shares.  (Answering Statement, p. 28, Section (II)).  That position is unsupported in the record and in law.  First, Neptune was not required to provide a legal opinion—either under the APA or the above wording of the restrictive legend itself.  Second, Neptune could not have provided a legal opinion that the removal of the legends complied with securities laws without a valid, contemporaneous request to remove only *eligible* legends—a request that UBS and PMGSL never provided in fall 2020.  Third, PMGSL ultimately *did* provide their own legal opinion in January 2023 as required, as set out below, and Neptune immediately assisted PMGSL in removing the restrictive legends.  PMGSL's argument therefore fails, as the requested legal opinion from Neptune would have been premature without a valid request for removal of eligible legends.  In any event, Neptune was not obligated to provide any legal opinion, and was not in breach of the APA in not doing so.

In its pre-trial brief on April 8, 2022, Neptune confirmed that it was willing to offer reasonable administrative assistance to PMGSL in removing the legends, if PMGSL could provide the required documentation.  Neptune stated in its brief:

> This claim fails because PMGSL has never furnished Neptune with the required documentation for removal of the Legends.  Neptune has never refused to remove the Legends upon receiving the required documentation.  That documentation has simply not been provided.  (Neptune Pre-Trial Brief, section (g), p. 15).

Mr. Galloway testified at trial that he read Neptune's Pre-Trial Brief, which included the above section, in April 2022.  (TT 2355:16-18).  However, it was then not until January 6, 2023 that PMGSL finally provided the required paperwork to remove the legends, as evidenced by the attached Exhibit A.  Upon receiving the required documentation, Mr. Piazza of Neptune then immediately assisted PMGSL's counsel in getting the legends removed, and a new share certificate was issued without the restrictive legends.  (See attached Exhibit A)

Thus, Neptune did provide administrative support to PMGSL concerning the restrictive legends, and never refused to provide that assistance or consent to the removal of the legends.  PMGSL simply failed to provide the necessary paperwork to remove the legends.  When Neptune informed PMGSL of the faults in its paperwork, PMGSL sued Neptune, again erroneously seeking the removal of all legends, despite only 1/3 of the legends being eligible for removal.  Neptune has not breached the APA,

and PMGSL is not entitled to damages for PMGSL's *own delay* in providing the appropriate paperwork for the removal of the legends.

Based on the foregoing, PMGSL's damages claim based on the legends is fundamentally flawed. Even assuming *arguendo* that Neptune failed to offer reasonable administrative assistance in removing the legends, PMGSL and Mr. Galloway admitted at trial that Neptune could not remove the legends unilaterally without a request and appropriate paperwork from PMGSL. (TT 2359:18-21 (Galloway)). Thus, Neptune *could not have* unilaterally removed the legends every six months. Yet PMGSL's damages model at Exhibit 762 (referenced at Answering Statement p. 28, Section (V)) assumes just that – namely that Neptune could have (and should have) removed 1/6 of the legends every six months, thus enabling Mr. Galloway to sell the shares at then-prevailing market rates. That damages model finds no support in the record of this case. PMGSL needed to **request** the removal of the legends as they became eligible, and also confirm with those requests that PMGSL was compliant with applicable securities laws. That was not done until January 6, 2023, at which point Neptune promptly assisted PMGSL in removing the legends within days.

PMGSL's claim that Neptune breached the APA by failing to offer administrative assistance in removing PMGSL's stock legends is misconceived and wholly unsupported by the record in this case. As such, it should be rejected.

In its May 1, 2023 submission, the Neptune side further said at pages 6-11 (emphasis in original; footnote omitted):

If, which is strongly denied, Neptune is liable for not removing the restrictive legends on PMGSL's shares despite Neptune not having the correct documentation to do so, damages should not be calculated based on the date on which the shares became eligible for removal, but rather the date on which PMGSL requested removal of the legends. PMGSL's first request to remove all of the restrictive legends (not just the first two tranches which were then eligible) was sent on September 1, 2020 with incorrect and incomplete paperwork. (Trial Exhibit 225 [sic, 226]). Even assuming PMGSL had provided the correct paperwork for Neptune to remove the legends on the first two tranches of shares around that time (which PMGSL did not do), and even assuming PMGSL intended to sell the shares upon removal of the legends (which appears not to be the case, as PMGSL still has not sold its unrestricted shares, as set out below), the legends could not have been removed nor the first two tranches

of shares sold until around September 2020 at the earliest, simply because PMGSL did not request removal before then and removal would therefore have been impossible. Mr. Galloway agreed at trial that Neptune was unable to remove the legends without the involvement of PMGSL. (TT 2359:18-21). Yet PMGSL claims damages for an alleged failure by Neptune to remove the restrictive legends on January 24, 2020 and July 24, 2020 (See Trial Exhibit 762)—something Neptune could not have done without PMGSL's involvement. There is therefore no basis in law or fact for awarding damages or prejudgment interest based on a theoretical removal of the restrictive legends and sale of the shares on January 24, 2020 or July 24, 2020, as PMGSL had not requested removal or provided necessary documentation by those dates.

PMGSL's next request to remove restrictive legends did not come until August 6, 2021, nearly a year later. (See Trial Exhibit 217; PMGSL's Answering Statement, p. 28, subparagraph III). Yet PMGSL requests damages based on Neptune's alleged failure to unilaterally remove the legends on the third and fourth tranches on January 25, 2021 and July 26, 2021, as they became eligible for removal. Here again, Neptune could not have removed the restrictive legends on those dates without being requested to do so and furnished with the necessary documentation by PMGSL, per applicable securities laws and the express language of the APA and the restrictive legend itself. Thus, there is no basis in law or fact to hold Neptune liable for an alleged failure to remove the restrictive legends from the third and fourth tranches prior to August 6, 2021.

Next, Neptune affirmatively stated in its pre-trial brief in April 2022 that it did not object to removing the restrictive legends over eligible shares, but it needed to receive the required documentation. (Neptune's Pre-Hearing Brief dated April 8, 2022, Section II(g)). Even then, PMGSL did not provide the required documentation until early January 2023, approximately nine months later. Nonetheless, PMGSL claims damages against Neptune for an alleged failure to remove restrictive legends on January 24, 2022 and July 24, 2022. By July 24, 2022, PMGSL could have had no doubt that it was pushing on an open door in relation to removing the stock legends. It needed only to supply the correct documentation to have the legends removed, but it did not do so. There is therefore no basis in law to hold Neptune liable for an alleged failure to remove restrictions in 2022 which Neptune stated its willingness to do, but could not do without PMGSL's cooperation.

Finally, in early January 2023, PMGSL supplied the required documentation for the removal of the legends, and

Neptune assisted PMGSL in getting the legends removed on January 9, 2023, mere days after receiving the proper and complete documentation. (See Exhibit 1 to Neptune's Response to PMGSL's Answering Statement dated March 1, 2023). Neptune cannot be held liable for any drop in share price while PMGSL inexplicably delayed supplying Neptune with the necessary documentation to remove the legends.

The lengthy delay in the removal of the restrictive legends on PMGSL's shares was PMGSL's responsibility, not Neptune's. PMGSL cannot claim damages based on the dates on which its shares were eligible to have the restrictive legends removed in circumstances where PMGSL did not request their removal and did not provide the necessary documentation to enable Neptune to assist in removing the legends.

In its May 9, 2023 comments on the Neptune side's May 1 submission, the PMGSL side said:

Neptune argues in its submission that "damages should not be calculated based on the date on which the shares became eligible for removal, but rather the date on which PMGSL requested removal of the legend." Id. at p. 6. The submission's following sentence states that PMGSL's "first request to remove all of the restrictive legends (not just the first two tranches which were then eligible) was sent on September 1, 2020 with incorrect and incomplete paperwork." Taking Neptune at its word, it was on notice of PMGSL's desire to remove the restrictive legends since September 1, 2020. However, it did not provide any meaningful response to PMGSL at the time, nor did it take action after PMGSL filed a claim regarding the stock on December 23, 2020. Indeed, Neptune did nothing to meaningfully respond to PMGSL's request – other than, as discussed below – represent that it would provide the needed legal opinion.

Neptune argues that it provided clear notice to PMGSL in its Pre[-]Hearing Brief that it stood ready to remove the restrictive legends. The facts do not support this assertion. In April 2022, Neptune included the following sentence at the conclusion of the section of its Pre-Hearing brief that listed all of PMGSL's supposed missteps with regard to Galloway's stock: "To this day, Neptune has not refused to remove the Legends subject to receiving the required supporting documents." This is hardly a clear notice to PMGSL that Neptune stood ready to cooperate, particularly in light of the several overtures on this issue to Neptune's counsel that had gone unanswered – and which remained unanswered after the Pre-Hearing Brief was filed. Neptune argues that PMGSL should have understood from the

Pre-Hearing Brief that there was now an "open door" to removal of the restrictive legends, but this position loses credibility in the context of the hotly-contested arbitration going on at the time and Neptune's continued refusal to affirmatively engage on the issue.

Neptune's position – that it could simply sit on its hands until presented with the right documents – is also squarely contradicted by its obligations under the Asset Purchase Agreement. Sections 5.8 and 5.13 of the APA. Section 5.8 provides in full:

> Each Party will use its commercially reasonable efforts to execute and deliver such further certificates, agreements and other documents and take such other actions as the other Party may reasonably request as may be necessary or appropriate to consummate or implement the transactions contemplated hereby or to evidence such events or matters.

Similarly, Section 5.13 provides:

> The Purchaser and the Parent will offer reasonable administrative or compliance related assistance to assist Sellers and its Member with any sale, transfer, or other issues related to the Common Shares issuable under this Agreement, provided that the Sellers or the Member, as applicable, shall be responsible for any out-of-pocket expenses of the Purchaser or Parent in connection therewith.

Neptune was therefore contractually obligated, both under the referenced sections and the duty of good faith and fair dealing, to provide "reasonable" and "commercially reasonable" assistance to Mr. Galloway in connection with his shares. This would at least include responding to requests from PMGSL and its counsel and providing at least a modicum of guidance on the required documents. Neptune did nothing of the sort, and instead obfuscated PMGSL's efforts. Neptune's Pre-Hearing Brief stated that Mr. Piazza initially agreed to produce a draft of the required legal opinion, but then failed to follow through: "Nonetheless, Mr. Piazza agreed to "try" to prepare the Legal Opinion. He ultimately did not provide that Legal Opinion as requested by PMGSL, but that was not a breach of the APA." Pre-Hearing Brief at p. 15. Instead of providing reasonable cooperation, Neptune stonewalled until the arrival of current counsel and now tries to argue that the situation is somehow the fault of Mr. Galloway. Even assuming, arguendo, that Neptune's statement in its April 2022 brief was enough to fulfill its obligations (which it was not), the damage was already done by that point, as Neptune's shares had already

plummeted to a fraction of the value that existed on the preceding anniversary dates. Consequently, the Panel should calculate the damages relating to each tranche of stock as of the date when it was eligible to be transferred – which could easily have been accomplished if Neptune had cooperated.

- **Analysis**

The Neptune side had no contractual obligation under the APA or the Lock-Up Agreement to unilaterally remove the legends on successive tranches of shares every six months or to provide the required opinion of counsel required to remove the legends.[116]  But, Neptune did have an obligation under APA § 5.8 to "use its commercially reasonable efforts to execute and deliver such further certificates, agreements and other documents and take such other actions as the other Party may reasonably request as may be necessary or appropriate to consummate or implement the transactions contemplated hereby" and under APA § 5.13 to "offer reasonable administrative or compliance related assistance to assist Sellers and its Member [Mr. Galloway] with any sale, transfer, or other issues related to the Common Shares …."

Neptune failed in its obligation.

Neptune received the first request to remove the legends no later than September 1, 2020. At that time, Mr. Piazza, who at the time was Senior Legal Counsel and Assistant Corporate Secretary of Neptune, stated in his September 1, 2020 email (emphasis added): "Please share with us details of the shares and the investor and we can advise on next steps."  Mr. Suric replied about 20 minutes later, providing the requested information, asking if Mr. Piazza could "issue the legal opinion to the transfer agent to remove the restriction," and thanking Mr. Piazza "for … [his] help with this request."  Despite reminders on September 3, September 14, and September 30 (referencing a telephone call the previous week), it was not until September 30, 2020 that Mr. Piazza responded, saying he would "try to get the opinion done by end of day tomorrow" and apologizing for the delay.  In a subsequent email later that same day, he said he would email a copy of the opinion to Mr. Suric when the opinion issued.  But still no opinion or information about the "next steps" was provided then.  Mr. Suric sent subsequent reminders on October 21, October 28, and November 20, 2020, but to no effect.

---

[116] APA § 3.25 requires the opinion to be "furnished to Purchaser and the Purchaser's transfer agent."  Purchaser was at all relevant times wholly owned by Neptune.  The Panel is puzzled by an attorney *at Neptune* possibly furnishing the opinion (since Purchaser and its transfer agent are presumably going to rely on it), but Mr. Piazza never did furnish the opinion and neither side has mentioned this as an issue.

Nor did the Neptune side provide that information following Mr. Cottrell's August 6, 2021 letter to Mr. Joyner, which read in part: "Another six[-]month anniversary has now passed. Please advise whether Neptune consents to release the restrictions on this tranche of stock as well as the prior tranches." By August 6, 2021, the first four of the six tranches were eligible.

Finally, in response to an August 30, 2022 email from Counsel for the PMGSL side to Mr. Waldon, the information was provided. More specifically, and with reference to Exhibit A to the Neptune side's March 1, 2023 submission,[117] on August 30, 2022, Counsel for the PMGSL side emailed Mr. Waldon, asking him to "please provide any information pertaining to what 'required supporting documents' Neptune requests and the parameters of any opinion of counsel that Neptune requires to release this stock." Mr. Waldon forwarded the email to Mr. Piazza, who by this time had become Neptune's Deputy General Counsel – Corporate and Assistant Corporate Secretary.

On September 6, 2022, just a few days after the PMGSL side's Counsel's request, Mr. Piazza responded to Counsel with a detailed email about the "next steps," which starts "Thank you for contacting us about the shares. I think we can work together to get this completed quickly" and ends with "I am available to answer any questions that you may have." There were subsequent emails between the two sides in which Counsel for the PMGSL side asked more questions and Mr. Piazza provided additional information, culminating in the required actions being taken and the legal opinion being sent to Messrs. Piazza and Waldon on January 6, 2023 (and the legends being removed shortly thereafter).

Provision of that information by Mr. Piazza in September 2022, his stating his belief that "this" could be "completed quickly," and his indicating his availability to "answer questions" are a far cry from Neptune's prior stonewalling, which started back in September 2020 and lasted two years.

The Neptune side has not explained why the information Mr. Piazza provided in September 2022 (which information finally allowed the PMGSL side to have the legends removed) could not have been provided to the PMGSL side two years earlier, particularly after Mr. Piazza said in his September 1, 2020 email to Mr. Suric (emphasis added): "Please share

---

[117]  Exhibit A was not part of the evidentiary record but it was offered by the Neptune side, the emails in that Exhibit A cited by the Panel in this Final Award are between the two sides, and the PMGSL side has not questioned the authenticity of those emails or otherwise objected to their being put before the Panel by the Neptune side.

with us details of the shares and the investor and <u>we can advise on next steps</u>." Mr. Piazza had no trouble telling the PMGSL side shortly after September 1, <u>2020</u> of its error in requesting removal of the legends for all the shares rather than for only the two tranches that had been released under the Lock-Up Agreement by the passage of time (i.e., the first and second tranches).[118]

It is not an excuse for failing back in September 2020 to provide the detailed information (the "next steps") that Mr. Galloway's initial request was erroneous (it covered all the shares rather than just the first two tranches) because that error, which could easily be corrected, had essentially nothing to do with the information, documents, and actions that the PMGSL side needed to gather, submit, and take to have the legends removed so the released shares could be sold.[119]

The Panel does *not* agree with the Neptune side's assertion in its March 1, 2023 submission that "In fact, Neptune *did* offer reasonable administrative and compliance [assistance] related to PMGSL's shares at that time [September 2020], informing PMGSL's agent that the request was defective, and that PMGSL could only request the removal of legends on one[-]third (529,100.3) of the common shares" (emphasis in original). As evidenced by Mr. Piazza's September <u>2022</u> communications to Counsel for the PMGSL side, there was substantial material information (the "next steps") that the Neptune side needed to provide and that it should have provided two years earlier in keeping with its obligations under the APA.

The Neptune side's stonewalling is consistent with its not being interested in helping Mr. Galloway. The evidence shows that by the time of Mr. Piazza's September 1, 2020 email, the Neptune side was unhappy with Mr. Galloway and the acquisition.[120] For example:

---

[118] The Neptune side said Mr. Piazza was available to testify but never called him. Tr. 2362.

[119] Based on Mr. Galloway's testimony, and the absence of any evidence from the Neptune side to the contrary, the Panel believes there would have been no point at that time in submitting a "new form" concerning only the first two tranches. Mr. Galloway testified (Tr. 2362 (emphasis added)):

> Q. Okay. But once Chris [Piazza] told them while this request that's been signed by Mr. Galloway was faulty, it can't apply to all the shares, they never sent the revised request, did they?
>
> A. They sent requests. They certainly were looking for updates. I don't believe that we submitted a new form. <u>We were getting ignored by this point.</u>

[120] Whether the Neptune side breached its contractual obligations does not depend on whether Neptune was unhappy with Mr. Galloway and the acquisition, but its unhappiness does provide context for the Neptune side's actions.

- Mr. Paradis in his September 2, 2019 email stated that Mr. Cammarata had already "changed the business model" for operating Sugarleaf and had asked Greenberg Traurig to draft the Transition Services Agreement; Mr. Paradis knew that how Mr. Galloway's earn-outs would be determined would need to be renegotiated (pages 70-71, above).

- In September 2019, Neptune considered issuing a press release stating that it owned the Forest Remedies brand (which it did not but which Mr. Cammarata wanted for Neptune) so that in negotiations with Mr. Galloway regarding the proposed Transition Services Agreement, "Pete can understand we can use whatever brand we want to if he doesn't play ball." See page 72, above.

- During an October 2019 telephone call, Mr. Cammarata told Mr. Galloway that his earn-out was going to be what Mr. Cammarata decided it would be (pages 75-76, above).

- In October 2019, Neptune expressed its unhappiness regarding the amount of biomass Mr. Galloway had purchased and his desire to purchase more (pages 77-78, above).

- In January 2020, Neptune proposed taking the Forest Remedies business from Sugarleaf and restructuring all the business. Mr. Galloway wrote: "This proposal takes what began as an achievable earn-out and substitutes complex changes to Sugarleaf business which would negate the earn-out potential for me" (pages 86-87, above).

- On January 21, 2020, Mr. Joyner sent Mr. Galloway a "Notice of Direct Claim for Indemnification" under the APA. Neptune said it was requesting indemnification for "Losses" stemming from the alleged misrepresentations that on the closing date, Sugarleaf was materially in compliance with all "Laws" and "Orders." See page 87, above.

- On January 22, 2020, Neptune informed Messrs. Galloway and others about a new U.S. Sales & Pricing Policy, which Mr. Galloway said meant Sugarleaf was "[e]ssentially … closed" (pages 87-88, above).

- In February 2020, a proposed revised organizational chart showed Messrs. Galloway and Coles (and several others) no longer being employed by Sugarleaf (pages 90-92, above).

- In March 2020, Neptune's COO wrote that "Conover [Sugarleaf] is draining us" (page 97, above).

- In May 2020, Mr. John Moretz asked Mr. Cammarata how to make certain that certain proposed business/financial changes did not increase the earn-out (page 100, above).

- In June 2020, Mr. Cammarata informed Mr. Lee Moritz that "adjustments" had been made and that Mr. Lee Moritz was now Sugarleaf's President and General Manager, in other words, that Mr. Galloway was no longer President (page 102, above).   (Notwithstanding this, in August 2020, Mr. Joyner wrote to Mr. Galloway's Counsel that Mr. Galloway "is and has always been Sugarleaf's President" (page 106, above).)

Until the PMGSL side made a request that could reasonably be understood to be a request to remove the legends or a request for help in (e.g., for information about) removing the legends, there could be no breach of APA § 5.13 requiring the Neptune side to provide assistance.  The Neptune side had no obligation to sua sponte start the process for removing the legends.

The Panel finds and holds that the Neptune side breached APA § 5.13 by failing to "offer reasonable administrative or compliance related assistance to assist Sellers and its Member [Mr. Galloway] with any sale, transfer, or other issues related to the Common Shares issuable under this Agreement" with respect to tranches 1 through 4 but not with respect to tranches 5 and 6.

## • **Stock Tranches 1 & 2**

September 1, 2020 is the earliest proven date that Mr. Galloway requested removal of the legends.  By that day, only the first two tranches, totaling 529,100 shares (one-third of the total 1,587,301 shares), had been released by the passage of time in accordance with § 2 of the Lock-Up Agreement and were eligible to have their legends removed.[121]  And that is the day on which Mr. Piazza said he would "advise on next steps," but which the Neptune side did not do until two years later.  That failure constituted a breach with respect to tranches 1 and 2.

---

[121]  The Neptune side recognizes September 1, 2020 as being appropriate if damages are owed (page 181, above).

The appropriate date for calculating damages for a given tranche of shares is the earliest date removal of the legends for that tranche was requested by the PMGSL side *after* that tranche had been released pursuant to § 2 of the Lock-Up Agreement by the passage of time, not just the date the tranche was released, as the PMGSL side asserts.  See footnote 121, above.

Mr. Galloway's testimony indicates he would promptly have sold the shares after the legends were removed (Tr. 2412 & 2153), and the Neptune side has not successfully challenged that.

Neither side provided the Panel with the share price on September 1, 2020 but Ex. 762 indicates a price of $2.98 on July 24, 2020 and $1.85 on January 25, 2021.  The Panel will assume a linear reduction in price from the first date to the second, which results in a calculated share price on September 1, 2020 of approximately $2.74; the Panel will use that price in the absence of any evidence of record to the contrary.

In response to a concern voiced by the Panel on June 5, 2023 concerning the fairness of awarding damages to Mr. Galloway resulting from the decrease in share price *and* allowing him to retain the shares (his subsequent sale of those shares could result in a windfall), the PMGSL side said in its June 9, 2023 submission (at page 2) that "To the extent that surrendering his Neptune stock would simplify the calculation of damages, Mr. Galloway is willing to surrender his stock to Neptune upon receipt of payment of a relevant award, as ordered by the Panel." Accordingly, the Panel will order Mr. Galloway to surrender the first two tranches of his shares to Neptune promptly upon his receipt of damages and of interest owed on those damages for those two tranches.[122,123]

The damages owed for the breach with respect to the first two tranches are calculated by multiplying 529,100 shares by $2.74/share, which equals $1,449,734.

---

[122]  In its June 16, 2023 submission, the Neptune side says: (i) the PMGSL side cannot receive a damage award and retain the shares because that would be unfair but also that (ii) the PMGSL side cannot receive damages and surrender the shares because that would be a forced buy-back by Neptune, which is a previously unrequested equitable remedy.  Thus, the Neptune side is saying in essence that the PMGSL side cannot have appropriate relief for Neptune's breach (of course, Neptune denies there was a breach).  However, Rule R-47(a) empowers the Panel to "grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties ...."  Furthermore, the reason the PMGSL side is in this position is because of the Neptune side's breach—the Neptune side is in no position to complain about an appropriate and fair remedy when the Neptune side itself caused the problem.

[123]  Neither side has told the Panel that any transfer fees or the like must be paid to any governmental entity or other authority to effectuate the surrender of the shares.  Out of an abundance of caution, the Panel will order Neptune to be responsible for the payment of any such fees.

Interest on that amount ($1,449,734) runs from September 1, 2020, which is almost the same day that interest starts to run on severance damages, namely, September 4, 2020 (see page 173, above). Accordingly, the same interest rate will be used (6.25%), and interest will be simple rather than compound. Assuming the $1,449,734 is paid on September 29, 2023 (which is what the Panel will order) and using an annual 6.25% rate, simple interest, and a 365-day calendar year, pre-award interest from September 1, 2020 to September 29, 2023 (1,123 days) is:

$$1,123 / 365 \; x \; 0.0625 \; x \; \$1,449,734 \; = \; \$278,775.90$$

That is a total of $1,728,509.90 due on September 29, 2023 for tranches 1 and 2 ($1,449,734 plus $278,775.90). If payment is made after September 29, 2023, interest on any portion of the $1,728,509.90 remaining unpaid after September 29, 2023 shall be owing and payable and determined using a rate of 10.50% per annum (the current Federal Discount Rate of 5.50% plus the 5% of 6 Del. C. § 2301), simple interest, based on a 365-day calendar year, until paid in full. The PMGSL side need not transfer any of the shares of tranches 1 and 2 to Neptune until all of the damages and interest for both of those two tranches have been paid. For the avoidance of doubt: there will be no decrease in the $1,728,509.90 owed if the Neptune side pays any or all of it before September 29, 2023.[124]

- **Stock Tranches 3 & 4**

August 6, 2021 is the earliest proven date there was a request to remove the legends for the third and fourth tranches after those tranches became eligible to have their legends removed.[125] But, again, Neptune's assistance was not provided until September 2022, thirteen months later. That failure constituted a breach by the Neptune side of APA § 5.13 with respect to tranches 3 and 4.

Neither side provided the Panel with the share price on August 6, 2021, but Ex. 762 indicates a price of $0.81 on July 26, 2021 and $0.37 on January 24, 2022. The Panel will assume a linear reduction in price from the first date to the second, which results in a calculated share price on August 6, 2021 of approximately $0.78; the Panel will use that price in the absence of any evidence of record to the contrary.

---

[124] See footnote 114, above.

[125] The Neptune side recognizes August 6, 2021 as being appropriate if damages are owed (pages 181-182, above).

Just as for tranches 1 and 2, the Panel will order Mr. Galloway to surrender the third and fourth tranches of his shares to Neptune promptly upon receipt of damages and of interest owed on those damages for those two tranches.[126]

The damages owed for tranches 3 and 4 are calculated by multiplying 529,100 shares by $0.78/share, which equals $412,698.

Interest on that amount ($412,698) runs from August 6, 2021. The average interest rate would be about 0.4% higher from that date until the present as compared to the average interest rate for September 2020 to the present. But, as compared to tranches 1 and 2, for tranches 3 and 4, the damages are smaller and the interest period is shorter. For those reasons and for the sake of simplicity, the same interest rate of 6.25% will be used for the damages for tranches 3 and 4. Assuming the $412,698 is paid on September 29, 2023 (which is what the Panel will order) and using an annual 6.25% rate, simple interest, and a 365-day calendar year, pre-award interest from August 6, 2021 to September 29, 2023 (784 days) is:

$$784 \, / \, 365 \; x \; 0.0625 \; x \; \$412,698 \; = \; \$55,403.29$$

That is a total of $468,101.29 due on September 29, 2023 for tranches 3 and 4 ($412,698 plus $55,403.29). If payment is made after September 29, 2023, interest on any portion of the $468,101.29 remaining unpaid after September 29, 2023 shall be owing and payable and determined using a rate of 10.50% per annum (the current Federal Discount Rate of 5.50% plus the 5% of 6 Del. C. § 2301), simple interest, based on a 365-day calendar year, until paid in full. The PMGSL side need not transfer any of the shares of tranches 3 and 4 to Neptune until all of the damages and interest for both of those two tranches have been paid. For the avoidance of doubt: there will be no decrease in the $468,101.29 owed if the Neptune side pays any or all of it before September 29, 2023.[127]

- **Stock Tranches 5 & 6**

The earliest date the PMGSL side requested removal of the legends for tranches 5 and 6 after those tranches were no longer locked-up is August 30, 2022. The Neptune side then promptly provided the information and answered subsequent questions from the PMGSL side. The opinion of Counsel was not provided by the PMGSL side until January 6, 2023, and the

---

[126] See footnotes 122 and 123, above.

[127] See footnote 114, above.

legends were removed a few days later. See page 186, above. The Neptune side did not breach APA § 5.13 with respect to tranches 5 and 6. For the avoidance of doubt: the Panel is not issuing any order concerning ownership or possession of those two tranches.

- ### Summary Of Findings And Holdings On The PMGSL Side's Claims

The PMGSL side has proved that the grounds asserted by the Neptune side for terminating Mr. Galloway's employment for Cause do not constitute Cause; however, the Neptune side could terminate his employment at any time for any reason (or for no reason at all) because he was an at-will employee. Thus, because the Neptune side terminated his employment without Cause, under § 2.2 of Mr. Galloway's employment agreement, the Neptune side owes him severance pay for 4 months, which equals $48,000. That amount should have been paid to him on September 4, 2020. The Panel will order that the $48,000 plus interest in the amount of $9,205.48, for a total of $57,205.48, be paid to him on September 29, 2023. Any portion of the $57,205.48 remaining unpaid after September 29, 2023 shall bear simple interest at the rate of 10.50% per year prorated per diem on the basis of a 365-day year until paid in full.

The PMGSL side has proved that the Neptune side breached APA § 5.13 with respect to tranches 1 to 4 of the restricted stock given to Mr. Galloway as part of the purchase price and that Mr. Galloway was damaged because he was unable to sell the stock when he wanted to because of the breach.

As to tranches 1 and 2, the Neptune sides owes and on September 29, 2023 shall pay Mr. Galloway $1,449,734 plus interest in the amount of $278,775.90, for a total of $1,728,509.90. Any portion of the $1,728,509.90 remaining unpaid after September 29, 2023 shall bear simple interest at the rate of 10.50% per year prorated per diem on the basis of a 365-day year until paid in full. The PMGSL side shall transfer the shares of tranches 1 and 2 to Neptune (or to its designated agent) as soon as possible after the PMGSL side receives payment in full (including full payment of any additional interest because payment by the Neptune side is made after September 29, 2023).

As to tranches 3 and 4, the Neptune sides owes and on September 29, 2023 shall pay Mr. Galloway $412,698 plus interest in the amount of $55,403.29, for a total of $468,101.29. Any portion of the $468,101.29 remaining unpaid after September 29, 2023 shall bear simple interest at the rate of 10.50% per year prorated per diem on the basis of a 365-day year until paid in full. The PMGSL side shall transfer the shares of tranches 3 and 4 to Neptune (or to its designated

agent) as soon as possible after the PMGSL side receives payment in full (including full payment of any additional interest because payment by the Neptune side is made after September 29, 2023).

The PMGSL side has not proved that the Neptune side breached any section of the APA with respect to tranches 5 and 6.

All other claims by the PMGSL side are denied.

- **Attorneys' Fees, Expenses/Costs, ICDR Fees, And Arbitrator Compensation**

APA § 11.14(h) provides as follows:

> the arbitration award shall be given in writing and shall be final and binding upon the Parties, not subject to any appeal, and shall deal with the question of costs of arbitration, including the determination of which party shall bear them or in what proportion they should be borne by them, and all matters related thereto ….

Rule R-47(c) requires the Panel to "assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55" and allows the Panel to "apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator [Panel] determines is appropriate."[128]

Rule R-47(d)(ii) permits an award of attorneys' fees "if all parties have requested such an award or it is authorized by law or their arbitration agreement." Both sides requested attorneys' fees, quantified those requests on June 30, 2023, and by July 28, 2023 finished commenting on each other's requests.

Thus, the APA and the governing AAA Rules require the Panel to allocate all fees, expenses, and costs. That includes AAA administrative fees, attorneys' fees, arbitration costs (e.g., court reporter fees, experts' fees, legal research fees), arbitrator compensation, etc.

In deciding how to allocate all of these fees, expenses, and costs, a Panel typically considers a number of factors, including the claims and defenses of each side, the difficulty in proving them, and the extent to which a side prevailed on them; the good faith of each side, e.g., in asserting and maintaining its claims and defenses; and its conduct leading up to and during the arbitration (e.g., were any of a side's actions apparently designed to hinder or delay resolution or

---

[128] Rule R-53 concerns the AAA administrative fees, R-54 concerns expenses for witness and arbitrator expenses, and R-55 concerns arbitrator compensation.

make it more difficult or expensive for the other side to present its claims and defenses).  There is no set formula for allocating fees, expenses, and costs.

Here, the PMGSL side prevailed on only two of its three claims (Counts) and certainly not to the total dollar extent it asserted for all its claims, but the Neptune side did not prevail on any of its claims.  In addition, *among other things*, the Neptune side: (i) did not make commercially reasonable efforts to maintain and increase existing levels of business as required by APA § 1.8(c) and, therefore, did not act in good faith with respect to operation of the Business as required by APA § 1.8(c); (ii) terminated Mr. Galloway's employment without Cause and continued to assert even in this Arbitration that there was Cause; (iii) for two years failed to provide the contractually required assistance to Mr. Galloway so that he could sell his shares of stock and offered no sound explanation for its failure to provide that assistance for so long (e.g., Mr. Piazza was not called to testify by the Neptune side although he was available (see footnote 118, above)); and (iv) refused to have Mr. Cammarata testify, even though he was the source of many significant communications and decisions at issue in this matter, and offered no sound reason for its refusal.[129]

All things considered the Neptune side will bear all of its own attorneys' fees, associated expenses, costs, and other disbursements and will reimburse the PMGSL side for two-thirds of the PMGSL side's attorneys' fees, associated expenses, costs, and other disbursements.

The two sides submitted their requests for attorneys' fees on June 30, 2023 and, at the Panel's request, were asked to provide some additional information, which they did by July 28, 2023.  The following table shows for each side what the Panel believes is the number of fee earners in each category (e.g., partners) and each category's total hours and total dollars. Although there may be some discrepancy between the Panel and the Parties regarding in which

---

[129]  The Neptune side based its refusal on "jurisdictional issues" and the so-called Apex Doctrine, which some courts have adopted to prevent harassment of high-level executives (e.g., being forced to sit for depositions even if they have no knowledge of the relevant facts in matters involving their companies): "We … object to his [Mr. Cammarata's] being compelled to testify in an arbitration seated in New York.  He's a resident in Florida.  He's also an apex witness with no unique knowledge about this case."  Tr. 1847-1848; and see page 41, above.  But many witnesses located far away from New York (and who presumably were not residents of New York) testified in this Arbitration, so Neptune's offering Mr. Cammarata's Florida residency as an excuse for the refusal to testify speaks for itself.  And the entire Hearing was conducted on a videoconference platform, so there would have been no travel burden imposed on him if he had testified.  Finally, and most significantly, he was a key actor in Neptune's decisions at the heart of this dispute—indeed, he apparently made many of those decisions and was the source of many of the communications at issue.

category some individuals should be placed, the Panel agrees with each side's calculated total hours and total dollars for all fees earners.

| | NEPTUNE SIDE | | | PMGSL SIDE | | |
|---|---|---|---|---|---|---|
| | No. | Hours | Dollars | No. | Hours | Dollars |
| Partners | 10[130] | 1,911.40 | 1,295,463.52 | 7 | 3,711.65 | 1,810,199.17 |
| Counsel/Of Counsel | 3 | 465.50 | 469,901.36 | 1 | 78.5 | 46,707.50 |
| Associates | 14 | 3,577.80 | 2,025,827.47 | 1 | 873.39 | 305,872.00 |
| Paralegals | 9[131] | 401.30 | 86,050.36 | 4 | 299.65 | 66,871.50 |
| Total (before adjustment[132]) | 36 | 6,356.00 | 3,877,242.71 | 13 | 4,963.19 | 2,229,650.17 |
| Total (after adjustment) | n/a | n/a | 3,457,860.98 | n/a | n/a | n/a |
| All Fee Earners' Average Rate | | $544/hour | | | $449/hour | |
| Attorney Fee Earners' Average Rate | | $566/hour | | | $464/hour | |
| Expenses/Costs (other than for AAA and Arbitrator)[133] | | 589,504.97 | | | 287,419.72 | |

The total fee earner hours for the Neptune side were about 28% greater than for the PMGSL side (6,356 v. 4,963.19). Fee earner dollars after adjustment by two of the Neptune side's outside law firms were about 55% higher ($3,457,860.98 v. $2,229,650.17), some of which stems from higher hourly rates. Expenses/costs for the Neptune side were slightly more

[130] Including Messrs. Wirt and Waldon.

[131] Including Practice Technicians.

[132] Each of two of the Neptune side's outside law firms made adjustments to (reductions in) the fees they charged (total of adjustments was $419,381.73).

[133] The AAA administrative (e.g., filing) fees and arbitrator fees (compensation), which the Neptune side included in Disbursements in its June 30, 2023 filing, have been deducted from the total $722,537.47 shown in that filing because those fees are separate categories in the AAA Rules and are allocated below.

than double those of the PMGSL side ($589,504.97 v. $287,419.72), most of which is attributable to the higher expert fees on the Neptune side.

The Neptune side used almost three times as many fee earners as the PMGSL side did (36 for the Neptune side v. 13 for the PMGSL side). The average hourly rate for all fee earners on the Neptune side was 21% higher than for those on the PMGSL side ($544 v. $449). If paralegals are excluded from that calculation, the average hourly rate for all attorneys on the Neptune side was 22% higher than for the attorneys on the PMGSL side ($566/hour v. $464/hour).

This was a lengthy, complex matter, and each side had many issues to deal with. Counsel fought vigorously for their respective clients.

The Panel finds and holds that the attorneys' fees and expenses/costs requested by the PMGSL side are reasonable, particularly when compared to the attorneys' fees and expenses/costs requested by the Neptune side. Although the Neptune side criticizes the PMGSL side's request, the PMGSL side used far fewer fee earners (which usually provides greater efficiency), had significantly lower total billable hours for its fee earners, and had significantly lower hourly rates for its attorneys.[134] And the PMGSL side's attorneys achieved success on two of their three claims (Counts); the Neptune side's attorneys achieved none on their claims.

The Neptune side will be ordered to reimburse the PMGSL side for two-thirds of the PMGSL side's attorneys' fees and associated expenses, costs, and other disbursements.

Finally, the Neptune side shall bear two-thirds of the ICDR administrative fees and arbitrator compensation.

The Final Award at pages 199-200, below, particularizes those numbers.

---

[134] Hourly rates for paralegals were slightly higher for the PMGSL side ($215/hour for the Neptune side v. $223/hour for the PMGSL side).

Case 1:24-cv-00117-ER    Document 2-5    Filed 01/08/24    Page 198 of 201

# **FINAL AWARD**

For the reasons set forth herein, I hereby FIND, HOLD, DECLARE, ORDER, and AWARD as follows:

1. All of the Neptune side's claims are DENIED.

2. The Neptune side wrongfully terminated Mr. Galloway's employment for Cause and is liable to him under the Employment Agreement for four month's severance, which should have been paid on September 4, 2020. Accordingly, on or before September 29, 2023, the Neptune side shall pay Mr. Galloway US$57,205.48, which includes pre-award interest. Post-award interest on any portion of the US$57,205.48 remaining unpaid after September 29, 2023 shall also be owing and payable to Mr. Galloway and determined using a rate of 10.50% per annum (but at no time above the maximum rate allowed by Delaware law), simple interest, based on a 365-day calendar year, until paid in full.

3. For four of the six tranches of the Neptune common stock that was part of the consideration Mr. Galloway was paid under the APA and which was subject to the Lock-Up Agreement, the Neptune side wrongfully failed to provide him with the assistance it was required to provide under the APA, thereby breaching the APA and causing him damage.

    a. As to tranches 1 and 2 of the six tranches of stock, the Neptune side owes and shall pay Mr. Galloway on or before September 29, 2023 the sum of US$1,728,509.90, which includes pre-award interest. Post-award interest on any portion of the US$1,728,509.90 remaining unpaid after September 29, 2023 shall also be owing and payable to Mr. Galloway and determined using a rate of 10.50% per annum (but at no time above the maximum rate allowed by Delaware law), simple interest, based on a 365-day calendar year, until paid in full. Mr. Galloway must surrender these shares to Neptune promptly upon his receipt of all monies owed under this paragraph (a). Neptune shall be responsible for the payment of any transfer fees or the like that must be paid to any governmental entity or other authority to effectuate the surrender of these shares.

    b.  As to tranches 3 and 4 of the six tranches of stock, the Neptune side owes and shall pay Mr. Galloway on or before September 29, 2023 the sum of US$468,101.29, which includes pre-award interest. Post-award interest on any portion of the US$468,101.29 remaining unpaid after September 29, 2023 shall also be owing and payable to Mr. Galloway and determined using a rate of 10.50% per annum (but at no time above the maximum rate allowed by Delaware law), simple interest, based on a 365-day calendar year, until paid in full. Mr. Galloway must surrender these shares to Neptune promptly upon his receipt of all monies owed under this paragraph (b). Neptune shall be responsible for the payment of any transfer fees or the like that must be paid to any governmental entity or other authority to effectuate the surrender of these shares.

    c.  The PMGSL side's claim for damages for tranches 5 and 6 of the six tranches of stock is DENIED because Neptune did not breach its obligations with respect to those two tranches.

4.  All other claims of the PMGSL side are DENIED.

5.  The Neptune side shall bear all of its own attorneys' fees and associated expenses, costs, and other disbursements.

6.  The Neptune side shall bear two-thirds of the PMGSL side's attorneys' fees and associated expenses, costs, and other disbursements, which equals two-thirds of US$2,229,650.17 (attorneys' fees) and two-thirds of US$287,419.72 (associated expenses, costs, and other disbursements), or US$1,486,433.45 and US$191,613.15, which together total US$1,678,046.60. That amount shall be paid by the Neptune side to the PMGSL side on or before September 29, 2023. Post-award interest on any portion of the US$1,678,046.60 remaining unpaid after September 29, 2023 shall also be owing and payable to the PMGSL side and determined using a rate of 10.50% per annum (but at no time above the maximum rate allowed by Delaware law), simple interest, based on a 365-day calendar year, until paid in full.

7.  The administrative fees of the American Arbitration Association totaling US$81,995.92 and the compensation of the Arbitrator totaling US$212,722.50 (which together total US$294,718.42) shall be borne two-thirds (i.e., US$196,478.95) by the Neptune side and one-third (i.e., US$98,239.47) by the PMGSL side.  On or before September 29, 2023, the Neptune side shall pay to the PMGSL side the sum of US$58,610.34 (which represents the amount previously advanced by the PMGSL side to the AAA for those fees and compensation in excess of its one-third obligation).  Post-award interest on any portion of the US$58,610.34 remaining unpaid after September 29, 2023 shall also be owing and payable to the PMGSL side and determined using a rate of 10.50% per annum (but at no time above the maximum rate allowed by Delaware law), simple interest, based on a 365-day calendar year, until paid in full.

8.  All arguments made by both sides have been fully considered.

9.  This Final Award is in full settlement and satisfaction of any and all claims and counterclaims in this case, and any and all claims and counterclaims not expressly ruled on in this Final Award are DENIED.

I, **Stephen P. Gilbert**, hereby certify that, for the purposes of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States of America.

August 23  2023
Date

**Stephen P. Gilbert**

I, **Stephen P. Gilbert**, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

August 23   2023
Date

**Stephen P. Gilbert**

State of New York          } SS:
County of Westchester

On this ___23___ day of ____August 2023____ before me personally came and appeared **Stephen P. Gilbert**, to me known and known to me to be the individual named immediately above and who had previously executed the foregoing instrument and who now acknowledged to me that he had previously executed the same on the date next to his signature immediately above.

August 23 , 2023
Dated

Notary Public

HERNANDO AGUILAR
Notary Public, State of New York
No. 01AG6357782
Qualified in Westchester County
Commission Expires April 24, 2025

Neptune v. PMGSL -and- Galloway v. Neptune          Page 201 of 201          Final Award – 23AUG2023
(Case Nos. 01-20-0015-1057 & 01-20-0015-1093)